## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

GRIFOLS, S.A. and GRIFOLS SHARED
SERVICES NORTH AMERICA, INC.,

                                 Plaintiffs,

                v.

DANIEL YU, an individual, GOTHAM CITY
RESEARCH LLC, GENERAL INDUSTRIAL
PARTNERS LLP, CYRUS DE WECK, an
individual, JOHN DOES 1-10, and XYZ
CORPORATIONS 1-10.

                                 Defendants.

No.: _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

PARTIES ........................................................................................................................... 13

JURISDICTION AND VENUE ........................................................................................ 16

FACTUAL ALLEGATIONS ............................................................................................ 17

    I.    GRIFOLS ............................................................................................................ 17

    II.   GOTHAM CITY RESEARCH LLC, DANIEL YU, AND THEIR AFFILIATES.......... 26

    III.  GRIFOLS' STRONG PERFORMANCE THREATENED DEFENDANTS' SHORT
    POSITION, RESULTING IN THE RELEASE OF THE GOTHAM REPORT...................... 32

    IV.  THE GOTHAM REPORT IS FULL OF DELIBERATE FALSEHOODS..................... 37

    V.   HARM TO GRIFOLS AND ITS SHAREHOLDERS .................................................. 64

CAUSES OF ACTION ...................................................................................................... 66

PRAYER FOR RELIEF .................................................................................................... 74

JURY TRIAL DEMAND .................................................................................................. 75

Grifols, S.A. and Grifols Shared Services North America, Inc. (together, "Grifols"), by and through their attorneys, Proskauer Rose LLP, for their Complaint against Defendants Daniel Yu, Gotham City Research, LLC ("Gotham"), General Industrial Partners LLP ("GIP"), Cyrus De Weck, John Does 1-10, and XYZ Corporations 1-10 (collectively, "Defendants"), respectfully allege as follows:

## INTRODUCTION

1. Grifols is a global healthcare leader founded over 100 years ago that supplies lifesaving plasma-derived medicines to patients with rare and chronic diseases. Defendants are predatory short sellers, led by convicted felon Daniel Yu, who illicitly profit from their rigged short-and-distort schemes.

2. Unlike other short sellers, Defendants crossed the line with their attack on Grifols by knowingly making false and misleading statements in furtherance of a single illegal purpose: to manipulate the value of Grifols' stock for their own monetary gain.

3. Defendants amassed a large short position in Grifols so they would profit if Grifols' share price fell. Then to cause a market panic, and to drive down Grifols' share price, Defendants published and disseminated a report filled with malicious falsehoods and distortions about Grifols' accounting, disclosures, finances, and integrity.

4. Among other lies, this January 9, 2024 report:

   a. Falsely claimed Grifols did not disclose a certain $95 million loan. The day after dumping their short position, *Defendants surreptitiously changed their report* to concede the opposite—that Grifols had in fact disclosed this loan. This tactical reversal alone proves Defendants' malicious lies.

   b. Falsely attacked Grifols' accounting practices, despite the unassailable facts that those practices are completely appropriate, audited, reviewed by regulators, and fully disclosed to investors.

1

c.  Falsely attributed over €1.3 billion in supposed "debt" to Grifols because it holds a call option in two Non-Controlling Interests ("NCIs"). Beyond the fact that a call option is not "debt," *those NCIs hold zero debt* per the Credit Agreement (as defined below).

d.  Falsely claimed that Grifols' stock is "worthless" and "will head to zero," despite that Defendants' *own* calculations—which are predicated on erroneous "adjustments" to Grifols' leverage ratio calculations—still value Grifols as worth billions of dollars.

5.  Defendants' lies directly caused Grifols' market capitalization to drop by more than 30%, or approximately €3 billion, and wreaked devastating damage to Grifols' reputation.

6.  In response to Defendants' knowingly false report, the Spanish National Securities Market Commission (the Comisión Nacional del Mercado de Valores or "CNMV"), the regulatory body supervising the relevant Spanish markets, requested certain information from Grifols, which Grifols provided. The CNMV released a statement on January 23, 2024, stating that it is now "*analysing **Gotham's** conduct* … to determine whether such conduct is compliant with European *market abuse regulations*, in particular with those tackling the *dissemination of misleading information*." (Emphasis added).

7.  The CNMV also stated that there "currently [is] no evidence, from the public information available, that the audited information published by Grifols fails to comply with the regulations," and that "[f]rom 9 January [when Defendants released their report] up to the present, the CNMV has not detected the existence of any specific privileged information pending publication involving any case of asymmetric information being given among investors [in Grifols]."

8.  Unlike Grifols, a corporate group founded on the principles of integrity, ethics, honesty, and transparency, defendant Gotham was formed for the purpose of financial fraud.

9.     Gotham's founder and principal, Yu, has served multiple stints in jail, including one jail term after being charged with theft, identity theft, and other financial crimes. After his release, Yu formed Gotham as a vehicle and shield for his criminal enterprise. Yu and Gotham have been sued before over their unlawful and defamatory practices but failed to appear in court and defaulted.

10.     Yu has also used other entities as part of this ongoing scheme, including defendant GIP, a partnership he formed with defendant Cyrus De Weck.

11.     Yu does not disclose when he began shorting—betting against—Grifols' share price, but claims he became interested in Grifols in early 2023. During that same timeframe, Grifols began taking steps to deleverage its balance sheet, and in turn, reduce its debt. Throughout 2023, Grifols publicly affirmed its commitment to reduce debt and announced an imminent deleveraging transaction.

12.     By the end of 2023, Grifols made good on this promise to investors. On December 29, 2023, Grifols announced a strategic alliance with Haier Group Corporation ("Haier") to develop the Chinese plasma market. Through a share purchase agreement, Grifols would sell approximately a 20% equity stake in Shanghai RAAS ("SRAAS") to Haier for RMB 12.5 billion cash (approximately $1.8 billion). Grifols announced that it would use the proceeds from this transaction to reduce debt. This announcement caused Grifols' stock price to rise immediately.

13.     This positive trend in Grifols' stock price posed a serious problem for those speculators betting against Grifols through a short position. Indeed, with the deleveraging deal with Haier expected to close in the first half of 2024, anyone with a short position in Grifols was facing the very real threat of an impending short squeeze. A short squeeze accelerates a stock's

price rise, forcing short sellers to bail out of their short positions to cut their losses. The higher a stock rises, the more exposure the short seller faces.

14.     As a result, Defendants, who had by then amassed a large short position in Grifols, were facing massive losses unless the price of Grifols' stock quickly declined. To cause that to happen, Defendants published a false report attacking Grifols with the sole intent and purpose of reducing the value of Grifols' stock.

15.     A core claim that Defendants made in their January 9 report about Grifols—indeed, this claim is emphasized in the report's opening summary—is that Grifols failed to disclose to its investors a certain $95 million loan. Defendants trumpet the supposed failure to disclose this loan as part of their false narrative relating to Scranton Enterprises B.V. ("Scranton"), the loan's recipient. But the report's statement that this loan went "undisclosed in Grifols' filings" is categorically false. And it is easily proven false: Grifols' Annual Reports on Form 20-F filed with the Securities and Exchange Commission ("SEC") disclosed the transaction for the investing public to see. Grifols also disclosed this loan in its filings with the CNMV.

16.     For example, Grifols' Annual Report on Form 20-F for the fiscal year ended on December 31, 2018 ("2018 Annual Report on Form 20-F") filed with the SEC disclosed the loan in two places:

     a.  "Scranton Enterprises B.V. financed the purchase in part through a loan from Grifols Worldwide Operations Limited for an initial principal sum of the euro equivalent of $95 million[.]" 2018 Annual Report on Form 20-F at 111.

     b.  "On 28 December 2018, the Group sold Biotest [BPC Plasma] and Haema to Scranton Enterprises B.V (shareholder of Grifols) for US Dollars 538,014 thousand (see note 3). For the payment of the mentioned amount of the sale, Scranton signed a loan contract dated 28 December 2018 for an amount of

US Dollars 95,000 thousand (Euros 82,969 thousand) with Grifols Worldwide Operations Limited." *Id.* at F-99.

17.    There is no doubt that Defendants closely reviewed Grifols' CNMV and SEC filings that disclosed this loan, including the Annual Report on Form 20-F quoted above. Defendants cite and distort those same disclosure documents to advance other lies and distortions in their report (as discussed below). Yet, to ensure the success of their short-and-distort scheme, and to damage Grifols' reputation, Defendants falsely claimed these disclosures in Grifols' SEC filings did not exist and wrongly accused Grifols of improperly concealing the $95 million loan (where a subsidiary of Grifols, S.A. figures as lender).

18.    After Defendants dumped their short position on January 9, they quietly modified their report on January 10 (collectively, the "Gotham Report"). They eliminated the original January 9 report (Ex. 1) from Gotham's website, revised the report's statements about the $95 million loan, and uploaded a modified report on January 10 (Ex. 2). In the altered January 10 version of the Gotham Report, Defendants withdrew their false claim that Grifols never disclosed to regulators and the market the $95 million loan.

19.    By making these changes in the January 10 report, and by recognizing the need for them, Defendants have conceded that the January 9 report was false: Grifols *did* disclose the $95 million loan in its Annual Reports on Form 20-F filed with the SEC *every single year* since 2018. Likewise, Grifols disclosed the loan in its filings to the CNMV.

20.    Yet Defendants did not alert the market that their original report—which had already caused Grifols' share price to plummet—contained this material misstatement of fact. Nor did Defendants alert the media of the need to correct this false statement that has been republished in articles that *remain online today* and that continue to harm Grifols' reputation. E.g., https://www.reuters.com/business/healthcare-pharmaceuticals/what-does-gotham-city-report-

5

say-about-grifols-2024-01-09/ ("A $95 million loan to Scranton Enterprises in 2018, is not disclosed in Grifols' filings and only appears in Scranton filings, the report says.").

21.     Instead, after Grifols' stock plummeted as a direct result of this false statement, and after Defendants dumped their short position and thereby unjustly profited from their false statement, Defendants surreptitiously uploaded the modified January 10 report without informing anyone of the changes, presumably in a misguided effort to cover their tracks. These facts clearly demonstrate Defendants' malicious intent to illicitly profit by harming Grifols, as do many other facts discussed below.

22.     And to make matters worse, the modified January 10 report continues to lie about the $95 million loan, falsely claiming that the disclosure is "buried" in a single "note" to its financial statements, when it also appears *in the body* of Grifols' 2018 Annual Report on Form 20-F filed with the SEC, and in numerous other filings with the CNMV.

23.     Another blatant untruth in the Gotham Report is that Grifols' "per credit agreement" definition of EBITDA[1] is "materially misleading and incorrect." Ex. 1 at 8. This is a lie. Grifols does not "manipulate" (*id.* at 4) its EBITDA or its components. Grifols has no control over this formula to begin with. Indeed, this EBITDA formula is *defined by Grifols' lenders*, including Bank of America and other renowned international banks, within Grifols' Credit and Guaranty Agreement dated as of November 15, 2019 ("Credit Agreement"). This definition is public, and known to Defendants, since the Credit Agreement is attached to all of Grifols' Annual

---

[1] EBITDA stands for "Earnings Before Interest, Taxes, Depreciation and Amortization." EBITDA is an alternate measure of profitability of a company's operations that investors and lenders require when analyzing a company's free cash flow or creditworthiness. This definition will also include non-recurrent, non-cash and other items specific to a company that are not in the ordinary course of its business.

Reports on Form 20-F since 2019. Defendants' accusation that Grifols uses a "materially misleading and incorrect" definition of EBITDA (*id.* at 8) is maliciously false.

24.     As discussed, Defendants' goal was not merely to harm Grifols' reputation, but to inflict maximum damage to Grifols' share price. Defendants therefore did not stop at accusing Grifols of manipulating its EBITDA and debt, the factors that determine its leverage ratio. Instead, to panic the market and send Grifols' share price into a free fall, Defendants took their lies a step further by suggesting they had exposed Grifols' materially higher "true leverage" based on "adjustments"—all unfavorable to Grifols, unsurprisingly—to how Grifols calculates its leverage. Ex. 1 at 6. The problem with this, of course, is that Grifols' calculations of its EBITDA and debt simply follow the applicable definitions of those terms as set forth in the Credit Agreement. The Gotham Report's calculations do not. Accordingly, the Gotham Report's "adjusted EBITDA" and "adjusted net debt" (*id.* at 6), and the resulting leverage ratio, misstate Grifols' "true leverage." They are false statements of purported fact.

25.     Specifically, the Gotham Report contends that Grifols' calculation of its leverage ratio improperly accounts for: (1) Grifols' purported NCIs in Grifols Diagnostic Solutions ("GDS"), BPC Plasma, Inc. f/k/a Biotest USA Corporation ("BPC Plasma"), and Haema AG ("Haema"); (2) Grifols' run rate cost savings; (3) Grifols' restructuring costs; and (4) costs relating to other financial assets with and loans to related parties. In fact, Grifols accounts for each of these items according to the applicable accounting standards and as provided in its Credit Agreement.

26.     To drive up Grifols' purported "true" leverage ratio, Defendants present a falsified "adjusted" calculation of Grifols' net debt as €9.767 billion. Ex. 1 at 6, 17. To get to that inflated figure, the Gotham Report adds €1.313 billion in debt that Defendants attribute to Haema's and BPC Plasma's liabilities. This is an egregious, bald-faced lie that Defendants knew was false.

7

27.     The €1.313 billion "debt" figure is *completely fabricated*. In fact, *Haema and BPC Plasma have zero debt* per the Credit Agreement.

28.     The Gotham Report tries to justify this figure by claiming that Grifols would need to spend €1.313 billion if it exercises its call option. This is false. A call option, which may or may not be exercised in the future, at the option of Grifols in this case, is not debt and does not belong in any calculation of debt. To treat the right to acquire a business as debt is nonsensical and completely divorced from International Financial Reporting Standards as issued by the International Accounting Standard Board and International Financial Reporting Standards as adopted by the European Union (collectively, "IFRS").

29.     Not content with putting forth the accounting alchemy of converting a right to acquire a business into a debt, Defendants double down by manipulating their own fabrication in order to exaggerate the "debt" that would result from the Gotham Report's erroneous formula. The exercise price for the call option as set forth in the relevant contract is equal to the greater of: (i) the same price for which the shares of Haema and BPC Plasma were sold to Scranton (which was €470 million, or $538 million), plus the expenses related to the transaction and the increase in net working capital from the time of the exercise of the option and the time of the sale (December 28, 2018); and (ii) the amount necessary to cancel Scranton's related debt financing, plus accrued interest, and any other amounts necessary to cancel such debt. Given the exercise price formula, the amount of "debt" under the Gotham Report's bizarre calculation would be far below the €1.313 billion that Defendants claim.

30.     Moreover, the Gotham Report is internally inconsistent because it asserts that Haema and BPC Plasma should *not* be consolidated. If that is so, Defendants' debt calculation should not include those entities' hypothetical debt. And while these entities' *EBITDA* should be

consolidated for the reasons discussed below, their hypothetical debt, which is actually zero according to the Credit Agreement, does not belong in any calculation of Grifols' leverage ratio.

31.     The Gotham Report also recalculates a lower EBITDA for Grifols based on several "adjustments." Defendants first assert that it is "materially deceptive and incorrect" for Grifols to consolidate GDS, BPC Plasma, and Haema in its EBITDA, and that Grifols does not have a "claim to these earnings." Ex. 1 at 4. The Gotham Report therefore "adjusts" for this by removing these "NCIs" from its calculation of Grifols' EBITDA for the last twelve months ("LTM") ending June 30, 2023, effectively reducing Grifols' EBITDA by €274 million. There are multiple falsehoods baked into this statement.

