## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GRIFOLS, S.A. and GRIFOLS SHARED SERVICES NORTH AMERICA, INC., | Index No. 1:24-cv-00576-LJL |
| Plaintiff, | |
| v. | |
| DANIEL YU, GOTHAM CITY RESEARCH LLC, GENERAL INDUSTRIAL PARTNERS LLP, and CYRUS DE WECK, | |
| Defendant. | |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
### MOTION TO DISMISS THE FIRST AMENDED COMPLAINT (Dkt. 22)

Dated: October 22, 2024

*/s/ David S. Korzenik*
David S. Korzenik
Gillian Vernick

**MILLER KORZENIK**
**SOMMERS RAYMAN LLP**
1501 Broadway, Suite 2015
New York, New York 10036
Tel: 212-752-9200
dkorzenik@mkslex.com

*Attorneys for Defendants*
*Gotham City Research,*
*Daniel Yu, General Industrial*
*Partners LLP and*
*Cyrus de Weck*

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** ................................................................................................ 1

**ARGUMENT** ............................................................................................................................. 4

   I.   GRIFOLS' FAILURE TO PLAUSIBLY PLEAD A DEFAMATION CLAIM
       WARRANTS DISMISSAL WITH PREJUDICE. ........................................................... 4

    A.  Defendant's Statements About a Publicly Traded Company Are Protected Opinion and
       Not Actionable as a Matter of Law. ..................................................................................... 5

       i. Report Explicitly States That It Contains Financial Opinions by Interested Short
         Investors and Thereby Signals Opinion. ................................................................... 6

       ii. Qualifying Phrases and Language of Assessment and Conjecture Signals to
         Readers That Report is Opinion. ............................................................................... 8

       iii. Report Cites Facts and Publicly Available Documents Upon Which Opinions Are
         Based and Does Not Imply Undisclosed Facts. ...................................................... 11

    B.  Gotham's Statements About Grifols Are Substantially True and Not Actionable as a
       Matter of Law. ................................................................................................................... 22

    C.  FAC Fails to Allege Facts to Support Plausible Inference that Defendants Published Each
       Statement with "Actual Malice." ...................................................................................... 25

II.     GRIFOLS ADDITIONAL CLAIMS ARE SIMILARLY MERITLESS. ........................ 29

    A.  Grifols's Allegations Do Not Amount to Tortious Interference with Business. ............... 30

    B.  Plaintiff Fails to Plead Actionable Underlying Tort for Aiding and Abetting Claims. .... 30

    C.  Plaintiff's Unjust Enrichment Claim Improperly Merges into Defamation Claim. .......... 31

    D.  Many Statements are Not Defamatory, FAC Fails to Plead Libel By Implication. ......... 32

    E.  No Plausible Pleading to Justify GSSNA Standing as a Plaintiff in Libel Case. ............. 32

**CONCLUSION** ...................................................................................................................... 32

# TABLE OF AUTHORITIES

**CASES**

*16 Casa Duse, LLC v. Merkin*
    791 F.3d 247 (2d Cir. 2015)................................................................. 30

*Adelson v. Harris*
    774 F.3d 803 (2d Cir. 2014)................................................................... 9

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009)............................................................................. 26

*Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC,*
    151 F. Supp. 3d 287 (E.D.N.Y. 2015) ............................................... 7

*Biro v. Conde Nast,*
    883 F. Supp. 2d 441 (S.D.N.Y. 2012) ............................................... 4

*Biro v. Condé Nast,*
    963 F. Supp. 2d 255 (S.D.N.Y. 2013) .................................... passim

*Brian v. Richardson,*
    87 N.Y.2d 46 (1995) ........................................................................... 19

*Cassava Scis., Inc. v. Bredt,*
    No. 1:22-CV-9409-GHW, 2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024)....... 5, 11, 28, 29

*Catskill Dev., L.L.C. v. Park Place Ent. Corp.,*
    547 F.3d 115 (2d Cir. 2008)................................................................ 30

*Celle v. Filipino Rep. Enterprises Inc.,*
    209 F.3d 163 (2d Cir. 2000)............................................ 4, 5, 26, 29

*Chau v. Lewis,*
    771 F.3d 118 (2d Cir. 2014)..................................................... 9, 19, 24

*Cooper v. Anheuser-Busch, LLC,*
    553 F. Supp. 3d 83 (S.D.N.Y. 2021) ............................................... 31

*Deer Consumer Products, Inc. v. Little Group,*
    No. 650823/2011, 2012 WL 5983641 (N.Y. Sup. Ct. 2012)............................ 30

*Dfinity Found. v. New York Times Co.*
    702 F.Supp.3d 167 (S.D.N.Y.) ................................................. 2, 4, 5

*DiLorenzo v. New York News, Inc.*,
    78 A.D.2d 669 (1980) ................................................................................. 27

*Eros Intern. PLC v. Mangrove Partners*,
    No. 653096/2017, 2019 WL 1129196 (N.Y. Sup. Ct. Mar. 8, 2019) ........................... 8, 14

*Fleckenstein v. Friedman*,
    266 N.Y. 19 (N.Y. 1934) ............................................................................ 23

*Garrison v. State of La.*,
    379 U.S. 64 (1964) ................................................................................... 26

*Gross v. New York Times*,
    82 N.Y.2d 146 (N.Y. 1993) ......................................................................... 19

*Guccione v. Hustler Mag., Inc.*,
    800 F.2d 298 (2d Cir. 1986) ........................................................................ 22

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989) ................................................................................. 28

*Hustler Magazine, Inc. v. Falwell*,
    485 U.S. 46 (1988) ................................................................................... 30

*Immuno AG v. Moor-Jankowski*,
    77 NY2d 235 (1991) ...................................................................... 2, 5, 10, 21

*In re Nanoviricides, Inc. v. Seeking Alpha, Inc.*,
    No. 151908/2014, 2014 WL 2930753 (N.Y. Sup. Ct. June 26, 2014) ..................... 6, 8, 11

*Kesner v. Down Jones & Co., Inc.*,
    515 F. Supp. 3d 149 (S.D.N.Y. 2021) ......................................................... 11, 17

*MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*,
    No. 17CV07568PGGKHP, 2018 WL 847014 (S.D.N.Y. Jan. 12, 2018) .................. passim

*Navarra v. Marlborough Gallery, Inc.*,
    No. 10CV7547BSJ-RLE, 2012 WL 13210272, (S.D.N.Y. Apr. 4, 2012) ...................... 31

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ......................................................................... 25, 26, 29

*Palin v. New York Times Co.*,
    482 F. Supp. 3d 208 (S.D.N.Y. 2020) ............................................................ 27

*Reliance Ins. Co. v. Barron's*,

442 F. Supp. 1341 (S.D.N.Y. 1977) .................................................................. 26

*Rinaldi v. Holt, Rinehart & Winston*,

    42 N.Y.2d 369 (N.Y. 1977) ......................................................... 12, 16, 28

*Sandals Resorts Intern. Ltd. v. Google, Inc*.,

    925 N.Y.S.2d 407 (1st Dep't 2011) ................................................. 6, 9, 22

*Silvercorp Metals Inc. v. Anthion Mgmt. LLC*,

    36 Misc. 3d 1231(A) (Sup. Ct. 2012) ...................................................... passim

*St. Amant v. Thompson*,

    390 U.S. 727 (1968) .......................................................................... 26, 28

*Steinhilber v. Alphonse*,

    68 N.Y.2d 283 (1986) ............................................................. 6, 11, 14, 17

*Stepanov v. Dow Jones & Co*.,

    987 N.Y.S.2d 37 (1st Dep't 2014) ............................................................ 32

*Tannerite Sports, LLC v. NBCUniversal News Grp*.,

    864 F.3d 236 (2d Cir. 2017)..................................................................... 23

*Ulrich v. Moody's Corp*.,

    No. 13-CV-8 (VSB), 2017 WL 1232709 (S.D.N.Y. Mar. 31, 2017)................ 31

*William Doyle Galleries v. Stettner,* 1

    67 A.D.3d 501 (1st Dep't 2018) ............................................................... 31

*Yangtze River Port and Logistics Ltd. v. Research,*

    No. 150721/2019, 2020 WL 905770 (N.Y. Sup. Ct. Feb. 25, 2020).......... 6, 7, 12, 13

## STATUTES

N.Y. Civil Rights Law § 76-a ................................................................................ 5

## PRELIMINARY STATEMENT

Defendants, Daniel Yu, Gotham City Research LLC, General Industrial Partners LLP, and Cyrus de Weck (collectively "Defendants" or "Gotham"), are business partners and financial investigative journalists who research and publish reports on public companies that are, in their opinion, overvalued and misunderstood by the market. In their reports, Gotham unequivocally discloses their short position on a particular company's stock to their sophisticated readers. Gotham publishes well researched financial news and analysis that many financial news organizations no longer have the resources or bandwidth to publish.[1] Gotham's reporting is in the public interest.

