UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 05/29/2025
```

------------------------------------------------------------------X
                                        :

GRIFOLS, S.A., GRIFOLS SHARED SERVICES   :
NORTH AMERICA, INC.,                           :
                                          :

                    Plaintiffs,       :         24-cv-576 (LJL)
                                          :

          -v-                           :    OPINION AND ORDER
                                          :

DANIEL YU, GOTHAM CITY RESEARCH, LLC,   :
GENERAL INDUSTRIAL PARTNERS LLP, CYRUS  :
DE WECK, JOHN DOES 1-10, XYZ CORPORATIONS :
1-10,                                     :
                                         :

                    Defendants.      :
                                          :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Defendants Daniel Yu ("Yu"), Gotham City Research LLC ("Gotham City Research"),

General Industrial Partners LLP ("GIP"), and Cyrus De Weck ("De Weck" and with Yu, Gotham

City, and GIP, "Defendants") move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to

dismiss the Amended Complaint.  Dkt. No. 26.

      For the following reasons, the motion to dismiss is granted in part and denied in part.

## BACKGROUND

      For purposes of this motion, the Court accepts as true the well-pleaded allegations of the

Amended Complaint as supplemented by the documents incorporated by reference.  *See Concord*

*Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 51 n. 2 (2d Cir. 2016).[1]

---

[1] The Amended Complaint heavily references and attaches the original January 9, 2024, version
of a report published by Gotham City Research regarding Grifols (the "Report"), Dkt. No. 22-1,
a revised January 10, 2024, version of the same report, Dkt. No. 22-2, and a report by the
Spanish National Securities Market Commission ("CNMV") which was prompted by the
Gotham City Research report and examined many of the same topics, Dkt. No. 22-4.  All of

## I.      The Relevant Parties

Grifols S.A. ("Grifols") is a sociedad anónima (limited liability company) first incorporated under Spanish law on June 22, 1987.  Dkt. No. 22 ¶ 52.  It conducts business under the name "Grifols," and its principal executive offices and registered office are located in Barcelona, Spain.  *Id.*  Grifols is a global leader in innovation, development, and production of essential lifesaving plasma-derived and transfusion medicines.  *Id.* ¶ 66.  Grifols sources raw material, manufactures various plasma-derived products, and sells and distributes final products to healthcare providers.  *Id.* ¶ 75.  Its plasma-derived medicines treat patients with chronic and rare diseases, including chronic liver diseases, primary and secondary immunodeficiencies, hematological disorders, chronic obstructive pulmonary disease, hepatitis B, rabies, Zika virus, and Ebola.  *Id.* ¶ 66.  Its stock is publicly traded on the Spanish Stock Exchanges.  *Id.* ¶¶ 67, 70.[2] Since 2011, Grifols' American Depositary Shares ("ADS") have traded on the NASDAQ Global Select Market in the United States.  *Id.* ¶ 72.

Grifols Shared Services North America, Inc. ("GSSNA"), formerly known as Grifols, Inc., is the primary Grifols operating entity in the United States and is the parent company of Grifols' operating entities in the United States.  *Id.* ¶¶ 53, 79.  Grifols' operating entities in the United States include Grifols Biologicals, LLC, Grifols Therapeutics, LLC, and Grifols USA, LLC, all of which are headquartered in Los Angeles, California.  *Id.* ¶ 53.  These entities are

---

these documents are considered by the Court as incorporated by reference.  *See In re Turquoise Hill Res. Ltd.*, 2024 WL 4711185, at *9 (S.D.N.Y. Nov. 7, 2024) (considering report which was quoted and discussed extensively in the operative complaint).

[2] The Spanish Stock Exchanges consist of four stock exchanges located in Madrid, Barcelona, Bilbao, and Valencia.  *Id.* ¶ 69 n.6.  The majority of the transactions conducted on them are done through the Spanish Automated Quotation System, which links the Spanish Stock Exchanges, providing those securities listed on it with a uniform continuous market that eliminates most of the differences among the Spanish Stock Exchanges.  *Id.*

involved in collecting and manufacturing plasma and marketing and distributing Grifols' products in the United States. *Id.* ¶¶ 53, 78.

Gotham City Research is a Delaware limited liability company which engages in short selling and publishes "research reports" on the targets of its short-selling activities. *Id.* ¶ 55. Yu is the founder, publisher, and editor of Gotham City Research. *Id.* ¶ 54. GIP is a limited liability partnership registered in both England and Wales and is an affiliate of Gotham City Research. *Id.* ¶ 56. GIP actively engages in short selling of the stock of companies who are the targets of reports published by Gotham City Research. *Id.* ¶ 56. De Weck is an individual who resides in England and who operates GIP. *Id.* ¶ 57. De Weck, Yu, and Gotham City Research coordinate with respect to the short positions taken by GIP. *Id.* ¶ 56. Yu and De Weck formed GIP together. *Id.* ¶¶ 56, 107–108.[3]

## II.    The Gotham City Research Report

On January 8, 2024, Gotham City Research posted on its X account, @GothamResearch, that it would be releasing a report the following day on an unnamed, "highly levered, $10+ billion company," whose shares were listed in Spain, and stated "we believe shares are uninvestable" and would "head to zero." *Id.* ¶ 121.

The following day, January 9, 2024, Gotham City Research published a report on its website entitled "Grifols SA: Scranton and the Undisclosed Debts". *Id.* ¶ 122. The Report, with its footnotes, is sixty-five pages long. Dkt. No. 22-1. It includes an eight-page appendix. The Report begins with a disclaimer. Dkt. No. 22-1 at 2. Among other things, it states:

---

[3] Plaintiffs also name John Does 1–10 and XYZ Corporations 1–10 as presently-unidentified affiliates of Defendants who participated in and benefitted from Defendants' unlawful acts. *Id.* ¶¶ 58–60.

Our research expresses our opinions, which we have based upon publicly obtainable information, field research, inferences and deductions through our due diligence and analytical processes.

Our research and Report include forward-looking statements, estimates, projections, and opinions prepared with respect to, among other things, certain accounting, legal, and regulatory issues the issuer faces and the potential impact of those issues on its future business, financial condition and results of operations, as well as more generally, the issuer's anticipated operating performance, access to capital markets, market conditions, assets and liabilities.  Such statements, estimates, projections and opinions may prove to be substantially inaccurate and are inherently subject to significant risks and uncertainties beyond GOTHAM CITY RESEARCH LLC's and its affiliates' control.  No representation is made, or warranty given as to the accuracy, completeness, achievability or reasonableness of such statements of opinion.

GOTHAM CITY RESEARCH LLC believes all information contained herein is accurate and reliable, and has been obtained from public sources it believes to be accurate and reliable.  However, such information is presented "as is," without warranty of any kind, whether express or implied.  GOTHAM CITY RESEARCH LLC and its affiliates make no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use.  All expressions of opinion are subject to change without notice, and GOTHAM CITY RESEARCH LLC is not obligated to update or supplement any Reports or any of the information, analysis and opinion contained in them.  GCR makes no representation, express or implied, as to the accuracy, completeness, achievability, reasonableness, timeliness of any such information or statements or with regard to the results to be obtained from its use.

*Id.*

The Report also includes a notice with respect to Gotham City Research's conflict of

interest:

**CONFLICT OF INTEREST**: At the time of publication of this Report, GOTHAM CITY RESEARCH LLC, its affiliates, or related persons (possibly along with or through its members, partners, affiliates, employees, and/or consultants), hold short positions in the Issuer mentioned in this Report in excess of 0.5% calculated in accordance with Article 3 of Regulations (EU) No 236/2012 and with Chapters III and IV of Commission Delegated Regulation (EU) No 918/2012 and stand to profit in the event the issuer's stock price declines.  Thus, while GOTHAM CITY RESEARCH LLC has made every effort to present the information contained in the Report in an objective manner, the reader of the Report must bear in mind that GOTHAM CITY RESEARCH LLC's interest and that of its affiliates is to see the price of the issuer's stock decline.

*Id*.

On the first substantive page, the Report has a column with Gotham City Research's opinions and the bases of those opinions. Under the heading, **GOTHAM CITY RESEARCH'S OPINIONS**, the Report states:

- GRF manipulates reported debt & EBITDA to artificially reduce reported leverage to 6x which we believe is closer to 10x–13x.

- Both GRF and Scranton Enterprises (a Grifols family vehicle) fully consolidate BPC + Haema onto their financial statements. This treatment is materially deceptive and incorrect.

- Should our estimate of the Grifols' true leverage be correct, GRF will face notably higher financing costs.

- Consequently, we believe shares are uninvestable, likely zero.

*Id*. at 4.

The thrust of the Report is that the manner in which Grifols reports its debt and its earnings before interest and debt amortization ("EBITDA") is misleading, that Grifols' "true" debt is far greater than reported and its EBITDA far lower than reported, that accordingly Grifols' "true leverage" is far greater than reported, and that, as a result, Grifols' shares are overvalued and, if the assumptions stated in the Report are applied, "uninvestable" and worth "likely zero." *Id*. The Report marshals a variety of evidence to support these conclusions.

A major emphasis of the Report is Grifols' decision to include in its financial results and reported EBITDA the financial results of two corporations, BPC Plasma ("BPC") and Haema AG ("Haema"), that are not owned by Grifols. *Id*. at 8–22, 26–28. The Report criticizes this reporting as "materially deceptive and incorrect." *Id*. at 4.

BPC and Haema were purchased by Grifols in 2018 and then were sold by the company on December 28, 2018 (one day before the end of Grifols' fiscal year), to Grifols' affiliate, Scranton Enterprises B.V. ("Scranton"). *Id*. at 10–11. Grifols purchased the companies for a

combined price of approximately $506 million and then sold them to Scranton for approximately $538 million. *Id.* The transaction was financed by a loan of $95 million provided by Grifols (the "Scranton Loan"). *Id.* at 23–24; *see id.* at 53–54. Grifols has a call option (the "Call Option") to purchase the operations of BPC and Haema from Scranton for a price equal to the higher of "a) the price at which Grifols sold the two companies plus costs incurred in the transaction and plus the increase in working capital and b) the amount of the debt that Scranton owns the date on which Grifols exercises the option." *Id.* at 11. Because of the Call Option, Grifols incorporates the results of Haema and BPC in its financial results. *Id.* Scranton also includes the results of the two companies in its financial results. *Id.* at 26–28.

The Report argues that, because Grifols has no equity in the two companies but only a call option, the earnings are not available to Grifols, including to service debt, and thus should not be included in EBITDA. *Id.* at 16. It suggests that "it is only fair to adjust Grifols' debt higher for the amount it would require to purchase these two assets, and thus benefit from their cash flows." *Id.* Thus, it states that if Grifols is to include Haema and BPC in its financial results, it should also include the purchase price for the exercise of the Call Option. *Id.*

The Report then attempts to calculate that price. It first notes some confusion regarding the price of the Call Option. *Id.* It states that Grifols' 2018, 2019, and 2020 annual reports "are clear that the price to exercise the call option is the higher of (a) the price at which Grifols sold them plus costs incurred and the increase in working capital, and (b) some amount of the debt that Scranton owns the date on which Grifols exercises the option," but are not clear as to the amount of debt referenced in option (b). *Id.* The language of each annual report is listed in the Appendix. *Id.* at 57–59. The 2018 text states that option (b) is "the amount of the debt that Scranton owns the date on which Grifols exercises the option (principal plus interests plus any

other cost to be able to cancel said loan)." *Id.* at 57.  The 2019 text states that option (b) is "the amount of debt that Scranton owns *related to this transaction* on the date on which Grifols exercises the option (principal plus interests plus any other cost to be able to cancel said loan)," *id.* at 58 (emphasis added), and the 2020 text refers to debt "related to this acquisition," *id.* at 59. The Report states that "[w]e don't know which is correct, but in the event the original 2018 language from the Grifols Annual Report is correct—that Grifols must assume all Scranton debt," Grifols' "Haema and BPC related liability" would be €1.313 billion. *Id.* at 17.  The Report recalculates Grifols' "adjusted net debt" based on this number.  *Id.*

The Report connects Haema and BPC to a broader critique that by including companies in which Grifols has only a non-controlling interest ("NCI") in its financial statements, Grifols provides a misleading and incomplete portrait of its health.  *Id.* at 9.  In the same vein, the Report notes that Grifols fully includes Grifols Diagnostic Solutions ("GDS") in its EBITDA despite having sold shares representing 45% of the economic rights and 40% of the voting rights in that company in March 2020, to Shanghai RAAS Blood Products Co. Ltd. ("SRAAS").  *Id.* at 12.  It suggests that this "overstates [Grifols'] earnings power considerably."  *Id.*  It argues that "[h]igh NCI values should be a red flag for investors," as they make it possible "to game the consolidation rules . . . to make consolidated leverage appear[] far lower than proportionally consolidated leverage."  *Id.* at 9.

