**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GRIFOLS, S.A.,<br><br>                              Plaintiff,<br><br>       v.<br><br>DANIEL YU, GOTHAM CITY RESEARCH LLC, GENERAL INDUSTRIAL PARTNERS LLP, and CYRUS DE WECK,<br><br>                              Defendants. | Index No. 1:24-cv-00576-LJL<br><br>**DECLARATION**<br>**OF CYRUS DE WECK**<br><br>**IN FURTHER SUPPORT OF MOTION FOR PROTECTIVE ORDER UNDER NEW YORK CIVIL RIGHTS LAW § 79-h.** |

**Cyrus de Weck** affirms as following to be true pursuant to 28 U.S.C. §1746:

1.  I am a defendant in this case. I make this Declaration in support of Defendants' Motion for Protective Order under New York's Reporters Privilege, § 79-h.

2.  Together with co-defendant Daniel Yu, I researched and published the report, "Grifols SA: Scranton and the Undisclosed Debts" on January 9, 2024 (the "Report").

3.  I am the founder and principal of General Industrial Partners LLP ("GIP"), which has an affiliate relationship with Gotham City Research LLC ("Gotham," "GCR"), which is owned and managed by Daniel Yu. I act as GIP's portfolio manager and one of the firm's research professionals.

4.  I grew up in Zurich, Switzerland and attended the University of Pennsylvania Wharton School of Business before moving to the United Kingdom, where I live today.

5.  I began my financial career in 2002 covering corporate debt in general, specifically distressed debt, at a large financial institution in London, before moving into investment management, eventually heading the London office of QVT Financial and then

1

finally launching my own firm in 2015, which was the precursor to GIP. My experience with distressed companies laid the groundwork for my perspective on the markets.

6. By the time I launched my own firm in 2015, I had developed a core expertise identifying short opportunities that were driven by apparent financial reporting irregularities, including NMC Health, which was censured and went into bankruptcy proceedings, and Wirecard AG, which went into bankruptcy and was the subject of criminal prosecutions and convictions.

7. I met Dan around twelve years ago in connection with his work on a German-listed company. For more than a decade now, Dan and I have both been researching and publishing short reports focused on exposing companies with misleading financial statements and unsustainable business models.

8. In 2022, we joined forces, combining an investment manager with a short selling research publishing business model.

9. Dan and I alone chose Grifols as the subject of the Report; we controlled the contents, writing and research of the Report, and we covered the costs of writing, researching and publishing all of our reports, including the Report on Grifols.

10. The Report on Grifols was based on our review and evaluation of publicly obtainable documents about Grifols, mostly its U.S. and Spanish regulatory filings.

11. The reports that we publish are written information and communications about matters of public concern, interest and welfare. Specifically, the activities of publicly traded and highly regulated companies such as Grifols. Grifols has regulatory filings in multiple countries. It is a pharmaceutical company selling, amongst other things, blood plasma. Grifols' business engages quite literally the welfare of the public, as demonstrated by this week's report in in the

*New York Times* that two paid "donors" of plasma died after transferring plasma in its Canadian facilities.[1] Not to mention the welfare of its public investors, who deserve to know about what appear to us as self-dealing transactions enriching the Grifols family at the expense of its shareholders. The information in our Report is a matter of public concern.

12. Other news reporting on Grifols and its suspect transactions with a related party company demonstrates the significant public concern and interest attached to them:

   a. "Grifols's Family Blood is Thicker Than Water," Bloomberg (June 24, 2025), https://www.bloomberg.com/news/newsletters/2025-06-24/grifols-s-family-blood-is-thicker-than-water.
   b. "Grifols Case Shows It Paid Family-Linked Entity More for Plasma," Bloomberg (June 23, 2025), https://www.bloomberg.com/news/articles/2025-06-23/grifols-case-shows-it-paid-family-linked-entity-more-for-plasma.
   "Grifols S.A. (GRFS) Admits Improper Accounting, Announces Restatements, Shares Decline Again," Business Wire (Aug. 2, 2024), https://www.businesswire.com/news/home/20240802347694/en/Grifols-S.A.-GRFS-Admits-Improper-Accounting-Announces-Restatements-Shares-Decline-Again-Hagens-Berman.