32.     First, the Gotham Report's statement that GDS is "treated as a non-controlling interest" by Grifols (Ex. 1 at 12) is false. GDS is a Grifols majority-owned subsidiary, not an NCI, so Grifols does not treat GDS as an NCI. Nor would such treatment be appropriate because Grifols owns 55% of GDS' economic rights and 60% of its voting rights. Defendants implicitly concede as much based on their explanation of Grifols' controlling interests elsewhere in the Gotham Report. The GDS-related figure in the NCI line item on Grifols' consolidated balance sheet simply refers to the portion of GDS' equity value that Grifols does not own.

33.     Second, consolidating GDS, BPC Plasma, and Haema on Grifols' EBITDA is fully consistent with IFRS, as well as the EBITDA formula set forth by Grifols' lenders in its Credit Agreement. In fact, IFRS *requires* GDS, as a majority-owned subsidiary, to be consolidated because Grifols controls 55% of the economic rights and 60% of the voting rights in GDS. Defendants must know this. And as explained below, while BPC Plasma and Haema comprise only a small portion, in the aggregate, of Grifols' €1.361 billion EBITDA per the Credit Agreement for the LTM ending June 30, 2023, their consolidation is also entirely appropriate under IFRS

standards. Therefore, the Gotham Report's "adjusted" EBITDA calculation is wrong and a false statement of purported fact.

34.     Next, the Gotham Report claims that Grifols' EBITDA calculation incorrectly adds back costs and expenses incurred by Grifols relating to cost savings, operating improvements, and synergies on a run rate because Grifols adjusts for €121 million in cost savings "that have yet to be realized." Ex. 1 at 13. Once again, there is nothing wrong with Grifols' calculation because it is mandated under the definition of "Consolidated Adjusted EBITDA" in the Credit Agreement.

35.     In addition, Grifols follows IFRS with the treatment of these costs and expenses in its related financial statements. In Grifols' 2023 half-year results report, it announced that it had 100% deployed an operational improvement plan that would result in €450 million in annualized cost savings based on initiatives it took to reduce its plasma costs and enhance plasma operations. The Gotham Report's assertion that these cost savings were improperly added back to the calculation of EBITDA, and that Grifols' EBITDA is overstated by €121 million, is patently untrue and a false statement of purported fact.

36.     The Gotham Report next takes issue with how Grifols' EBITDA calculation adds back €104 million in restructuring costs. A restructuring cost is a one-time expense that a company pays when reorganizing its operation. For the 2022 fiscal year and the first half of 2023, Grifols incurred one-time restructuring costs of €36 million and €171 million, respectively. The Gotham Report arrives at its €104 million "adjustment" by taking the average of these two numbers, which were disclosed in Grifols' 2023 investor presentation. In short, the Gotham Report uses in its claim a made-up number that is not supported by any accounting principles. Grifols' 2023 investor presentation also states in multiple places that these figures are one-time restructuring costs. The Gotham Report ignores these disclosures and falsely states that Grifols "has been embarking on

*continual* restructuring costs over a significant period of time [which] indicates that restructuring costs are an *ongoing* business expense." Ex. 1 at 14 (emphasis added). Not only is it standard and proper practice to add back non-recurring, one-off restructuring costs when calculating EBITDA, but the inclusion of these charges in such a calculation is explicitly *mandated* under the Credit Agreement's definition of EBITDA.

37.     Finally, the Gotham Report falsely states that Grifols' EBITDA calculation improperly adds back €83 million in "other financial assets to related parties" and "loans to related parties." Ex. 1 at 14. This is a made-up figure that Defendants apparently calculated by taking the average of the year-over-year change in these two accounts over the last four years. This figure has no basis in reality or IFRS accounting standards. As balance sheet items, they do not belong in the calculation of EBITDA, which is an alternate measure fully derived from income statements, not balance sheets. Furthermore, these items are related to financings and not to operations, so they do not reduce Grifols' EBITDA. Indeed, the definition of "Consolidated Adjusted EBITDA" in the Credit Agreement requires that financial results be added back, confirming that Grifols' calculation is accurate and that the Gotham Report's calculation is false.

38.     For each of the reasons discussed above, the Gotham Report's "calculation" of Grifols' "true leverage" is wildly off the mark. It is so far from the real-world facts as to be materially false and misleading.

39.     The foregoing also demonstrates the falsity of the Gotham Report's ultimate conclusion that Grifols' equity is "uninvestable" and "worthless." As an initial matter, Defendants' use of such inflammatory and destructive language when describing the value of Grifols' equity highlights their transparent goal of creating a panic-driven sell-off of Grifols' stock that would, in turn, unjustly reward Defendants' short position.

40.     Nevertheless, even if the Gotham Report were correct (it is not) that Grifols' "true leverage" ratio is "closer to 10x-13x," the company's implied equity value would still fall somewhere between ~€1.6 billion to ~€5.3 billion—nowhere near "worthless."[2]

**Gotham City's Adjustments to Grifols' Valuation**

| €in millions | Gotham City's Low End | Gotham City's High End |
|---|---|---|
| Grifols EV/Adj. EBITDA multiple [D] | 15.3x | 15.3x |
| GCR Grifols Adj. EBITDA (LTM as at H1 23) [G] | 928 | 741 |
| GCR Grifols Net Debt (LTM as at H1 23) [H] | 8,919 | 9,767 |
| GCR Implied Grifols LTM Net Debt / Adj. EBITDA LTM multiple [I = H/G] | 9.6x | 13.2x |
| Implied Grifols Equity Value [J = D*G-H] | 5,280 | 1,571 |
| Implied Equity / Adj. EBITDA LTM multiple [K = D-I] | 5.7x | 2.1x |

41.     In fact, Defendants' own behavior reflects that they never believed that Grifols' equity is worthless. If Defendants really thought that were so, they would not have raced to dump their short position after Grifols' share price had dropped by 43%, but instead would have waited until it had dropped by close to 100% (which has not happened, will not happen, and Defendants never believed would happen because Grifols is not "worthless").

42.     The Gotham Report contains many more demonstrably false statements of fact that Defendants made to deliberately harm Grifols as part of Defendants' illegal short-and-distort scheme. *See* Section IV, *infra.*

43.     As a direct and proximate result of Defendants' actions, both Grifols plaintiffs, and their officers and directors, and employees, have suffered substantial reputational harm and financial damages. Among other things, they have: (i) suffered lost business opportunities and lost profits as potential business partners, customers, investors, lenders, and others now avoid associating with a corporate group purportedly "exposed" as engaging in false and deceptive business practices; (ii) expended substantial resources to refute and defend against Defendants' false accusations, including spending significant time and money to investigate, analyze, and

---

[2] These calculations are explained below in paragraph 196.

outline the falsity of the Gotham Report in submissions to the CNMV and SEC; and (iii) expended resources in preparing to defend against shareholder litigation as plaintiffs' law firms announced an intention to sue Grifols.

44.     The irreparable harm to Grifols and other stakeholders will continue if Defendants are not permanently enjoined from issuing additional reports containing false and defamatory statements about Grifols. Accordingly, Grifols brings this action to remediate the harm that Defendants have caused Grifols so far and to prevent further harm.

45.     To be clear, Grifols' complaint is not that Defendants shorted Grifols' stock, but that Defendants did so as part of a malicious short-and-distort scheme. A legitimate short seller would have contacted Grifols before publishing its report to determine whether the short seller's accusations had any basis in fact. Defendants did not do that because they never cared about the truth. Defendants are fraudsters and criminals who authored, published, and disseminated a knowingly false report to create a panic-driven, artificial sell-off of the company's stock, which drove the share price down so that Defendants could unjustly profit by dumping their substantial short position. That is illegal. It is time for Defendants to be held accountable for their unlawful conduct, starting with this lawsuit.

## PARTIES

46.     Plaintiff Grifols S.A. is a sociedad anónima (a limited liability company), first incorporated under Spanish law on June 22, 1987. The company conducts business under the commercial name "Grifols." Its principal executive office is located at Avinguda de la Generalitat, 152 Parque Empresarial Can Sant Joan, 08174 Sant Cugat del Vallès, Barcelona, Spain. Its registered office is located at c/Jesús y María, 6, Barcelona, Spain.

47.     Plaintiff Grifols Shared Services North America, Inc. (formerly known as Grifols, Inc.) is a Virginia corporation with its executive offices and principal place of business located at

2410 Grifols Way, Los Angeles, California 90032. Grifols Shared Services North America, Inc. is the primary Grifols operating entity in the United States and is the parent company of Grifols' operating entities in the United States, including, but not limited to, Grifols Biologicals, LLC, Grifols Therapeutics, LLC, and Grifols USA, LLC, which are involved in collecting and manufacturing plasma, and marketing and distributing Grifols' products in the United States.

48.     Defendant Daniel Yu is an individual, who upon information and belief, resides in Manhattan, New York. Upon information and belief, Yu goes by various other aliases and frequently changes his address. Yu is the founder, publisher, and editor of Gotham. He writes, edits, and publishes Gotham's reports, including the Gotham Report that is the subject of this Complaint.

49.     Gotham City Research LLC was registered in Delaware as a limited liability company.[3] Gotham's principal place of business is in the State of New York. Upon information and belief, Gotham is under the sole control of Daniel Yu, who serves as Gotham's sole member. Yu has acted as Gotham's alter ego, while dominating, managing, and controlling Gotham's affairs, without regard to the separate existence of the corporate entity. Upon information and belief: (i) Gotham is underfunded; (ii) Gotham's funds have been comingled with Yu's personal funds; (iii) Yu treats Gotham's funds as his own; and (iv) Gotham does not observe corporate formalities. Gotham, through Yu and in coordination with Defendants GIP and De Weck, engages in short selling and publishes "research reports" about the target company of its short selling positions on its website, www.gothamcityresearch.com.

---

[3] Gotham's corporate registration in Delaware was cancelled due to its failure to appoint a registered agent after its previous registered agent resigned. Nevertheless, Yu continues to operate a business called "Gotham City Research LLC" and released the Gotham Report under that entity's name.

50.     General Industrial Partners LLP is a limited liability partnership registered in both England and Wales. It is an affiliate of Gotham that Yu and De Weck formed together. *See* https://www.hedgeweek.com/gotham-and-portsea-founders-team-launch-new-short-selling-hedge-fund/ (explaining that Yu and De Weck were teaming up to "launch a new short-selling fund, General Industrial Partners"). GIP has been listed as an affiliate in the past two short reports issued by Gotham. GIP is headquartered in England. GIP has four LLP members: (1) Christian Cluett (individual); (2) Defendant Cyrus De Weck (individual); (3) Amy Shelagh Gilliland (individual); and (iv) Portsea AIFM Malta LTD ("Portsea"), a corporate entity. The individual members are all residents of England. Portsea is registered in Malta. GIP is an affiliate of Gotham and actively engages in short selling of stock of companies who are the target of reports published by Gotham. Upon information and belief, Gotham and Yu coordinate with GIP and profit from trades made by GIP.

51.     Cyrus De Weck is an individual, who upon information and belief, resides in England. Upon information and belief, De Weck operates GIP and coordinates with Yu and Gotham to take short positions that will allow GIP to profit from Gotham's false reports.

52.     Upon information and belief, other affiliates of Defendants participated in and benefitted from their unlawful acts. *See* https://www.hedgeweek.com/gotham-and-portsea-founders-team-launch-new-short-selling-hedge-fund/ (explaining that "Yu and De Weck may also use a separate vehicle to take a very concentrated position should they identify a particularly compelling target"). Grifols currently does not know the identities of all Defendants and thus sues certain of them as "John Does 1-10" and "XYZ Corporations 1-10," inclusive. Grifols believes that such Defendants are in some manner liable for, and have unjustly profited from, the wrongful

acts and damages alleged in this Complaint. Grifols will amend this Complaint to allege the true names and capacities of such Defendants when ascertained.

53.     Upon information and belief, John Does 1-10 are persons domiciled under the laws of states to be determined. Grifols alleges that, at all times alleged in this Complaint, each of the Defendants John Does 1-10 was the agent, servant, employee, partner, joint venturer, representative, subsidiary, parent, affiliate, alter ego, or co-conspirator of the other Defendants, each had full knowledge of and gave substantial assistance to the alleged activities, and in doing the things alleged, each was acting within the scope of such agency, service, employment, partnership, joint venture, representation, affiliation, or conspiracy, and each is legally responsible for the acts and omissions of the other Defendants.

54.     Upon information and belief, XYZ Corporations 1-10 are corporate entities registered or domiciled under the laws of states to be determined. Grifols alleges that, at all times alleged in this Complaint, each of the XYZ Corporations 1-10 was the agent, servant, employee, partner, joint venturer, representative, subsidiary, parent, affiliate, alter ego, or co-conspirator of the other Defendants, each had full knowledge of and gave substantial assistance to the alleged activities, and in doing the things alleged, each was acting within the scope of such agency, service, employment, partnership, joint venture, representation, affiliation, or conspiracy, and each is legally responsible for the acts and omissions of the other Defendants.

## JURISDICTION AND VENUE

55.     The Court has jurisdiction over Daniel Yu pursuant to CPLR § 301 because Yu is a resident of and is domiciled in the State of New York.

56.     The Court has jurisdiction over Gotham pursuant to CPLR § 301 because Gotham has its principal place of business in New York and is solely controlled by a New York resident, Daniel Yu.

16

57.     The Court also has jurisdiction over all Defendants pursuant to CPLR § 302(a)(1)-(2) because Defendants transact business in and have directed their activities toward the State of New York by, among other things, authoring, publishing and disseminating false statements about Grifols in New York with the goal of depressing Grifols' share price and short-selling shares, and unjustly enriching themselves by manipulating the market for Grifols' shares that trade on NASDAQ in the State of New York.

58.     The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because diversity of jurisdiction exists and the amount in dispute exceeds the sum of $75,000.

59.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Yu and Gotham reside in the State of New York and a substantial part of the events or omissions giving rise to the claim occurred in the State of New York, including in this District.

## FACTUAL ALLEGATIONS

I.     **GRIFOLS**

   A. **Grifols Has Become an International Powerhouse in Developing, Manufacturing, and Providing Lifesaving Medicines and Treatments.**

60.     Founded over a century ago, Grifols is a global leader in innovation, development, and production of essential lifesaving plasma-derived and transfusion medicines. Grifols has a longstanding commitment to improving the health and well-being of people around the world, as well as helping society on all fronts by strengthening its positive social, economic, and environmental impacts. Grifols' plasma-derived medicines treat hundreds of thousands of patients with chronic and rare diseases that can be life-threatening, including chronic liver diseases, primary and secondary immunodeficiencies, hematological disorders, chronic obstructive pulmonary disease, hepatitis B, rabies, Zika virus, and Ebola. Given the nature of Grifols' business, Grifols' reputation is imperative to succeeding with its business partners and customers.

61.     As a publicly traded company, Grifols is committed to ethics and integrity not only as part of its core mission in delivering healthcare and medical innovation to the world, but also in its corporate governance practices. Grifols' finances and internal governance are subject to regulatory oversight in Spain, the European Union, and the United States.

62.     Grifols' growth through the twentieth century and beyond has been a story of dedication and unique vision. The company began as a small business in 1909 with the goal of revolutionizing the field of plasma-based therapies. Since then, from the development of new techniques that make plasma conservation possible, to opening and operating a constantly expanding network of blood and plasma donation centers and banks, to publishing cutting-edge research, Grifols has been at the forefront of medical innovation. Today, its reach, resources, and expertise extend across the globe, as what is now a large international corporation.