Defendants reported on Plaintiff Grifols S.A. ("Grifols," "GRF"), a publicly traded Spanish pharmaceutical and blood plasma collection company, in their Jan. 9, 2024 report, "*Grifols SA: Scranton and the Undisclosed Debts*" (the "Report"). Follow-up reports on GRF, including a Jan. 10 revision, responded to GRF's public statements and action against GRF by the Spanish financial regulator ("CNMV") requiring GRF to restate financial disclosures that the Report had called out as deficient. *See* Ex. B., Declaration of David S. Korzenik.

GRF admits in its First Amended Complaint ("FAC"), dkt. 22, at Para. 10:

> "[T]he CNMV only expressed concerns about (1) the detail and accuracy of select financial breakdowns and explanatory notes for certain reporting years, and (2) the detail provided alongside the reporting of Grifols EBITDA and debt-to-EBITDA ratio."

Remarkably, those are the same deficiencies that Gotham highlighted in its Report, and which surround the putative "falsehoods" alleged in the FAC.

---

[1] Defendants reported on EBIX and Lets Gowex, both later discredited. They shorted *Wirecard* an enterprise whose principals were later charged with financial crimes. Doing this kind of short reporting carries many risks: At first, European regulators took the side of Wirecard before its fall. Also, the subjects of short reports often sue for libel to intimidate those who might speak negatively about them or short their stock. Typically, those cases fail. Some of those cases are cited here. But they are costly and punitive.

GRF's libel action is a SLAPP suit, one brought in bad faith. Grifols' FAC with its defective and vexatiously blunderbuss pleading, is at its core an argumentative PR presentation. It does not even reach the allegedly defamatory statements (the "Statements") until page 40. There it *begins* its quarrels with the Report by "challeng[ing] the inferences drawn from the facts cited in the [] Report, rather than the facts themselves" - just as in *Dfinity Found. v. New York Times Co.* 702 F.Supp.3d 167, 176 (S.D.N.Y.), *aff'd,* No. 23-7838-CV, 2024 WL 3565762, at *1 (2d Cir. July 29, 2024) (dismissing libel claims against short report which accused Dfinity of a "massive crypto scam" and "violat[ing] securities laws," ruling the Report protected opinion).

When the FAC finally addresses the language in the Report, it strains to portray classic statements of opinion, broadly protected under New York's Constitution, as libelous. *Immuno AG v. Moor-Jankowski,* 77 NY2d 235 (1991)*, cert. denied,* 111 S.Ct. 2261 (1991)*.* The Report carries all the benchmarks of opinion. ***First***, it is based entirely on *publicly available documents*, mostly Grifols' own, quoted at length, cited in five pages of 125 endnotes and often hyperlinked, The Report's first page is a chart listing "*Gotham City Research's Opinions*" followed by a list entitled, "*Summary of the Bases of Opinions*," supported by the endnotes and appendix cites.

***Second***, the Report builds on a *transparent structure*: Each section begins with statements publicly made by GRF. Each section quotes or screenshots GRF's own financial statements at length and then critiques them based on other cited public documents and GRF financial statements. Each section follows that same progression. The reader is equipped to evaluate and then agree or disagree with the Report's opinions. This repeated pattern of citation and critique is *alone* dispositive of the opinion issue.

***Third***, the Report is laden with the language of belief, surmise, assessment and evaluation signaling opinion and estimation too many to count. For example, "[o]n the one hand, … on the

other hand," at 5, "we believe," at 7 "based on our assumptions," "our analysis," and "should our assumptions be wrong." *See infra* Sect. I.A.ii. The Report acknowledges the 20 analysts who have "buy ratings" for GRF and explains why Gotham disagrees, citing, among other things, Grifols' varying definitions of adjusted EBITDA. Adjusted EBITDA is not of a fixed meaning, as the name "adjusted" EBITDA indicates. Aside from the CNMV's conclusion that Grifols "must correct" its numerous and varied EBITDA calculations, *see* Ex. B., Korzenik Decl., the Report's appendix lists <u>all six</u> ways Grifols calculates its adjusted EBITDA, allowing readers to judge the merit and import of this changing definition. None of this can support a claim for libel.

**Fourth**, the *social context* of "short reports" is a well understood form of financial criticism and analysis. The Report's opening page discloses that Defendants held a short position in GRF, signaling to their sophisticated audience that the Report is opinion rather than fact. It is simply a part of the ever-contentious debate between those who are long versus short on a company's prospects. Their objective and overall character are understood in that clear light. This is the understood social context in which activist short reports are published, a context that makes their status as opinion even more obvious to their readers.

**Fifth**, the entire pitch and tenor of the FAC is an admission that the Report is opinion. As noted, the *FAC is a PR argument* over what *should* be inferred from GRF's public statements. The FAC tries to evade the opinion defense by reading each putatively libelous statement *in narrow isolation, out of its context*. GRF ignores Gotham's declared purpose: to assess the overall economic strength and sustainability of GRF's business. The Report's assessments of GRF's EBITDA, cash flow, debt and leverage ratio and their poorly illuminated related-party transactions are all part of an effort to assess that bigger picture. The Report is **not** about GRF's compliance with accounting disclosure rules and requirements. The FAC relies on this narrow

and squinty-eyed reading of isolated statements to evade the ultimate reality that the Report delivers broad opinion.

The bottom line is "courts must give the disputed language a fair reading in the context of the *publication as a whole*. Challenged statements are not to be read in isolation but must be perused as the average reader would against the whole apparent scope and intent of the writing." *Celle v. Filipino Rep. Enterprises Inc.,* 209 F.3d 163, 177 (2d Cir. 2000) (emphasis not added).

## ARGUMENT

### I.    GRIFOLS' FAILURE TO PLAUSIBLY PLEAD A DEFAMATION CLAIM WARRANTS DISMISSAL WITH PREJUDICE.

Grifols must plead *plausibly* each element of defamation: (1) a written defamatory statement of and concerning plaintiff, (2) publication to a third party, (3) fault [here *actual malice with clear and convincing evidence*], (4) falsity of the defamatory statement [which requires *factually specific pleading*], and (5) special damages or per se actionability. *Celle*, 209 F.3d at 176 (annotations added).

The 12(b)(6) stage scrutiny of libel claims calls for strict attention to plausible pleading requirements when free speech is at stake. "[T]here is particular value in resolving defamation claims at the pleading stage, so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 457 (S.D.N.Y. 2012). "In other words, in defamation cases, Rule 12(b)(6) not only protects against the costs of meritless litigation but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *Dfinity*, 702 F.Supp.3d at 173 (quoting *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013).

4

GRF's FAC fails to plausibly plead libel because **a)** its claims against the Statements cannot overcome New York's strong State constitutional protection for *opinion*, **b)** Grifols baselessly asserts liability for Statements that *substantially true*—indeed, some subject to the same criticism by the CNMV that required GRF to restate its filings, **c)** Grifols does not plausibly plead *actual malice*, required both because Grifols is a public figure,[2] and New York state requires the actual malice standard for all libel plaintiffs. *See* N.Y. Civil Rights Law § 76-a. The FAC's hair-on-fire claims of financial motive and "short and distort" accusations cannot stand in for actual malice.[3] Moreover, Gotham's prompt revision of its statement about the $95 million loan shows nothing in the way of actual malice. To the contrary, it *negates* actual malice. *See infra* Sect.I.C.  Finally, **d)** many of the statements at issue are simply *not defamatory*, **e)** some are not even *about* GRF,[4] and **f)** the FAC's undercooked attempt at an "implication" pleading is defective on its face.

### A. Defendant's Statements About a Publicly Traded Company Are Protected Opinion and Not Actionable as a Matter of Law.

Expressions of opinion are not defamatory as a matter of law. They receive absolute protection under New York's Constitution, Art. I, Sec, 8, which provides stronger protections for opinion than the First Amendment of the U.S. Constitution, because it defines opinion more generously. *See generally Celle*, 209 F.3d at 178; *Immuno,* 77 N.Y.2d at 252. "The dispositive inquiry . . . is whether a reasonable [reader] could have concluded that [the articles were]

---

[2] *MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, No. 17CV07568PGGKHP, 2018 WL 847014, at *6 (S.D.N.Y. Jan. 12, 2018), rep. and rec. adopted, No. 17 CIV. 7568 (PGG), 2018 WL 4735717 (S.D.N.Y. Sept. 29, 2018) ("When the plaintiff is a public figure, as a public company, the plaintiff must demonstrate that the defendant acted with 'actual malice' in connection with the defamatory statements").

[3] Actual malice cannot be shown by financial interest or motive alone. Several recent cases involving short reports have ruled that short interests in reports on a plaintiff company do not show actual malice in any respect. *See Cassava Scis., Inc. v. Bredt,* No. 1:22-CV-9409-GHW, 2024 WL 1347362, at *1 (S.D.N.Y. Mar. 28, 2024), *Dfinity*, 702 F. Supp. 3d at 171.