The Report also criticizes other inclusions in Grifols' EBITDA.  It describes as "highly suspect" Grifols' inclusion of "run rate cost savings, synergies that have yet to be realized" because "Grifols has claimed many run rate cost savings in recent periods but has very little to show in terms of EBITDA uplift."  *Id.* at 14.  The Report removes restructuring costs from the calculation of EBITDA (or more precisely includes those costs in expenses) on the theory that

restructuring costs are "an ongoing business expense [for Grifols], and not unusual nor exceptional expenses." *Id.* at 15. The Report also states that Grifols EBITDA calculation improperly adds back €83 million in "other financial assets to related parties" and "loans to related parties." *Id.* at 14. After adjusting for all of these issues, the Report suggests Grifols' reported EBITDA is overstated by at least 32%, debt is understated by €920 million, and Grifols is levered 10x–13x, rather than 6.7x as reported. *Id.* at 6–7.

The Report draws attention to additional aspects of Grifols' financial practices which may signal that "the true picture can be far worse than suspected by the public" or estimated in the Report. *Id.* at 17. It notes that Grifols has engaged in unspecified reverse factoring activity, which was a negative sign in other cases. *Id.* at 18. It also notes that Grifols tried to reclassify debt as equity in a 2021 deal, but the amount "was correctly classified as a financial liability after an investigation by KPMG." *Id.* at 19–20. And it states that Grifols has guaranteed GDS EBITDA of $1.3 billion from January 2019–December 2023 to SRAAS, but this was only disclosed in filings by SRAAS, not Grifols. *Id.* at 18.

Relatedly, the Report focuses an entire section on "undisclosed loans to Scranton Enterprises." *Id.* at 23–25. Grifols lent $95 million to Scranton Enterprises in 2018, about which the report states that:

> Grifols does not disclose that the company lent $95 million to Scranton. We did not see any mention of this $95 million loan to Scranton in its GRF annual reports nor in its Corporate governance reports—in English or in Spanish. We should expect to find details about related party loans in Note 11 and Note 31 of GRF Annual Report. Instead, we find that Note 11 refers to Note 31 for details, and Note 31 refers to Note 11 for details—a circular reference. And neither provides any details about a loan to Scranton.

*Id.* at 24. The Report also accuses Grifols of failing to disclose in its filings an increase of €59 million relating to advance payments from Grifols Worldwide Operations Ltd. *Id.*

The Report has a number of other criticisms of Grifols.  It expresses concern that Scranton, which is closely related to Grifols, is "highly levered, between 27x and 31x," and has been involved in several purportedly suspicious transactions.  *Id.* at 29–33.  It suggests that Grifols bought certain plasma collection centers from Bio Products Laboratory Holdings Ltd. ("Bio Products") at a price of approximately $15 million per center when it costs only $3 million to construct such a center, and that the overpayment may have been a way to bail out Scranton on a related transaction.  *Id.* at 34–40.  And it criticizes a €124 million advance payment made by Grifols to ImmunoTek Bio Centers LLC ("ImmunoTek"), purportedly to develop new plasma collection centers, on the similar basis that "the implied price per center is $14.8 million per center" while the cost to construct the centers would only be $3 million.  *Id.* at 41–44.  The Report also suggests that this payment to ImmunoTek is out of line with actual efforts that have been undertaken to construct the centers.  *Id.* at 43–47.

The report concludes that Grifols' shares are overvalued by 34–75% based on EBITDA and that additionally if "the market reprices Grifols' interest rates to reflect higher leverage," Grifols' financial position would be unsustainable.  *Id.* at 51–52.  It therefore states that "the shares of Grifols are uninvestable and likely are worth zero."  *Id.* at 51.

## III.    The Stock Price Reaction

Plaintiffs allege that as a result of the Gotham City report, Grifols' shares fell as much as 43% during trading on January 9, 2024, causing the company to lose nearly $3 billion of market value.  Dkt. No. 22 ¶ 127.

Shortly after the Gotham City report was issued and Grifols' stock plummeted, Defendants reduced their short position in Grifols' stock from .57% to .06%, resulting in a multimillion-dollar windfall.  *Id.* ¶ 128.

IV.    **The January 10 Modification**

On January 10, after selling a large portion of their short position, Defendants modified the Report.  *Id.* ¶¶ 143, 242.  Defendants eliminated the accusation that Grifols had failed to disclose the Scranton Loan.  *Id.* ¶ 144.  Instead of claiming that only Scranton had disclosed the loan, the modified Report stated that the loan was "undisclosed in Grifols' corporate governance filings" and that the details about the Scranton Loan "lied buried in Note 31," which the Report found "odd."  *Id.*

V.    **The Alleged Misstatements**

Plaintiffs allege that the Report is "full of deliberate falsehoods."  Dkt. No. 22 at 37.

First, Plaintiffs assert that it is not true that Grifols failed to disclose the $95 million loan it made to Scranton.  Dkt. No. 22 ¶¶ 137–148.  Plaintiffs state that the $95 million loan to Scranton is disclosed on every single Annual Report on Form 20-F filed by Grifols with the United States Securities and Exchange Commission ("SEC") from 2018–2022, as well as on Grifols' filings with the CNMV.  *Id.* ¶ 139.  In each of these years, Grifols' Annual Report on Form 20-F disclosed the following under the heading **Sale of Haema AG and Biotest US Corporation**:

> Scranton Enterprises B.V. financed the purchase in part through a loan from Grifols Worldwide Operations Limited for an initial principal sum of the euro equivalent of $95 million, with an interest rate of EURIBOR plus 200 basis points.

*Id.* ¶ 139.

Plaintiffs further allege that after the Report was modified on January 10, 2024, the revised language about the Scranton Loan was still false.  *Id.* ¶ 146–147.  The statement that the Scranton Loan was not disclosed in "corporate governance filings" was false, because Form 20-F is a corporate governance filing.  *Id.* ¶ 146.  And the statement that details of the Scranton Loan

were only reported in footnote 31 also was false; the loan was disclosed in the body of Grifols'
2018 Annual Report filed on Form 20-F.  *Id.* ¶ 147.

Second, Plaintiffs assert that the Report's statement that "we find even this Grifols 'per
credit agreement' definition of EBITDA materially misleading and incorrect" was also false and
defamatory.  *Id.* ¶¶ 149–153.  Plaintiffs assert that the formula for EBITDA under the credit
agreement was set by Grifols' lenders and that it was therefore "above-board."  *Id.* ¶¶ 152–153.

Third, Plaintiffs challenge the Report's assertion that Grifols "manipulates reported debt
& EDBITDA to artificially reduce reported leverage to 6x which we believe is closer to 10x–
13x."  *Id.* ¶ 155 (quoting Dkt. No. 22-1 at 5).  According to Plaintiffs, their calculation is
consistent with the EBITDA definition in the Credit Agreement and consistent with International
Financial Reporting Standards ("IFRS") accounting principles.  *Id.* ¶ 156.  Plaintiffs state that the
Call Option is not debt and cannot be considered debt under IFRS.  *Id.* ¶ 162.

Plaintiffs additionally allege that even if the cost of exercising the Call Option were to be
considered a liability, such cost would be closer to €470 million rather than €1.313 billion.  *Id.* ¶¶
162–164.  The Report arrives at the €1.313 billion figure only by misreading the cost of the Call
Option to equal *all* of Scranton's debt, rather than only the debt Scranton owes related to its
acquisition of Haema and BPC.  *Id.* ¶ 165.  Defendants knew that this was not the actual cost of
the option, because Grifols' 2019 and 2020 statements expressly state that the cost is only the
debt related to the transaction.  *Id.*

Relatedly, Plaintiffs challenge the Report's adjustments to EBITDA to arrive at net
leverage.  *Id.* ¶¶ 169–191.  Specifically, Plaintiffs object to the statements that Grifols includes
earnings from NCIs "despite not actually having claim to these earnings," that the full inclusion
of GDS into EBITDA "overstates . . . earning power considerably," that the Report would

exclude "run rate cost savings," that "Grifols has been embarking on continual restructuring costs over a significant period of time," and that outflows marked "loans to related parties," "other financial assets to related parties," and "loans to third parties" are "suspect." *Id.* ¶ 169. Plaintiffs state that these criticisms "misrepresent[] accounting principles that Grifols is required to use to calculate its EBITDA under its Credit Agreement with its lenders." *Id.* ¶ 170. Grifols' claim to earnings of BPC and Haema as NCIs is similarly appropriate under IFRS and the definition of EBITDA in the Credit Agreement. *Id.* ¶¶ 175–178. Grifols' treatment of GDS, BPC, and Haema was confirmed as appropriate by a CNMV report. *Id.* ¶¶ 174, 179. The decision to add back costs and expenses incurred by Grifols related to cost savings, operating improvements and synergies on a run rate is consistent with the definition of Consolidated Adjusted EBITDA in the Credit Agreement and follows IFRS requirements. *Id.* ¶¶ 183–184. Likewise, non-recurring items such as restructuring costs are not included in calculating EBITDA under the Credit Agreement. *Id.* ¶ 185. Finally, the Report's addback of €87 million in "other financial assets to related parties" and "loans to related parties" is incorrect because the treatment of these items is required under the Credit Agreement, and in any case they are balance sheet items which are never included in EBITDA. *Id.* ¶¶ 189–190.

Fourth, Plaintiffs claim that Defendant's assertion that Grifols' shares are "uninvestable" and "worthless" is "wildly off the mark" even by Defendants' own calculations. *Id.* ¶¶ 192–200. Even if the Report were correct that Grifols' leverage is closer to 10x–13x, the company's equity value would not be worthless but would be in the range of €1.6 billion to €5.3 billion. *Id.* ¶ 195. Defendants' statements that Grifols' debt would be "unsustainable" if the market understood its leverage is inaccurate because the cash proceeds from the SRAAS transaction would be

sufficient to pay notes coming due in 2025, which in any case have fixed interest rates, and the next set of principal repayments on Grifols' debt is not until November 2027. *Id.* ¶ 198.

Fifth, Plaintiffs allege that the Report's statements that the "full inclusion of GDS onto GRF EBITDA overstates GRF's earnings power considerably" is false and defamatory. *Id.* ¶ 201 (quoting Dkt. No. 22-1 at 12). Because "GDS is a majority-owned subsidiary of Grifols," "inclusion of GDS follows IFRS and therefore contributes to the *accurate* calculation of Grifols' earnings power." Dkt. No. 22 ¶ 202.

Finally, Plaintiffs assert that Defendants' statements regarding the ImmunoTek Transaction are false because they presume that the transaction was limited to the construction of plasma centers, whereas the transaction's purpose was to establish a joint arrangement to obtain source plasma through the construction, development, operating and operation of the centers. *Id.* ¶ 213. Plaintiffs also allege that the statement that it costs only $3 million per center to construct a center is false. *Id.* ¶ 214.