13. Some materials that we have regarding Grifols and the Report are communications with persons to whom we have promised anonymity and confidentiality. We must honor those commitments and assert the Reporter's Privilege to so do. I understand that New York protects such confidential information and communications *absolutely and unconditionally*. We therefore seek the absolute protections due to such confidential communications.

14. Some materials that we have concerning Grifols and the Report constitute *unpublished news*, information, and communications obtained and prepared by us in the course of our work on the Report and in gathering information for the Report. To the extent that we

---

[1] Vjosa Isai & Roni Caryn Rabin, "Two People Die After Paid Plasma Donation at Clinics in Canada," New York Times (March 11, 2026), https://www.nytimes.com/2026/03/11/world/canada/winnipeg-plasma-blood-donation-deaths.html.

3

relied upon and identified that publicly available information, those public records can be produced. But to the extent that they are unpublished, we assert the Reporters Privilege as to them. I understand that New York protects such unpublished materials as well, and that protection can only be overcome upon a "clear and specific" showing of particularized "critical" need, not mere generalized speculation or claims of relevance.

15. If Grifols had described what they needed with any specificity, I could address that. But Grifols' purported need in its papers is so general and unspecific that it does not allow me to address the specific or "critical" need that is required to overcome the privilege. Grifols has done nothing to show any such particularized and "critical" need. Merely saying that the unpublished materials might be "relevant" does not, I understand, suffice.

16. The Court should note that when we follow a company that we are reporting on, we continue to gather news and information about that company with potential further reporting in view. We have done that with other reports, and here, we have continued to report on Grifols. Grifols knows that and sues us to suppress our further coverage. But the news, information, and materials that we gather post-publication of the Report as part of that continued research are no less entitled to protection by the Reporters Privilege.

**I.      Our Status as Professional Journalists Under 79-h(a)(6).**

17. Dan and I are professional journalists under the broad definition of New York's Reporters Privilege statute.

18. Our primary purpose in what Dan and I do is to publish meaningful information and opinions about publicly traded companies that are overvalued or misunderstood by the market either because their public statements obscure their business realities, otherwise mislead

4

readers of their public statements, or because they are simply fraudulent. We research, write and regularly publish reports on such companies.

19. We publish our reports for "gain and livelihood," as I understand the statute requires of "professional journalists." We short the stocks on which we report and hope to benefit in doing so. We fully disclose this financial motive to our readers at the outset. We regularly "process and research" financial news intended for dissemination to the public.

20. Our ability to secure such gains turns on our credibility, and on the soundness and dependability of our reporting. For that reason, Dan and I exercise great care in preparing our reports.

21. The risks and perils of our work are significant. Not only can we lose substantial sums if our reporting is not correct and sound, but the companies that we report on can sue for libel; they can and do, as here, initiate complaints to regulators; and they undertake broad public relations attacks on us as well. Sometimes, through private investigators, they engage in other acts of intimidation and harm, a common concern of short report publishers.

22. Grifols' complaints to the U.S. Securities Exchange Commission (SEC) resulted in a "no action letter" from the SEC. Grifols' complaints to the Spanish regulator, the CNMV, resulted in Grifols being required to restate their public disclosures - including their disclosures regarding related party transactions and loans, one of which remains at issue in this case.[2]

23. A company's libel suits can, as here, be largely dismissed at threshold. But such libel actions are undertaken by these companies for their punitive effect – to impose high costs

---

[2] We had initially reported that Grifols had not reported a $95 million loan from related party Scranton. We believed that to be correct because Grifols did not report that related party loan in its Corporate Governance statement – where such related party transactions are supposed to appear and where we had expected it would be. When we learned that the loan had been reported elsewhere in Grifols' public statements, we corrected that in less than 24 hours. Ultimately, the Spanish regulator, the CNMV, required Grifols to make that disclosure in Grifols' Corporate Governance statement – where it should have been disclosed in the first place. We have no objection to any discovery regarding our reporting on that related party loan and our prompt correction.