63.     Grifols completed a successful initial public offering ("IPO") in Spain on May 17, 2006, with a concurrent private placement with qualified institutional buyers in the United States.[4] As part of its IPO, Grifols, like any applicant for admission to the Spanish Stock Exchanges, was required to submit extensive documentation to the CNMV, evidencing the company's compliance with Spanish law, a description of the securities and their compliance with various legal requirements, as well as the issuer's audited financial statements, and a public offering prospectus, which disclosed material information about Grifols, including its business, organizational

---

[4] The Spanish securities market for equity securities consists of four stock exchanges located in Madrid, Barcelona, Bilbao and Valencia (collectively, the "Spanish Stock Exchanges"). The majority of the transactions conducted on them are done through the Spanish Automated Quotation System, which links the Spanish Stock Exchanges, providing those securities listed on it with a uniform continuous market that eliminates most of the differences among the Spanish Stock Exchanges. The Spanish Automated Quotation System is operated and regulated by the Sociedad de Bolsas, a corporation owned by the companies that manage the Spanish Stock Exchanges.

structure, management and shareholders, financial information, and the offered securities and placement procedures.

64.     Grifols' Class A shares have been listed on the Spanish Stock Exchanges since the company went public and are quoted on the SIBE under the ticker symbol "GRF." Since January 2008, Grifols has been part of the IBEX-35 Index, which comprises the top 35 listed Spanish companies by liquidity and market capitalization. Grifols' Class B shares were issued as part of the consideration for the acquisition of Talecris Plasma Resources, Inc. ("Talecris"), a company that has since been merged into Grifols' subsidiary Biomat USA, and are listed on the Spanish Stock Exchanges and quoted on the SIBE under the ticker symbol "GRF.P."

65.     As a publicly traded company in Spain, Grifols is subject to Spanish laws and oversight by the CNMV, which impose obligations and requirements to ensure adequate levels of transparency, accountability, and good governance. Grifols also must comply with European Union securities regulations. For example, Grifols is required to publish on its website and submit to the CNMV audited annual financial statements and half-year financial statements, annual corporate governance reports detailing the structure of the company's governing system and how it functions, and an annual directors' report describing the payments they receive in connection with their positions, and the company's policy on the payment of its directors.

66.     The Spanish CNMV is not the only regulator overseeing Grifols' finances, accounting, and corporate governance. As a result of its acquisition of Talecris, Grifols S.A.'s equity securities began trading on the NASDAQ in 2011 and thus are subject to NASDAQ listing standards and SEC regulations for foreign private issuers. Grifols S.A.'s Class B shares are traded in the United States on the NASDAQ Global Select Market in the form of ADSs, evidenced by ADRs, under the symbol "GRFS." Each ADS represents one of Grifols S.A.'s Class B shares.

Grifols S.A.'s ADSs are currently traded in U.S. dollars. In November 2011, Grifols S.A.'s ADSs were added to the NASDAQ Biotechnology Index.

67.     Grifols is committed to strong and ethical corporate governance. A majority of the Board are independent Directors.

68.     Grifols' commitment to effective governance is exemplified by the company's Executive Chairman and Chief Executive Officer, Thomas Glanzmann. Contrary to the Gotham Report's false assertion that he is a "Grifols in everything but name only[,]" Mr. Glanzmann has 30 years of experience in the healthcare industry, and is highly respected in that space. In addition to his current position at Grifols, he is also on the board of Alcon, a Swiss-American pharmaceutical and medical device company.

69.     Mr. Glanzmann joined Grifols in 2006, after serving as the CEO and Managing Director of HemoCue AB, a company which developed, produced, and marketed medical diagnostic products. Before that, Mr. Glanzmann had held various positions at other major players in the global biosciences and medical equipment markets, including Baxter Healthcare Corporation, which, like Grifols, also develops and produces plasma-derived therapies. Mr. Glanzmann was Senior Vice-President and Senior Corporate Officer of Baxter Healthcare Corporation, President of Baxter Bioscience, Chief Executive Officer of Immuno International, and President of the European Biotech Group, among others.

70.     Accordingly, Mr. Glanzmann joined Grifols as a director with extensive experience, knowledge, and expertise in the industry, which he applies at Grifols to serve the interests of the company's shareholders. Mr. Glanzmann originally served in the capacity as a director upon his hiring in 2006 and became Vice Chairman in 2017. He was appointed Executive Chairman in 2023.

71.     Over the 18 years since its Spanish IPO, Grifols has grown from a predominantly domestic Spanish company into a global company by expanding both organically and through acquisitions throughout Europe, the United States, Latin America and Asia.

72.     Today, Grifols is a vertically integrated global producer of plasma derivatives, ranking in the top three largest producers in the industry. Grifols' present-day activities include sourcing raw material, manufacturing various plasma derivative products and selling and distributing final products to healthcare providers. As of December 31, 2022, Grifols had 392 operating plasma collection centers located across the United States, Germany, Austria, Hungary, Canada, and Egypt, with a processing capacity of approximately 22 million liters of plasma per year.

73.     The United States is the largest sales region in the world for the plasma derivative sector. For the year ended December 31, 2022, the United States and Canada accounted for 63.6% of Grifols' total net revenue, the substantial majority of which comes from the United States.

**B. Grifols' Expansion in the United States is a Story of Rapid, Stable Growth and Success.**

74.     Grifols officially expanded into the United States in 2002, when it acquired the company SeraCare, now Biomat USA, Inc., and its 43 plasma donation centers in the United States. Grifols solidified its American expansion in 2003 by acquiring Alpha Therapeutic Corporation, including its plasma fractionation plant in Los Angeles, and founding Grifols USA, LLC. Today, all of Grifols' United States plasma donation centers are managed by one of three of its subsidiaries: Biomat USA, Inc., PlasmaCare, Inc., or Talecris Plasma Resources, Inc.

75.     Grifols is one of the largest producers of lifesaving plasma medicines and other innovative biopharmaceutical solutions in the world. Plaintiff Grifols Shared Services North America, Inc., and its subsidiaries, cover the United States market, where the company offers a

comprehensive portfolio of Grifols products and services. These subsidiaries include Grifols Biologicals, LLC, Grifols Therapeutics, LLC, and Grifols USA, LLC, all of which are headquartered in Los Angeles.

76.     Grifols Shared Services North America, Inc. is the shared service arm of the Grifols entities in the United States. As the parent company for most of the Grifols' United States entities, Grifols Shared Services North America, Inc. provides support services for the collection, manufacture, sale and distribution of plasma derivatives and related products. Grifols Shared Services North America, Inc.'s and its affiliates' employees, located primarily in California and North Carolina, provide legal, accounting, compliance, human resources, and corporate support to Grifols companies in the United States.

77.     Grifols Biologicals, Inc. serves as the research, development, and production arm for Grifols' therapeutic proteins. Grifols Therapeutics, LLC discovers, develops, and produces Grifols' critical care treatment products, which serve patients, hospitals, pharmacies, and healthcare professionals worldwide. Grifols USA, LLC is the sales and marketing arm for Grifols in the United States for the sale of biopharmaceutical products. The global Biopharma business unit accounted for €5,005.4 million, or 82.5%, of Grifols' total net revenue in 2022.

78.     Grifols' United States manufacturing sites are located in Clayton, North Carolina; Los Angeles, California; and Emeryville, California. Grifols also has major operational sites elsewhere in the United States.

79.     Grifols, S.A. and Grifols Shared Services North America, Inc., through their aforementioned subsidiaries, regularly enter into sales, distribution, supply and fulfillment contracts for their lifesaving products, particularly immunoglobulin, with group purchasing

organizations, home care companies, alternate infusion sites, and hospital groups, including major hospitals in Manhattan, New York.

80.     Today, Grifols Shared Services North America, Inc., and its affiliates, have more than 18,000 employees in the United States, representing 75% of Grifols' global workforce.

> ### C.  Grifols S.A.'s Audited Financial Reports Consistently Reflect Transparency and Good Accounting Practices.

81.     Grifols, S.A. prepares and discloses its consolidated annual accounts.

82.     Grifols S.A.'s annual accounts are audited by internationally-recognized, independent outside auditors, pursuant to Spanish legislation and SEC requirements for foreign issuers. From fiscal year-end December 31, 2003 until fiscal year-end December 31, 2020, the audits were conducted by KPMG Auditores, S.L., along with Grant Thornton, S.L.P. beginning in fiscal year-end 2017. For fiscal years 2021-2022, the audits were conducted by Deloitte, S.L. These three top firms, KPMG, S.L., Grant Thornton, S.L.P., and Deloitte, S.L., are all registered with the Public Company Accounting Oversight Board ("PCAOB").

83.     The Board of Directors is responsible for approving the annual accounts in such a way that they give a true and fair view of the equity, financial position, and financial performance of Grifols in accordance with IFRS and other provisions of the financial reporting framework applicable to Grifols in Spain, and for such internal control as the Directors determine necessary to enable the preparation of the annual accounts that are free from material misstatement, whether due to fraud or error. Grifols' Audit Committee, which is made up of three independent directors per NASDAQ rules, is responsible for overseeing the preparation and presentation of the annual accounts.

84.     Every year, the independent auditor reviewing Grifols S.A.'s Annual Reports for filing with the SEC and the CNMV has determined, based upon an examination carried out in

accordance with generally accepted auditing standards that the Annual Reports present fairly, in all material respects, Grifols' financial position, and the results of its operations and its cash flows for each of the fiscal years in the three-year period preceding that year-end, in conformity with IFRS.

85.     In the United States, Grifols, S.A.'s revenues and profits are also publicly reported each fiscal year as part of the financial statements the company files with the SEC. Grifols, S.A.'s Annual Report is filed on a "Form 20-F." Grifols S.A. has filed an Annual Report on Form 20-F each year since the company began trading on the NASDAQ in 2011.

86.     Grifols S.A.'s Annual Report on Form 20-F is a critical component of the company's commitment to transparency and accountability. It provides investors with an overview of the company's governance practices, including information about the Board of Directors and its committees, executive compensation, and risk management. It includes, among other things, the financial statements of Grifols S.A. for that given fiscal year in accordance with IFRS that were audited and certified in compliance with internal control over financial reporting by independent auditing firms, as discussed above.

87.     Grifols also submits all material information that it submits to Spanish securities regulators, files with the Spanish stock exchanges, or publicizes to its investors, to the SEC via the filing of the Form 6-K. Through the filing of the Form 6-K, Grifols also ensures any other material information that arises between Annual Reports is also disclosed directly to the SEC and the market.

**D.  Grifols is Subject to Due Diligence Conducted as Part of Bond Issuances.**

88.     On top of the stringent disclosure and corporate governance requirements that Grifols is subject to by Spanish and United States regulators, Grifols is also periodically subject to thorough due diligence processes whenever it issues debt securities to the market.

89.     Due diligence for the preparation of annual reports on Form 20-F with the SEC and its CNMV equivalent is a lengthy and comprehensive exercise, involving management from multiple areas of Grifols, as well as its auditors and its Spanish and United States outside legal counsel. A due diligence process in the context of a bond issuance is even more exacting. The reason is that, in addition to the parties involved in the preparation of an annual report, the process of preparing disclosure documents (typically an offering memorandum or prospectus) for an issuance requires the participation of bankers, industry analysts, and covenant experts for the investment banks that are placing the securities with investors, as well as their own Spanish and outside counsel.

90.     Recently, Grifols has issued either secured or unsecured bonds in each of 2017, 2019 and 2021. Each such issuance involved different leading United States and international financial institutions acting as initial purchasers. To protect themselves from potential liability from investors or regulators, the financial institutions require a very stringent due diligence process, which culminates with each outside counsel providing the banks a letter confirming that the disclosure documents do not contain any material omission or misstatement of fact, as well as a comfort letter from the company's auditors certifying that every financial figure appearing in the disclosure documents has been vetted by the auditor and is accurate.

91.     A due diligence process for a bond issuance involves a comprehensive investigation of a company's business, including descriptions of its business (including its strategy and competitive advantages, its manufacturing, sourcing, suppliers, distribution and sales processes, material contracts, its intellectual property assets, its employees, its major shareholders and management, its related party transactions, and its existing legal proceedings), its finances (including explanations for its financial performance in its last three years, as well as descriptions

of its outstanding debt, contingencies, and cash flow), and the terms of the offering (including primarily, a description of potential risks associated with investing in the company). To this end, the parties to the bond issuance participate in numerous meetings, including business due diligence, financial due diligence, auditor due diligence and other general due diligence meetings.

## II.   GOTHAM CITY RESEARCH LLC, DANIEL YU, AND THEIR AFFILIATES

92.   Gotham touts itself as a research company focused on "due diligence-based investing." In reality, Gotham is an alter ego entity Daniel Yu uses in furtherance of Defendants' predatory stock manipulation schemes.

### A.   Daniel Yu is a Convicted Felon with a History of Theft and Financial Crimes.

93.   Despite likening himself to the "Batman of Wall Street," Yu has a sordid criminal history and is a convicted felon. He has served time in jail for theft and has previously been charged with identity theft and other financial crimes.

94.   In 2007, Yu was charged in Colorado with theft, burglary, identify theft, and criminal possession of a financial device. These are all felonies in Colorado.

95.   According to a May 29, 2007 arrest report, while Yu was working as a securities analyst for Dividend Capital, he stole multiple cell phones, iPods, computers, and checks from the company. Yu also stole passports and copied driver's licenses and other form of identification from multiple Dividend Capital employees. Colorado Police conducted a forensic investigation of one of the computers stolen by Yu and discovered Yu had used the computer to access websites related to identity theft.

96.   A subsequent search of Yu's residence by Colorado Police revealed Yu was also in possession of a litany of checks, photocopies of credit cards, photocopies of driver's licenses, student identifications for multiple Massachusetts Institute of Technology students, bank and credit card statements and other financial documents, bank account numbers, social security

numbers, birthdates, addresses, W-2 and K-1 statements, a tax return, and a death certificate, all belonging to someone other than Yu.

97.     On August 31, 2007, Yu pled guilty to one count of Theft, a class four felony and one count of Theft, a class two misdemeanor.

98.     On October 19, 2007, the court granted a motion and stipulation for a 4-year supervised deferred judgment and sentence as to the Felony Theft charge. For the misdemeanor Theft charge, Yu was sentenced to one year of probation. Yu was ordered to pay $134,152.51 in restitution to Dividend Capital.

99.     On January 25, 2008, the State of Colorado filed a revocation of Yu's probation, claiming Yu did not comply with the terms of the Court's order by failing to maintain a permanent residence in Colorado and missing several probation appointments. On January 28, 2008, an arrest warrant was issued for Yu due to his failure to comply with the terms of his probation.

100.     On October 23, 2008, the court revoked the deferred judgment, and Yu was resentenced to 90 days in jail.

101.     Time in jail did little to deter Yu from engaging in criminal activity. Throughout 2011, Yu continued to violate the terms of his parole. He periodically traveled outside of Colorado (including to New York) despite being confined to the state. He also misled and lied to his probation officer about his employment status.

102.     In 2011, Yu initially advised his parole officer that he was employed by a company called General Patent Corporation. Sometime thereafter, Yu changed his story and stated he was employed by a company called Avcott Research. On July 11, 2011, Yu's parole office attempted to verify Yu's claim by searching for any website or corporate registration for Avcott Research, but could not find any records to verify the existence of such a company. On July 27, 2011, Yu's

parole officer conducted another internet search and this time, was able to locate a website for Avcott Research.