[4] The Statements are certainly not "of and pertaining to" the other putative plaintiff, "GRF Shared Services," which gets little to no mention in the FAC outside of the caption.

conveying facts about the plaintiff[.]" *Silvercorp Metals Inc. v. Anthion Mgmt. LLC*, 36 Misc. 3d 1231(A), 8 (Sup. Ct. 2012) (dismissing libel claim concerning short report). The *Immuno* four-part test guides New York's opinion analysis: "(1) whether the statement at issue has a precise meaning so as to give rise to clear factual implications, (2) the degree to which the statements are verifiable, i.e., objectively capable of proof or disproof', (3) whether the full context of the communication in which the statement appears signals to the reader its nature as opinion, and (4) whether the broader context of the communication so signals the reader." *Sandals Resorts Intern. Ltd. v. Google, Inc*., 925 N.Y.S.2d 407, 412 (1st Dep't 2011). "Pure opinion," a *separate* species of opinion, is a statement "accompanied by a recitation of the facts upon which it is based" and is not actionable. *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289 (1986). An opinion not accompanied by direct recitation of the facts may *still* be a 'pure opinion' if it "does not imply that it is based upon undisclosed facts." *Id*.

### i.   The Report Explicitly States That It Contains Financial Opinions by Interested Short Investors and Thereby Signals Opinion.

The broader context of Gotham's Report— sophisticated financial commentary written by known short-sellers to a financially literate audience—has been "frequently determine[d] [to] constitute[] the author's opinion." *See Yangtze River Port and Logistics Ltd. v. Research,* No. 150721/2019, 2020 WL 905770, at *7 (N.Y. Sup. Ct. Feb. 25, 2020). *See also Mimedx Grp., Inc.*, 2018 U.S. Dist. LEXIS 28026, at *3 ("conversations between two sophisticated investors concern[ing] allegations" of fraud against a public company expressed opinions "not statements of fact"); *In re Nanoviricides, Inc. v. Seeking Alpha, Inc.,* No. 151908/2014, 2014 WL 2930753, at *5 (N.Y. Sup. Ct. June 26, 2014) (short-interested speaker accusing "worthless shell" company of serious misconduct expressed opinion based on recitation of public facts).

The Report, published in this well-understood context, presents the textbook indicia that New York courts have consistently held to be opinion. The Report presents an opening disclaimer asserting that it reflects Gotham's opinions: "Our research **expresses our opinions**, which we have based upon publicly obtainable information, field research, inferences and deductions through our due diligence and analytical process." Plaintiff's Ex. 1-2, Report, at 2 (emphasis added) (hereinafter the "Report"). The disclaimer affirms Gotham's financial motive:

> "At the time of publication of this Report, GOTHAM CITY RESEARCH LLC, its affiliates, or related persons… **hold short positions** in the issuer mentioned in this Report… the reader of the Report must bear in mind that **GOTHAM CITY RESEARCH LLC's interest** and that of its affiliates **is to see the price of the issuer's stock decline**." *Id*., at 2 (emphasis added).

Defendants included this "general disclaimer making clear not only that the Report was based on opinion, but that the author had a financial interest in [Plaintiff's] stock" to indicate it expressed Defendants' opinion. *Yangtze*, 2020 WL 905770, at *7 ("disclaimer unequivocally signaled to readers that the article is one of opinion"); *see also Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC,* 151 F. Supp. 3d 287, 296 (E.D.N.Y. 2015), *aff'd*, 670 F. App'x 731 (2d Cir. 2016) ("where circumstances surrounding an allegedly defamatory statement indicate that the person making the statement has a special interest in the matter, courts have routinely held that a reasonable observer would understand such a statement to be one of opinion, rather than fact."). A reader confronted *at the outset* with this firm disclaimer could not reasonably conclude it held anything other than Gotham's opinion. *See Silvercorp,* 36 Misc. 3d at 2 (finding "author works for a firm that has a short position in Silvercorp's stock, readers knew that the writer had a financial interest, and this disclosed motive indicates that the author is expressing his opinion."). The challenged statements in the cited short report cases all involved far more aggressive and factual sounding statements than the Statements.

###### ii.  Qualifying Phrases and Language of Assessment and Conjecture Signals to Readers That Report is Opinion.

Qualifying language negates the prospect that a reader would understand the Statements as fact. *See In re Nanoviricides, Inc.*, 2014 WL 2930753, at *5 ("article contains the phrases 'we believe,' 'it seems to us' or the relevant equivalent over fifteen times" signifies opinion). The Report's steady flow of qualifying phrases are too numerous to count, with its repeated use of terms such as "we estimate," "we believe," "we find," "we calculate," "key assumption," and "based on our calculations." *Silvercorp*, 36 Misc. 3d at 11 ("conclusions reached were expressly 'Based on ... research,' indicating to a reasonable reader that the claim of accounting fraud is an opinion, and not a statement of fact."). "The language of conjecture pervades [the] article,"[5] indicating the Report conveys Gotham's opinion in obvious ways, such as:

- **Statement 4:** "Nevertheless, ***we find*** even this Grifols "per credit agreement" definition of EBITDA materially misleading and incorrect, and that the market fundamentally misunderstands this business." Cmpl., ¶ 150.
- **Statement 5:** "GRF manipulates reported debt & EBITDA to artificially reduce reported leverage to 6x which ***we believe*** is closer to 10x-13x." *Id.*, ¶ 155.
- **Statement 7:** "These observations ***lead us to believe*** the true debt picture may be far worse than ***we are able to presently determine***. That being said, ***we estimate*** that true debt, at minimum, is closer to EUR8.9 billion, not EUR8.0 billion." *Id.*, ¶ 157.
- **Statement 8:** "…So if a new investor were to evaluate Grifols, ***we don't see how*** they would know that Grifols fully consolidate BPC Plasma and Haema (which account for a very large portion of earnings), while owning zero percent of each entity. ***We find*** this accounting treatment non-obvious and suspect." *Id.*, ¶ 157.
- **Statement 15:** "Consequently, ***we find*** GRF shares uninvestable, and likely worthless." *Id.*, ¶ 193.
- **Statement 16:** "The ***Gotham City Research believes that*** the shares of Grifols are uninvestable and likely are worth zero, ***based on our analysis*** of Grifols and its related entities." *Id.*
- **Statement 18:** "Not only do ***we find*** GRF's accounting treatment and inclusion of BPC Plasma + Haema in its EBITDA suspect: ***we find*** Grifols' full inclusion of GDS onto GRF EBITDA overstates GRF's earnings power considerably." *Id.*, ¶ 201.

---

[5] *Eros Intern. PLC v. Mangrove Partners*, No. 653096/2017, 2019 WL 1129196, at *8 (N.Y. Sup. Ct. Mar. 8, 2019) (language "we believe Eros is facing liquidity crisis," "in our opinion, recent sale rumors are not credible," indicate "it is conveying authors' opinion" in dismissing defamation case against short report criticism of public company).

- **Statement 20:** "Grifols' EUR124 million advanced payment to Immunotek ***appears to be*** an unexplained outflow of cash not relate[d] to the development of these centers." *Id.*
- **Statement 21:** "GRF paid ~15 million per center for Bio Products centers. ***Our investigation reveals that*** it cost $3 million per center to construct these centers. ***We are unable to reconcile*** this 5x difference." *Id.*, ¶ 210.
- **Statement 22:** "***We believe that*** this EUR124 million advanced payment does not relate to the development of these centers; rather ***we see*** the payment as an unexplained outflows of cash, just as Grifols' [sic] has demonstrated in other transactions." *Id.*
- **Statement 23:** "***We cannot reconcile*** the actual evolution of the Immunotek-Freedom Plasma project with a EUR 124 million payment" *Id.*
- **Statement 25:** "***We believe*** a EUR124 million advance payment is out of line with the funding requirements of opening plasma centers in the USA. ***Based on our analysis and investigation*** of the economics per plasma center, it's cheaper to construct them organically. ***We estimate that*** it cost $3 million per center to construct plasma centers, pre- covid." *Id.* (emphasis added).

The collective import of these words of opinion renders the full Report and its conclusions to be an exercise of judgement, surmise and opinion.

Statements 15 and 16 ("uninvestable"), Statement 18 ("suspect"), Statement 16 ("likely worth zero"), Statements 15 and 17 ("likely worthless, "worthless") Statement 17 ("unsustainable"), cannot "reasonably appear to state or imply assertions of objective fact." *Eros*, 2019 WL 129196, at *8. They are "not [themselves] fact[s]—but rather, one's perception of facts—at the time it is uttered." *Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014) (dismissing libel action against *The Big Short* by Michael Lewis and short seller source, Steven Eisman). These statements mean little to a financially literate audience of financial commentary and they are "not the stuff of defamation." *See id.* at 131. *See also Adelson v. Harris*, 774 F.3d 803, 807 (2d Cir. 2014) ("characterization of [Plaintiff's] money as 'dirty' and 'tainted' … is unfalsifiable opinion protected by the First Amendment."). What is "worthless," "suspect," or "uninvestable" to one investor is not the same to another, rendering these statements objectively incapable of "proof or disproof," and hence non-actionable. *See Sandals*, 86 AD3d at 40. Such words are not factual and simply reflect the obvious—Gotham takes a short view of GRF's prospects.