## VI.    The Report of the Spanish National Securities Market Commission

In response to the Report, the Spanish National Securities Market Commission ("CNMV"), the regulatory body supervising the relevant Spanish markets, requested certain information from Grifols related to Grifols' financial reporting for the years 2018 through 2022, which Grifols provided. *Id.* ¶ 9.

On March 21, 2024, the CNMV issued a report summarizing the findings of its analysis of Grifols' financial reporting for the years 2018 to 2022 (the "CNMV Report"). *Id.* ¶ 10 *see* Dkt. No. 22-4. The CNMV Report found that there were not "significant errors in the quantitative magnitudes" of Grifols' main financial statements, with one exception, nor was there evidence "to conclude that the financial indebtedness reflected by Grifols in its consolidated annual financial statements does not correspond to reality." Dkt. No. 22-4 at 2. However, it found

"significant deficiencies" in "the detail and accuracy of the breakdowns and explanatory notes supporting the figures of the financial information" and in "alternative measures of performance (APMs), in particular EBITDA and debt-to-EBITDA ratios." *Id.* It found that these shortcomings "should be considered significant as they have hindered investors' ability to adequately understand the issuer's financial position." *Id.*

Specifically, the CNMV found that Grifols' consolidation of BPC, Haema, and GDS was reasonable. *Id.* at 2–4. However, it found that Grifols failed to properly explain the consolidation of these entities, failed to adequately break down information on Haema and BPC in reports from 2022 and before, and it failed to adequately break down information on GDS in reports from 2020 to 2022. *Id.* In addition, the CNMV Report found that Grifols failed to disclose relevant information from 2019 to 2022 regarding its transaction with SRAAS involving GDS, including certain contingent consideration owed to SRAAS. *Id.* at 4.

The CNMV Report found that the acquisition of plasma centers from Bio Products was consistent with their market value. *Id.* at 3. However, it concluded that the accounting treatment of Grifols' agreement with ImmunoTek was inadequate and that the deal should have been recorded as a joint venture rather than a financial investment, leading to negative adjustments of €33.3 million to Grifols' consolidated loss and earnings statement in 2022 and €15 million in 2023. *Id.* at 4. It also found that Grifols had provided inadequate information to investors regarding the risks and benefits of this collaboration. *Id.*

The CNMV Report found that Grifols either failed to report or failed to properly break down a number of related-party transactions, including with Scranton. *Id.* at 4–7. However, it found that the specific $95 million loan to Scranton which the Gotham report stated was

undisclosed had in fact been disclosed.  *See id.* at 6 n.1 ("Gotham's first report stated that Grifols had not broken this loan in its consolidated annual financial report, which was not true.").

The CNMV described Grifols' EBITDA reporting as a "significant deficiency."  *Id.* at 8. It stated that "the use of adjusted EBITDA without excluding the results attributable to non-controlled interests when explaining the Grifols group's financial leverage ratio and its financial capacity to satisfy debt . . . is not in accordance with the legal obligations to reflect useful, relevant, objective and neutral information."  *Id.*  It suggested that Grifols had "misname[d] items as non-recurring, uncommon, or unusual," and that if items are adjusted for costs savings or operational improvements "it should be expressly stated that the financial measure does not express a measure of the entity's current performance."  *Id.* at 8.  It stated that Grifols should clarify when it is using adjusted measures and should provide figures without adjustment when doing so, and furthermore that it should provide information that would enable investors to calculate EBITDA excluding results attributed to NCIs.  *Id.* at 8–9.

In conclusion, the CNMV ordered Grifols to include breakdowns "related to the scope of consolidation" and "of related-party transactions" in all future financial statements, to publish within fifteen days a detail of EBITDA that would allow an investor to "calculate the leverage ratio considering, or excluding, the EBITDA and the debt corresponding to the participation in its subsidiaries," and to detail within fifteen days the commitments that the entity will assume to adapt the use of APMs.  *Id.* at 9–10.

## PROCEDURAL HISTORY

Plaintiffs instituted this action by complaint filed on January 26, 2024.  Dkt. No. 1.

Plaintiffs filed their amended complaint (the "Amended Complaint") on September 9, 2024.  Dkt. No. 22.  The Amended Complaint has five counts: libel and defamation by implication against Yu and Gotham City, *id.* ¶¶ 231–244; aiding and abetting libel and

defamation by implication against GIP and De Weck, *id.* ¶¶ 245–254; tortious interference with business relations against Yu and Gotham City, *id.* ¶¶ 255–266; aiding and abetting tortious interference with business relations against GIP and De Weck, *id.* ¶¶ 267–275; and unjust enrichment against all defendants, *id.* ¶¶ 276–281.

The parties stipulated that they would serve papers in support and in opposition to the motion to dismiss upon one another by certain deadlines and that they would then file all such papers with the Court simultaneously on December 20, 2024.  Dkt. No. 24.  Defendants' motion to dismiss is supported by a memorandum of law and an affidavit of counsel with three exhibits.  Dkt. Nos. 25–26.  Plaintiffs have filed a memorandum of law in opposition to the motion, which is accompanied by an appendix of challenged statements and a hearing transcript cited to in the brief.  Dkt. No. 27.  Defendants have filed a reply memorandum of law in further support of the motion, accompanied by an affidavit of De Weck with one exhibit.  Dkt. No. 28.

On January 2, 2025, Plaintiffs filed a letter motion to for leave to file a sur-reply to the motion to dismiss, along with the sur-reply.  Dkt. No. 33.  Plaintiffs stated such sur-reply was necessary to address misrepresentations in Defendants' reply memorandum and Defendants' use of a factual declaration in connection with the reply.  *Id.* at 1.[4]

---

[4] "[T]he Court has discretion to permit a sur-reply." *Vilella v. Pup Culture LLC*, 2023 WL 7986562, at *4 (S.D.N.Y. Nov. 17, 2023).  Although a sur-reply is generally inappropriate when the reply merely responds to issues raised in opposition briefing, a sur-reply may be appropriate to address issues newly raised by a movant's reply. *See Convergen Energy LLC v. Brooks*, 2020 WL 4500184, at *3 n.2 (S.D.N.Y. Aug. 5, 2020) (noting that a sur-reply could be warranted to respond to a declaration which "offers new evidence on reply," but not when the declaration merely "responded directly to the arguments advanced through [Defendants'] opposition memorandum" (quoting *Kapiti v. Kelly*, 2008 WL 754686, at *1 n.1 (S.D.N.Y. Mar. 12, 2008)).  Here, the portion of Plaintiffs' sur-reply addressing the reply's discussion of *NovaGold Res., Inc. v. J Cap. Rsch. USA LLC*, 2022 WL 900604 (E.D.N.Y. 2022), will not be considered because the reply simply responds to issues raised in Plaintiffs' opposition.  The remainder of the sur-reply will also not be considered because it continues to litigate representations by both parties

In addition, on December 20, 2025, Defendants filed a cross-motion to strike prejudicial content from the amended complaint as well as a memorandum of law and an affidavit of De Weck in support of that motion. Dkt. Nos. 29–30. On January 17, 2025, Plaintiffs filed a memorandum of law in opposition to the cross motion to strike. Dkt. No. 41. On January 28, 2025, Defendants filed a reply memorandum of law in further support of the motion to strike. Dkt. No. 44.

On January 31, 2025, Defendants filed a motion for attorney's fees under the New York anti-SLAPP statute. Dkt. No. 45. Plaintiff filed a memorandum of law in opposition to that motion on February 21, 2025. Dkt. No. 46. On February 28, 2025, Defendants filed a reply memorandum of law in further support of the motion for attorney's fees. Dkt. No. 47.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Twombly*, 550 U.S. at 555, 557. The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the

---

regarding ongoing enforcement proceedings involving the CNMV and SEC which are not relevant to the decision of this motion. *See* Dkt. No. 33-1. Therefore, the motion for leave to file a sur-reply, Dkt. No. 33, is denied.

reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another

way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that

discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also*

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

## DISCUSSION

Plaintiff brings claims for libel and defamation by implication against Yu and Gotham

City, *id.* ¶¶ 231–244; aiding and abetting libel and defamation by implication against GIP and De

Weck, *id.* ¶¶ 245–254; tortious interference with business relations against Yu and Gotham City,

*id.* ¶¶ 255–266; aiding and abetting tortious interference with business relations against GIP and

De Weck, *id.* ¶¶ 267–275; and unjust enrichment against all defendants, *id.* ¶¶ 276–281.

Defendants argue that the statements in the Report are not actionable as defamation and that

Plaintiffs' remaining claims are similarly meritless.  Dkt. No. 25.

The Court largely agrees with Defendants.  However, Plaintiff has stated a claim for

defamation based on Defendants' statements that Grifols failed to disclose a $95 million loan to

Scranton Enterprises, which is a factual statement that is actionable as a matter of law.  The

motion to dismiss is therefore granted in part and denied in part.

## I.    Defamation

Plaintiff's first cause of action is for libel and defamation by implication against Yu and

Gotham City Research.  Dkt. No. 22 ¶¶ 231–244.

"Under New York law a defamation plaintiff must establish five elements: (1) a written

defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault,

(4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin v.*

*N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019).  "Since falsity is a *sine qua non* of a libel

claim and since only assertions of fact are capable of being proven false, … a libel action cannot

18

be maintained unless it is premised on published assertions of *fact*." *Brian v. Richardson*, 660

N.E.2d 1126, 1129 (N.Y. 1995). "Determining whether a statement is an allegation of fact or

mere opinion is a legal question for the court." *Chau v. Lewis*, 771 F.3d 118, 128 (2d Cir. 2014).

"This is no easy task." *Id.*; *see Brian*, 660 N.E.2d at 1129 ("Distinguishing between assertions of

fact and nonactionable expressions of opinion has often proved a difficult task"); *Sandals*

*Resorts Intern. Ltd. v. Google, Inc.,* 925 N.Y.S.2d 407, 412 (1st Dept 2011).

      The factors to be considered in determining whether a statement is one of fact or of

opinion are: "(1) whether the specific language in issue has a precise meaning which is readily

understood; (2) whether the statements are capable of being proven true or false; and (3) whether

either the full context of the communication in which the statement appears or the broader social

context and surrounding circumstances are such as to signal readers or listeners that what is

being read or heard is likely to be opinion, not fact." *Davis v. Boeheim*, 22 N.E.3d 999, 1005

(N.Y. 2014) (quoting *Mann v. Abel*, 885 N.E.2d 884, 886 (N.Y. 2008)); *see Sandals Resorts,* 925

N.Y.S.2d at 412–13 (noting that because the New York Constitution provides broader speech

protections than the United States Constitution, New York defamation law does not follow the

analysis set out in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)). New York courts adopt

"a holistic approach" to determining whether a statement is fact or opinion, including

consideration of "the content of the communication as a whole, its tone and apparent purpose."

*Boeheim*, 22 N.E.3d at 1005. "Rather than sifting through a communication for the purpose of

isolating and identifying assertions of fact, the court should look to the over-all context in which

the assertions were made and determine on that basis 'whether the reasonable reader would have

believed that the challenged statements were conveying facts about the . . . plaintiff.'" *Id.*

(quoting *Brian*, 660 N.E.2d at 1130); *see Mann*, 885 N.E.2d at 886 ("Although one could sift

through the article and argue that false factual assertions were made by the author, viewing the content of the article as a whole, as we must, we conclude that the article constituted an expression of protected opinion.").