5

on anyone who questions or criticizes them. Grifols, a politically influential Catalan company, is able to marshal, and has marshalled, far more favorable press coverage in Spain than we ever could.

24. We consider our mission as short report publishers to be all the more important given that financial news organizations have diminished resources and their ability to fund and carry out investigative studies of company reports and activities has become increasingly hollowed out. These kinds of reports require extensive work and effort, and it is becoming harder for news organizations to undertake and pay for such reporting. Regulators too have less bandwidth to monitor publicly traded companies. They will often turn to short report publishers to aid their own inquiries.

25. Short report publishers carry out an important and well recognized function. For example, activist short seller James Chanos exposed Enron (his work was the subject the film, *The Smartest Guys in the Room*); Peter Eisman exposed the sub-prime mortgage lenders and their CDO's (his efforts were the subject of Michael Lewis' book, *The Big Short*); and other short report publishers exposed the fraudulent Chinese companies that traded on U.S. exchanges (their efforts were recounted in the documentary *The China Hustle*.) There are many others who have carried out this critical but difficult public function – making it their professional commitment to publish reports on overvalued or fraudulent publicly traded companies.

26. In our own work, we've exposed, amongst others, the extraordinary fraud committed by Wirecard, whose principals were later prosecuted and convicted.[3] Additionally, we have helped expose large scale fraud at Steinhoff and NMC Health. We believe that this work

---

[3] Wirecard initially attacked and took legal action against shorts reporters and news reporters. They were able to buy time with complaints to regulators and other legal actions, but years later, the convictions followed.

serves a compelling public interest that fewer people and organizations have the experience and resources to undertake.

27. Thus, our function is entirely in line with the broad range of activities I understand to be protected by New York's Reporters Privilege.

28. The fact that we have an acknowledged financial interest is not at odds with First Amendment values. I understand that, in his ruling, Judge Liman recognized that short-seller report publishers like us have "an economic interest in driving down the company's stock price, [and that they] ha[ve] the same right to express opinion and analysis as any other market participant."[4] Dkt. 56 at 23.

**II.   Our Reports Are "News" Under 79-h(a)(8).**

29. The reports that we regularly publish represent "news" that we disseminate to the public on our website. Through our reports, we publish written "information … concerning local national or worldwide events or other matters of public concern or public interest or affecting public welfare." The activities and valuation of publicly traded (and regulated) companies are plainly matters of legitimate public interest and concern. Our Report on Grifols on its face engages matters of clear public concern and interest.

30. Here too, I understand that Judge Liman recognized the strong public interest served by short-seller reports such as ours:

> "Short-seller reports 'perform a useful function by bringing information that securities are overvalued to the market.' [Citing cases such as *Long Miao*] It is through the percolation of ideas and opinions, both positive and negative, that the market can accurately value a security." Dkt. 56 at p. 23.

---

[4] Insiders, I understand, have less protection because of their status as insiders, which we are not. When companies pay analysts to advocate for their stock value, they are not independent but are compensated by insiders whom they are promoting. We, however, are outsiders with no special access to inside information. We provide increasingly rare offsetting opinions.

31. Our Report on Grifols is "news" and Gotham's activity is the dissemination of "news" to the public, as I understand the statute broadly defines it.

32. We were not commissioned by any third-party to prepare and publish this Report. All of Gotham's reports are researched and written by our own team, whom we have identified. If we occasionally seek and obtain opinions of others regarding our reports, that does not diminish our role as professional journalists, who typically in the course of their reporting seek other views and opinions. Our Report itself states transparently what its analysis and conclusions were directed at. We meticulously prepared and set out our endnotes, quotations, sources, and citations in the Report.