103.    Yu's parole officer began to question Yu extensively about his supposed employment with Avcott Research. In response, Yu backtracked once again and replied that he returned to work for General Patent Corporation.

104.    Yu's parole officer became skeptical about Yu's representations about his employment and income. This prompted an additional investigation into Yu's employment history during his probation. On August 26, 2011, Yu's probation officer contacted General Patent Corporation and inquired about the accuracy of letters, paystubs, and a check Yu provided to his probation office to verify his employment and wages. Yu's probation officer was advised by General Patent Corporation that the letters, paystubs, and the copy of the check provided by Yu were forged.

105.    Yu's probation officer believed Yu altered these documents prior to submission to the probation office to: (1) make it appear as though he was earning less money than he was and in turn, allow him to make decreased restitution payments to his previous victims; and (2) to conceal the fact that the check he received included a New York address, rather than Colorado. Yu had not been granted permission by the probation department to reside outside of Colorado.

106.    As a result, on October 19, 2011, Yu was once again arrested and charged with attempting to influence a public servant and forgery. These crimes are both felonies in Colorado.

107.    On February 17, 2012, Yu entered into a plea agreement and pled guilty to one count of attempting to influence a public servant, which is a class-4 felony. That same day, he was sentenced to three-months in prison in Denver County Jail.

**B. Yu Forms Gotham as a Mouthpiece for His Short Selling Scheme.**

108.    In 2013, after being released from jail, Yu ironically began publishing "reports" concerning purported fraud and mismanagement by public companies, using Gotham as his mouthpiece. Since then, Yu has written, edited and published Gotham's reports.

109.    A view of Gotham's structure and presence confirms the suspicious nature of its activity. Indeed, unlike a typical research-based, short-selling firm, Gotham's website does not paint a picture of transparency. It lists no employees, no headquarters, no promotional material, and no direct contact information. It is also unclear whether Gotham even remains a legal entity as the State of Delaware cancelled Gotham's LLC registration in 2021 after it failed to appoint a registered agent.



110.    Since Gotham's inception, Defendants have employed a business model with a singular purpose: to reap massive profits by rigging bets that the share price of a publicly traded company will collapse after the company is the target of a disparaging report by Gotham.

111.    Under ordinary circumstances, these bets are known as "short sales." A short sale is when someone sells shares of stock that the seller does not own. The short seller borrows the

shares from a broker or other lender at the current market price. The short seller then sells the shares and retains the proceeds. If the price of the stock drops, the short seller can buy back the stock at the lower price, return the shares to the lender with a lower value, and profit from the difference. On the other hand, if the stock's share price rises, the short seller's exposure to its lender is limitless.

112.    With respect to their attack on Grifols, Defendants did not engage in ordinary short selling using typical market research and analysis. Instead, after Defendants took a short position on the company's stock, they attacked the company's credibility by issuing a scathing and knowingly false report about Grifols' accounting, disclosures, finances, and integrity.

113.    Gotham's report about Grifols was specifically designed to inject panic in the market, thereby causing a drop in the Grifols' stock price, resulting in Defendants' "bet" paying off. Defendants' specific intent was to damage and destroy Grifols' value. While this scheme reaped huge profits for Defendants, it destroyed value for Grifols, its shareholders, and other stakeholders.

114.    In this case, Defendants went so far as to ignore industry custom and failed to provide an opportunity for Grifols to confirm or deny Defendants' pending report's conclusions prior to Defendants releasing their statements to the public. For example, the Gotham Report identifies supposedly "unexplained" transactions, but did not seek an explanation from Grifols. This demonstrates that Defendants do not care about telling the truth; they only care about the success of their scheme no matter the cost or collateral damage they leave in their wake.

115.    This is not the first time Gotham and Mr. Yu's practices have been brought to light in a legal forum. In 2014, Quindell Plc sued Gotham and Yu for libel in the High Court of England based on Gotham's "short report" that questioned Quindell's finances. After alleging the report

was "highly defamatory" and "deliberately misrepresentative," default judgment was entered in favor of Quindell after Gotham and Yu failed to appear.

116.    Defendants' tactics have become more deceitful as time has passed. For example, in 2017, Gotham published multiple short reports alleging that a publicly traded company, Criteo SA, was engaged in fraud. Predictably, Criteo stock suffered significant losses after Gotham's report was published. In response, Criteo issued a public statement highlighting numerous false assertions in Gotham's report. Then, in 2021, after Criteo's stock finally began to recover from Gotham's attack, Gotham made a shameless and transparent about-face and took a bullish, *long* position on Criteo.

117.    Gotham and Yu's misdeeds appear to have caught up with them as it was recently reported that they are subjects of a Department of Justice investigation into potential trading abuses. As noted, the CNMV has also announced that it is "analysing Gotham's conduct" in connection with the Gotham Report about Grifols "to determine whether such conduct is compliant with European market abuse regulations, in particular with those tackling the dissemination of misleading information."

### C.  Yu Partners with Cyrus De Deck to Form GIP, Gotham's Investing Affiliate.

118.    In October 2022, it was reported by Financial Times that Yu and Cyrus De Weck, the principal of Portsea Management, were forming a new short selling fund. *See* https://www.ft.com/content/38bf866b-380b-4917-98f4-ce32a1b8c4fb ("Founders of Gotham and Portsea join forces in new short selling fund").

119.    Upon information and belief, GIP was formed by Yu and De Weck in early 2023 and has since served as the investing arm for Defendants' short selling schemes.

120.    Upon information and belief, GIP and De Weck substantially assist Gotham and Yu's short-selling schemes by way of providing financial capital and material assistance for preparing and disseminating Gotham and Yu's "short reports," including the Gotham Report.

121.    Upon information and belief, GIP and De Weck coordinate with Gotham and Yu to time their short positions in advance of an upcoming report from Gotham and Yu targeting Defendants' next victim, including with respect to the Gotham Report.

122.    Upon information and belief, GIP held a short position against Grifols in connection with the Gotham Report.

123.    Upon information and belief, GIP and De Weck aided and abetted, and acted in concert with, Gotham, Yu, and others, to knowingly publish false statements about Grifols for the purpose of damaging Grifols so that Defendants' short position would turn a profit.

### III.    GRIFOLS' STRONG PERFORMANCE THREATENED DEFENDANTS' SHORT POSITION, RESULTING IN THE RELEASE OF THE GOTHAM REPORT.

#### A.    Grifols Announces its Plan to Deleverage its Balance Sheet and Reduce its Debt through a Sale of a Portion of its Equity in Shanghai RAAS.

124.    Grifols has publicly acknowledged the need to deleverage its balance sheet. In plain language, this means reduce its debt. The company began taking great strides to achieve that goal in 2023, announcing on May 9, 2023 a commitment to reduce its leverage ratio to 4.0x, which would constitute approximately a 43% decrease from its then-current leverage ratio of 7.0x.

125.    In furtherance of that goal, on July 27, 2023, Grifols announced in a press release that it was working to close on a deleveraging transaction. On November 2, 2023, Grifols reiterated its commitment to sign and announce a deleveraging transaction in the near future.

126.    Grifols made good on its promise to investors. On December 29, 2023, Grifols announced a strategic alliance with Haier to develop the Chinese plasma market. Through a share

purchase agreement, Grifols would sell approximately a 20% equity stake in SRAAS to Haier for RMB 12.5 billion (approximately $1.8 billion) cash consideration, at a price of RMB 9.405 per share. The proceeds from this transaction, it was announced, would be used to reduce Grifols' debt.

127.    Grifols shares rose following the announcement. Grifols Class A shares had closed on the Bolsas y Mercados Españoles ("BME") at €14.23 on December 28, 2023. Grifols Class B shares closed on the BME at €9.54 a share, and on the NASDAQ at $10.52 a share. Grifols announced the deal to reduce its debt by $1.8 billion the morning of December 29, 2023 and by that same evening, Grifols Class A shares closed at €15.46, while the Class B shares rose to €10.55 on the BME and to $11.56 on NASDAQ. Well into the New Year, Grifols Class B shares did not drop below €10. On January 8, 2024, Class B shares closed on the BME at €10.11.

**B.    Defendants Amass a Large Short Position in Grifols and then Release the Gotham Report.**

128.    According to Gotham, Gotham and Yu's "investigation" of Grifols began in Spring 2023, approximately nine months prior to the release of the Gotham Report in January 2024.

129.    The positive trend in Grifols' share value in the second half of 2023 posed a serious problem for any investor who held a short position in Grifols. This problem became more acute after Grifols' December 29, 2023 announcement that its deleveraging deal with Haier was expected to close in the first half of 2024. At this point, any short seller who had been building up a short position in Grifols' stock prior was facing the very real threat of an impending short squeeze.

130.    Defendants were among those short sellers and had amassed a large short position in Grifols. Unless Grifols' share price started dropping, and fast, Defendants were facing potentially massive losses.

131.    On January 8, 2024, Gotham posted on its X account, @GothamResearch, that the following day it would be releasing a report on an unnamed, multi-billion-dollar company located in Spain. Gotham further boasted that the unnamed company's shares were "uninvestable" and would "head to zero." Gotham was, of course, referring to Grifols.



132.    The following day, January 9, 2024, Defendants unleashed their short attack on Grifols. They published and disseminated a "report" on Gotham's website titled, "Grifols SA: Scranton and the Undisclosed Debts." On the first substantive page of the report, the Gotham Report again proclaimed that Grifols' shares "are uninvestable, likely zero."

133.    "Daniel Y," referring to Yu, is identified as the author in the January 9 report's properties:



134.     Defendants thereafter aggressively spread the Gotham Report throughout social media. In conjunction with the report's release, Defendants also posted a series of messages from Gotham's X.com account doubling down on the lies and other misleading statements in the Gotham Report. In these posts, Defendants claimed that some of Grifols' accounting practices were "deceptive," certain transactions by Grifols were "undisclosed" and "GRF equity = 0." Gotham Research X Account, January 9, 2024, available at https://x.com/GothamResearch.

135.     The Gotham Report and the litany of falsehoods within were reported on by many global news companies, including, but not limited to Bloomberg, Yahoo Finance, Reuters, and Nasdaq. *See, e.g.*, https://www.reuters.com/business/healthcare-pharmaceuticals/what-does-gotham-city-report-say-about-grifols-2024-01-09/ ("What does the Gotham City report say about Grifols?"); https://finance.yahoo.com/news/grifols-sinks-short-seller-gotham-105814480.html ("Grifols Sinks as Short Seller Gotham Criticizes Accounting").

136.     By publishing the Gotham Report, Defendants intended to cause shareholders to panic and sell their shares, intentionally manipulating the market and thereby artificially causing Grifols' share price to plummet.

137.     As a result of the Gotham Report, Grifols shares fell as much as 43% during trading on January 9, 2024. https://www.bloomberg.com/news/articles/2024-01-10/gotham-city-owner-slashes-grifols-short-position-after-plunge-lr7q8sfu. These losses caused Grifols' stock to lose nearly $3 billion of its market value.



138.    Defendants wasted no time cashing in their ill-gotten profits as a result of their immense short positions as to Grifols' stock. Shortly after the Gotham Report was issued and Grifols' stock plummeted, Defendants reduced their short position from .57% to .06%, resulting in a multi-million-dollar windfall.

139.    However, Defendants' haste to seize their ill-gotten gains alone exposed that the Gotham Report is built on lies. Indeed, despite Defendants' explicit assertions that Grifols shares are "worthless," Defendants chose to cash in on their short position just before Grifols made its first public response to the false statements in the Gotham Report.

140.    Upon information and belief, Defendants sold their short position in Grifols when they did because Defendants know the Gotham Report is based on falsehoods and that, once the panic in the market subsides and Gotham's lies are debunked, Grifols' shares will rise again (like with Criteo, a prior Gotham victim). Indeed, if Grifols' stock truly were worthless, as Defendants

36

told the marketplace, Defendants would not have left millions of dollars on the table by dumping their short position after the stock had "only" dropped by 43% rather than an amount closer to the 100% drop that Defendants predicted.

## IV.     THE GOTHAM REPORT IS FULL OF DELIBERATE FALSEHOODS

141.    Gotham holds itself out as being committed to "due diligence-based investing." GIP, in turn, represents even in the Gotham Report itself that is a Registered Investment Advisor with the SEC, and that it is authorized and regulated by the Financial Conduct Authority in the United Kingdom. Because Defendants hold themselves out as credible research firms, reasonable investors would understand the conclusions reached in the Gotham Report, including its "leverage analysis," to be conveying provable facts about Grifols. The ensuing rush to sell Grifols' stock immediately following the publication of the Gotham Report confirms as much.

142.    Attempting to couch their factual statements and conclusions as "opinions" cannot shield Defendants from liability for deliberately publishing false statements about Grifols' finances and accounting in order to manipulate its stock for their own personal gain. In particular, Defendants' transparent attempt to shield themselves from liability is belied on the very first substantive page of the Gotham Report, where in addition to summarizing their so-called "opinions," Defendants also list a "SUMMARY OF THE **BASES** OF [THEIR] OPINIONS" (emphasis added) – wherein Defendants lay out purported ***bases in fact***, which are riddled with falsities. Ex. 1 at 4.

143.    The conclusions and analysis in the Gotham Report are expressed in absolute terms, not couched or qualified as opinions. The following statements appear in the Gotham Report, which unequivocally purport to make actual findings of fact as to Grifols' financing, accounting, and regulatory disclosures:

- Grifols' treatment of certain entities is "***materially deceptive and incorrect***." Ex. 1 at 4 (emphasis added).

- "Upon a deeper ***investigation*** of GRF over the last 9 months, we ***find*** that the market seems to misunderstand the company." *Id.* at 5 (emphasis added).

- "We see an eerily similar ***fact pattern*** between NMC and Grifols." *Id.* at 5.

- "We estimate that GRF's ***true*** leverage as of Q3 2023 is at least 9.6x and could be 13.2x, should the recent sale of SRAAS stake close without complications." *Id.* at 6 (emphasis added).

- "***In fact***, the story of GRF is ***inaccurate and incomplete*** without examining its non-controlling interests." *Id.* at 9 (emphasis added).

- "***[W]e find*** (i) undisclosed cash outflows from Grifols to related parties (such as Scranton) (ii) cash outflows to partners/subsidiaries that don't make economic sense to us, such as to Immunotek and (iii) ***evidence*** of a complex circular flow of transactions between Grifols and Scranton (see Bio Products)." *Id.* at 14 (emphasis added).

- "That being said, we estimate that ***true*** debt, at minimum . . ." *Id.* at 15 (emphasis added).

- Charts in the Gotham Report are entitled simply "GRF SM's ***true*** debt." *Id.* at 15, 17 (emphasis added).

- "As the NMC Health and Casino examples show, when companies understate debt, the ***true picture*** can be far worse than suspected by the public (even to skeptics)." *Id.* at 17 (emphasis added).

- "Grifols ***does not disclose*** that the company lent $95 million to Scranton." *Id.* at 23 (emphasis added).

- "The above transaction to Scranton **_is NOT disclosed_** by Grifols, per our review of the company's filings. We find **_the fact_** Grifols does not disclose this transaction suspect, given **_the fact_** Grifols has disclosed far smaller transactions with Scranton." *Id.* at 24 (emphasis added).

- "**_In fact_**, Thomas Glanzmann is not new to Grifols . . ." *Id.* at 48 (emphasis added).