*Predictions and Forward-Looking Statements are Opinion*: "[P]redictions as to what 'appeared to be' or 'might well be' or 'could well happen' or 'should be' would not have been viewed by the average reader [] as conveying actual facts about plaintiff." *Immuno*, 77 N.Y.2d at 255. Defendants' forecasts in **Statement 17** that Grifols stock "are either worthless or will face significant dilution," and that Grifols' debt is "unsustainable," and **Statement 18**, that Grifols inclusion of an independent company in its EDBITA calculation "overstates earning power considerably" are "predictions about possible outcomes… that, even if deprecating the plaintiff, are not actionable." *MiMedx*, 2018 WL 847014, at *7 (statements "with no hesitation that 'this is definitely a revenue fraud situation,' 'could be a jailable offense for the CEO,' 'will end up with some MiMedx employees being dragged away in handcuffs'" non-actionable opinion). The Gotham Report makes no statements of that vituperative kind.

Similarly, **Statement 7**, Defendants "believe [Grifols'] true debt picture may be far worse than we are able to presently determine," and **Statement 8**, "if a new investor were to evaluate Grifols, we don't see how they would know that Grifols fully consolidate BPC Plasma and Haema… we find this accounting treatment non-obvious and suspect" are "[s]peculations as to the ... potential future consequences of proposed conduct generally [] not readily verifiable, and are therefore intrinsically unsuited as a foundation for libel." *Immuno,* 74 N.Y.2d at 560.

*Forward Looking Statements Blended with Referenced Unknowns and Possibilities are Plain Opinion*: In that same vein, **Statements 20-25** express the conditional *possibility* that "Grifols' EUR124 million advanced payment to Immunotek appears to be an unexplained outflow of cash not relate[d] to the development of these centers." FAC ¶ 210. These Statements do not "anywhere flatly state" facts about the ImmunoTek transaction, but, as in *Kesner*, "instead merely identified this as a possibility." *See Kesner v. Down Jones & Co., Inc.,* 515 F. Supp. 3d

149, 180 (S.D.N.Y. 2021). The Report's opinion that "[we] are unable to reconcile" the advanced

payment Grifols made to ImmunoTek (**Statement 21**), "believe that this … advanced payment

does not relate to the development of these centers; rather we see the payment as unexplained

outflows of cash," (**Statement 22**), "cannot reconcile the actual evolution" of the payment

(**Statement 23**), find the payment "makes no sense," (**Statement 24**) and is "out of line"

(**Statement 25**) are all flat opinion. Numerous times, the Report couches these statements as

mere possibility, in "our investigation, "we believe," "we cannot reconcile," and "based on our

analysis and investigation," thus rooting them in opinion. *Cassava Scis.,* 2024 WL 1347362, at

*15 ("using phrases like 'we believe' and 'may' and referring to 'evidence' of wrongdoing…

understood by any reasonable reader as expressions of opinions.").

### iii.  Report Cites Facts and Publicly Available Documents Upon Which Opinions Are Based and Does Not Imply Undisclosed Facts.

Not only do the Statements come with compounding contextual signals of opinion, but

many are "pure opinion" because each is accompanied by either a thorough "recitation of the

facts upon which [they are] based," *Steinhilber*, 68 N.Y.2d at 289, or give "no implication" of a

basis "on undisclosed facts". *Silvercorp*, 36 Misc. 3d, at *10. Under this *independent* foundation

for opinion, distinct from the *Immuno* four factors, the Statements are not actionable.

The Report provides a "Summary of the Basis of Opinions" on the first page, an eight-

page Appendix and five pages of end notes with 125 citations to sources including hyperlinks to

Plaintiff's own website, SEC filings, annual reports, investor analysis presentations, and

corporate governance reports. That "giv[es] readers the opportunity to review the underlying

'facts' and form their own opinion." *Nanoviricides, Inc.*, 2014 WL 2930753, at *5. *See e.g*

*Yangtze,* 2020 WL 905770, at *8 ("Embedded within the allegedly defamatory statements are

electronic links to various publicly available sources, most prominently Yangtze's SEC filings.").

11

**Net leverage ratio; Statements 5, 6, 9 and 10.** The Report opines that Grifols'
calculation of its leverage ratio (the measure of a company's EBITDA against debt load) leads
the market to "fundamentally misunderstand" Grifols' value. Report, at 7. The Report cites
*Grifols own filings*: "We explain in detail why we believe leverage is closer to 10x-13x by
examining the components of leverage: EBITDA and Debt." *Id.*, 6-7.

- **Statement 9:** "NCI [non-controlling interest] has grown from nearly 0% of earnings in
  2017 to nearly 100% of net income as of 2023 YTD. GRF fully includes earnings from
  NCI in its EBITDA per credit agreement, despite not actually having claim to these
  earnings." Id. at 4." Cmpl., ¶ 169.

In short, Defendants' examination of Grifols' EBITDA and debt in its *own public filing*s
indicated that Plaintiff was claiming the benefits of owning non-controlling interests (NCI) in
certain companies, including GDS, that Grifols *does not own,* without accounting for what it
would cost to *actually buy them* (i.e. gain a controlling interest) from a private company. The
reader can decide the merit or demerit of that.

- **Statement 10:** "Grifols' full inclusion of GDS onto GRF EBITDA overstates GRF's
  earnings power considerably." Id. at 13." Cmpl., ¶ 169

The Report explains its view of how Grifols' inclusion of GDS's revenue results in a
higher EBITDA and lower debt figure, thereby making Grifols' leverage ratio lower. Based on
those "key assumptions" **Statement 5**, *hypothesizes*: "GRF manipulates reported debt &
EBITDA to artificially reduce reported leverage to 6x which we believe is closer to 10x-13x."
FAC. ¶ 155. First, "manipulates" is not a statement of fact. *See Rinaldi v. Holt, Rinehart &
Winston*, 42 N.Y.2d 369, 381 (N.Y. 1977) ("probably corrupt" and "suspiciously lenient" are
opinions in "loose, figurative sense"). Next, the Report illustrates through **eight pages** of
calculations and graphics how "Grifols understates its debt burden and is, therefore, materially
more leveraged than the company indicates." FAC ¶ 157, **Statement 6.** Significantly, the Report

cites Grifols own Q3 2023 presentation and a third-party credit rating source with direct screenshots of charts and text and explains its *disagreement* with these projections. *Id.* Defendants' opinion on Grifols' leverage ratio is "quintessential opinion based on disclosed public information," *Yangtze*, 2020 WL 905770, at *8. This is non-actionable opinion.

**EBITDA Calculations, Statements 4, 11-14, 18-19.** The Report provides extensive citation and explanation, "dedicat[ing] the following two sections of this report as to why we believe EBITDA is overstated by at least 32%[.]" Report, at 7. This is garden-variety "financial commentary based on the publicly available information." *Yangtze*, 2020 WL 905770, at *8. The Report relies directly on Grifols' own 2018 and 2021 filings, "textbook opinion." *Id.*

- **Statement 18:** "Not only do we find GRF's [Grifols] accounting treatment and inclusion of BPC Plasma + Haema in its EBITDA suspect: we find Grifols' full inclusion of GDS [Grifols Diagnostic Solutions, Inc.] onto GRF EBITDA overstates GRF's earnings power considerably." FAC ¶ 201.

- **Statement 19:** "Grifols adjusted EBITDA includes income the company has no claim to, i.e. non-controlling interests, and then adds back theoretical cost savings the company may never realize." FAC ¶ 201.

Here, the Report cites and screenshots Grifols' financial filings to calculate its own "*Gotham City Research Adjusted EBITDA,*" *transparently and hypothetically* calculated by "simply revers[ing]" the addition of $274 mln. of NCI earnings that Gotham believes to be inflated by profits of NCIs that Grifols *does not own a controlling interest* in. Nevertheless, Grifols includes that revenue on its income statements. The Report does not assess whether Grifols can technically consolidate under IFRS rules or its credit agreement, but instead opines *based on Grifols own filings* "[w]hy we believe Grifols' EBITDA is fundamentally misunderstood by the Market." Report at 8. Gotham's opinion on Grifols' consolidation of NCIs is "accompanied by a recitation of facts on which [it is] based," rendering it non-actionable. *Eros*, 140 N.Y.S.3d at 519.

**Statement 11:** "We exclude the 'Run rate cost savings, synergies that have yet to be realized' adjustments Grifols makes to its EBITDA. Grifols has claimed many run rate cost savings in recent periods but has very little to show in terms of EBITDA uplift." Id. at 13." FAC¶ 169

The Report "then adds back theoretical cost savings the company may never realize," i.e., $121 mln in premature savings because this "'[r]un rate cost savings, synergies that have yet to be realized' – that is, theoretical cost savings – we find this adjustment to EBITDA highly suspect." *Id.*, at 7, 13. Because Grifols has not "demonstrated ability to reduce costs, it would appear restructuring costs and associated savings/synergies are simply a fact of life for a company that is struggling." Report, at 13. Therefore, these "theoretical cost savings" don't add up, in Gotham's opinion. The Report therefore *subtracts* them to give readers what Defendants believe is a more accurate economic picture of the company. This Statement and the related ones are thus built on a completely ***transparent hypothetical*** that qualifies them as outright opinion.