"A pure opinion cannot be the subject of a defamation claim." *Boeheim*, 22 N.E.3d at 1004.  However, New York courts distinguish between a pure opinion and a "mixed opinion." *Gross*, 623 N.E.2d at 1168; *see Boeheim*, 22 N.E.3d at 1004.  A pure opinion may be either "a statement of opinion which is accompanied by a recitation of the facts upon which it is based," or "'[a]n opinion not accompanied by such a factual recitation' so long as 'it does not imply that it is based upon undisclosed facts.'"  *Boeheim*, 22 N.E.3d at 1004 (quoting *Steinhilber v. Alphonse*, 501 N.E.2d 550, 552 (N.Y. 1986)).  By contrast, a mixed opinion "implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it."  *Id.* (quoting *Steinhilber*, 501 N.E.2d at 552–53).  Mixed opinions are "actionable not because they convey false opinions but rather because a reasonable listener or reader would infer that the speaker or writer knows certain facts, unknown to the audience, which support the opinion and are detrimental to the person toward whom the communication is directed."  *Gross*, 623 N.E.2d at 1168 (internal citations, quotations, and brackets omitted); *see Steinhilber*, 501 N.E.2d at 553.

Grifols does not contest that it is a public figure and is thus required to show that Defendants published the challenged statements with "actual malice."  *See BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 819 (S.D.N.Y. 2021) (holding that Plaintiff was a public figure when it did not respond to Defendants' argument that it was a public figure and only recited the defamation standard applicable to public figures), *aff'd*, 2022 WL 598973 (2d Cir. Mar. 1, 2022); *see also MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, 2018 WL 847014, at *6 (S.D.N.Y. Jan. 12, 2018) (holding that publicly held company was a public figure), *report and recommendation*

*adopted*, 2018 WL 4735717 (S.D.N.Y. Sept. 29, 2018).  "Actual malice" is "knowledge that the statements were false or . . . reckless disregard as to their falsity."  *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015).  Thus, "the actual malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication."  *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001).  Actual malice "must be alleged plausibly in accordance with Rule 8."  *Biro*, 807 F.3d at 545.  A plaintiff may plausibly allege actual malice through, among other things, a lack of sourcing for the defamatory statements, "obvious . . . reasons to doubt the veracity" of the information, or the "'inherently improbable' nature of the statements themselves."  *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)).

Defendants argue that the Amended Complaint should be dismissed because: (1) the challenged statements constitute opinion protectable under the New York Constitution; (2) the statements are substantially true; (3) Plaintiffs do not plead actual malice; (4) many of the statements are not defamatory; (5) Plaintiffs plead statements that are not of or concerning Plaintiffs; and (6) the Amended Complaint's pleading of defamation by implication is defective on its face.  Dkt. No. 25 at 5.

Almost all of the statements challenged by Plaintiffs are protected opinion.  However, Plaintiffs have adequately pled a defamation claim based on the statement that Grifols failed to disclose the Scranton Loan.

### A.    Fact and Opinion

Plaintiff describes six categories of alleged defamatory statements in the amended complaint: 1) statements regarding the disclosure of a $95 million loan to Scranton (Section IV.A of the Amended Complaint, Dkt. No. 22 ¶¶ 137–148); 2) statements that Grifols' definition of EBITDA is misleading and incorrect (Section IV.B, *id.* ¶¶ 149–153); 3) false calculations of

Grifols' leverage ratio (Section IV.C, *id.* ¶¶ 154–191); 4) statements that Grifols' shares are "uninvestable" or "worthless" (Section IV.D, *id.* ¶¶ 192–200); 5) false statements regarding Grifols' consolidation of GDS (Section IV.E, *id.* ¶¶ 201–208); and 6) false statements about the ImmunoTek transaction (Section IV.F, *id.* ¶¶ 209–216).[5]  Considered in the context of the communication as a whole, only the first category of statements would be understood by a reasonable reader as "conveying facts about the plaintiff."  *Boeheim*, 24 N.Y. 3d at 1005 (quoting *Gross*, 82 N.Y.2d at 152).

The Court first considers "the over-all context in which the assertions were made."  *Id.*; *see Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270, 1281 (1991) (stating that analysis should "begin[] by looking at the content of the whole communication, its tone and apparent purpose" rather than by examining the specific challenged statements).  The Report provides a short-seller's financial analysis explaining why it believes a company is overvalued.  It makes this clear to the reader by beginning with an extensive disclaimer stating that the author is a short-seller.  Dkt. No. 22-1 at 2–3.  By its own terms, the Report is not a report of new facts, but "expresses our opinions, which we have based upon publicly obtainable information."  *Id.* at 2.  The "apparent purpose" of the communication is to persuade the reader to agree with the Report's opinion that the company is overvalued.  *Immuno AG*, 567 N.E.2d at 1281.

"[C]ourts frequently determine that investment analysis . . . constitutes the author's opinion."  *Yangtze River Port and Logistics Ltd. v. Research*, 2020 WL 905770 (N.Y. Sup. Ct.

---

[5] In an appendix to Plaintiffs' opposition to the motion to dismiss, Plaintiffs separate the category of false calculations of Grifols' leverage ratio into three separate categories: false calculations of Grifols' leverage ratio, falsification of net debt by adding €1.313 billion in nonexistent debt, and false and misleading adjustments to EBITDA.  Dkt. No. 27-1 at 2–4.  The Court's analysis does not turn on how Plaintiff chooses to group the statements, and the Court addresses Plaintiff's distinctions only to the extent they are legally relevant.

Feb. 25, 2020); *see MiMedx Grp.*, 2018 WL 847014, at *6–7 (holding that investment recommendations regarding a public company were protected opinion). A short-seller, "an entity with an economic interest in driving down the company's stock price," has the same right to express opinions and analysis as any other market participant. *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 154 (S.D.N.Y. 2023). An issuer, which has an economic interest in driving up the stock price, is permitted to operate with a hopeful outlook, *see Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004), and, up to a point, be optimistic about its business prospects and to marshal facts supportive of a positive picture, *see In re Synchonry Financial Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 20210; *Tongue v. Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016). So too short-sellers, which have "an obvious motive to exaggerate the infirmities of the securities in which they speculate," are permitted to highlight the facts and assumptions that support their views. *Long Miao v. Fanhua, Inc*., 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020) (quoting *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 577 (S.D.N.Y. 2012)). Short-seller reports "perform a useful function by bringing information that securities are overvalued to the market." *Long Miao*, 442 F. Supp. 3d at 801 (quoting *In re Longtop*, 910 F. Supp. 2d at 577). It is through the percolation of ideas and opinions, both positive and negative, that the market can accurately value a security.

Moreover, unlike the issuer, the short-seller is not presumed to have special knowledge or material non-public information that informs its opinion. *Compare Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,* 575 U.S. 175, 191 (2015). Thus, a reasonable reader will view the statements in such a report "with caution." *In re DraftKings*, 650 F. Supp. 3d at 154. A statement about a company's finances which, divorced from context, might appear to be a simple statement of fact, may in the context of a short-seller report be understood as an

interested opinion which a reasonable reader would independently investigate.  *See Silvercorp Metals Inc. v. Anthion Mgmt. LLC*, 2012 WL 3569952, at *9–12 (N.Y. Sup. Ct. 2012) (noting that disclosure of a short-seller's motive "indicates to the reader that the author is expressing his opinion," rather than disinterested facts).  Thus, the context of a short-seller report "would lead a reasonable reader to likely believe that the author was conveying his or her opinion about [the company's] business practices and its stock value."  *Nanoviricides, Inc. v. Seeking Alpha, Inc.*, 2014 WL 2930753, at *5 (N.Y. Sup. Ct. June 26, 2014); *see Silvercorp*, 2012 WL 3569952, at *9–12 (stating that "tone and immediate context" of short-seller letters and postings criticizing company "signal to the reasonable reader that the statements are non-actionable opinion").

    The overall structure and tone of the Report reinforce the impression that it, like other short-seller reports, focuses on conveying the author's opinions.  After the disclaimer, the Report begins with a summary of "Opinions" and "Bases of Opinions."  Dkt. No. 22-1 at 4.  The "Opinions" are that Grifols "manipulates" debt and EBITDA, that Grifols' consolidation of BPC and Haema is "deceptive and incorrect," and that "we believe shares are uninvestable."  *Id.*  The "Bases" are specific pieces of financial information drawn from public filings.  *Id.*  This conveys that the Report is conveying the opinions of the author based on analysis of the financial filings. The Report then repeatedly uses signals of opinion, such as "we estimate," "we believe," "by our assessment," and "we find," as well as qualifiers like "may be" or "appears," to describe the conclusions it draws from the financial data.  *Id.*; *see Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287, 194 (E.D.N.Y. 2015) ("[T]he use of 'appeared to be,' 'might well be,' 'could well happen,' and 'should be' . . . signal presumptions and predictions rather than facts.") (quoting *Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 154 (2d Cir. 2000)), *aff'd*, 670 F. App'x 731 (2d Cir. 2016); *Eros Intern. PLC v. Mangrove Partners*, 2019 WL

1129196, at *15–16 (N.Y. Sup. Ct. Mar. 08, 2019) ("[T]he frequent use of opinion-like language further indicates to the reasonable reader that the author is expressing an opinion.").[6]  The Report emphasizes that its conclusions differ from those of other analysts that have examined the same data.  Dkt. No. 22 at 5.  It is clear to readers that the Report seeks to provide an opinion on Grifols' financial health that is supportive of the short-seller's general negative outlook on the company and its securities, rather than merely factually reporting Grifols' finances.

Moreover, the Report makes clear that its opinions are based on publicly available financial filings, not undisclosed facts.  The Report repeatedly references the relevant filings, and includes screenshots, quotations, and citations to the facts which form the basis for the opinions. *See Deer Consumer Prods., Inc. v. Little Group*, 2012 WL 5983641, at *19 (N.Y. Sup. Ct. Nov. 29, 2012) (holding statements of opinion nonactionable when "followed by a recitation of 'facts' uncovered from public filings and private sources, all of which were disclosed and provided in the document itself"); *Silvercorp*, 2012 WL 3569952, at *10 (holding statements of opinion nonactionable when "the challenged statements were derived from data accessible by the provided hyperlink, giving readers the opportunity to review the underlying facts and form their own conclusions"); *Nanoviricides*, 2014 WL 2930753, at *5 ("[T]he author links directly to the Shareholder Complaint, giving readers the opportunity to review the underlying 'facts' and form

---

[6] Applying federal constitutional law, the Supreme Court has noted that a speaker cannot immunize a statement of fact from being actionable merely by labeling it as opinion.  *See Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18–19 (1990); *see also Elias v. Rolling Stone LLC*, 872 F.3d 97, 111 (2d Cir. 2017) ("[A] statement of fact will not be transformed into a statement of opinion solely by use of language expressing uncertainty or qualification.").  Nevertheless, the way the speaker frames a statement is relevant to whether the reasonable reader would perceive it as conveying facts.  *See Immuno AG*, 567 N.E.2d at 1281 ("[T]he writer's presumptions and predictions as to what 'appeared to be' or 'might well be' or 'could well happen' or 'should be' would not have been viewed by the average reader of the Journal as conveying actual facts about plaintiff.").

their own opinion."). The authors of the Report do not purport to have any non-public information or unique knowledge. This renders the opinion statements in the Report "pure opinion" rather than "mixed opinion," as they are "accompanied by a recitation of the facts upon which [they are] based." *Sandals Resorts*, 925 N.Y.S.2d at 413 (quoting *Steinhilber*, 68 N.Y.2d at 289–90).

The specific statements challenged by Grifols must be considered in the context of a Report that has the purpose of financial commentary and analysis from a party with a disclosed interest, not factual reporting, and that is aimed at conveying this interested party's particular viewpoint or perspective on Grifols based on publicly available financial data. Within this context, only the Report's statements regarding the Scranton loan would be understood by a reasonable reader as factual.