**III.   Categories of Documents for Which the Privilege is Asserted.**

33. The documents for which we seek protection under the Reporters Privilege are described above. *See infra* ¶¶ 12 – 13. Further categories of documents that we consider entitled to protection are as follows:

   a. I understand that Grifols seeks discovery of *communications, drafts and editorial process concerning statements which Judge Liman dismissed and ruled nonactionable* as a matter of law. *See* Dkt 56, at 18-21 ("The Court largely agrees with Defendants…[a]lmost all of the statements challenged by Plaintiffs are protected opinion."). I have set out why these materials are all protected by § 79-h. To obtain them, I am told that Grifols must meet the demanding three-pronged "particularized need test." Under that test, I do not believe it is sufficient to claim that the materials are or might be "relevant." These materials involving *dismissed claims* are not relevant to how we made the only statement left, the Loan Statement. Because of that, Grifols could never make the showing that such materials are

8

"*critical*" to Grifols' claims – a showing far more demanding than relevance. In all events, I understand they made nothing close to any required showing. They barely attempted it.

    b.       I understand that Grifols seeks discovery of our communications, drafts and editorial process *concerning statements which it never challenged in its FAC.* I have set out why these materials are all protected by §79-h. To obtain them, I am told that Grifols must meet the three-pronged "particularized need test." These materials involving *unchallenged claims* are not relevant to how we made the only statement at issue, the Loan Statement, which is in its own specific section of the Report.

    c.       We object to any discovery that pertains to any *confidential sources* that we may have had. We had no confidential sources that pertained to the remaining loan disclosure claim. To the extent that we had confidential communications with third parties that related to *unchallenged or dismissed statements* in the Report or which related to *unpublished information*, I understand that those materials would be absolutely privileged under §79-h(b). I am told they would not be subject to disclosure even under the three-pronged test and are *absolutely* barred from disclosure. We take our confidentiality obligations very seriously and rely on protections like those under New York's Reporters Privilege.

    d.       We object to producing any non-confidential sources or third-party communications that do not relate to the only actionable statement, the Loan Statement. Again, I am told these materials are all protected by §79-h. To obtain them, I understand Grifols must meet the three-pronged "particularized need test." Under that test, I am told it is not sufficient to claim that the materials are or might be "relevant." These materials involve *unpublished matters*, *unmade* and *unchallenged claims* that have nothing to do with how we made the only actionable statement, the Loan Statement, which appeared in its own discrete

9

section of the Report. Because of that, such materials could not possibly be *"critical"* to Grifols' claims. It is inconceivable that Grifols could even *particularize* its demands in a way that would even begin to address the "particularized need test" – which, I understand, requires that Grifols make a "clear and specific showing" of each prong of that test. 79-h(c). I understand that Grifols has not made any showing of any kind that I could address.

     e.     We object to other production of any documents or materials that simply pertain to Grifols or Scranton generally or to broad, unfocused and *unparticularized* requests for production. I understand that Judge Liman almost uniformly ruled that our Report on Grifols consisted largely of constitutionally protected opinion. For that reason, Grifols' demands that are not tailored to the one actionable statement and instead seek discovery about our protected opinions would be barred from discovery under §79-h. I have seen that virtually all of Grifols RFP's reviewed in Gotham's Opposition to the motion to compel are broad, unparticularized, shotgun requests.

     **Wherefore**, Defendants respectfully ask the Court for an order 1) denying Grifols' motion to compel; 2) granting Defendants a protective order under N.Y. Civil Rights Law § 79-h; and 3) granting such further relief as the Court deems just and proper.

     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 13, 2026

London, GB, UK

                                                                            */s/ Cyrus de Weck*

                                                                            CYRUS DE WECK