144.   The Report's repeated conclusion that "Grifols reminds [Defendants] of NMC Health plc[,]" an entity which was found to be falsifying its financial statements and obscuring information from investors, further shows that Defendants intended their report to convey factual conclusions and for investors to rely upon those conclusions as statements of fact, not opinion. The Gotham Report explains that NMC's "hidden debt problem turned out larger than [Defendants] had previously estimated, and the company filed for bankruptcy." Ex. 1 at 5. This is an unequivocal assertion of fact about NMC, the report that was published exposing NMC, and the resulting bankruptcy of the company. The Gotham Report explains that "[w]e were short NMC Health because **_like GRF_**, NMC had been a debt-financed serial acquiror where we identified suspect accounting, undisclosed related party transactions, and undisclosed debts. . . . **_[w]e see an eerily similar fact pattern between NMC and Grifols_**." *Id.* (emphasis added). The comparison to NMC is intended to be an assertion of fact, not opinion, conveying that the conclusions made about NMC regarding "suspect accounting, undisclosed related party transactions, and undisclosed debts" also apply to Grifols.

145.   The central factual conclusion conveyed to investors in the Gotham Report is that Grifols is a fraud that fails to disclose transactions and "manipulates reported debt & EBITDA to artificially reduce reported leverage." Ex. 1 at 4. As set forth more fully below, Defendants use several misstatements of fact and present an intentionally misleading narrative, ultimately accusing

the company of (i) failing to disclose "material [. . .] related party transactions and [engaging in] suspect accounting," (ii) failing to disclose "loans and share pledges tied to" a related entity, and (iii) to have engaged in these fraudulent practices for the "purpose of . . . present[ing] Grifols' leverage at 6x, whereas [Defendants] estimate leverage is closer to 10x-13x." *Id.* at 5.

146.     The Gotham Report is filled with knowingly false and misleading statements. Discussed below are representative examples that demonstrate Defendants' deliberate intent to manipulate the market by spreading lies about Grifols. Grifols intends to prove the falsity of additional statements in the Gotham Report as well.

**A. Defendants' False Statements Regarding the Disclosure of a $95 million Loan to Scranton.**

147.     The Gotham Report is riddled with false claims that Grifols failed to disclose a $95 million loan it made to Scranton.

148.     Defendants claimed in the January 9 report:

- "Grifols lent Scranton $95 million in 2018. This loan appears tied to the BPC [Plasma]/Haema transaction, yet ***this loan is undisclosed in Grifols' filings***, only appearing in Scranton filings." Ex. 1 at 4 (emphasis added).

- "Grifols ***does not disclose*** that the company lent $95 million to Scranton." *Id.* at 23 (emphasis added).

- "Grifols ***did not disclose*** its $95 million loan to Scranton Enterprises in 2018[.]" *Id.* at 25 (emphasis added).

149.     These statements are false. Grifols' $95 million loan to Scranton Enterprises ***is disclosed*** in Grifols' filings. In fact, the loan is ***disclosed on every single Annual Report on Form 20-F filed by Grifols to the SEC from 2018-2022, as well as on Grifols' filings with the CNMV***.

Grifols' 2018 Annual Report on Form 20-F at 111:

**Sale of Haema AG and Biotest US Corporation**

In December 2018, we sold our 100% stake in Haema AG and Biotest US Corporation to Scranton Plasma B.V., one of our major shareholders and a related party, for a total of $538 million. Scranton Enterprises B.V. financed the purchase in part through a loan from Grifols Worldwide Operations Limited for an initial principal sum of the euro equivalent of $95 million, with an interest rate of EURIBOR plus 200 basis points. As of December 31, 2018, the euro equivalent of $95 million was outstanding on the loan. As of March 31, 2019, the euro equivalent of $95 million was outstanding on the loan.

Grifols' 2019 Annual Report on Form 20-F at 121:

**Sale of Haema AG and Biotest US Corporation**

In December 2018, we sold our 100% stake in Haema AG and Biotest US Corporation to Scranton Plasma B.V., one of our major shareholders and a related party, for a total of $538 million. Scranton Enterprises B.V. financed the purchase in part through a loan from Grifols Worldwide Operations Limited for an initial principal sum of the euro equivalent of $95 million, with an interest rate of EURIBOR plus 200 basis points. As of December 31, 2019, the euro equivalent of $95 million was outstanding on the loan.

Grifols' 2020 Annual Report on Form 20-F at 113:

**Sale of Haema AG and Biotest US Corporation**

In December 2018, we sold our 100% stake in Haema AG and Biotest US Corporation to Scranton Plasma B.V., one of our major shareholders and a related party, for a total of $538 million. Scranton Enterprises B.V. financed the purchase in part through a loan from Grifols Worldwide Operations Limited for an initial principal sum of the euro equivalent of $95 million, with an interest rate of EURIBOR plus 200 basis points. As of December 31, 2020, the euro equivalent of $95 million was outstanding on the loan.

Grifols' 2021 Annual Report on Form 20-F 122:

**Sale of Haema AG and Biotest US Corporation**

In December 2018, we sold our 100% stake in Haema AG and Biotest US Corporation to Scranton Plasma B.V., one of our major shareholders and a related party, for a total of $538 million. Scranton Enterprises B.V. financed the purchase in part through a loan from Grifols Worldwide Operations Limited for an initial principal sum of the euro equivalent of $95 million, with an interest rate of EURIBOR plus 200 basis points. As of December 31, 2021, the euro equivalent of $95 million was outstanding on the loan.

Grifols' 2022 Annual Report on Form 20-F at 129:

**Sale of Haema AG and Biotest US Corporation**

In December 2018, we sold our 100% stake in Haema AG and Biotest US Corporation to Scranton Plasma B.V., one of our major shareholders and a related party, for a total of $538 million. Scranton Enterprises B.V. financed the purchase in part through a loan from Grifols Worldwide Operations Limited for an initial principal sum of the euro equivalent of $95 million, with an interest rate of EURIBOR plus 200 basis points. As of December 31, 2022, the euro equivalent of $95 million was outstanding on the loan.

150.    The claim that Grifols failed to disclose the $95 million loan to Scranton to its investors and to the market is demonstrably false, as shown above. And Defendants knew it was false. Tellingly, Defendants cite to Grifols' Annual Report on Form 20-F filings when the filings contain information that Defendants try to spin to support their false narrative. E.g., Ex. 1 at 48 (citing the 2016 and 2017 Annual Report on Form 20-F filings). So, clearly, Defendants are aware

41

of, have access to, *and closely reviewed* Grifols' SEC filings. And yet, bent on misrepresenting the truth in their effort to destroy Grifols' reputation and misinform the public, Defendants willfully turned a blind eye to repeated disclosures that are in those same filings, plain as day, when falsely claiming that Grifols does not disclose the $95 million loan to Scranton.

151.    Defendants have even acknowledged the falsity of the claims made in the Gotham Report. The Gotham Report was published on January 9, 2024. Defendants dumped their short position in Grifols that same day.

152.    The next day—after having profited from their false statements by dumping their short position—Defendants modified the Gotham Report, as shown in the document properties for the version of the report that is available on Gotham's website today:



153.    A comparison of the original January 9 Gotham Report and its January 10 counterpart shows that Defendants revised their statements about their false assertion that Grifols failed to disclose the $95 million loan in its filings.

Comparison of January 9 and 10 versions of the Gotham Report (Ex. 3) at 4:

> • Grifols lent Scranton $95 million in 2018. This loan appears tied to the BPC/Haema transaction, yet this loan is undisclosed in Grifols' <u>corporate governance</u> filings~~, only appearing in Scranton filings~~.

*Id.* at 23:

---

**Grifols does not disclose that it lent to Scranton in ~~2018~~its corporate governance reports**

Grifols does not disclose that the company lent $95 million to Scranton. ~~We did not see any mention of this $95 million loan to Scranton~~ in its ~~GRF annual reports nor in its Corporate~~corporate governance ~~reports~~ filings in English or in Spanish. We would expect to find clear details about related party loans in Note 11 and Note 31 of GRF 2018 Annual Report. Instead, we find that Note 11 refers to Note 31 for details, and Note 31 refers to Note 11 for details – a circular reference. ~~And neither provides any~~The details about a loan to Scranton lie buried in Note 31, appearing nowhere else, which we find odd. Note 31 from GRF 2018 AR[3]~~:~~.

---

*Id.* at 26:

---

**Grifols has disclosed smaller related party transactions with Scranton Enterprises in its GRF filings**

Grifols did not disclose its $95 million loan to Scranton Enterprises in ~~2018~~its corporate governance filings nor its 2021 advance payment to Scranton~~.~~ in any GRF filings. Yet ~~it is not as if Grifols has never disclosed its related party activities with Scranton before.~~ Grifols has disclosed smaller ~~ones.~~transactions with Scranton before. For example, in 2022, Grifols discloses transactions with Scranton amounting to EUR6.3 million lease payments and EUR3.4 million purchases of PP&E[7]:

---

154.    By changing the Gotham Report on January 10, Defendants tacitly acknowledge that their claims about the $95 million loan in the original January 9 Gotham Report were false. But their acknowledgment is exactly that – tacit. Defendants did not publicize that they had made a material false statement in the January 9 version. They did not issue a press release about it or inform followers on social media. Instead, they uploaded the January 10 version of the report without any indication that the January 9 version was being replaced.

43

155.    By making these edits and walking back their original false claim, Defendants concede that Grifols did disclose the $95 million loan. But rather than come clean and admit they made a false statement, Defendants instead tried to fabricate some non-existent distinction between "corporate governance filings" and "filings" generally. In the January 10 version of the Gotham Report, Defendants state that Grifols failed to disclose the loan in its "corporate governance filings." Ex. 1 at 4, 23, 25 (emphasis added). But Grifols did disclose the loan in its Annual Report on Form 20-F filings with the SEC and its annual accounts filed with the CNMV, which *are corporate governance filings*. Thus, the revised January 10 report is still false.

156.    Defendants also make another false statement in the January 10 report that "[t]he details about [the $95 million] loan lie buried in Note 31 [of Grifols' 2018 Annual Report], appearing nowhere else…." Ex. 2 at 23. In fact, the disclosure was ***also*** made in the body of Grifols' 2018 Annual Report on Form 20-F filed with the SEC:

**Sale of Haema AG and Biotest US Corporation**

In December 2018, we sold our 100% stake in Haema AG and Biotest US Corporation to Scranton Plasma B.V., one of our major shareholders and a related party, for a total of $538 million. Scranton Enterprises B.V. financed the purchase in part through a loan from Grifols Worldwide Operations Limited for an initial principal sum of the euro equivalent of $95 million, with an interest rate of EURIBOR plus 200 basis points. As of December 31, 2018, the euro equivalent of $95 million was outstanding on the loan. As of March 31, 2019, the euro equivalent of $95 million was outstanding on the loan.

157.    Defendants' repeated false statements on this subject demonstrate their malicious intent to mislead investors and the market and to destroy Grifols' reputation under false pretenses.

### B.  Defendants' Lie that Grifols "Manipulates" its EBITDA and Debt.

158.    Another blatant untruth in the Gotham Report is that Grifols' definition of EBITDA is "materially misleading and incorrect." Ex. 1 at 8. This is a lie.

159.    As Defendants know, Grifols does not "manipulate" its EBITDA, or the components of EBITDA, because Grifols has no control over this formula to begin with.

160.    Indeed, that formula is determined in the Credit Agreement by Grifols' lenders, all of whom are internationally renowned banks, including, but not limited to Bank of America, BNP Paribas S.A., HSBC France, J.P. Morgan Securities PLC, Industrial and Commercial Bank of China (Europe) S.A., and Banco Santander, S.A. The Credit Agreement is attached to each of Grifols' Annual Report on Form 20-F since 2019, all public filings, which Defendants repeatedly reference and skew in support of their scheme.

161.    Yet, Defendants once again disregard this information and assert another falsehood to create the impression that Grifols' financial reporting is not above-board.

### C. Defendants' False Calculation of Grifols' Leverage Ratio.

162.    Next, the Gotham Report falsely claims that Grifols "manipulates reported debt & EBITDA to artificially reduce reported leverage" (Ex. 1 at 4) in an attempt to create a false impression that Grifols intentionally miscalculates its leverage ratio in its disclosures to the SEC, to Spanish regulatory bodies, and to the market. Defendants offer their calculation of Grifols' purported "true leverage" by injecting unfounded "adjustments" into the original, audited and accepted accounting formulas Grifols used to reach its reported ratio.

163.    Defendants' adjustments not only flout the EBITDA definition in the Credit Agreement, but some directly contradict IFRS accounting requirements that Grifols *must* use when calculating its leverage ratio. Defendants take their misrepresentations a step further by explicitly stating that some of the accounting practices Grifols engaged in are improper when, in fact, such practices are required by the controlling accounting rules set forth in the IFRS. And as discussed immediately below, Defendants wholly fabricate €1.313 billion in debt and inject it into their false calculation of Grifols' leverage ratio.

     *i.  Gotham Falsifies Grifols' Net Debt by Adding €1.313 Billion in Purported Debt that Simply Does Not Exist.*

164.    The Gotham Report falsely claims that "Grifols understates its debt burden and is, therefore, materially more levered than the company indicates." Ex. 1 at 15.

165.    In support of this false claim, the Gotham Report presents the following adjusted "true debt" calculation for Grifols:

| GRF SM's true debt | |
|---|---:|
| **EUR mln** | **H1 2023** |
| Non-current obligations | 4,626.3 |
| Senior secured debt (non-current) | 3,361.6 |
| Other loans (non-current) | 698.2 |
| Other non-current finanical liabilities | 825.2 |
| Current obligations | 149.4 |
| Senior secured debt (current) | 26.4 |
| Other loans (current) | 438.5 |
| Other current finanical liabilities | 76.6 |
| **Gross debt** | **10,202.3** |
| Cash on balance sheet | -523.4 |
| Cash from SRAAS divestiture * | -1,592.9 |
| **Net Debt** | **8,086.1** |
| Volume of invoices sold without recourse not collected | 367.9 |
| Haema and BPC related liability | 1,313.2 |
| **GCR adjusted net debt** | **9,767.1** |

Ex. 1 at 17.

166.    As shown above, the Gotham Report's calculation of Grifols' "true debt" (LTM ending June 30, 2023) as €9.767 billion includes €1.313 billion in debt relating to "Haema and BPC related liability." Ex. 1 at 17. This figure is a complete fabrication.

167.    As an initial matter, Haema and BPC Plasma have no debt per the Credit Agreement. Not €1.313 billion in debt. ***Zero debt***.

168.    The Gotham Report's "reasoning" for inflating Grifols' debt by this amount is to account for the supposed purchase price of Haema and BPC Plasma *in the event that Grifols exercises its call option on those entities*. There is no basis in IFRS or logic to inflate Grifols' debt by €1.313 billion merely because it has a call option on Haema and BPC Plasma. A call option is

a call option, not debt. Grifols may or may not exercise the option, so there is no basis to treat it as debt. The Gotham Report's calculation is not only illogical, but also completely divorced from IFRS accounting.

169.     Moreover, the €1.313 billion figure is grossly overstated. Not only do Haema and BPC Plasma have no debt, but there is no circumstance in which the call option would cost Grifols anywhere close to €1.313 billion. Defendants grossly inflate this figure by deliberately miscalculating what Grifols would owe *if* it exercises its call option.

170.     The exercise price for the call option as set forth in the relevant contract is equal to the greater of: (i) the same price for which the shares of Haema and BPC Plasma were sold to Scranton (which was €470 million, or $538 million), plus the expenses related to the transaction and the increase in net working capital from the time of the exercise of the option and the time of the sale (December 28, 2018), and (ii) the amount necessary to cancel Scranton's related debt financing, plus accrued interest, and any other amounts necessary to cancel such debt. Given the exercise price formula, the amount of "debt" under the Gotham Report's bizarre calculation would be far below the €1.313 billion that the Gotham Report claims.