- **Statement 12:** "How EBITDA could be overstated by at least 46%." FAC ¶ 169.

Gotham's EBIDTA adjustment is just their "conservative" estimate. The Report explains "should the accounting and related party issues run deeper, we could see EBITDA overstated by at least 46%." To illustrate that point, the Report *transparently* subtracts additional line items, which had the effect of lowering the company's presented EBITDA by 620 million euros. *Id*. at 8. The Report provides another chart showing these calculations and cites Grifols' 2023 interim report and consolidated annual reports, providing a "recitation of the facts upon which [they are] based." *Steinhilber*, 68 N.Y.2d at 289. It is frivolous to treat these Statements, *built on declared assumptions and hypotheticals*, as anything other than "pure opinion."

- **Statement 13:** "Restructuring costs are a large percentage of earnings - We remove restructuring costs from EBITDA because Grifols has been embarking on continual restructuring costs over a significant period of time. This indicates that restructuring costs are an ongoing business expense, not unusual nor exceptional expenses." FAC ¶ 169.

14

The Report *subtracts* 104 mln. of GRF's so-called "exceptional" restructuring costs from Grifols' EBIDTA. Report, at 14. That is a transparent opinion about the classification of these costs that the reader can agree or disagree with. The Report cites a lack of expected "cost cuts and margin increases" in Grifols' business, "leading us to believe that restructuring costs are a part of Grifols' business, given they appear to be running very hard, only to end up moving backwards." *Id.* Thus, Gotham sets out why it believes that these restructuring costs should be regarded as an "ongoing business expense" and why it believes that the inclusion of such costs would give the market a more informed understanding of Grifols' financials. *Id.* Again, this is a *transparent hypothetical based on disclosed assumptions*. The readers can take their own measure of it.

- **Statement 14:** "Concurrently, we see certain cash outflows at Grifols as suspect – notably the 'loans to related parties', 'other financial asserts to related parties', and 'loans to third parties' items." FAC ¶ 169.

The Report *subtracts* 83 mln. in average annual loans to related parties like Scranton and Immunotek because "we find (i) undisclosed cash outflows from Grifols to related parties (such as Scranton) (ii) cash outflows to partners/subsidiaries that don't make economic sense to us, such as Immunotek, and (iii) evidence of a complex circular flow of transactions between Grifols and Scranton (see Bio Products)." Report, at 14. The basis for this *hypothetical subtraction* is fully set out. The assumptions are disclosed – the essence of opinion.

- **Statement 4:** "Nevertheless, we find even this Grifols "per credit agreement" definition of EBITDA materially misleading and incorrect, and that the market fundamentally misunderstands this business." FAC, ¶ 150.

The Report focuses on the definition *as given* in Grifols credit agreement, which is the product of a contract between Grifols and its lender. The Report does not state that Grifols did

not comply with its Credit Agreement, but rather, "[b]ased on our calculations, creditors claim to GRF EBITDA is at least 32% lower." Report, at 8.

GRF claims to have no control over its EBITDA formula or components. FAC, ¶ 44. That is *not* Gotham's point. As the Report states (and Grifols does not dispute), Grifols discloses <u>six different definitions of its EBITDA</u>. Report, at 8. The Report acknowledges GRF's justification: "GRF fully includes earnings from NCI in its EBITDA per credit agreement, despite not actually having claim to these earnings." Report, at 4. However, the Report concludes the credit agreement adjusted EBITDA is not an instructive reflection of Grifols' financial condition.

Plaintiff hides behind accounting principles, arguing its Credit Agreement definition of EBITDA allowed the consolidation of NCIs "yet to be realized" savings or restructuring costs under International Financial Reporting Standards (IFRS). FAC, ¶ 45. But, again, Plaintiff misses the point. *The Report is not about accounting rules*. It does not take a position on whether Grifols can technically consolidate these assets or account for the savings under IFRS. The Report seeks to understand the *economic substance* of Grifols' business. After its analysis, Gotham concluded that, whether or not Grifols was in technical compliance with IFRS 10, Grifols presented a set of financials that overstates the likely state of its operations and value of its business, leading the market to "fundamentally misunderstand the company, and its composition of earnings." Report, at 7. This is textbook opinion: GRF's statements and Gotham's assumptions were plainly set forth, and "each reader may draw his own conclusion as to whether [the] views should be supported or challenged." *Rinaldi*, 42 N.Y.2d at 381.

**Debt calculations, Statements 6-8.** The Report concluded "Grifols understates its debt burden and is, therefore, materially more levered than the company indicates … Gotham City Research estimates that Debt is understated by at least EUR 900 million." Report, at 15.

- **Statement 7:** "These observations lead us to believe the true debt picture may be far worse than we are able to presently determine. That being said, we estimate that true debt, at minimum, is closer to EUR8.9 billion, not EUR8.0 billion." Id." FAC, ¶ 157.

Gotham's estimate in **Statement 7** is non-actionable "speculat[ion] based on disclosed facts." *See Kesner*, 515 F. Supp. 3d at 179 ("'could signal' action from SEC 'in the near future' made clear [author] was speculating based on disclosed facts"). The Report states: "[w]e have identified undisclosed related party loans to Scranton, undisclosed lending activities (e.g., reverse factoring), activity that suggests Grifols de facto may assume responsibility for Scrantons' debts, and a history of trying to obfuscate its true financial position." The Report provides a full "recitation of the facts upon which [it is] based," *Steinhilber*, 68 N.Y.2d at 289, *Grifols own financials*. Defendants "made clear" they were "speculating based on" the financials to "bring factoring back on balance sheet because factoring is a form of debt…then we add debt from the haema/biotest parking transaction" to explain Gotham's debt estimate. *Kesner* 515 F. Supp. 3d at 179, Report at 16. **Statement 7** is a transparent hypothetical based on *articulated assumptions*, speculating on "disclosed facts" as in *Kesner*, and is not factual as a matter of law.

GRF claims it has "zero debt" for Haema and BPC as per its Credit Agreement, because it has not exercised its option to acquire these entities yet. The Report is not about GRF's compliance with its creditor nor accounting standards. Rather the Report simply opines "that it is only fair to adjust Grifols' debt higher for the amount **it would require** to purchase these two assets, and thus benefit from their cash flows." Report, at 16. To calculate *hypothetically* the price of exercising the call options, the Report looks at Grifols *own* annual reports to add "Haema and BPC transaction values parked at Scranton" into its "*GCR [Gotham City Research] adjusted net debt*" calculation. Report, at 15. All assumptions are laid out.

- **Statement 8:** "Grifols' 2018, 2019, and 2020 annual reports' language may differ on the amount of the debt that Grifols assumes. But suspiciously, these details regarding the

BPC Plasma/Haema transaction completely disappear in the Grifols 2021 and 2022 Annual Reports. So if a new investor were to evaluate Grifols, we don't see how they would know that Grifols fully consolidate BPC Plasma and Haema (which account for a very large portion of earnings), while owning zero percent of each entity. We find this accounting treatment non-obvious and suspect." *Id.*, at 17." FAC, ¶ 157.

In **Statement 8,** it is Defendants' opinion that this lack of clarity and apparent inconsistency in GRF's disclosures regarding the BPC Plasma/Haema transaction would leave a new investor unable to evaluate Grifols. Plaintiff complains that the Report calls its calculations of Grifols debt and leverage "true debt" and "true leverage." FAC, ¶ 38. No reasonable reader of the Report—investment journalism by short investors—would take this rhetorical and hypothetical description as statements of fact – especially as they appear amidst the Report's continuous drumbeat of opinion indicators. The simple presence of the word "true" does not transform "estimates," assumptions and hypothetical "calculations" into fact. "True" speaks to Gotham's transparent conclusions: the Report provides charts and explains line items within its estimate in **eight pages** of analysis from pages 15-22, citing and footnoting *GRF's own calculations*, such that it "cannot reasonably be understood to imply the assertion of undisclosed facts justifying the accusation." *See Silvercorp,* 36 Misc. 3d at 2 (accusations of "accounting irregularities" included chart and citations, not based on undisclosed facts).

**Uninvestable, Worthless, Head to Zero, Statements 15-17.**  The Report's opinion that Grifols is "uninvestable," "worthless," and its stock will "head to zero," quite apart from being predictive and figurative, are also based on Gotham's analysis of Grifols' leverage ratio and based on a hypothetical *future* reaction by the credit markets. Report, at 7. In Defendants' opinion, Grifols' estimated EBITDA did not give the company sufficient earnings to service its estimated debt. *Id.* at 51. When a company cannot service its debt, it is likely the company will eventually become insolvent, which in Defendants' opinion, makes it "uninvestable,"

"worthless" and heading "to zero." Defendants "set out the basis for [their] opinion, leaving it to the readers to evaluate it for themselves." *Brian v. Richardson*, 87 N.Y.2d 46, 53 (1995) (accusation of participation in illegal conspiracy author's opinion, no basis on undisclosed facts).