### 1.    The Scranton Loan

The Report states that "Grifols lent Scranton $95 million in 2018. . . . [T]his loan is undisclosed in Grifols' filings." Dkt. No. 22 ¶ 138. It also states that "Grifols does not disclose that the company lent $95 million to Scranton," and that "Grifols did not disclose its $95 million loan to Scranton Enterprises in 2018." *Id.* The January 10 revision to the Report states that "[t]he details about a loan to Scranton lie buried in Note 31, appearing nowhere else." *Id.* ¶ 147. These statements are factual, even in the context of a report consisting largely of opinion, because they state specific and verifiable details regarding what Grifols did or did not report.

"[T]he specific language in issue has a precise meaning which is readily understood." *Boeheim*, 22 N.E.3d at 1005 (quoting *Mann*, 885 N.E.2d at 886). Disclosure of a loan means stating to investors and the public that it was made. The Report extensively analyzes and relies on Grifols' public financial filings. *See generally* Dkt. No. 22-1. The Report specifically states that "we do not see any mention of this $95 million loan to Scranton in its GRF annual reports

nor its Corporate Governance Reports—in English or in Spanish." *Id.* at 23. The statements that "Grifols did not disclose" the loan or that "the loan is undisclosed" is readily understood to mean that Grifols did not report the loan in its filings.

In addition, "the statements are capable of being proven true or false." *Boeheim*, 22 N.E.3d at 1005 (quoting *Mann*, 885 N.E.2d at 886). Whether the loans are disclosed in the filings can be determined by examining the filings.

The "full context" of the Report does not signal to the reader that these facially factual statements should be understood as simply the author's opinion. *Boeheim*, 22 N.E.3d at 1005 (quoting *Mann*, 885 N.E.2d at 886). As noted above, the Report focuses on interpretation and analysis of publicly available facts. However, the statement that the Scranton Loan is undisclosed is not presented as a result of interpretation or analysis—it is presented as one of the publicly available facts. *Cf. Eros Intern.*, 2019 WL 1129196, at *13 (dismissing claims when "the company targets the articles' conclusions and critique their authors' methodologies but does not dispute the underlying facts"). The Report does not state that it believes or concludes, based on an inference from some publicly available data, that Grifols made an undisclosed loan to Scranton. It states that "Grifols lent $95 million to Scranton Enterprises in 2018," a fact which was disclosed in Scranton's Netherland's filing. Dkt. No. 22-1 at 23. It then states that Grifols does not disclose this fact in its own filings. *Id.* The fact of nondisclosure is used as the basis for an opinion that "Scranton is at the heart of many suspicious transactions, a pattern of behavior that suggests that the GRF public company benefits the Grifols family at the subordination and sometimes detriment of common shareholders and creditors." *Id.*; *see also id.* at 5 (expressing opinion that "Scranton . . . plays a critical role to present Grifols in a better light," based on "undisclosed loans and share pledges tied to Scranton"); *id.* at 4 (describing

undisclosed loans as one of the "bases for opinion," rather than an "opinion"). A reasonable reader would understand the lack of disclosure of the loan as a fact about Grifols' public filings, rather than a conclusion drawn from the facts in those filings.

Plaintiff suggests that the Report is about "a broader analysis of [Grifols'] business," and that the Scranton Loan was "disclosed in the wrong place," and "oblique[ly]" such that investors could not understand "its impact on debt and leverage." Dkt. No. 25 at 19–20. This does not explain why the statements about nondisclosure should be regarded as opinion. The Report's repeated statements that "this loan is undisclosed in Grifols' filings," "Grifols does not disclose that the company lent $95 million to Scranton," and "Grifols did not disclose its $95 million loan to Scranton Enterprises in 2018," Dkt. No. 22 ¶ 138, cannot be read to state only an opinion that the loan was not disclosed clearly or in a useful manner. The takeaway for a reasonable reader is that the loan was not disclosed at all. This is a statement of fact which can be proven true or false.[7]

### 2.    Other Statements

However, all the other statements challenged by Grifols are nonactionable statements of opinion. Many of the statements would not, even viewed in isolation, carry "a precise meaning which is readily understood" or be "capable of being proven true or false." *Boeheim*, 22 N.E.3d at 1005 (quoting *Mann*, 885 N.E.2d at 886). And any doubt as to whether a reader would regard

---

[7] On reply, Defendants characterize the statements as an opinion that Gotham "did not find the $95 mln. Loan disclosed," with the basis for the opinion being that Gotham consulted relevant corporate governance documents. Dkt. No. 28 at 7. This is similarly unavailing. The statement in the Report is not that Defendants failed to find the disclosure but that "Grifols does not disclose that the company lent $95 million to Scranton," Dkt. No. 22 ¶ 138, a statement that a reasonable reader would regard as a factual statement about Grifols' filings. This fact does not become an opinion simply because Gotham City Research explains or provides a "basis" for how it discovered the fact. Such explanation arguably reinforces the factual nature of the statement, because it conveys to the reader that the statement is based on investigation and personal knowledge rather than speculation or conjecture.

the statements as factual is dispelled when they are considered in "the full context of the communication in which the statement[s] appear[]." *Id.* (quoting *Mann*, 885 N.E.2d at 886). The statements express "financial commentary based on the publicly available information cited . . . in other words, textbook opinion." *Yangtze*, 2020 WL 905770, at *11.

The Court will first address the Reports' statements regarding Grifols' accounting and reporting practices (Sections IV.B, IV.C, and IV.E of the Amended Complaint, Dkt. No. 22 ¶¶ 149–191, 201–208), followed by statements that Grifols' shares are "uninvestable" or "worthless" (Section IV.D, Dkt. No. 22 ¶¶ 192–200), and statements about the ImmunoTek transaction (Section IV.F, Dkt. No. 22 ¶¶ 209–216).

a.    **Statements about Grifols' Accounting and Reporting Practices (Sections IV.B, IV.C, and IV.E of the Amended Complaint)**

Numerous statements challenged by Grifols express the Report's view that Grifols' accounting practices do not give an accurate picture of the value of the business. *See* Dkt. No. 22 ¶¶ 150, 155 157, 169, 201. The Report criticizes Grifols' definitions of EBITDA as "materially misleading and incorrect," *id.* ¶ 150, and states that Grifols "manipulates reported debt and EBITDA," *id.* ¶ 155, because of the way Grifols consolidates NCIs and makes adjustments for "run rate cost savings," *id.* ¶ 169. It claims that Grifols "understates its debt burden" and has "true debt" greater than reported, *id.* ¶ 157, uses "non-obvious" and "suspect" accounting, *id.*, "overstates [its] earning power considerably" by fully including GDS in Grifols' EBITDA, *id.* ¶ 201, and numerous other statements along the same lines, *see id.* ¶¶ 149–191, 201–208. None of these statements are actionable.

Courts have regularly held that a short-seller's analysis of a company's financial position, based on disclosed facts, is nonactionable opinion. *See Yangtze*, 2020 WL 905770, at *7 (collecting cases); *MiMedx Grp.*, 2018 WL 847014, at *6–8; *Nanoviricides*, 2014 WL 2930753,

at *5; *Silvercorp*, 2012 WL 3569952, at *11. The Report's criticisms of Grifols' EBITDA, debt

reporting, and consolidation practices all start with undisputed facts regarding how Grifols has

chosen to report its income. It is a fact that Grifols had NCIs with certain characteristics, and it

is a fact that it chose to report EBITDA in a certain way. The Report discloses these facts. Dkt.

No. 22-1 at 8–22. The Report then expresses an opinion that given these facts, calculating

EBITDA, debt, and related metrics in a different way would give a more accurate picture of

Grifols' earning power and actual debt given the relevant facts. Dkt. No. 22-1 at 7. "That is a

viewpoint; it is not an actionable claim for defamation." *Eros Intern.*, 2019 WL 1129196, at

*14.

Terms such as "overstate[d]" as opposed to accurate EBITDA, or "true debt" as opposed

to "manipulat[ed] debt," Dkt. No. 22 ¶¶ 157–158, 169, do not carry "a precise meaning which is

readily understood," especially in the context of the Report, *Boeheim*, 22 N.E.3d at 1005

(quoting *Mann*, 885 N.E.2d at 886). A certain company's EBITDA, for example, is not a fact

that can be proven true or false. "[A]djusted EBITDA is a non-GAAP[8] metric with no singular

definition—meaning a company may calculate adjusted EBITDA as it chooses." *Lickteig v.

Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 323 n.12 (S.D.N.Y. 2022); *see Ironworkers

Loc. 580—Joint Funds v. Linn Energy, LLC*, 29 F. Supp. 3d 400, 426 (S.D.N.Y. 2014)

(describing adjusted EBITDA and other metrics as "non-GAAP metrics for which there is no

'right' formula because, unlike GAAP metrics, they have no uniform definition"); *N. Collier

Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC

Partners, Inc.*, 2016 WL 5794774, at *12 (S.D.N.Y. Sept. 30, 2016) (collecting cases). It is a

---

[8] GAAP stands for "Generally Accepted Accounting Principles," and "encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 90, 101 (1995) (citation omitted).

calculation based on assumptions about what constitutes a company's earnings and what constitutes its operational costs used to generate those earnings.  Grifols provided several of its own measures of EBITDA based on differing assumptions. See Dkt. No. 22-1 at 8 (six different measures of EBITDA).  Gotham City Research provided yet another.  Its measure of EBITDA, among other things, excluded earnings from NCIs and included restructuring costs among operational expenses.  The calculation led to a lower figure for EBITDA than that calculated by Grifols and to the conclusion that Grifols' figure was overstated.  Grifols may be persuasive in its view that Gotham City's calculation undervalued the firm; it also may be wrong.  But alongside its calculation of EBIDTA, Gotham City also provided the basis upon which it made that calculation for all investors to make the judgment.  The view that this calculation of EBITDA properly values the company is an opinion based on disclosed facts.  *See Lickteig*, 589 F. Supp. 3d at 323 n.12 ("The definition of adjusted EBITDA used by a company, and whether a company chooses to use different definitions in different contexts, are matters of judgment that may fairly be characterized as opinions.").

A similar conclusion follows with respect to debt.  "Actuarial or accounting assumptions depend on the particular methodology and assumptions used and are not objective factual matters."  *In re Avon Sec. Litig.*, 2019 WL 6115349, at *16 (S.D.N.Y. Nov. 18, 2019).  Grifols calculated its debt using conventions from IFRS.  Dkt. No. 22 ¶¶ 32, 86–89.  Those conventions are intended to provide some level of uniformity among reporting entities.  *See* Martin Gelter & Zehra G. Kavame Eroglu, *Whose Trojan Horse? The Dynamics of Resistance Against IFRS*, 36 U. Pa. J. Int'l L. 89, 95 (2014) ("Both U.S. GAAP and IFRS share a common basis: the assumption that the purpose of public accounting is to provide a useful basis for

decision-making by participants in capital markets.").[9]  But while IFRS is a standard metric in

some settings, it is not the only possible method of calculating debt.  Simply making nonstandard

accounting assumptions is not a proper grounds for liability, if those assumptions are disclosed.

*See Ironworkers Local 580*, 29 F. Supp. 3d at 426 ("It is not fraudulent for a reporting entity to

calculate metrics that are not defined under GAAP.").  It is only when a party misleads the reader

into thinking it is reporting a standard metric, when it in fact it is not, that liability may follow.

*See id.*; *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 69–77

(S.D.N.Y. 2015); *Lickteig*, 589 F. Supp. 3d at 323 n.12 ("Using non-GAAP metrics without

properly disclosing how the company is computing those metrics may make those metrics

misleading as a matter of fact.").