171.     Defendants' use of this inflated figure reveals that their goal in publishing the Gotham Report was to calculate as high of an "adjusted" leverage ratio for Grifols as they could. To get to the €1.313 billion figure, Defendants took *all* of Scranton's debt, as opposed to the debt that Scranton owes related to its acquisition of Haema and BPC Plasma. And Defendants knew this treatment was false because Grifols' 2019 and 2020 consolidated financial statements, which were filed with Grifols' Annual Reports on Form 20-F, expressly state that only debt related to the acquisition factors into the determination of the call option's price.

172.     It is also internally inconsistent for Defendants to attribute this hypothetical debt to Grifols because, according to the Gotham Report itself, Haema and BPC Plasma should *not* be consolidated. If that is so, Defendants' debt calculation should not include those entities' hypothetical debt, which is zero at any rate.[5]

173.     For each of these reasons, the Gotham Report presents a knowingly false and misleading "true debt" figure for Grifols.

> ii.  *Defendants' Adjustments to Grifols' EBITDA Accounting for Purposes of Calculating Grifols' Net Leverage are False, Misleading and Omit Key Information.*

174.     The Gotham Report presents the following "Adjusted EBITDA LTM [ending June 30, 2023] as per Credit Agreement" based on its assertion that Grifols' financials make an "overstatement" of its EBITDA:

| Adjusted EBITDA LTM as per Credit Agreement: breaking down the overstatement | |
| --- | --- |
| **EUR mln** | **LTM H1 2023** |
| **Adjusted EBITDA LTM as per Credit Agreement (stated by Grifols)** | **1,361** |
| Less: Estimated EBITDA attributable to NCIs | 274 |
| Less: cost savings, operating improvements and synergies on a run rate | 121 |
| Less: Restructuring costs * | 104 |
| Less: YoY change in "Other financial assets to related parties" and "loans to related parties" ** | 83 |
| Less: SRAAS 20% share of profit/(loss) divested | 38 |
| **GCR Adjusted EBITDA** | **741** |
| % delta | -45.6% |

Ex. 1 at 14.

175.     The Gotham Report's statement that Grifols' "true" EBITDA is overstated by 46% and should be adjusted from €1.361 billion to €741 million is baseless. This is confirmed by a simple analysis of the calculation Defendants conducted to reach these figures. When Defendants' calculations are scrutinized, it is apparent that Defendants are misrepresenting accounting

---

[5] To be clear, these entities' contributions to Grifols' EBITDA are appropriately consolidated in accordance with IFRS (as explained in the next section below), yet their (non-existent) debt still would not be consolidated under IFRS because it would be non-recourse debt to Grifols.

principles that Grifols is required to use in order to calculate its EBITDA under its Credit Agreement with its lenders.

176.    First, Defendants assert that Grifols' accounting of its supposed NCIs—GDS, BPC Plasma, and Haema—is "suspect" because Grifols does not have a claim to these entities' earnings: "[Grifols] fully includes earnings from NCI in its EBITDA per credit agreement, *despite not actually having claim to these earnings*." Ex. 1 at 4 (emphasis added). This statement is patently false for multiple reasons.

177.    As an initial matter, the Gotham Report's statement that GDS is "treated" as an NCI by Grifols is false. *See* Ex. 1 at 12. Instead, GDS is, and is "treated" by Grifols as, a majority-owned subsidiary given Grifols owns 55% of GDS' economic rights and 60% of its voting rights. Defendants implicitly concede as much based on their explanation of Grifols' *controlling* interests in GDS. *See, e.g.*, *id.* at 12-13. This demonstrates Defendants' false statements are deliberate.

178.    Moreover, Grifols does have a claim to the earnings for not only GDS as a majority-owned subsidiary, but also BPC Plasma and Haema as NCIs, based on IFRS and the definition of EBITDA in its Credit Agreement.

179.    Indeed, IFRS states that for purposes of Consolidated Financial Statements, "[w]hen assessing control, an investor considers its potential voting rights as well as potential voting rights held by other parties, to determine whether it has power. Potential voting rights are rights to obtain voting rights of an investee, such as those arising from convertible instruments or options, including forward contracts." *See* IFRS 10 – 2021 Issued IFRS Standards (Part A) at B-47.

180.    IFRS goes on to state, "[a]n entity **shall attribute** the **profit** or loss and each component of other comprehensive income to the owners of the parent **and to the non-controlling**

*interests*. The entity shall also attribute total comprehensive income to the owners of the parent and to the non-controlling interests even if this results in the non-controlling interests having a deficit balance." *Id.* at B-94 (emphasis added).

181.    Finally, IFRS states "that even despite having less than 50% of the voting shares in an investee, an investor may still have power over the investee if it has the practical ability to direct the relevant activities." https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/ ifrs_and_us_gaap_sim/ifrs_and_us_gaap_sim_US/chapter_12_consolida_US/124_consolidation _mo_US.html#pwc-topic.dita_313cc389-7672-45cf-8ddb-36cd8fba524a.

182.    Defendants ignore these accounting rules and contend that these entities should be removed from Grifols' EBITDA—contrary to IFRS—and therefore claim that €274 million should be subtracted.

183.    Breaking that figure down, Defendants first appear to deduct approximately €200 million from Grifols' EBITDA (for LTM ending June 30, 2023) because, supposedly, "Grifols' full inclusion of GDS onto GRF EBITDA overstates GRF's earnings power considerably." Ex. 1 at 12. That is false. Grifols' EBITDA is based off its financial statements, and IFRS requires majority owned subsidiaries to be consolidated on financial statements. Grifols controls 55% of the economic rights and 60% of the voting rights in GDS. Thus, as a majority-owned subsidiary, GDS *must* be consolidated into Grifols' EBITDA. As a result, the Gotham Report's adjusted EBITDA calculation is false.

184.    Then, the Gotham Report claims that BPC Plasma and Haema should not be consolidated and included on Grifols' EBITDA. But these NCIs are appropriately consolidated because Grifols controls them based on its call option rights and business management agreements.

As set forth above, this accounting treatment is appropriate in accordance with IFRS. Regardless, BPC Plasma and Haema account for only a small portion of Grifols' EBITDA.

185.     Next, the Gotham Report claims that Grifols' EBITDA calculation incorrectly adds back costs and expenses incurred by Grifols relating to cost savings, operating improvements, and synergies on a run rate because Grifols adjusts for €121 million in cost savings "that have yet to be realized." Ex. 1 at 13. Once again, there is nothing wrong with Grifols' calculation, including because it is consistent with the definition of "Consolidated Adjusted EBITDA" in the Credit Agreement:

> "Consolidated Adjusted EBITDA" means (a) Consolidated Net Income of the Parent and its Subsidiaries, plus, to the extent deducted in determining Consolidated Net Income of the Parent and its Subsidiaries the sum, without duplication, of amounts for . . . (xiii) **the amount of cost savings, adjustments, operating expense reductions, operating improvements and synergies, in each case on a "run rate" basis and in connection with Permitted Acquisitions, investments, restructurings, business optimization projects and other operational changes and initiatives ("Run Rate Amounts") that are identifiable and projected in good faith to result from actions that have been or are expected to be taken within twelve (12) months of such date of determination**; provided, that (x) the Administrative Agent shall have received a reasonably detailed statement or schedule of such Run Rate Amounts, (y) such amounts are reasonably identifiable, reasonably attributable to the actions specified and reasonably anticipated to result from such actions and (z) the benefits resulting therefrom are anticipated by the Borrowers to be realized within twelve (12) months of the end of such date on which Consolidated Adjusted EBITDA is tested…" *Id.* at 11 (emphasis added).

186.     In addition, the treatment of these costs and expenses in the related financial statements follows IFRS requirements. In Grifols' 2023 half-year results report, it announced that it had 100% deployed an operational improvement plan that would result in €450 million in annualized cost savings based on initiatives it took to reduce its plasma costs and enhance plasma operations. The Gotham Report's assertion that these cost savings were improperly added back to the calculation of EBITDA, and that Grifols' EBITDA is overstated by €121 million, is patently false.

187.    The Gotham Report next takes issue with how Grifols' EBITDA calculation adds back €104 million in restructuring costs. A restructuring cost is a one-time expense that a company pays when reorganizing its operation. For the 2022 fiscal year and the first half of 2023, Grifols incurred one-time restructuring costs of €36 million and €171 million, respectively. The Gotham Report arrives at the €104 million adjustment by taking the average of these two numbers, which were disclosed in Grifols' 2023 investor presentation. In short, the Gotham Report uses in its claim a made-up number that is not supported by any accounting principles. Grifols' 2023 investor presentation also states in multiple places that these figures are one-time restructuring costs. The Gotham Report completely ignores these disclosures and falsely states that Grifols "has been embarking on continual restructuring costs over a significant period of time [which] indicates that restructuring costs are an ongoing business expense[.]" Ex. 1 at 14 (emphasis added). Not only is it standard practice to add back non-recurring, one-off restructuring costs when calculating EBITDA, but the inclusion of these charges in such a calculation is explicitly mandated under the Credit Agreement's definition of [EBITDA]:

> "Consolidated Adjusted EBITDA" means (a) Consolidated Net Income of the Parent and its Subsidiaries, ***plus, to the extent deducted in determining Consolidated Net Income*** of the Parent and its Subsidiaries the sum, without duplication, of amounts for . . . ***(ix) non-recurring items (as determined in accordance with IFRS)*** realized other than in the ordinary course of business, without duplication, resulting in a loss . . . ." *Id.* (emphasis added).

188.    The Gotham Report's assertions that these restructuring costs are not one-off costs, and should not be accounted for as one-off costs, are simply false.

189.    Finally, the Gotham Report falsely states that Grifols' EBITDA calculation improperly adds back €83 million in "other financial assets to related parties" and "loans to related parties." Ex. 1 at 14. This statement is false on multiple levels.

190.    First, the €83 million figure is completely fabricated. It appears that Defendants calculated it by taking the average of the year-over-year change in these two accounts over the last four years. To say the least, this is not a valid accounting method under IFRS. It is a made-up figure.

191.    Second, "other financial assets to related parties" and "loans to related parties" are balance sheet items, not income statement items. EBITDA is an alternate measure fully derived from income statements, not balance sheets. Balance sheet items are never included in EBITDA calculations. Nor are items related to financings.

192.    Third, "other financial assets to related parties" and "loans to related parties" are financial results. They are not related to operations. Under the Credit Agreement, these items must be added back to the calculation of "Consolidated Adjusted EBITDA":

> "Consolidated Adjusted EBITDA" means (a) Consolidated Net Income of the Parent and its Subsidiaries, plus, to the extent deducted in determining Consolidated Net Income of the Parent and its Subsidiaries the sum, without duplication, of amounts for (i) *all financial results including interest expense, amortization or write-off of debt discount, other deferred financing costs, other fees and charges associated with Indebtedness* . . . [and] (x) *fees and expenses incurred in connection with the Transactions or, to the extent permitted hereunder, any Permitted Acquisition, Investment, Asset Disposition, or incurrence of Indebtedness, in each case, whether or not consummated, including such fees and expenses related to any offering of Additional Debt, any Credit Agreement Refinancing Indebtedness and any Permitted Refinancing Indebtedness* . . . ." *Id.* (emphasis added).

Accordingly, Grifols correctly reports its Consolidated Adjusted EBITDA and the Gotham Report's purported calculation is false.

193.    In sum, Grifols does not "manipulate[]…EBITDA to artificially reduce reported leverage" as Gotham led investors to believe. Ex. 1 at 4. Grifols complies with the EBITDA metric mandated under the Credit Agreement and follows accounting rules. Defendants must know this. Their claims to the contrary are malicious lies.

### D. Defendants' Lie that Grifols' Shares are "Uninvestable" and "Worthless."

194.    For the reasons discussed above, the Gotham Report's "calculation" of Grifols' "true leverage" is wildly off the mark. This exposes another core lie in the Gotham Report: that Grifols' equity is "uninvestable" and "worthless." Ex. 1 at 5, 51-52.

195.    This lie was meant to maximize panic in the market, especially among investors who did not read the entire Gotham Report, but only the headlines or Defendants' social media posts.

196.    Indeed, even if the Gotham Report were correct (it is not) that Grifols' "true leverage" ratio is "closer to 10x-13x," the company's implied equity value would still be nowhere near "worthless." The Gotham Report's calculations are based on its stated LTM EBITDA multiple of 15.3x at the time of the report and the low- and high-end of the report's adjusted EBITDA, the product of which results in their implied enterprise value. Subtracting the report's low- and high-end adjusted net debt from their implied enterprise values results in the implied equity value range of ~€1.6 billion to ~€5.3 billion:

**Gotham City's Adjustments to Grifols' Valuation**

| €in millions | Gotham City's Low End | Gotham City's High End |
|---|---|---|
| Grifols EV/Adj. EBITDA LTM multiple [D] | 15.3x | 15.3x |
| GCR Grifols Adj. EBITDA (LTM as at H 1 23) [G] | 928 | 741 |
| GCR Grifols Net Debt (LTM as at H 1 23) [H] | 8,919 | 9,767 |
| GCR Implied Grifols LTM Net Debt / Adj. EBITDA LTM multiple [I = H/G] | 9.6x | 13.2x |
| Implied Grifols Equity Value [J = D*G-H] | 5,280 | 1,571 |
| Implied Equity / Adj. EBITDA LTM multiple [K = D-I] | 5.7x | 2.1x |

197.    The Gotham Report also claims that Grifols' shares are "***worthless***" because Grifols' "debt ***is unsustainable***." Ex. 1 at 51 (emphasis added). Defendants state that if the markets were to reprice Grifols' debt based on Defendants' above-referenced, flawed calculations, Grifols' cost of debt—or the interest it would need to pay on borrowed loans—would increase to 10%. *Id.* at 52. Defendants go on to specifically state, as a factual assertion, that "[t]his ***clearly*** indicates that Grifols debt ***is unsustainable*** and shares are either ***worthless*** or will face significant dilution

54

in order to rightsize the debt burden to more sustainable levels via capital raising." *Id.* (emphasis added). This is another demonstrably false statement.

198.    As an initial matter, the Gotham Report's conclusion that Grifols ultimately will have to borrow more money at a higher interest rate is incorrect based solely on the fact that the report's leverage ratio calculation is based on demonstrably false assumptions and outright lies, as explained above.

199.    Likewise, this statement is also untrue because the cash proceeds generated from the previously discussed deleveraging transaction, the SRAAS divestiture, would be broadly sufficient to repay Grifols' interest on Grifols' notes that come due in 2025. Moreover, that debt has fixed interest rates. Additionally, beyond the interest payments due in 2025, the next set of principal repayments due on Grifols' debt is not due until November 2027. As a result, Grifols does not need to refinance these loans in the near-term.

200.    With the capital in-hand to cover unchanging interest rates on debt coming due in the next three years, Defendants' statement that Grifols' debt is "clearly ... unsustainable" is shown to be yet another lie. Ex. 1 at 52.

201.    Defendants' own behavior confirms that they never believed that Grifols' equity is worthless. If Defendants really thought that were so, they would not have raced to dump their short position after Grifols' share price had dropped by 43%, but instead would have waited until it had dropped by close to 100% (i.e., headed to zero). They, of course, did not do that since they knew Grifols' stock is not "worthless" and would not "head to zero."