**Disclosure of Loans to Scranton, Statements 1-3.** The Report devotes a section on what it finds to be Grifols' "suspicious transactions," and "suspect," "odd" disclosures on loans from Grifols to Scranton – *a related party*. The words "suspicious," "suspect" and "odd" do not connote fact. *Chau,* 771 F.3d at 129 ("crooks," "fool," "frontman" are "not actionable opinion.") They raise unresolved issues; they are not even conclusions. Further, the Report explains its hypothesis with **three pages** of footnotes and screenshots to Grifols own filings, "a full recitation of the facts on which it is based [] readily understood by the audience as conjecture." *See Gross v. New York Times*, 82 N.Y.2d 146, 154 (N.Y. 1993). First, Defendants think it is "odd" that the $95m disclosures are not in the company's filings, where "we would expect to find it." Report, at 23. *They were not disclosed in Grifols'* **Corporate Governance Reports** *where the CNMV said* **related party** *loans* **should have been disclosed**. Second, Gotham "review[ed] the company's corporate governance and annual report filings" for the payment to "find the fact Grifols does not disclose this transaction suspect, given the fact Grifols has disclosed far smaller transactions with Scranton." *Id.*, at 24. Gotham concluded that its inquiry into GRF's statements "suggests to us that Grifols has selectively disclosed certain related party transactions with Scranton, but not others." *Id.*, at 25.

Third, and most serious, the FAC takes **Statements 1-3** on the $95mln loan disclosure out of context as if it was an IFRS issue when in fact the Report views the $95mln loan as only one piece of GRF's bigger valuation picture. GRF's oblique disclosure of the loan *does not disclose any information about that loan to allow an investor to understand its impact on debt and*

19

*leverage*. How much would GRF have to pay to exercise the claimed call option and get this asset back from Scranton? On what terms? That information would be material for any investor who is trying to assess GRF debt and leverage. Without this information, the Report finds, "[t]hese observations lead us to believe the true debt picture may be far worse than we are able to presently determine." Report, at 15. **Statements 1-3** must be read in *full context* of the surrounding analysis of EBITDA, debt and leverage ratios, as New York law requires under *Immuno*. They cannot be read in the narrow and isolated frame as the FAC would have it. The Report is *not* about accounting rule compliance. It is about a broader analysis of GRF's business, its adjusted EBITDA, debt and leverage, and GRF's admittedly inadequate financial statements. In that proper reading of the Report, **Statements 1-3** are matters of opinion. Even with $95mln disclosed in the wrong place, investors *still lack* material information about this related party transaction and therefore cannot fairly assess its potential impact on Grifols' business.

**ImmunoTek unexplained outflow of cash, Statements 20-25**. Defendants "belie[f]" about a $124.1mln. payment to Immunotek Bio Centers is premised on **seven pages** of citation, footnotes, and screenshots to Grifols *own financial documents*. Report, 41-46. These statements "[b]ased on our analysis and investigation of the economics per plasma center" are pure opinion. *See Silvercorp*, 36 Misc. 3d at 11 ("conclusions 'Based on ... research'" are "opinion, not fact.").

**Statements 20, 23 and 25** do not make factual assertions – even in isolation. That something "appears to be unexplained" to a speaker (**Statement 20**), "cannot [be] reconciled" by a speaker (**Statement 23**) or is "out of line" (**Statement 25**) are imprecise statements of opinion that could not be "viewed by the average reader as conveying actual facts about plaintiff." *Immuno,* 74 N.Y.2d at 255 (the average reader would not view vague impressions as to what

"appeared to be," "might well be," "could well happen," or "should be" as facts). **Statements 20,**

**23,** and **25** are even more attenuated and lacking in the "precise meaning" that *Immuno* requires.

- **Statement 22:** "We believe that this EUR124 million advanced payment does not relate to the development of these centers; rather we see the payment as an unexplained outflows of cash, just as Grifols' [] has demonstrated in other transactions." FAC ¶ 210.

  The Report states: "The following support our opinion" in **Statement 22:**

  - "The EUR124.1 million payment to Immunotek is not consistent with our estimate of the per center requirements (~3 million per center) for opening plasma centers.
  - Our per center estimate implies that Grifols is planning to fund the opening of ~44 centers under Freedom Plasma, but we were unable to verify evidence for such a large opening.
  - We cannot reconcile the actual evolution of the Immunotek-Freedom Plasma project with a EUR 124 million payment."

The Report's "estimate" of the construction cost, its comparison to Grifols accounting,

and its statements that they were "*unable to verify evidence*" and "*cannot reconcile*" the payment

are understood as "mere allegations to be investigated and further examined rather than as facts."

*Silvercorp*., 36 Misc. 3d at 9 (finding more serious statement than here alleging "massive

accounting fraud" "expressly reflects the author's belie[f]" about Silvercorp).

- **Statement 25:** "We believe a EUR124 million advance payment is out of line with the funding requirements of opening plasma centers in the USA. Based on our analysis and investigation of the economics per plasma center, it's cheaper to construct them organically. We estimate that it cost $3 million per center to construct plasma centers, pre- covid." FAC ¶ 210.

Similarly, **Statement 25** rests on Defendants' own belief and estimate, "on our analysis and

investigation of the economics per plasma center," based on *predictions of anticipated costs*.

- **Statement 24:** "Surprisingly though, in their 2022 Annual Report, Grifols disclosed a large increase in advance payments relating to the Immunotek / Freedom Plasma project of EUR124.1 million, up nearly 3x from EUR42.3 million in 2021. It makes no sense that, more than 4 months after all 21 centers were already open and accepting donations, Grifols still recognized an additional EUR124 million "advanced payments related to this project" on its balance sheet." FAC ¶ 210.

The Report screenshots and cites references regarding the timing of plasma center openings, to conclude that, upon review of *Grifols own 2022 Annual Report*, the continued to citation of the ImmunoTek payment "makes no sense." Report, at 42. Again, these are at best "mere allegations to be investigated," as Defendants are trying to do, and would not be understood as a reasonable reader to be anything other than inquiry and surmise. *See Silvercorp.*, 36 Misc. 3d at 10. The conclusion of "makes no sense" seals **Statement 24** as utter opinion.

**Social media posts**. Plaintiff alleges Defendants' social media posting linking to its Report and making similar opinions are defamatory. However, repeating what already is non-actionable opinion online is *even less* susceptible to defamation. *Sandals*, 925 N.Y.S.2d at 416 ("less credence to allegedly defamatory remarks published on the Internet than to similar remarks made in other contexts").

### B.  Gotham's Statements About Grifols Are Substantially True and Not Actionable as a Matter of Law.

Grifols must prove each Statement false. *See Guccione v. Hustler Mag., Inc.*, 800 F.2d 298, 301 (2d Cir. 1986) (burden of proving falsity is on Plaintiff). Grifols cannot make this showing because, as Grifols concedes, many of the Statements were indeed *validated by the CNMV*, the Spanish market regulator in its findings and again in Grifols' subsequent adjustments required to correct the deficiencies cited by the CNMV. *See* Ex. B-1 annexed to Korzenik Decl. (hereinafter "CNMV Conclusions").

The FAC cites to the March 21, 2024 CNMV Conclusions to spin its own misleading narrative. Grifols' subsequent admissions and the CNMV's Conclusions are also referenced in

the FAC. [6]  Both demonstrate that Grifols states no claim for defamation because the challenged Statements addressed by the CNMV are substantially true.

The test for truth or falsity is not absolute truth—it is "substantial truth." *Chau*, 771 F.3d at 129. New York provides that "a statement need not be completely true, but can be substantially true, as when the overall 'gist or substance of the challenged statement' is true." *Id*. A statement is substantially true "if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." *See, e.g.*, *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 242 (2d Cir. 2017). "When the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done." *Fleckenstein v. Friedman*, 266 N.Y. 19, 23 (N.Y. 1934).

**Net Leverage Ratio, EBITDA and Net Debt, NCI assets.** The CNMV "found relevant deficiencies - if evaluated as a whole – in…. [t]he presentation of alternative performance measures (APM), in particular the **EBITDA** and the **debt/EBITDA ratio**." Ex. B-1, at 2, (emphasis added). Gotham's Report "estimate[d]" that "Grifols' leverage is closer to 10x-13x not 6x," citing Grifols "claim[] to be 6.7x levered as of Q3 2023." Report, at 6. Now, Grifols admits to the CNMV that the company has an <u>8.4x leverage ratio</u> "according to profit and loss." *See* Ex. B-2 annexed to Korzenik Decl. at 2-3 (hereinafter "GRF CNMV Admissions"). To get to this new leverage ratio, Grifols adopted one of the Report's key adjustments, making the *very same deductions* of "234 million…corresponding to: (i) extraordinary, unusual or non-recurring expenses; [and] (ii) cost savings and operational improvements for the next 12 months[.]" Ex. B-

---

[6]  To the extent the CNMV found deficiencies in Grifols' filings, as it did, that illustrates the substantial truth of the relevant Statements. To the extent the CNMV found Grifols filings reasonable, that has no bearing on Statements. It would not prove them false, nor would it alter their status as non-actionable opinion under the U.S. Constitution.