      Gotham City Research did not purport to be applying IFRS or any other particular

accounting standard.  In its view, the IFRS calculation of debt did not provide a fair view of the

obligations that Grifols would have to satisfy based on the earnings for which it claimed credit.

It thus expressed the opinion that, regardless of what IFRS might dictate, as an economic matter

the price it understood Grifols would have to pay to exercise the call option in order to enjoy an

unfettered right to the profits of the NCIs should be included in debt.  Grifols complains that

Gotham City's calculation of debt was inconsistent with IFRS.  Dkt. No. 22 ¶¶ 156, 162, 175–

182.  But that misses the point.  The Report never claims that its calculation of debt was

consistent with IFRS, just as it never claimed that its calculation of EBITDA was based on the

_____

[9] Notably, "IFRS commonly requires management to employ estimates, assumptions, and
judgment calls in financial reporting."  *In re XP Inc. Sec. Litig.*, 524 F. Supp. 3d 23, 32
(E.D.N.Y. 2021) (quoting Karim Popatia, *IFRS & GAAP: Reconciling Differences Between
Accounting Systems and Assessing the Proposed Changes to the IFRS Constitution*, 38 Nw. J.
Int'l L. & Bus. 137, 141–42 (2017)).  Therefore, even under IFRS, there is not one "true"
measure of a company's debt.

Credit Agreement definition of EBITDA. The Report stated that in order to arrive at what the authors believed to be the true value of Grifols' debt, it was appropriate to include the price of the Call Option. That view may or may not provide a better picture of Grifols' financial health. But it also is neither true nor false. It is a calculation based on assumptions set forth in the Report in a manner that would permit investors—and not the Court or a jury—to determine its merit.

Plaintiffs additionally challenge the Report's statements that Grifols "manipulates reported debt and EBITDA," Dkt. No. 22 ¶ 155, that its consolidation of BPC and Haema is "materially deceptive," *id.* ¶ 133, and that it engages in "suspect" accounting, *id.* ¶¶ 157, 169, 201. The words "manipulates" and "deceptive" are used to frame the key takeaways of the Report, Dkt. No. 22-1 at 4, and the Report explicitly states among other things that Grifols "has attempted (and failed) to cleverly understate debt before," *id.* at 7, that Grifols may be engaging "tunneling transactions" intended to funnel value out of the company, *id.* at 12, that Grifols "gained as large as possible a stake in SRAAS without having to deconsolidate GDS," *id.* at 12, and that Grifols is "massaging its balance sheet," *id.* at 14. In this context, a reasonable reader would understand the challenged statements to convey that Grifols intentionally uses accounting, reporting, and consolidation practices to make its finances look better.[10]   Grifols contends that "[t]his can be proven true or false." Dkt. No. 27 at 19.

---

[10] Plaintiffs plead in the alternative a theory of "defamation by implication"—that by "omitting and strategically juxtaposing key facts," Defendants "conveyed a defamatory inference that Grifols had been dishonest." Dkt. No. 22 ¶¶ 241–242. "Defamation by implication is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements." *Armstrong v. Simon & Schuster, Inc.*, 649 N.E.2d 825, 829 (N.Y. 1995). "To survive a motion to dismiss a claim for defamation by implication where the factual statements at issue are substantially true, the plaintiff must make a rigorous showing that the language of the communication as a whole can be reasonably read both to impart a defamatory

But the characterization that Grifols actively "manipulates" its accounting is no more actionable than the Report's views that Grifols' accounting is "inaccurate." It is a truism that, within a range, a company has discretion regarding how to present its financial results. In the context of the Report, a reasonable reader would not understand the reference to manipulation to convey some nefarious undisclosed facts, but merely that Grifols used its discretion to choose favorable over unfavorable metrics.[11] The Report clearly discloses the publicly available facts underlying the claim of manipulation, namely that Grifols consolidates Haema and BPC without including the price of the call option as debt, fully consolidates GDS, and claims significant "run rate cost savings," such that Grifols' reported results do not reflect the company's underlying economic reality. Dkt. No. 22-1 at 4. A reader would understand that Grifols made these accounting decisions to portray its business in a positive manner, albeit in a manner that—in the opinion of Gotham City Research—was unduly positive and optimistic. This is all the

---

inference and to affirmatively suggest that the author intended or endorsed that inference." *Stepanov v. Dow Jones & Co.*, 987 N.Y.S.2d 37, 44 (1st Dep't 2014). Because the Report states directly that Grifols "manipulates" its accounting, there is no need to address Plaintiffs' theory of defamation by implication.

[11] Plaintiffs note that the accounting definitions Grifols used were required by IFRS or Grifols' credit agreement, suggesting that Grifols therefore had no choice in the information it presented. Dkt. No. 27 at 17–19. The conclusion does not follow from the premise. That Grifols followed IFRS or signed an agreement with one definition of EBITDA does not mean it could not have used other and additional metrics in its public reporting. Plaintiffs do not suggest that IFRS or Grifols' creditors would have prohibited Grifols from also presenting alternative numbers it believed would be useful to investors. Grifols was later required by the CNMV to increase its use of APMs and to provide information that would allow an investor to "calculate the leverage ratio considering, or excluding, the EBITDA and the debt corresponding to the participation in its subsidiaries." *Id.* at 9–10. Grifols could have reported such information in its 2018–2022 filings, but it chose to focus on other numbers. Moreover, the purported manipulation alleged by the Report is partly that Grifols is "gam[ing] the consolidation rules" and structuring transactions to maximize accounting benefits rather than real economic benefit. Dkt. No. 22-1 at 9–12. This is essentially an accusation that Grifols is "taking advantage of the letter" of accounting rules in a manner "inconsistent with the spirit" of such rules, which is "a non-verifiable characterization that is not actionable." *Cummins*, 649 F.Supp.2d at 247. It is no answer to this accusation to state that Plaintiff followed the accounting rules.

accusations of "manipulation" convey.  The statement that the figures are "manipulated" thus

goes hand in hand with the accusation that figures are "inaccurate," as both reference the same

underlying assessment that Grifols' reporting fails to reflect its actual financial health.  The fact

that the Report sometimes referred to Grifols' reporting as "manipulation" rather than "choice of

favorable metrics" does not lead to a different result.  *See Cummins v. Suntrust Cap. Mkts., Inc.*,

649 F. Supp. 2d 224, 248 (S.D.N.Y. 2009) ("The statement that the plaintiff's conduct

constituted a manipulation of the concept of fair value was plainly a non-actionable

characterization rather than a statement of fact."), *aff'd*, 416 F. App'x 101 (2d Cir. 2011), and

*aff'd*, 416 F. App'x 101 (2d Cir. 2011).  Characterization of Grifols' accounting practices as

"manipulative" or "suspect," like characterization of them as "incorrect," is protected as opinion

drawn from clearly disclosed facts.[12]

Plaintiffs analyze the Report's statements to a "factual accusation of criminal activity"

or "fraud," which is "not constitutionally protected."  Dkt. No. 27 at 19–20 (quoting *Rinaldi v.*

*Holt, Rinehart & Winston, Inc.*, 366 N.E.2d 1299, 1307 (N.Y. 1977)).  But the statement that

Grifols "manipulates" debt and EBITDA to make itself look more favorable is not akin to an

accusation of criminal activity or fraud.  Companies are not forbidden from using metrics that

will portray their business in a positive light, and in fact they are generally expected to do so.

*See Rombach*, 355 F.3d at 174 ("People in charge of an enterprise are not required to take a

---

[12] Plaintiffs cite to *NOVAGOLD Resources, Inc. v. J Capital Research USA LLC*, which allowed
the Plaintiff to proceed on a defamation claim based in part on the statement that Plaintiff
"deliberately misleads investors with custom metrics designed to deceive."  Dkt. No. 27 at 20
(citing 2022 WL 900604, at *9 (E.D.N.Y. Mar. 28, 2022)).  However, the opinion in
*NOVAGOLD* did not discuss whether this particular statement was fact or opinion.  *See id.* at *5–
6.  And it relied primarily on the circumstances that the relevant document did not contain
"signals to the reader that the statements made therein were opinion" and "impl[ied] that
Defendant is aware of undisclosed facts" by relying on an anonymous source, neither of which is
true here.  *Id.*

gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129–30 (2d Cir.1994))).[13] Therefore, Plaintiffs' analogy does nothing to alter the conclusion that the Report's allegations of manipulation and suspect activity are protected opinion.

### b.    Statements that Shares are "Uninvestable" or "Worthless"

Section IV.D of Plaintiff's complaint challenges the Report's statements that Grifols' shares are "uninvestable" or "worthless." Dkt. No. 22 ¶¶ 192–200. These statements are clearly protected opinion.

The Report states that Grifols' shares are "uninvestable, likely zero" in summarizing a lengthy takedown of the company by a short-seller who has a vested interest in its failure. Dkt. No. 22-1 at 4. This type of "loose, figurative or hyperbolic" language is generally not actionable because a reasonable reader would not perceive it as a statement of literal fact. *See Dillon v. City of New York*, 704 N.Y.S.2d 1, 5 (1st Dep't 1999); *MiMedx Grp.*, 2018 WL 847014, at *7 (holding statements that "this is definitely a revenue fraud situation" and employees will be "dragged away in handcuffs" not actionable in the context of investment advice). Rather, such phrases are understood as "nonactionable rhetorical hyperbole or vigorous epithets.'" *Gross*, 623 N.E.2d at 1169.

---

[13] Moreover, while the Court need not reach the issue, even if the statements in the Report did amount to charges of fraud, the New York Court of Appeals has clarified that like other statements, opinions of criminality are "not actionable if the facts on which they are based are fully and accurately set forth and it is clear to the reasonable reader or listener that the accusation is merely a personal surmise built upon those facts." *Gross*, 623 N.E.2d at 1169; *see Silvercorp*, 2012 WL 3569952, at *11 ("The conclusions reached were expressly ''Based on . . . research,'' indicating to a reasonable reader that the claim of accounting fraud is an opinion, and not a statement of fact."); *Deer Consumer Prods.*, 2012 WL 5983641, at *19 (holding that statements that company "likely committed fraud" were protected opinion when "followed by a recitation of 'facts' uncovered from public filings and private sources").

Plaintiffs object that the concluding section of the Report gives some indication that the Report is stating Grifols' shares could be literally "worth zero." *See* Dkt. No. 22-1 at 51. Indeed, the section explains that Grifols' shares could be "worthless" under certain conditions. *Id.* However, the same section clearly states the facts and assumptions on which this opinion is based—Grifols' shares would be worth zero if the estimates in the Report "turn out to be correct" and "the market reprices Grifols interest rates to reflect higher leverage," given that "at 10% yields Grifols' debt is unsustainable, leaving shares worthless or subject to massive dilution." *Id.* Whether Grifols' shares are worthless or uninvestable based on the estimates and assumptions in the Report is a matter of opinion. The reader can "review the underlying facts and form their own conclusions." *Silvercorp*, 2012 WL 3569952, at *10.

Plaintiffs argue that these statements "can be proven true or false based on the value of Grifols' stock and whether Grifols can pay its debt." Dkt. No. 27 at 17. This again misreads the Report as addressed to reporting metrics rather than underlying economic reality. The Report's claim that Grifols' shares are "worthless" is not a claim that Grifols' stock price on the day of the Report was $0. It is a claim that Grifols has negative economic value. The Report also does not claim that Grifols will not be able to pay its debts on some specified date. It claims that *if* its estimates "turn out to be correct" and *if* the market takes certain actions, Grifols would be unable to pay its debts. Dkt. No. 22-1 at 51. Moreover, even if the Report had claimed that Grifols would be unable to pay its debts on some future date, "[a]ny reasonable person . . . would realize that [the Report] had no way of predicting future events," and thus would regard the statement as merely an opinion based on the stated facts. *MiMedx Grp.*, 2018 WL 847014, at *7; *see Immuno AG,* 567 N.E.2d at 1281 (noting that the average reader would not view "the writer's . . . predictions" as "conveying actual facts"); *Shawe v. Kramer Levin Naftalis &*

*Frankel LLP*, N.Y.S.3d 369, 372 (1st Dep't 2018) ("Although . . . certain of defendants' predictions . . . did not come to pass, the predictions are not actionable as defamation.").