### E.    Defendants' False Statements Regarding Grifols' Accounting Treatment for the Consolidation of BPC Plasma and Haema.

202.    Despite casting misleading aspersions as to the appropriateness of the sale of BPC Plasma and Haema to Scranton, and Grifols' continued consolidation of BPC Plasma and Haema

in its accountings, even Defendants are forced to admit that the transaction, the fact that Scranton is a related party, and the accounting reasoning which justifies consolidation, are all fully disclosed and explained in Grifols' Annual Reports on Form 20-F and its annual accounts filed with the CNMV. *See*, *e.g.*, Ex. 1 at 11 ("Grifols justifies this accounting treatment – i.e. fully consolidating BPC Plasma and Haema onto their financial statements, while owning zero percent of each – as the company claims (i) to possess a call option to buy the operations back from Scranton and (ii) exert full control over these two assets"; "The company provides the details in their 2018-2020 Annual Reports.").

203.   Indeed, in the 2018 Annual Report on Form 20-F, Grifols disclosed that, in December 2018, it "sold [its] 100% stake in Haema AG and [BPC Plasma] to Scranton Plasma B.V., one of [its] major shareholders and a related party, for a total of $538 million." 2018 Annual Report on Form 20-F at 111. Grifols S.A. further explained through its 2018 Annual Report on Form 20-F filing that the company "will have the ability to repurchase the shares sold to Scranton Plasma B.V. at any time" and that the company's Plasma Supply Agreement in place with Haema and [BPC Plasma] extended for a 30-year period, and as such, Grifols would "continue to operate the companies' plasma centers." *Id*. at 112.

204.   Regarding consolidation specifically, Grifols further disclosed in the Notes to its consolidated financial statements that "[t]he current sale of [BPC Plasma] and Haema to Scranton took place for the same price, at the current US Dollar/Euro exchange rate, and under the same terms and conditions existing when Grifols acquired both companies." *Id*. at F-21. Grifols further explained that, "[t]he sale of [BPC Plasma] and Haema has not resulted in a loss of control for the Group. In assessing the existence of control, Grifols has considered the potential voting rights to determine whether it has power and therefore control." Specifically, Grifols explained that the

company holds potential voting rights arising from the repurchase options of the shares, which are "substantive[,]" based on the following:

"●     The sale contract includes a call option for Grifols which grants the irrevocable and exclusive right (not an obligation) to be able to acquire the shares sold to Scranton (both at the same time) at any time from the effective date of sale.

●     The purchase option has been negotiated jointly in the same sale agreement of the entities.

●     The price of exercising the call option will be equal to the higher of: a) the price at which Grifols sold them plus costs incurred in the transaction and plus the increase in working capital and (b) the amount of the debt that Scranton owns the date on which Grifols exercises the option (principal plus interest plus any other cost to be able to cancel said loan). Considering that the projections for the entities are for growth and an improvement in their results is expected, it is concluded that said call option is "in the money" since their market price is estimated to be higher than that agreed in the call option.

●     Even if a nullity clause on the call option is included in the case of default by the buyer (standard clause included in financing agreements), it has been considered remote since Grifols will have the capacity to exercise said call option in the remediation period of 90 days.

●     There are no agreements between shareholders that establish that the relevant decisions are approved in a different manner than by majority vote.

●     There is a commitment from Grifols to provide support services in the plasma collection business of the donation centers for their subsequent sale and thus ensure that these companies will continue to operate effectively, as well as ensuring the continuity and growth of said entities. Likewise, there is a 'Plasma Supply Agreement' agreement whereby the plasma to be produced by these entities will be almost entirely to meet the needs of Grifols. There is no exclusivity of sale." *Id.*, F-2–F-22.

205.     Grifols explained that it determined that the "aforementioned are indicators of Grifols' power over these entities, even after their sale, considering that the repurchase options are susceptible to being exercised and Grifols would have the financial capacity to carry them out" and "[c]onsequently, the sale of the entities does not result in a loss of control, which is why the

entities continue to consolidate, recording the sale as a transaction in equity without any impact on the consolidated statements of profit and loss." *Id*. at F-22.

206.   The same detailed disclosures both as to the details of the sale, the relatedness of the parties, and the reason for Grifols' continued consolidation of BPC Plasma and Haema, pursuant to and consistent with IFRS, are also made in Grifols' 2020 Annual Report on Form 20-F (at 49, 69, 82, 121, F-16, and F-25–F-26) and its 2020 Annual Report on Form 20-F (at 119, F-17, and F-31–F-32).

207.   The fact that the details of the transaction, and the reasoning behind the consolidation, have been repeatedly reviewed by independent auditors *without correction* or any type of qualification to the auditors' reports demonstrates that the justification is not a "claim" dishonestly made by Grifols, but a correct and appropriate application of IFRS.

208.   However, rather than simply acknowledge that the justification for consolidation is fully explained in Grifols' annual accounts, reports and regulatory filings, Defendants instead make a material misstatement regarding the company's disclosures, claiming that "Grifols does not provide any explanation as to how the company fully consolidates BPC Plasma and Haema, despite owning zero percent of each, in its 2021 and 2022 [A]nnual Reports." Ex. 1 at 11. The Gotham Report doubles down on its false allegation by claiming that the purported "disappear[ance]" of the details found in the 2018-2020 Annual Reports "regarding the BPC Plasma/Haema transaction" from "the Grifols 2021 and 2022 Annual Reports" makes it so that "if a new investor were to evaluate Grifols, we don't see how they would [not] know that Grifols fully consolidate BPC Plasma and Haema (which account for a very large portion of earnings), while owning zero percent of each entity." Ex. 1 at 17.

209.     Although the financial statements attached to the 2021 and 2022 Annual Reports on Form 20-F did not explain the consolidation in the same way as prior reports, the fact that BPC Plasma and Haema are fully consolidated *is* disclosed in such filings, so contrary to what Gotham asserts, "new" investors would plainly know that Grifols consolidates the earnings of those entities.

210.     In Note 3 to the Grifols financial statements attached to Grifols' 2021 Annual Report on Form 20-F, it clearly indicates that Appendix I to such financial statements contains all consolidated subsidiaries, and *BPC Plasma and Haema are listed therein*. Grifols also explains in general terms (at F-32) the basis of consolidation, including the possibility to exert control through call option rights. Indeed, earlier in the filing (at 122-123), Grifols specifically discloses that the company sold its 100% stake in BPC Plasma and Haema to Scranton in 2018, and further discloses the right to repurchase BPC Plasma and Haema shares.

211.     Similarly, in Grifols' 2022 Annual Report on Form 20-F, Grifols again includes BPC Plasma and Haema on the list of consolidated subsidiaries (at F-31). Again, Grifols repeats its general explanation of the basis for consolidation, including the possibility to exert control through call option rights (at F-43). And just as in 2021, this is not the only mention of the justification for consolidation – the 2022 Annual Report on Form 20-F discloses (at 129) that Grifols sold 100% of its shares in those companies, and informs of the right to repurchase BPC Plasma and Haema shares in multiple places.

212.     It is therefore plainly false that "Grifols does not provide any explanation as to how the company fully consolidates BPC Plasma and Haema" in its 2021 and 2022 Annual Reports. Ex. 1 at 11. And it is equally false that a potential investor would have no way to know that BPC Plasma and Haema are consolidated or would not be able to identify the general basis for such

consolidation, based on Grifols' 2021 and 2022 Annual Reports on Form 20-F, given that those facts and explanations are found therein.

### F. Defendants' False Statements Regarding Grifols' Consolidation of GDS.

213.    The Gotham Report claims that "Grifols' full inclusion of GDS [Grifols Diagnostic Solutions] onto GRF EBITDA overstates GRF's earnings power considerably." Ex. 1 at 12. It also asserts that Grifols' EBITDA "includes income the company has no claim to, i.e., non-controlling interests." *Id.* at 8.

214.    It is false that Grifols' inclusion of GDS "overstates" Grifols' earnings power. It is also false that Grifols has no claim to GDS' income. As mentioned, GDS is a majority-owned subsidiary of Grifols. As such, inclusion of GDS follows IFRS and therefore contributes to the *accurate* calculation of Grifols' earnings power.

215.    As disclosed in Grifols' 2019 Annual Report on Form 20-F (at F-15), in "March 2019, Grifols entered into a shares exchange agreement with Shanghai RAAS Blood Products Co. Ltd. (hereinafter SRAAS), through which Grifols should deliver 90 shares of its US subsidiary Grifols Diagnostic Solutions Inc. (hereinafter GDS) (representing 45% of the economic rights and 40% of the voting rights), and in exchange should receive 1,766 million of SRAAS shares (representing 26.2% of the share capital)."

216.    The above-mentioned Annual Report on Form 20-F explains that "Grifols will retain the control of GDS through the retention of the 55% of the economic rights and 60% of the voting rights and shares received of SRAAS will be considered as an investment in an associate because Grifols will have a significant influence according to IAS 28 – Investment in Associates and Joint Ventures." *Id.*

217.    As Grifols explains, "[t]he delivery of GDS shares had no impact on the consolidated results of Grifols Group according to IFRS 10 – Consolidated Financial Statements,

since it is considered a transaction with non-controlling interest where Grifols retained control over GDS." *Id*. "The impact in the Consolidated balance sheet at 31 December 2019 resulted in an increase of: Other Current Financial Assets amounting to EUR 1,717 million (note 12); Non-controlling Interests amounting to EUR 1,511 million (note 18); Retained Earnings amounting to EUR 227 million (note 16), a decrease in translation differences for an amount of Euros 22 million and a benefit in the consolidated statement of profit and loss from fiscal year 2019 amounting Euros 1 million related to the change in the contractual right value (note 27)." *Id*.

218.   The explanation of the transaction and the consolidation has been explained in every Grifols Annual Report on Form 20-F filed since the date of the transaction. 2020 Annual Report on Form-F at F-67, note 11; 2021 Annual Report on Form-F at F-65, note 11; 2022 Annual Report on Form-F at F-57, note 10.

219.   And as discussed above, the full inclusion of GDS onto Grifols' EBITDA was appropriate and indeed required, because IFRS requires GDS to be consolidated on Grifols' financial statements as a majority-owned subsidiary. Grifols' earnings power therefore is not "overstated" as a result of its inclusion.

### G. Defendants' False Statements About the Immunotek Transaction.

220.   Much of the Gotham Report is spent calling into question payments made by Grifols to obtain source plasma through the construction, development, opening, and operation of 28 plasma collection centers in the United States in collaboration with the U.S. firm ImmunoTek Bio Centers LLC ("ImmunoTek"). Ex. 1 at 41-47.

221.   This transaction had a simple purpose: to collaborate with ImmunoTek to develop centers to collect plasma, such that Grifols would obtain an annual run rate of over 1.5 million liters of plasma after an initial three-year period. In fact, after only one and a half years, the collaboration already has an annual run rate of over 1 million liters of plasma. This collaboration

is intended for Grifols to further expand its plasma availability to meet anticipated robust demand and to guarantee the supply of essential plasma therapies for patients who need them.

222.    Pursuant to the collaboration agreement with ImmunoTek, Grifols agreed to make advance payments to ImmunoTek to offset the costs of constructing, developing, and operating 28 new plasma centers contemplated by the agreement, including costs to ramp up collections to the agreed annual run rate. In fact, the costs of ramping up the centers' collection activities requires significant investment well beyond the simple costs of construction or site improvements. Among many others, for example, plasma collected during the period prior to licensing cannot be sold or otherwise used for further manufacture until the individual center is fully licensed by FDA, and the cost of ramping up to an increased plasma collection volume requires fixed costs well beyond that which can be absorbed by the collections during the ramp up period.

223.    The Gotham Report claims that "Grifols' EUR124 million advanced payment to Immunotek appears to be an unexplained outflow of cash not relate[d] to the development of these centers." Ex. 1 at 4. The Report repeatedly asserts that the advanced payment is not for the plasma centers at all and instead is an "unexplained outflow of cash," based on the false premise that the plasma centers cost only $3 million to construct. *Id.* at 34 ("GRF paid ~15 million per center for Bio Products centers. Our investigation reveals that it cost $3 million per center to construct these centers. We are unable to reconcile this 5x difference."); *id.* at 41 ("We believe that this EUR124 million advanced payment does not relate to the development of these centers; rather we see the payment as an unexplained outflows of cash"; "We cannot reconcile the actual evolution of the Immunotek-Freedom Plasma project with a EUR 124 million payment"); *id.* at 42 ("Surprisingly though, in their 2022 Annual Report, Grifols disclosed a large increase in advance payments relating to the Immunotek / Freedom Plasma project of EUR124.1 million, up nearly 3x from

EUR42.3 million in 2021. It makes no sense that, more than 4 months after all 21 centers were already open and accepting donations, Grifols still recognized an additional EUR124 million "advanced payments related to this project" on its balance sheet").

224.    The Gotham Report's statements are false on two levels. First, the Gotham Report deliberately mischaracterizes the ImmunoTek transaction as a deal to "construct plasma centers." Ex. 1 at 44. But as noted, the transaction's purpose was to collaborate with ImmunoTek to obtain source plasma through the construction, *development, opening, and operation of* the centers, so that Grifols could *obtain over 1.5 million liters per year in plasma* by the end of the three-year period. The costs relating to this project are not limited to constructing centers. Anyone who understands Grifols' business would know this.

225.    Second, even if the transaction were limited to building new centers, the Gotham Report's statements that "it cost[s] $3 million per center to construct these centers" (Ex. 1 at 34, 35, 44) are knowingly false and misleading.

226.    These lies further expose Defendants' malicious intent in issuing the Gotham Report. Defendants could have reached out to Grifols prior to its publication of the report and ask that Grifols explain these supposedly "unexplained" cash outflows. Defendants chose not to do so because they had no desire to present the truth.

227.    Defendants knew that their assertions were false and misleading. Defendants' questioning of Grifols' commitment to expanding plasma donation in order to increase the supply of essential, lifesaving therapies—the very heart of Grifols' mission—was calculated to defame the company, to create the false impression that the company's very core mission is a sham, and to deceive its shareholders into selling their shares to drive the stock price down, all so that Defendants could maximize their own unjustly gained profits on their short position.

## V.        HARM TO GRIFOLS AND ITS SHAREHOLDERS

228.    Precisely as Defendants schemed, the release of the Gotham Report caused serious financial damage to Grifols and tanked its stock price.

229.    The night before Defendants released the Gotham Report, Grifols Class A shares closed on the BME at €14.24 a share. Class B shares closed on the BME at €10.11 a share, and on the NASDAQ at $11.13 a share.

230.    Following Defendants' publication of the Gotham Report, Class A shares plummeted to €10.55 – a total loss in value of 26% in just one day. Class B shares fell to €7.59 on the BME (a 25% decrease), and to $8.70 on the NASDAQ (a 22% decrease).

231.    Grifols' response to Defendants' scheme to manipulate the market and cheat shareholders for Defendants' own financial gain has been as swift and complete as possible. On January 11, 2024, Grifols' CEO categorically denied and rejected all the allegations made in the Gotham Report. But the damage could not so easily be undone.

232.    Despite Grifols' assurances to investors of the falsity of the Gotham Report, share values continued to drop throughout the week. A further drop of 10% on Friday brought the weekly loss to nearly 40% for Grifols' shareholders. That fall represents Grifols' worst week on record in its entire history since going public in 2003. As of the date of this filing, Grifols' stock continues to trade at a share price far below its pre-Gotham Report price. Having suffered billions in losses as a direct result of Defendants' intentional, fraudulent, self-serving conduct, Grifols' thousands of shareholders can and should initiate their own lawsuits against Defendants.