2, at 4. Gotham's **Statements 9-14** about net leverage overstatement are thus *substantially true*, "as the gist or substance of the challenged statement[s] [are] true." *See Chau*, 771 F.3d at 129.

The CNMV found EBITDA and debt/EBITDA ratio deficiencies "as a whole must be considered significant, to the extent that in some years they have hindered the ability of investors to adequately understand the financial situation, results and cash flows of the transmitter." Ex. B-1, at 2. It is substantially true then that Grifols "definition of EBITDA materially [was] misleading and incorrect, and that the market fundamentally misunderstands this business." (**Statement 4.**) Grifols admitted to the CNMV that its Credit Agreement EBITDA does not "reflect the business's financial performance" and agreed to "reduce the number of measures used to reflect EBITDA in its earnings reports to two," Ex. B-2 at 2, as opposed to the "6 different definitions of EBITDA" that Gotham's Report cited from Grifols Q3 2023 presentation. Report, at 8, fn 1. It is substantially true then, as the Report stated, that Grifols "manipulates reported debt & EBITDA to artificially reduce reported leverage to 6x." (**Statement 5**).

Further, Grifols finally disclosed the EBITDA numbers for its NCI assets, confirming Gotham's view that subtracting the NCI assets from Grifols' EBITDA would increase the 8.4x leverage by even more, bringing the final net leverage ratio closer to the 10-13x figure the Report opined. Ex. B-2, at 5.

**Non-controlling Interests.** The CNMV found that "Grifols omitted certain information breakdowns on the entities in which there were significant non-controlling interests in the annual financial reports for the years 2022 and previous. Specifically, it should have broken down the sales figure and the operating, investing and financing cash flows of Haema AG and BPC Plasma Inc." Ex. B-1, at 3. Grifols admitted that it had not previously broken down this information, confirming its "future commitment to provide a detailed breakdown of EBITDA and net

financial debt for those relevant entities in which we have non-controlling interests." Ex. B-2 at 4. It is substantially true then to say, as **Statements 18 and 19** state, that "Grifols does not provide any explanation as to how the company fully consolidates BPC Plasma and Haema, despite owning zero percent of each, in its 2021 and 2022 annual reports." Report, at 11.

**Scranton Undisclosed Related Party Transactions**. Like Gotham, the CNMV also found Grifols lack of transparency in related party transactions with Scranton objectionable:

> "Grifols should have broken down, in the consolidated annual financial report and in the ACGR for fiscal year 2020 … The payment made to Scranton in the amount of USD 200 million … should have been broken down in the consolidated annual financial report and in the annual corporate governance report for the fiscal year 2021." Ex. B-1, 5 (emphasis added).

Grifols admitted this non-disclosure to the CMNV, stating Grifols "notes the omissions noted by the Regulator in the report above, dated 21 March 2024, and that in the future, to the extent that they continue to be material, they will be included in the financial information to be reported." Ex. B-2 at 7 (emphasis added). It is *substantially true*, as **Statements 1-3** state, Grifols had "undisclosed loans and share pledges tied to Scranton." Report, at 5.

### C. FAC Fails to Allege Facts to Support Plausible Inference that Defendants Published *Each* Statement with "Actual Malice."

Grifols, a public company, must prove actual malice plausibly with factual allegations specific to each alleged falsehood. *See generally New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). Actual malice " does not simply connote ill will or spite." *Biro*, 963 F. Supp. 2d at 276. It is not to be confused with common malice, as the FAC does, but rather it is "a term of art denoting deliberate or reckless falsification." *Id*. It is a state of mind involving the knowing falsehood of a *particular* statement alleged to be false. *See generally Sullivan*, 376 U.S. 254.

Plaintiff is a public figure. *See e.g. MiMedx Grp., Inc*, 2018 WL 847014, at *6 (NASDAQ-listed public company with market capitalization exceeding $1.5bln is public figure).

Grifols is a large corporation, subject to Spanish regulation, traded on the NYSE, and in an industry of great public interest and regulation – health care and pharmaceuticals. *See Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341,1348 (S.D.N.Y. 1977) (considering size of corporation, public interest, public trading, field subject to regulation, and filing reports with government as indicative of public figure company). Additionally, Grifols must prove "actual malice with clear and convincing evidence" under New York's actual malice standard of fault for both public and private figures on speech pertaining to matters of "public interest." § 76-a (2).

Grifols is thus obligated to plead that Gotham acted with "actual malice" in the publication of *each* Statement. *See Biro*, 963 F. Supp. 2d at 276. Grifols' FAC does nothing of the kind. Actual malice requires proof that the speaker "had a *subjective* awareness of either falsity or probable falsity of the defamatory statement, or acted with reckless disregard of its truth or falsity." *Celle*, 209 F.3d at 182 (citing *Sullivan,* 376 U.S. at 280). Notably, "reckless disregard" is not measured by "whether a reasonably prudent man would have published or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Instead, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication," *id*, and had a "high degree of awareness of their probable falsity." *Garrison v. State of La.,* 379 U.S. 64, 74 (1964). On a motion to dismiss where a particular state of mind is a necessary element of a claim, "pleading of that state of mind must be plausible and supported by factual allegations." *Biro*, 963 F. Supp. 2d at 278 (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 686-87 (2009)). The FAC provides no factual allegations, and must be dismissed under 12(b)(6) for such defects, as libel claims regularly are.

*Legal Buzzwords Do Not Suffice*: The FAC's barren attempts at actual malice fall flat. Threadbare recitations of "actual malice buzzwords" like FAC's constant refrain of "knowingly

false" do not meet the "heavy burden" of pleading actual malice on a motion to dismiss. *Biro*, 963 F. Supp. 2d at 279. These "'actual malice buzzwords' [are] simply not enough to nudge a case into discovery." *Id*. Further, the FAC's confused use of common law malice language such as "malicious intent" or "malicious falsehood" is even more defective. *See id.* at 276.

*Prompt Corrections Are Not Evidence of Actual Malice— They Negate It*: Grifols complains that the Report's prompt next-day correction clarifying where Grifols disclosed its $95mln. loan to Scranton demonstrates "malicious intent." FAC ¶ 140. It is well-settled that corrections are insufficient to establish actual malice as matter of law. *Biro*, 963 F. Supp. 2d at 281. Defendants moved swiftly, less than 24 hours after publication, to make a correction. The Report's revision noted that while Grifols did disclose the loan its Spanish annual report, Grifols failed to disclose the related party loan in its own corporate governance filings, which is where Defendants (and the CNMV) would reasonably expect to see such a disclosure. Pl. Ex. 2, at 23. Defendants' willingness to quickly correct its reporting is considered evidence of a *lack of malice. See DiLorenzo v. New York News, Inc*., 78 A.D.2d 669, 673 (1980); *Palin v. New York Times Co*., 482 F. Supp. 3d 208, 222 (S.D.N.Y. 2020), mod., 510 F. Supp. 3d 21 ("willingness to quickly acknowledge and correct [] error ordinarily weighs against a finding of actual malice.").

Moreover, Defendants were under no obligation to "issue a press release" or "inform followers on social media" about its correction, as Plaintiffs complain because "a defamation defendant's behavior *after* the publication of a defamatory statement is not enough to nudge allegations from possible to plausible." *Biro*, 963 F. Supp. 2d at 287.

*Failure to Investigate Is Not Actual Malice*: Plaintiffs cannot show actual malice by arguing that Defendants were allegedly "aware of, have access to, and *closely reviewed* Grifols' SEC filings" to support its argument that Defendants "knew" the loan disclosure statement was

false. FAC ¶ 150. First, allegations that the Report cited Grifols' 2016 and 2017 SEC Annual Report on Form 20-F filings is not evidence that Defendants themselves were subjectively aware of any particular error. Such pleading will not suffice in any case.

Second, and more significantly, "[f]ailure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989). The question is not whether Defendants "acted negligently by failing to verify an article, whether it would have been 'prudent' to verify an article, or whether there was an 'obligation to ensure' that the article was correct." *Biro*, 963 F. Supp. 2d at 278. Instead, "the operative question is whether a defendant failed to investigate *in the face of actual, subjective doubts* as to the accuracy of the story." *Id.* (emphasis added). Plaintiff has not plausibly pled facts that would show Defendants "published [their] allegation …  knowing that allegation to be false or in reckless disregard of its truth." *Rinaldi*, 42 N.Y.2d at 382. Defendants had no "obligation to ensure" its statements against Grifols' 2018 – 2022 Form 20-F filings were correct. *See Biro*, 963 F. Supp. 2d at 278. Alleging falsehood, error, negligence or failure to investigate is *not* actual malice. Even if the initial statement about the loan was incorrect, "as [it] may well be, the Constitution, as interpreted by the United States Supreme Court, bars recovery." *See Rinaldi*, 42 N.Y.2d at 382. The FAC's barren attempts at actual malice argue over Gotham's interpretations, not subjective doubt.