### c.    Statements About the ImmunoTek Transaction

Finally, Section IV.F of Plaintiff's complaint challenges various statements in the Report about Grifols' transaction with ImmunoTek.  Dkt. No. 22 ¶¶ 209–216.  These statements are also protected opinion.

Defendants specifically allege that the following statements are false:

- "Grifols' EUR124 million advanced payment to Immunotek appears to be an unexplained outflow of cash not relate[d] to the development of these centers."

- "GRF paid ~15 million per center for Bio Products centers.  Our investigation reveals that it cost $3 million per center to construct these centers.  We are unable to reconcile this 5x difference."

- "We believe that this EUR124 million advanced payment does not relate to the development of these centers; rather we see the payment as an unexplained outflows of cash, just as Grifols' [sic] has demonstrated in other transactions."

- "We cannot reconcile the actual evolution of the Immunotek-Freedom Plasma project with a EUR 124 million payment."

- "Surprisingly though, in their 2022 Annual Report, Grifols disclosed a large increase in advance payments relating to the Immunotek / Freedom Plasma project of EUR124.1 million, up nearly 3x from EUR42.3 million in 2021.  It makes no sense that, more than 4 months after all 21 centers were already open and accepting donations, Grifols still recognized an additional EUR124 million 'advanced payments related to this project' on its balance sheet."

- "We believe a EUR124 million advance payment is out of line with the funding requirements of opening plasma centers in the USA.  Based on our analysis and investigation of the economics per plasma center, it's cheaper to construct them organically.  We estimate that it cost $3 million per center to construct plasma centers, pre-covid."

*Id.* ¶ 210.

Both in isolation and in the context of the Report as a whole, no "reasonable reader would have believed that the challenged statements were conveying facts about the . . .

plaintiff.'" *Boeheim*, 22 N.E.3d at 1005 (quoting *Brian*, 660 N.E.2d at 1130).  The statements are replete with language of assumption and opinion, using phrases such as "appears," "we believe" "we estimate," and "we cannot reconcile."  Dkt. No. 22 ¶ 210; *see Bellavia Blatt*, 151 F. Supp. 3d at 194.  The purpose of this section is not to report on some specific wrongdoing with regard to the transaction, but to present a somewhat speculative view that €124 million "appears" to be a significant overpayment based on available information about the transaction and the Report's "estimate" of the cost of constructing a plasma center.  *See* Dkt. No. 22-1 at 41–47. The bases for this opinion are clearly laid out, as the Report states:

> The following support our opinion:
>
> - The EUR124.1 million payment to Immunotek is not consistent with our estimate of the per center requirements (~3 million per center) for opening plasma centers.
>
> - Our per center estimate implies that Grifols is planning to fund the opening of ~44 centers under Freedom Plasma, but we were unable to verify evidence for such a large opening.
>
> - We cannot reconcile the actual evolution of the Immunotek-Freedom Plasma project with a EUR 124 million payment.

*Id.*  The Report then walks the reader through, in some detail, its reasoning and evidence regarding exactly which centers were opened at which times and how this is purportedly inconsistent with the timing of Immunotek's announcement of a €124 million payment in 2022. *See id.* at 42–47.  The Report makes clear that it is conducting evaluation and financial commentary based on somewhat sparse available data, just as it has repeatedly done with respect to other transactions.

Plaintiffs complain that phrases "like 'out of line,' 'unexplained,' 'unable to reconcile,' and 'make no sense' [] declare to the reader that the payments to ImmunoTek are bogus."  Dkt. No. 27 at 21.  But whether the statements are positive or negative towards Plaintiff is an entirely separate issue from whether they are fact or opinion.  The exact same phrases referenced by

Plaintiffs convey that the evaluations advanced by the Report are the Report's perspective rather than objective fact—the Report declares not that it has evidence the Immunotek transaction was fraudulent but that the transaction is "unexplained" and "make[s] no sense" based on the data available to the author.  The subjective opinion that the transaction "make[s] no sense" or is "out of line" is "inherently unverifiable."  *MiMedx Grp.*, 2018 WL 847014, at *7.  It does not "convey[] facts about the . . . plaintiff."  *Boeheim*, 22 N.E.3d at 1005 (quoting *Brian*, 660 N.E.2d at 1130).[14]

Plaintiff points to two specific factual issues with the statements regarding the ImmunoTek transaction.  First, Plaintiffs state that "the Gotham Report deliberately mischaracterizes the ImmunoTek transaction as a deal to 'construct plasma centers,'" when it is in fact to "obtain source plasma through the construction, development, opening, and operation of the centers," explaining the higher costs.  Dkt. No. 22 ¶ 213.  However, the Report quotes and cites a press release from Grifols announcing a project to "develop 21 new plasma collection centers" and a later statement that the €124 million payment is "to open 21 plasma centers."  Dkt. No. 22-1 at 41, 43.  The Report interprets the press release to convey that the €124 million would mainly be used to construct the centers.  Grifols denies that is the case.  But both the assumption and the release that the assumption is based upon are made available to the reader.

---

[14] Plaintiffs suggest that "whether the payments are legitimate and explained can be proven true or false by reviewing Grifols' collaboration agreement with ImmunoTek."  Dkt. No. 27 at 21. This again misreads the Report by entirely ignoring relevant context.  The statement that the payment is "unexplained" is not a woodenly literal statement that Grifols or Immunotek have never offered any explanation for the payment, such that Plaintiffs could disprove it by pointing to the stated purpose of the transaction.  *See Gross*, 623 N.E.2d at 1169 ("[W]e stress once again our commitment to avoiding the ''hypertechnical parsing'' of written and spoken words." (quoting *Immuno AG*, 567 N.E.2d at 1282)).  The Report squarely acknowledges that there was a stated explanation for the payment: to fund the development of new plasma centers.  Dkt. No. 22-1 at 41.  The point the Report is making is that it is "unexplained" why this amount of money is necessary for this purpose, which cannot be answered by pointing back to the stated purpose.

Thus, it is clear that Gotham City Research is presenting the underlying facts and then giving its own conclusion based on those facts. The readers themselves may "review the underlying facts and form their own conclusions." *Silvercorp*, 2012 WL 3569952, at *10; *see Gross*, 623 N.E.2d at 1168 (noting that a defamation claim cannot be brought on the basis that a statement conveys "false opinions"); *Eros Intern*, 2019 WL 1129196, at *8 (stating that "fail[ure] to consider other variables" in reaching a conclusion "cannot transform a difference of opinion . . . into a defamation claim."). Second, Plaintiffs state that the statement that "it cost[s] $3 million per center to construct these centers" is "knowingly false and misleading." *Id.* ¶ 214.[15] But the estimate that constructing a center costs $3 million is clearly labeled as the Report's "estimate," and no reasonable reader would take it to convey "convey[] facts about the . . . plaintiff." *Boeheim*, 22 N.E.3d at 1005 (quoting *Brian*, 660 N.E.2d at 1130).[16]

  In summary, only the Report's statements regarding the Scranton Loan are actionable statements of fact.

---

[15] Plaintiffs suggest that the estimate is an actionable mixed opinion because the Report does not explain the facts and analysis supporting the estimate. Dkt. No. 27 at 21–22. But in any case, the Report's opinion that constructing a center costs $3 million does not imply that it is based on any undisclosed facts *about Plaintiffs*. *See Steinhilber*, 501 N.E.2d at 553 ("[T]he actionable element of a "mixed opinion" . . . is the implication that the speaker knows certain facts, unknown to his audience, which support his opinion and are detrimental to the person about whom he is speaking."). Plaintiffs cannot complain that the Report fails to explain how it derives the cost of constructing plasma centers as a general matter.

[16] Even assuming these statements were factual, Plaintiffs' allegations of falsity and scienter are entirely conclusory. Plaintiffs state that the €124 payment had purposes beyond mere construction of the centers, but do not provide a source for this information or suggest that it was available to investors beyond stating that "[a]nyone who understands Grifols' business would know this." Dkt. No. 22 ¶¶ 211–213. Regarding the estimate, Plaintiffs simply state without explanation that it was "knowingly false and misleading." *Id.* ¶ 214.

B.      **Falsity and Actual Malice**

Defendants argue that the statements regarding the Scranton Loan are not actionable even if they are factual, because they are substantially true and Plaintiffs have not pled actual malice. Dkt. No. 25 at 24–26.[17]  Defendants' arguments lack merit.

The Report states that "Grifols lent Scranton $95 million in 2018. . . . this loan is undisclosed in Grifols' filings," and repeats several times that this loan to Scranton was undisclosed.  Dkt. No. 22 ¶ 138.  However, Plaintiffs plead that the loan was disclosed on Grifols' 2018, 2019, 2020, 2021, and 2022 Annual Reports on Form 20-F, and provides quotations from these documents, with citations, stating that "Scranton Enterprises B.V. financed the purchase in part through a loan from Grifols Worldwide Operations Limited for an initial principal sum of the euro equivalent of $95 million."  *Id.* ¶ 139.  Therefore, Plaintiffs have pled that the statement was false.[18]

_____

[17] Defendants also argue that certain of the Report's statements about Grifols' accounting practices were confirmed to be substantially true by the CNMV Report.  Dkt. No. 25 at 22–24.  Because the Court holds these statements to be non-falsifiable statements of opinion, the Court will not consider whether the the CNMV report proves them to be "true."  The Court will similarly not address Defendants'' arguments that the statements were not made with actual malice, *id.* at 25–29, which requires "knowledge that the statements were false or . . . reckless disregard as to their falsity," *Biro*, 807 F.3d at 544.

[18] Defendants' argument that the statements about the Scranton Loan are "substantially true" is without merit.  Dkt. No. 25 at 25; Dkt. No. 28 at 14.  "[A] statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced."  *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 242 (2d Cir. 2017).  Defendants argue that the statements were substantially true because the CNMV "found Grifols lack of transparency in related party transactions with Scranton objectionable."  Dkt. No. 25 at 25.  But the fact that Grifols failed to fully disaggregate and break down the Scranton Loan, as stated in the CMNV report, *see* Dkt. No. 22-4 at 6, would "have a different effect on the mind of the reader" than the statement that Grifols failed to disclose such loan at all, *Tannerite Sports*, 864 F.3d at 242.  The CMNV explicitly found that "Gotham's first report stated that Grifols had not broken this loan in its consolidated annual financial report, which was not true."  Dkt. No. 22-4 at 6.

Essentially the same facts suffice to show actual malice, which requires "knowledge that the statements were false or . . . reckless disregard as to their falsity." *Biro*, 807 F.3d at 544. The Report repeatedly cites to Grifols' financial filings, giving rise to the plausible inference that the author reviewed them. *See generally* Dkt. No. 22-1. The Report specifically references note 31 of the 2018 Annual Report as somewhere "we would expect to find" the loan. Dkt. No. 22-1 at 23. It then states the loan was undisclosed. *Id.* But the revisions made to the Report the next day acknowledged that the loan in fact was disclosed in Note 31 of the 2018 Annual Report. Dkt. No. 22 ¶ 144. It is therefore plausible to infer that the author saw the disclosure and, notwithstanding having seen the disclosure, stated precisely the opposite. Because the author had "obvious . . . reasons to doubt the veracity" of the information he was imparting, actual malice has been plausibly pled. *Biro*, 807 F.3d at 545; *see Palin*, 940 F.3d at 813–15 (holding that plausible inference of actual malice existed when author had reviewed numerous articles showing contrary facts); *Tiversa Holding Corp. v. LabMD*, 2014 WL 1584211, at *7 (W.D. Pa. Apr. 21, 2014) (holding that actual malice was adequately pled by showing that the speaker was aware of contrary facts).