233.    Grifols' shareholders are not the only victims of Defendants' scheme. The damage to Grifols' reputation is substantial. In the Gotham Report, Defendants falsely accuse Grifols of manipulating its financial metrics, misrepresenting its leverage, deceiving current and potential investors, engaging in undisclosed self-dealing, and defrauding regulatory agencies. In reality, it

is Defendants who have engaged in a fraudulent scheme to deceive investors and regulators. The Gotham Report misrepresents Grifols' value to shareholders, falsely denigrates the integrity, transparency, and independence of Grifols' Directors and management, and fed materially false information about the company to the investing public.

234.    Grifols has expended substantial resources to refute Defendants' false accusations, including to investigate, analyze, and outline the falsity of the Gotham Report.

235.    Grifols has also been forced to take steps to prepare to defend against potential civil litigation spurred by the Gotham Report, including class actions. In the United States, no fewer than 13 plaintiffs' law firms announced their intent to sue Grifols over the false allegations made in the Gotham Report. Facing material litigation that is only made possible by Defendants' falsehoods is expected to generate significant ongoing costs.

236.    Nor is the harm to Grifols' reputation a theoretical one. The dragging through the mud of Grifols' integrity and reliability is expected to manifest itself in the form of lost business opportunities, lost profits as hospitals and other clients refuse to work with the company and its subsidiaries (including both Plaintiffs), difficulty in recruiting a talented salesforce, and the increased costs of borrowing, as creditors increase interest rates to account for the potential uncertainty in lending to a company which has been seemingly "exposed" as engaging in false and deceptive business practices.

237.    The impacts of the damage done by the Gotham Report do not extend only to Grifols S.A. As wholly owned subsidiaries who share the Grifols name, damage to Grifols S.A.'s reputation equally damages the reputations of Grifols Shared Services North America, Inc., and its subsidiaries.

238.    Additionally, Grifols Shared Services North America, Inc. is directly harmed by the damage done by the Gotham Report by virtue of the fact that it is one of the guarantors of indebtedness for the bonds issued by Grifols S.A. Grifols Shared Services North America, Inc. is also a creditor on the Credit Agreement. When that debt must be refinanced, the increased cost to do so—the result of the Gotham Report's false representation to the market that Grifols is a risky borrower—will equally impact Grifols Shared Services North America, Inc. as a guarantor of the bonds. The increased cost of financing will also impact the operations of Grifols Shared Services North America, Inc., which is funded by Grifols S.A.'s indebtedness.

239.    Grifols has had to engage in a lengthy and expensive investigation to demonstrate the falsity of Defendants' accusations and its impact on Grifols and continues to uncover the financial and reputational damage that Defendants' conduct has caused. Such damages will be quantified through expert analysis and discovery.

## CAUSES OF ACTION

## COUNT I

## Defamation – Libel and Defamation by Implication (Against Daniel Yu and Gotham Research LLC)

240.    Grifols repeats and realleges the allegations set forth above as though fully set forth herein.

241.    Yu and Gotham authored, published, and widely disseminated, without privilege or authorization, the Gotham Report.

242.    The Gotham Report contains false statements of fact.  Representative false and defamatory statements are referenced in Section IV and elsewhere in this Complaint.

243.    Yu and Gotham authored and caused to be published and broadly disseminated to the public these false and defamatory statements without sufficient factual bases for making

the statements and did so with knowledge of their falsity, or at the very least, with reckless disregard for their truth or falsity. Yu and Gotham acted with malice.

244.    Yu and Gotham devised a scheme to fabricate and disseminate the false and defamatory statements to numerous persons, including all persons who accessed the Gotham Report on Gotham's website (www.gothamcityresearch.com), all persons to whom Yu and Gotham circulated the Gotham Report, and Grifols' potential equity and debt investors.

245.    Yu and Gotham knew, or should have known, the statements were false when made.

246.    Yu and Gotham authored and published these false and defamatory statements, and Yu and Gotham conspired to disseminate them, for the purpose of manipulating Grifols' stock price to benefit Yu and Gotham's short-and-distort scheme.  Yu and Gotham's actions have damaged Grifols' reputation and caused Grifols to suffer lost profits, lost business opportunities, and incur substantial expenses, including:  (i) defending itself against anticipated securities class action lawsuits; (ii) conducting comprehensive investigations to demonstrate the falsity of Gotham's accusations and its impact on Grifols; (iii) responding to inquiries from regulatory bodies concerning the truth and substance of the Gotham Report; and (iv) damaging Grifols' reputation and relationships with, among others, its equity investors, potential investors, sell-side analysts, debt investors, banks, auditors, lawyers, customers, and suppliers.

247.    The false and defamatory statements authored, published, and disseminated by Yu and Gotham falsely suggest that Grifols has been engaging in behavior incompatible with the proper ethical or professional conduct of its business trade and thus constitute libel *per se*.

248.    Grifols has suffered, and continues to suffer, damages as a direct and proximate result of the false and defamatory statements in an amount to be determined at trial.

249.    In addition, Yu and Gotham have engaged in willful and malicious conduct, or conduct that manifests a knowing and reckless indifference toward, and disregard of, the rights of Grifols.

250.    In the alternative, Grifols pleads defamation by implication. The Gotham Report contains false suggestions, impressions, and implications. By omitting and strategically juxtaposing key facts—especially related to, for example, their inaccurate calculation of Grifols' debt ratio and its alleged "true debt," and the false statements regarding various consolidations and advances made by Grifols—Defendants Yu and Gotham authored communications that reasonably conveyed a defamatory inference that Grifols had been dishonest in its disclosures and about the overall financial health of the company.

251.    Yu and Gotham intended to convey the defamatory implication. The Gotham Report authored by Yu and Gotham affirmatively and contextually suggested that they intended or endorsed the defamatory interest. As detailed in Section IV, Gotham claimed that Grifols' shares were "uninvestable" and called Grifols' accounting practices "deceptive," among other accusations. Shortly after the publication of the Gotham Report, Yu confirmed his defamatory intent by selling a large portion of his short position in Grifols, cashing in on his defamatory statements.

252.    As a result of Defendants' wrongful conduct, both Grifols plaintiffs have experienced a disruption to their business and have suffered reputational harm that will impair their ability to do business in the United States. In particular, the reputational harm that they have suffered has lowered their standing with and the morale of their employees, and will make it more challenging, and more expensive, to enter business agreements with suppliers, lenders, customers, potential acquirees, and others.

253.    As a result of such conduct, Grifols is entitled to an award of exemplary and punitive damages against Defendants, and all costs, expenses, and attorneys' fees incurred in these proceedings by Grifols.

## COUNT II

### Aiding and Abetting Defamation – Libel and Defamation by Implication (Against General Industrial Partners LLP and Cyrus De Weck)

254.    Grifols repeats and realleges the allegations set forth above as though fully set forth herein.

255.    Upon information and belief, GIP and De Weck knowingly participated in and substantially assisted Gotham and Yu in publishing statements regarding Grifols in the Gotham Report.

256.    Each of the Gotham Report's statements identified herein as false is reasonably understood by those persons who read or heard them to cast doubt upon the professional integrity, business practices and reputation of Grifols.

257.    These statements in the Gotham Report, by necessary implication, regarding Grifols, were false, misleading, and defamatory.

258.    These statements in the Gotham Report, by necessary implication, regarding Grifols, are defamatory per se, in that they impugn the basic integrity, creditworthiness and competence of Grifols.

259.    These statements were made with malice, in that they were made with actual knowledge of their falsity or reckless disregard for the truth or falsity of the statements.

260.    GIP and De Weck's substantial assistance and encouragement was a substantial factor in causing the defamatory statements to be published and the damage to Grifols that flowed therefrom.

261.    The foregoing conduct constitutes aiding and abetting defamation and libel per se under the common law of the State of New York.

262.    This conduct has caused the Grifols substantial damage to its worldwide professional reputations and damage and injury to its business and property.

263.    The conduct as aforesaid has caused great and irreparable injury to Grifols, and unless corrective action is ordered, Grifols will continue to suffer great and irreparable injury, including, but not limited to, their continued loss of value.

## COUNT III

## Tortious Interference With Business Relations (Against Daniel Yu and Gotham City Research LLC)

264.    Grifols repeats and realleges the allegations set forth above as though fully set forth herein.

265.    Grifols has business relationships with, among others, its equity investors, sell-side analysts, debt investors, banks, auditors, lawyers, customers, and suppliers.

266.    Yu and Gotham have been, at all relevant times, aware of Grifols' business relationships with, among others, its equity investors, sell-side analysts, debt investors, banks, auditors, lawyers, customers, and suppliers. This awareness is demonstrated by, among other things, Yu and Gotham's assertions that they have reviewed Grifols' financial statements that reference these relationships.

267.    As set forth above, Yu and Gotham made false and defamatory statements about Grifols' business practices, and Yu and Gotham conspired to fabricate, publish, and disseminate those false and defamatory statements broadly to the public. Their intent was to manipulate the market in an illegal manner. This is tortious misconduct.

268.    By making false and defamatory statements about Grifols' business practices in the Gotham Report, Yu and Gotham intentionally interfered with Grifols' business relationships with, among others, its equity investors, sell-side analysts, debt investors, banks, auditors, lawyers, customers, and suppliers.

269.    Yu and Gotham acted solely out of malice, or in the alternative, Gotham and Yu used dishonest, unfair, or improper means to interfere with Grifols' business relationships with its auditors, stockholders, investors, and financiers.

270.    Yu and Gotham acted with the sole purpose of harming Grifols by causing its stock price to fall, which in turn, was intended solely to benefit Yu and Gotham financially by permitting them to cover their short positions at a profit.

271.    Yu and Gotham's actions have damaged Grifols' business relationships by calling into question the accuracy and completeness of Grifols's financial disclosures, which caused Grifols' stockholders to sell their stock resulting in a massive decline in Grifols' market capitalization. Specifically, on January 8, 2024, Grifols' market capitalization stood at approximately €8.6 billion. Then, on January 9, 2024, a day after the Gotham Report was released, Grifols' market capitalization closed at €6.4 billion. Defendants' lies caused a €2.2 billion drop in Grifols' market capitalization in a single day. Periodic drops to Grifols' market capitalization continued thereafter. For example, as of January 11, 2024, Grifols' market capitalization was €6 billion. Then, at the close of January 16, 2024, Grifols' market capitalization stood at €5.4 billion. As of January 25, 2024, Grifols' market capitalization was approximately €5.7 billion.  The full repercussions of the harm to Grifols' reputation are yet to be determined and could include financiers refusing to extend loans and other lines of credit to Grifols completely or without Grifols agreeing to paying higher interest rates, resulting in higher capital costs for Grifols.

272.     Grifols has suffered, and continues to suffer, damages as a direct and proximate result of the false and defamatory statements in an amount to be determined at trial.

273.     In addition, the foregoing conduct of Yu and Gotham is the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and disregard of, the rights of Grifols.

274.     As a result of Defendants' wrongful conduct, both Grifols plaintiffs have experienced a disruption to their business and have suffered reputational harm that will impair their ability to do business in the United States. In particular, the reputational harm that they have suffered has lowered their standing with and the morale of their employees, and will make it more challenging, and more expensive, to enter business agreements with suppliers, lenders, customers, potential acquirees, and others.

275.     As a result of such conduct, Grifols is entitled to an award of exemplary and punitive damages against Yu and Gotham, and all costs, expenses, and attorneys' fees incurred in these proceedings by Grifols.

## COUNT IV

## Aiding and Abetting Tortious Interference With Business Relations (Against General Industrial Partners LLP and Cyrus De Weck)

276.     Grifols repeats and realleges the allegations set forth above as though fully set forth herein.

277.     Upon information and belief, GIP and De Weck knowingly participated in and substantially assisted Gotham and Yu in publishing statements regarding Grifols in the Gotham Report.

278.    Each of the Gotham Report's statements identified herein as false is reasonably understood by those persons who read or heard them to cast doubt upon the professional integrity, business practices and reputation of Grifols.

279.    By providing making false and defamatory statements about Grifols' business practices in the Gotham Report, Yu and Gotham intentionally interfered with Grifols' business relationships with, among others, its equity investors, sell-side analysts, debt investors, banks, auditors, lawyers, customers, and suppliers.

280.    GIP and De Weck substantially assisted Yu and Gotham in making the false and defamatory statements about Grifols' business practices in the Gotham Report by providing financial assistance, information, analysis and/or encouragement to Yu and Gotham.

281.    GIP and De Weck's substantial assistance and encouragement was a substantial factor in causing the interference by Yu and Gotham with Grifols' business relationships with, among others, its equity investors, sell-side analysts, debt investors, banks, auditors, lawyers, customers, and suppliers.

282.    The foregoing conduct constitutes aiding and abetting tortious interference with business relations under the common law of the State of New York.

283.    This conduct has caused the Grifols substantial damage to its worldwide professional reputations and damage and injury to its business and property.

284.    The conduct as aforesaid has caused great and irreparable injury to Grifols, and unless corrective action is ordered, Grifols will continue to suffer great and irreparable injury, including but not limited to their continued loss of value.

## COUNT V

## Unjust Enrichment (Against All Defendants)

285.    Grifols repeats and realleges the allegations set forth above as though fully set forth herein.

286.    Defendants were impermissibly and unfairly enriched by their aforesaid tortious and improper conduct, at Grifols' detriment and expense.

287.    Equity and good conscience militate against permitting Defendants to retain the benefits of their tortious and improper conduct.

288.    By the aforementioned actions and/or omissions, Defendants have been and will be unjustly enriched at Grifols' expense.

289.    Defendants are also liable to Grifols for damages in amounts to be determined by the Court to be just and equitable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.    For an Order and Judgment which:

   a.  Permanently enjoins and restrains Defendants and their alter egos, and their officers, members, directors, agents, servants, employees, confederates, and all persons acting for, with, by, through or under them, from publishing, causing to be published, or disseminating any further false and defamatory statements concerning Plaintiffs;

   b.  Requires Defendants and their alter egos, and their officers, members, directors, agents, servants, employees, confederates, and all persons acting for, with, by, through or under them, to immediately remove all false and defamatory statements concerning Plaintiffs; and

   c.  Requires Defendants to publish a retraction of their previous false and defamatory statements for such a period as the Court may direct.

2.    For an Order and Judgment in favor of Plaintiffs, against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, including:

a.   Compensatory money damages in an amount to be determined at trial;

b.   An award of Defendants' unjustly gained profits;

c.   Punitive damages in an amount sufficient to deter further wrongful and improper conduct;

d.   Costs and expenses incurred in connection with this action, including reasonable attorneys' fees to the extent available under any applicable law;

e.   Prejudgment interest at the maximum legal rate applicable to a judgment issued by this Court; and

3.   For an award of such other and further relief as this Court deems just and proper.

## **<u>JURY TRIAL DEMAND</u>**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues triable by jury.

Dated:    January 26, 2024

**PROSKAUER ROSE LLP**

By:    */s/ Peter D. Doyle*

Peter D. Doyle
Jeff Warshafsky
William T. Walsh, Jr. (*Pro Hac Vice* Admission
Forthcoming)
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3000
pdoyle@proskauer.com
jwarshafsky@proskauer.com
wwalsh@proskauer.com

Kelly M. Curtis (*Pro Hac Vice* Admission
Forthcoming)
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3010
Telephone: (310) 557-2900
kcurtis@proskauer.com

*Counsel for Plaintiffs Grifols,*
*S.A. and Grifols Shared Services*
*North America, Inc.*

76