*Financial Motive or Short Interest Will Not Suffice to Plausibly Plead Actual Malice*: Simply pointing out that Defendants have a "personal gain" in shorting Grifols' stock does not show that Defendants "entertained serious doubts as to the truth of [its] publication." *St. Amant*, 390 U.S. at 731. Financial motives, specifically a short position, are not a basis to find actual malice. *Cassava Scis.*, 2024 WL 1347362, at *25 ("short positions on their own do not support a

showing of actual malice[.]")[7] While a short position could be a "profit motive to publicize the short seller's critiques," that does not support an inference that Defendants "did not subjectively believe those critiques." *Id.* (citing *Biro*, 963 F. Supp. 2d at 278.) If anything, short positions support the "contrary inference," evidence of "Defendants' genuine conviction that Plaintiff's stock was overvalued[.]" *Id.*

In sum, Plaintiffs' vacuous allegations do not achieve anything close to the "accumulation of the evidence and appropriate inferences" needed to adequately plead actual malice. *See Celle*, 209 F.3d at 183. A plaintiff cannot plead actual malice simply by repeating "knowingly false," "deliberately false," "acted with malice," and the like ad nauseum.[8] These buzzwords do not get Grifols' FAC off the starting block. Actual malice pleading, difficult as it may be, is the high threshold that "must be protected if the freedoms of expression are to have the breathing space that they need to survive." *Sullivan*, 376 U.S. at 271–72. That is why many libel suits fail at the 12(b)(6) threshold, as this one should.

## II.    GRIFOLS ADDITIONAL CLAIMS ARE SIMILARLY MERITLESS.

Grifols' desperate attempt to manufacture additional claims merely repeats its failed libel pleading. These claims are "based on the dissemination of alleged injurious falsehoods contained" in the Report, and as a result, they "sound[] in defamation." *Cassava Scis.*, 2024 WL 1347362, at *16 fn. 32. Plaintiff fails to plead facts to show the Report itself is actionable as defamation, *supra* Sect. I, and cannot plead additional falsehood claims in the face of this failure.

---

[7] Adopting rep. and rec., No. 22CV9409GHWOTW, 2024 WL 555484, at *fn 28 (S.D.N.Y. Jan. 3, 2024) (Wang) ("Pleading [] Defendants are short sellers is insufficient to plead [] Defendants knew [publications] were false or made with reckless disregard for their falsity."). *See also Dfinity*, 702 F.Supp.3d at 176 (allegation short seller profited and fled country not basis for actual malice).

[8] Not only does FAC confuse common law malice buzzwords with actual malice buzzwords, but it relies on nothing more than sprinkling buzzwords that leave its actual malice pleading defective.

*See Hustler Mag., Inc. v. Falwell,* 485 U.S. 46, 51-56 (1988) (plaintiff cannot evade First Amendment restrictions on defamation claim by pleading another tort).

### A.  Grifols's Allegations Do Not Amount to Tortious Interference with Business.

Grifols' claim for tortious interference with business relations is unsupportable and warrants dismissal. In New York, a claim for tortious interference with business relations requires a plaintiff to show "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Catskill Dev., L.L.C. v. Park Place Ent. Corp*., 547 F.3d 115, 132 (2d Cir. 2008).

The FAC fails to identify with requisite specificity "particular allegation of interference with a specific contract" and instead pleads "general allegations" with "equity investors, sell-side analysts, debt investors, banks, auditors, lawyers, customers, and suppliers." *See 16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015) ("New York courts have placed some limits on what constitutes 'business relations' by rejecting… 'general allegations'"). As such, Plaintiff's "general allegations" are "fatal to the tortious interference with business relations claim." *See Deer Consumer Products, Inc. v. Little Group*, No. 650823/2011, 2012 WL 5983641, at *3 (N.Y. Sup. Ct. 2012) (dismissing pleading for "absence of any allegation of a specific relationship").

Plaintiff alleges Yu and GCR "acted with the sole purpose of harming Grifols by causing its stock price to fall, which in turn, was intended solely to benefit Yu and Gotham financially[.]" FAC ¶ 270. It is well-established that "acting with a permissible purpose such as normal, economic self-interest" is not "wrongful means." *MiMedx Grp., Inc*., 2018 WL 847014, at *10.

### B.  Plaintiff Fails to Plead Actionable Underlying Tort to Support Aiding and Abetting Claims.

"In order to allege a claim for aiding and abetting a particular tort, there must first be an actionable underlying tort." *Navarra v. Marlborough Gallery, Inc*., No. 10CV7547BSJ-RLE, 2012 WL 13210272, at *9 (S.D.N.Y. Apr. 4, 2012). Here, Plaintiff's aiding and abetting claims for tortious interference and defamation against GIP and de Weck warrant dismissal because, for all the reasons thus stated, the FAC fails to plead either "actionable underlying tort." *Id.*, *see also Ulrich v. Moody's Corp*., No. 13-CV-8 (VSB), 2017 WL 1232709, at *20 (S.D.N.Y. Mar. 31, 2017) (dismissing aiding and abetting defamation as "Plaintiff has failed to establish primary liability for [speaker]"); *William Doyle Galleries v. Stettner,* 167 A.D.3d 501, 503 (1st Dep't 2018) ("plaintiff alleging an aiding-and-abetting fraud claim must allege the existence of the underlying fraud, actual knowledge, and substantial assistance.").

### C.  Plaintiff's Unjust Enrichment Claim Improperly Merges into Defamation Claim.

Finally, Plaintiff's unjust enrichment claim fails as it "improperly merges into the defamation claim." *Silvercorp*, 36 Misc. 3d at 12 (dismissing unjust enrichment claim alongside defamation claim premised on same profits from "short selling scheme"). The basic elements of unjust enrichment require "proof that (1) [the] defendant was enriched, (2) at [the] plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what [the] plaintiff is seeking to recover." *Cooper v. Anheuser-Busch, LLC*, 553 F. Supp. 3d 83, 115 (S.D.N.Y. 2021). New York courts do not allow "[a]n unjust enrichment claim… where it simply duplicates, or replaces, a conventional contract or tort claim." *Id*. Here, Plaintiff's unjust enrichment claim is "premised on the same factual allegations as those supporting Plaintiffs' other claims," *Id*. Plaintiff claims "Defendants were impermissibly and unfairly enriched by their aforesaid tortious and improper conduct, at Grifols' detriment and expense," FAC ¶ 286, all but admitting "the unjust enrichment in this action derives from and is the result of the alleged

defamation." *See Silvercorp*, 36 Misc. 3d at 12. Therefore, because Plaintiff's unjust enrichment claim "has no independent basis, this claim is dismissed." *See id*.

### D. Many Statements are Not Defamatory, FAC Fails to Plead Libel By Implication.

A final obvious defect in much of the FAC is that most of the challenged statements are not defamatory of Grifols. They are statements about business activities, EBITDA, revenues and debt, but not defamatory without several leaps of implications. It is not defamatory of Grifols to say that a definition of EBITDA is incorrect or misleading. It is not defamatory to say that based on a reading of Grifols public filings, debt appears understated. It is not defamatory for the Report to say that it considers restructuring costs to be ongoing or that it is cheaper to construct a plasma center than Grifols proposes. To plead libel by implication, the implication must be specifically articulated; and it must be shown to be adopted elsewhere in the Report by its authors. *See generally Stepanov v. Dow Jones & Co*., 987 N.Y.S.2d 37, 38 (1st Dep't 2014). The FAC does not plead the requisite elements. A plaintiff does not get to rewrite the article they are attacking. FAC's libel by implication after-thought at ¶ 241 – 243 tries to plead it generally with scotch tape and baling wire. It lacks the specific pleading required of implication claims. It hangs on the most abject terms and statements of non-actionable opinion.

### E. No Plausible Pleading in FAC to Justify Grifols Shared Services North America, Inc. Standing as a Plaintiff in Libel Case.

Grifols Shared Services North America, Inc. (GSSNA) is named as a Plaintiff in this libel case. There are no allegations that plausibly justify its presence as a plaintiff. Its corporate filings are not at issue. There is nothing in the Report about GSSNA.

<u>CONCLUSION</u>

For the above reasons, the Complaint should be dismissed in its entirety with prejudice.

Dated: October 22, 2024

*/s/ David S. Korzenik*

David S. Korzenik
Gillian Vernick
**MILLER KORZENIK
SOMMERS RAYMAN LLP**
1501 Broadway, Suite 2015
New York, New York 10036
Tel: 212-752-9200
dkorzenik@mkslex.com