The January 10 revision supports the inference of actual malice, rather than rebutting it. Actual malice is judged "at the time of publication." *Celle*, 209 F.3d at 182. Although prompt correction can be evidence that the original error was unknowing, in other circumstances it can support the inference that the defendant knew of its falsehood at the time and was simply trying to create a cover story to protect itself from liability. *See Palin*, 940 F.3d at 815 ("[I]t is also plausible that the correction was issued after a calculus that standing by the editorial was not worth the cost of the public backlash."). The facts pleaded by Plaintiff here support the latter inference. The January 10 changes occurred *after* Grifols had cashed out on its short position.

Dkt. No. 22 ¶ 43. [19]  At that time, the purpose for which Gotham City Research allegedly had made the negative statements regarding Grifols had been accomplished.  There was no need to continue the defamation.  Moreover, there is no apparent explanation for why, if Gotham City Research knew on January 10 that the loan had been disclosed, it did not know the same facts on January 9.  The inference arises that it knew that fact but simply chose not to disclose it. Furthermore, unlike the original Report, which was widely and loudly distributed, Dkt. No. 22 ¶¶ 121–126, the "correction" was made on the quiet, *id.* ¶¶ 23, 145.  The modified report was simply posted without comment and does not draw the reader's attention to the correction that was made.  *Id.* ¶ 145.  Perhaps most importantly, the January 10 changes still did not clearly and accurately explain Grifols' disclosure of the loan.  The January 10 revision stated that the loan was undisclosed in Grifols' "corporate governance filings" and that it "lie[s] buried in Note 31" of the Annual Report.  *Id.* ¶ 144.  But Plaintiff alleges that Note 31 of the Annual Report is part of a corporate governance filing and that the disclosure is in the body of the 2018 Annual Report, not only in Note 31.  *Id.* at ¶ 147.  Given these circumstances, it is plausible to infer that Gotham City Research knew at the time it published the original report that the loan had been disclosed but simply chose to report the opposite and that the changes made on January 10 were not a good-faith correction but an attempt to cover up or soften the consequences of the initial falsehood.

Plaintiffs have adequately pled a defamation claim based solely on Defendants' statements regarding the Scranton Loan.

---

[19] Defendants submit an affidavit of De Weck stating among other things that "[w]e maintain a substantial short position to this very day in Grifols shares."  Dkt. No. 28-1 ¶ 14.  However, the Court may not consider this affidavit on a motion to dismiss under Rule 12(b)(6) and will disregard it.

## II.    Aiding and Abetting Defamation

Plaintiffs' second cause of action is for aiding and abetting libel and defamation by implication against GIP and De Weck.  Dkt. No. 22 ¶¶ 245–254.  Defendants' only argument regarding this claim is that Plaintiffs fail to plead the underlying tort of defamation.  Dkt. No. 25 at 30–31.  Because the Court holds that Plaintiffs have adequately pled the underlying tort, Defendants' motion to dismiss is denied as to the second cause of action.

## III.    Tortious Interference with Business Relations

Plaintiffs' third cause of action is for tortious interference with business relations against Yu and Gotham City Research.  Dkt. No. 22 ¶¶ 255–266.  This cause of action must be dismissed.

"The elements of tortious interference with a business relationship are that '(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship.'"  *JPMorgan Chase Bank, N.A. v. 29-33 Ninth Ave., LLC*, 710 F. Supp. 3d 259 (S.D.N.Y. 2024) (quoting *Catskill Dev., L.L.C. v. Park Place Enter. Corp.*, 547 F.3d 115, 132 (2d Cir. 2008)).  "Conduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship."  *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1104 (N.Y. 2004).  "Failure to identify a specific business relationship with a third party is 'fatal' to a tortious interference claim."  *POSCO Energy Co. v. FuelCell Energy, Inc.*, 560 F. Supp. 3d 747, 759 (S.D.N.Y. 2021) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 115 (2d Cir. 2010)); *see Cambridge Cap. LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 473 (S.D.N.Y. 2021) (collecting cases).

Plaintiffs' allegations here are "too conclusory, vague, and lacking in a factual basis" to support a claim for tortious interference with business relations. *DiFolco*, 622 F.3d at 115.  The alleged interference is not with a specific business relationship but "Grifols' business relationships with, among others, its equity investors, sell-side analysts, debt investors, banks, auditors, lawyers, customers, and suppliers."  Dkt. No. 22 ¶¶ 257–259.  The complaint alleges the Report damaged these relationships by "calling into question the accuracy and completeness of Grifols's financial disclosures" and causing Grifols' shareholders to sell their stock. *Id.* ¶ 262. But tortious interference with business relations concerns conduct directed towards a specific business relationship that damages that relationship, not conduct directed towards a company that damages its reputation generally. *See Evliyaoglu Tekstil A.S. v. Turko Textile LLC*, 2020 WL 7774377, at *2 (S.D.N.Y. Dec. 30, 2020) (collecting cases); *POSCO Energy*, 560 F. Supp. 3d at 760 ("POSCO's 'prospective contractual relationship[s]' with 'third party purchasers in the trading market' are too vague and conclusory to state a tortious interference claim."); *Cambridge Cap.*, 565 F. Supp. 3d at 473 ("Ruby Has's claim fails because it has not alleged that Cambridge Capital engaged in the wrongful conduct with knowledge of the plaintiff's relationship with a third party and with the intent to interfere with that relationship.").  Plaintiffs have not stated a claim that Defendants interfered with any specific business relationship.

Plaintiffs point to an allegation that "upon information and belief, a company that Grifols is a significant investor in and controls board multiple board seats for, had its longtime lender decline to renew financing due to a perceived credit risk . . . because it did not want to be associated with the negative media attention Grifols and its affiliates have received as a result of the Gotham Report."  Dkt. No. 22 ¶ 227; *see* Dkt. No. 27 at 30.  But there is no allegation that Defendants engaged in any conduct directed at this unknown non-Grifols company's relationship

with its lender.  *See Carvel Corp.*, 818 N.E.2d at 1104.  Plaintiffs also do not explain how they

could bring a tort claim based on harm suffered by this other entity.

Because Plaintiffs' claims for tortious interference with business relations must be

dismissed, Plaintiffs' claims for aiding and abetting tortious interference with business relations

Dkt. No. 22 ¶¶ 267–275, must also be dismissed, *see Navarra v. Marlborough Gallery, Inc.*,

2012 WL 13210272, at *9 (S.D.N.Y. Apr. 4, 2012) ("In order to allege a claim for aiding and

abetting a particular tort, there must first be an actionable underlying tort."); *Bigio v. Coca-Cola

Co.*, 675 F.3d 163, 172 (2d Cir. 2012).

## IV.    Unjust Enrichment

Plaintiffs' final claim is for unjust enrichment against all Defendants.  Dkt. No. 22

¶¶ 276–281.  This claim must be dismissed as duplicative of Plaintiffs' tort claims.

"Under New York law, '[a]n unjust enrichment claim is not available where it simply

duplicates, or replaces, a conventional contract or tort claim.'"  *In re 305 E. 61st St. Grp. LLC*,

130 F.4th 272, 282 (2d Cir. 2025) (quoting *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185

(N.Y. 2012)).  "[I]t is available only in unusual situations when, though the defendant has not

breached a contract nor committed a recognized tort, circumstances create an equitable

obligation running from the defendant to the plaintiff."  *Corsello*, 967 N.E.2d at 1185.  Here,

Plaintiffs expressly plead that "Defendants were impermissibly and unfairly enriched by their

aforesaid tortious and improper conduct," Dkt. No. 22 ¶ 277, which is obviously duplicative of

the prior claims.  Plaintiffs additionally plead that Defendants were unfairly enriched by

"additional conduct" that "includes criminal statutory trading abuses and criminal statutory

market manipulation related to Grifols' stock."  *Id.* ¶ 278.  However, this theory of liability is

unexplained, and the purported criminal activity appears to be based on the same facts as

Plaintiffs' defamation claims—that Defendants made defamatory statements in the Report

causing a decrease in Grifols' stock price.  *See 305 E. 61st St. Grp.*, 130 F.4th at 282 ("Two claims are duplicative of one another if they 'arise from the same facts and do not allege distinct damages.'" (quoting *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008))).  Because Plaintiffs advance no legitimate alternative theory of liability, their unjust enrichment claim must be dismissed.

## V.    Plaintiff Grifols Shared Services North America, Inc.

Defendants finally argue that Grifols Shared Services North America, Inc. ("GSSNA) is not a proper plaintiff because neither the allegations in the complaint nor the Report concern GSSNA.  Dkt. No. 32.  Defendants are correct.  Plaintiffs allege only that "Grifols Shared Services North America, Inc. is directly harmed by the damage done by the Gotham Report by virtue of the fact that it is one of the guarantors of indebtedness for the bonds issued by Grifols S.A.," and that when Grifols' debt must be refinanced "the increased cost to do so—the result of the Gotham Report's false representation to the market that Grifols is a risky borrower—will equally impact Grifols Shared Services North America, Inc."  Dkt. No. 66 ¶ 229.  But GSSNA's downstream experience of the injury to Grifols does not allow it to state a claim for relief in its own right.  GSSNA was not defamed by Defendants, and therefore cannot bring a claim for defamation.  *See Palin*, 940 F.3d 804, 809 (requiring "a written defamatory statement of and concerning the plaintiff").  There are also no allegations that Defendants interfered with GSSNA's business relations with a specific party, nor do Plaintiffs provide any specific theory of unjust enrichment with respect to GSSNA.  Plaintiffs have not stated any claim for which GSSNA could recover.

## VI.    Defendants' Motion for Anti-SLAPP Fees

Based on the foregoing discussion, Defendants' motion for fees pursuant to New York Civil Rights Law § 70-a must be denied.  Dkt. No. 45.  Section 70-a states that "[a] defendant in

an action involving public petition and participation" may recover attorney's fees upon a demonstration "that the action involving public petition and participation was commenced or continued without a substantial basis in fact and law." N.Y. Civ. Rts. Law § 70-a(1)(a). Plaintiffs disclosed the Scranton Loan in financial filings, and the Report, having reviewed those filings, stated multiple times that Plaintiffs did not do so. This provides a substantial basis for Plaintiffs to commence this action.[20] Because the motion for anti-SLAPP fees must be denied in any case, the Court need not address Plaintiffs' arguments that such motion cannot be properly brought in federal court. *See* Dkt. No. 46.

## CONCLUSION

Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART. The motion to dismiss is granted as to Plaintiffs' claim for defamation based on the statements in Sections IV.B–F of Plaintiffs' amended complaint and as to Plaintiffs' third, fourth, and fifth causes of action. In addition, GSSNA is dismissed as Plaintiff. The motion to dismiss is denied as to Grifols' claim for defamation based on the statements in Section IV.A of the Amended Complaint and as to Grifols' second cause of action.

Plaintiffs' motion for attorney's fees under New York's anti-SLAPP statute is DENIED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 25, 26, 33, and 45.

SO ORDERED.

Dated: May 29, 2025
       New York, New York

_____
       LEWIS J. LIMAN
       United States District Judge

---

[20] Contrary to Defendants' contention, the statute speaks to the commencement of the "action," not each individual claim. N.Y. Civ. Rts. Law § 70-a(1)(a); *see LoanStreet, Inc. v. Troia*, 2023 WL 5836237, at *7 (S.D.N.Y. Sept. 8, 2023) (stating that the action had a substantial basis when certain claims were dismissed and others were plausibly pled).