# EXHIBIT D

FORM ADV PART 2A: Firm Brochure

# General Industrial Partners LLP

**10 Queen Street Place**
**London**
**EC4R 1AG**
**UNITED KINGDOM**

**June 2025**

This Brochure provides information about the qualifications and business practices of General Industrial Partners LLP ("GIP" or "the Firm"). If you have any questions about the contents of this Brochure, please contact Amy Gilliland, the Chief Compliance Officer ("**CCO**") at +44 7397 886 636 or by email at AG@generalindustrialpartners.com. The information in this Brochure has not been approved or verified by the United States Securities and Exchange Commission ("**SEC**") or by any state securities authority.

Any reference to General Industrial Partners LLP as a "registered investment adviser" or as being "registered" does not imply a certain level of skill or training.

Additional information about GIP is also available on the SEC's website www.adviserinfo.sec.gov.

2

**Item 2: Material Changes**

We will ensure that you receive a summary of any materials changes to this and subsequent Brochures within 120 days of the close of our business' fiscal year. We may further provide other ongoing disclosure information about material changes, as necessary.

We will further provide you with a new Brochure as necessary based on changes or new information, at any time, without charge.

The Firm launched one new vehicle for which it is the AIFM that being a standalone vehicle which forms part of the Special Opportunities Fund Series (GIP Special Opportunities Fund Series - GIP Special Opportunities Fund I).

The Firms corporate partner, Portsea AIFM Malta Ltd, ceased to be a corporate partner of the Firm.

General Industrial Partners LLP                                    Form ADV Part 2A

## Item 3: Table of Contents

Item 2: Material Changes.............................................................................................2
Item 3: Table of Contents...........................................................................................3
Item 4: Advisory Business ..........................................................................................4
Item 5: Fees and Compensation..................................................................................5
Item 6: Performance-Based Fees and Side by Side Management....................................8
Item 7: Types of Clients..............................................................................................9
Item 8: Methods of Analysis, Investment Strategies and Risk of Loss.........................10
Item 9: Disciplinary Information ................................................................................17
Item 10: Other Financial Industry Activities and Affiliations.......................................18
Item 11: Code of Ethics, Participation or Interest in Client Transactions and Personal Trading
.................................................................................................................................19
Item 12: Brokerage Practices ....................................................................................20
Item 13: Review of Accounts .....................................................................................22
Item 14: Client Referrals and Other Compensation ....................................................23
Item 15: Custody.......................................................................................................24
Item 16: Investment Discretion ..................................................................................25
Item 17: Voting Client Securities................................................................................26
Item 18: Financial Information....................................................................................27

**Item 4: Advisory Business**

General Industrial Partners LLP (hereinafter "**GIP**", or the "**Firm**") is a limited liability partnership incorporated in the United Kingdom. The Firm was founded in May 2015 by its Managing Member and Chief Investment Officer, Cyrus de Weck. The Firm is authorised and regulated to carry on an investment business in the UK by the Financial Conduct Authority.

GIP is the AIFM of, and provides discretionary investment management services to accredited investors through its private pooled investment funds: General Industrial Master Fund L.P (the "**Master Fund**"); General Industrial Offshore Fund Ltd and General Industrial Onshore Fund (collectively the "**Feeder Funds**") and the GIP Special Opportunities Fund Series LP and its individual series when established (the "**Special Ops Fund**").

General Industrial Master Fund L.P is registered in the Cayman Islands as an exempted limited partnership incorporated with limited liability and unlimited duration formed under the laws of the Cayman Islands under registered number MC-112537 on 7 June 2021. Originally named South Place Special Purpose Fund 2 LP it completed a name change on 19 October 2022. The Partnership's general partner is General Industrial Partners GP Limited (the "General Partner") a Cayman Islands exempted limited company. Both the Master Fund and the GP have their registered office at c/o Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.

The Master Fund is registered with the Cayman Islands Monetary Authority ("CIMA"). The Master Fund receives investments from General Industrial Offshore Fund Ltd, a Cayman Islands exempted company, a private feeder fund, and General Industrial Onshore Fund LP, a Delaware private feeder fund.

The purpose of the Partnership is to seek to generate good returns for investors by investing its assets in a globally focused short bias strategy.

Unless specified otherwise, from hereinafter the Feeder Funds, Master Fund and Special Ops Fund will be referred to collectively as the "**Clients**".

The Fund is managed pursuant to the objectives specified in the materials by which the Fund offers its ownership interests to investors. GIP does not tailor its services to individual investor needs and the Fund's investors do not have the right to specify, restrict, or influence the Fund's investment objectives or any investment or trading decisions.

As of March 31, 2025, GIP had $ 64,526,879 of regulatory assets under management ("**RAUM**").

**Item 5: Fees and Compensation**

**Fees**

The fee scale generally includes performance fees paid to GIP. Fees are deducted from client assets and are not generally negotiable. Specific fee details are contained in the prospectus for each client.

With respect to the Fund, a standard performance fee is charged equal to 30% for net performance under 40% and 40% for net performance over 40% by the Manager of the net profits of a client paid annually in arrears. The calculation of this fee is subject to a high-water mark. Should an investor redeem all or part of their investment during a year any performance fee due on the investment will become due upon the redemption date.

Certain share classes in the Fund may charge performance fees which may be higher or lower than the stated range or subject to hurdle rates, and these are disclosed fully in the Fund's offering documentation.

The Special Ops Fund charges performance fees to each series as established. The standard performance fee on each series is equal to 30% for net performance under 40% and 40% for net performance over 40% paid on redemption of interest in the structure. Certain series may be subject to higher or lower performance fees, full details are disclosed in the individual series appendix to the offering memorandum when established.

**Other Expenses**

As described in more detail in their respective offering documentation, the Fund bears its organizational and initial offering expenses, and its operating and other expenses, which may include (but are not limited to):

i)      investment and custodial expenses;

ii)     administrative expenses;

iii)    administrator and depositary fees;

iv)     interest on borrowings, including borrowings from Prime Brokers;

v)      broker commissions, borrowing charges on securities sold short, clearing and settlement charges and any issue or transfer taxes or stamp duties chargeable in connection with securities transactions;

vi)     sell-side broker and other independent research and corporate access;

vii)    research related travel

viii)   consulting, advisory, investment banking and other professional fees relating to investments or contemplated investments paid to unrelated third parties;

ix)     all taxes and regulatory and/or corporate fees payable to governments or agencies;

x)      directors' and administrator's fees and expenses, including reasonable travel expenses;

xi)     the charges and expenses of external legal advisers and auditors;

xii)    communication expenses with respect to investor services and all expenses of meetings of Shareholders and of preparing, printing and distributing financial and other reports, proxy forms, offering and similar documents;

xiii)   subject to the requirements of ERISA Section 410(b) (as applicable), the cost of insurance, for the benefit of the directors and officers of the Fund and the officers of the Investment Manager;

xiv)    litigation and indemnification expenses and extraordinary expenses not incurred in the ordinary course of business;

xv)    jurisdictional registration costs and costs related to the maintenance of such registrations, including state security filings("Blue Sky" filings and fees); xvii) all expenses related to compliance with Automatic Exchange of Information ("AEOI") Regulations; and

xvi)    valuation specific services (i.e., third-party valuation agents).

**Operating Expenses**

As described in more detail in their respective offering documentation; the Fund bears the operating expenses incurred by GIP on behalf of behalf of the Master Fund, the Partnership and the Cayman Feeder Fund together with, subject to the limitations described in the offering documentation. Expenses include, but are not limited to:

- expenses, salaries and equivalent compensation, fringe benefits, bonuses and performance-based compensation paid or reimbursed to all employees and officers of the Investment Manager and its delegates, with the exception of Messrs de Weck and Yu;

- expenses related to computers, equipment and technology (including, without limitation, information technology hardware and software and third-party software licensing, implementation, data management and recovery services and custom development costs);

- expenses related to maintaining offices, including leases, fixtures and leasehold improvements;

- insurance premiums, including, without limitation, for general partner liability insurance, directors and officers/errors and omissions insurance, casualty and property, cyber liability and other risk-specific insurance and "key-man" life insurance on certain personnel;

- financing costs, exchange fees and expenses, brokerage fees and expenses, expenses relating to short sales, clearing and settlement charges, custodial fees, bank service fees and interest expenses, research- and market data-related fees and expenses, telecommunications, travel expenses, and other expenses related to the investment activities of the Master Fund;

- accounting and valuation expenses, tax (including withholding tax) expenses, legal expenses, fees and expenses of other advisors, expenses related to preparing and making regulatory and compliance filings associated with the Master Fund, the Partnership, the Investment Manager and its delegates and their respective investment and other activities, such as filing fees and costs of software and systems relating to such filings and other administrative and operating expenses, and costs related to investor reporting and preparation and updating of investor disclosures;

- fees and expenses paid for the services of entities that support the Investment Manager in its management of the Master Fund's assets (including without limitation the expenses of the Investment Adviser, the Research Provider and GIP Management Ltd; and

- other miscellaneous expenses.

**Compensation**

Save as disclosed herein, GIP nor any of its employees accept compensation for the sale of securities or other services or other investment services or products.

**Item 6: Performance-Based Fees and Side by Side Management**

GIP is entitled to receive performance-based fees from the Funds. The performance-based fees may create an incentive for GIP to cause the relevant Client to make investments that are riskier or more speculative than would be the case if GIP did not receive a performance-based fee, or to direct investments in favour of a Client receiving a performance-based fee. Please refer to Item 11 "Code of Ethics Participation in Client Transactions and Personal Trading" and Item 12 "Brokerage Practices" for a discussion of conflict management procedures, incentive compensation arrangements, managerial review and oversight and allocation policies applicable to GIP, all of which are intended to mitigate conflicts. GIP recognizes that it is a fiduciary and as such must act in the best interests of its Clients. Further, GIP recognizes that it must treat all Clients fairly and must refrain from favouring one client's interests over another's.

**Item 7: Types of Clients**

The Firm's clients are the Funds.

The minimum initial investment for the master-feeder structure is $1,000,000 payable in full (net of any bank charges), unless waived by the Directors.

Further applications by existing shareholders can be made for any amount subject to a minimum of $100,000.

There is no minimum initial investment for the Special Ops Fund.

**Item 8: Methods of Analysis, Investment Strategies and Risk of Loss**

The Fund Directors have overall responsibility for the investment approach of the Fund. As the Manager, GIP handles the day-to-day portfolio management of the Funds. Risk management activities have been retained by GIP, the AIFM. GIPs Investment Committee sets the overall risk limits and risk tolerance.

**Investment Strategy and Methods of Analysis**

The primary investment objective of GIP on behalf of the Master Fund in respect of the Portfolio is to seek to achieve attractive risk-adjusted returns and long-term capital appreciation primarily by implementing a catalyst-short strategy. In managing the Master Fund, the GIP will seek to invest in a manner which focuses on absolute returns.

GIP will seek to pursue a catalyst-short investment approach to identify and exploit mis-valuations and other opportunities resulting from its perception of company and security valuations, market liquidity, lack of transparency and/or price dislocations. GIP believes that it can achieve its investment objective by focusing time and capital on a limited number of investment opportunities as a result of its research and the experience of its principals. As such, the Investment Manager will typically seek to concentrate the Master Fund's investments in approximately 0 to 15 short strategies usually hedging each short position with one or several long positions which will be either an "basket" of equities, an index, or if none of the above is suitable, individual long positions or other securities.  GIP believes that holding periods will be 0 to 24 months and that individual positions will be increased and reduced actively.

In seeking an absolute return, the Master Fund will hold both long and short positions and may invest in the full spectrum of markets, asset classes and financial instruments. GIP will generally seek to pursue a low-beta strategy through the cycle.  Given the focus on hedging, we would expect market correlation to be limited over the long-term.

The geographical focus of the Funds instruments is not constricted to a specific region. The Funds investments cover instruments globally.

The Master Fund has maximum flexibility to invest in global financial markets, including but not limited to, spot currencies and forward foreign exchange contracts, government and corporate debt securities, loans, interest rate instruments, equity securities, convertibles, stock indices, precious metals and traditional and base industrial commodities through the use of cash-settled spot transactions, forwards, futures, options and swap markets, as well as in hybrid securities and other derivative instruments, including warrants, American Depositary Receipts ("ADRs"), contracts for differences, credit derivatives (including credit default swaps) or other tradable rights and investable entitlements. The Master Fund may invest in certificates and other collective investment vehicles, including unit trusts, mutual funds, investment companies and exchange traded funds ("ETFs"). The instruments in which the Master Fund invests may be listed or unlisted and rated or unrated. Derivative instruments may be exchange traded or over-the-counter. The Master Fund will not invest in collective investment vehicles managed or advised by the Investment Manager or the Investment Adviser other than the GIP Special Opportunities Fund Series LP and other vehicles managed by GIP, if established. The Master Fund may also retain amounts in cash or cash equivalents, pending investment or reinvestment or when the Investment Manager otherwise considers this appropriate.

Short investments can be made in equity or credit securities and options, credit default swaps or other securities. A risk factor in these investments is the ability to secure and maintain securities to borrow, as when the company's issues become more broadly understood by the market, the demand for borrow increases and the cost and supply of borrow is less predictable. GIP will evaluate these risks on an ongoing basis and will seek to position the Master Fund to limit the risk of borrow liquidity, to the extent practicable and commercially desirable.

The instruments in which the Fund invests may be listed or unlisted and rated or unrated. Derivative instruments may be exchange traded or over-the-counter. Collective investment vehicles may be established within or outside of the EEA and may not be subject to regulatory review or discipline. The Fund will not originate loans and in no circumstances will the Fund have a direct relationship as a lender to a borrower.

The investment program of the Clients is speculative and may entail substantial risks. Market risks are inherent in all securities investments to varying degrees. There can be no assurance that the investment objective will be achieved. In fact, certain investment practices described above can, in some circumstances, potentially increase the adverse impact on the Clients' investment portfolio.

The Special Ops Fund individual series are established only when the Master Fund has reached a maximum position size subject to its RAUM and risk limitations. Each series will be established for the purpose of a specific trade idea and as such the investment idea, risk limitations, size constraints, geographical focus and other investment related considerations will be dependent on the series being established. Investors should refer to the offering documentation of each series prior to investing.

As at March 31 2024 the GIP Special Opportunities Fund Series LP – GIP Special Opportunities Fund Series 2 will be investing in European listed equities and over-the-counter derivatives.

**Risk Factors**

An investment in one of the Funds involves a high degree of risk, including the risk that the entire amount invested may be lost. No guarantee or representation is made that the investment program will be successful, or that its returns will exhibit low correlation with an investor's traditional securities portfolio. Investment techniques may be utilized which can involve substantial volatility and can, in certain circumstances, substantially increase any potential adverse impact to which the investment portfolio may be subject. Prospective investors should consider the following additional factors in determining whether an investment in the Fund or an Account is a suitable investment.

There are significant risks associated with an investment in the Fund. Investment may not be suitable for all investors. It is intended for sophisticated investors who can accept the risks associated with such investment including a substantial or complete loss of their investment. There can be no assurance that the Fund will achieve its investment objective and losses may be incurred. Each prospective investor should carefully review this Information Memorandum and carefully consider the risks before deciding to invest.

**Risks Related to Certain Investment Strategies**

*Concentration of Investments/Lack of Asset Diversification*

The Funds are subject to limited diversification requirements and will likely invest a significant portion of its assets in a relatively small number of investments. As a result, the Funds may be more susceptible to risks associated with a single economic, political or regulatory occurrence than would be the case with a more diversified portfolio and the Fund may be subject to significant losses in the event that it holds a large position in a particular investment that declines in value or is otherwise adversely affected, including by default of the issuer.

*Short Sales*
The Fund engages in short selling as its core strategy. A short sale involves the sale of a security that the Fund does not own in the expectation of purchasing the same security (or a security exchangeable therefore) at a later date at a lower price.  In order to deliver to the buyer, the Fund must borrow the security and later purchase the security to return to the lender.  A short sale involves a risk of a theoretically unlimited increase in the market price of the security. Short selling allows the investor to profit from a decline in market price to the extent such decline exceeds the transaction costs and the costs of borrowing the securities. The extent to which the Fund engages in short sales will depend upon the investment strategy and the opportunities available. A short sale creates the risk of theoretically unlimited loss, in that the price of the underlying security could theoretically increase without limit, thus increasing the cost to the Fund of buying those securities to cover the short position.  There can be no assurance that the Fund will be able to maintain the ability to repurchase securities in the open market to return to the lender. There also can be no assurance that the securities necessary to cover a short position will be available for purchase at or near prices quoted in the market.  Purchasing securities to close out a short position can itself cause the price of the securities to rise further, thereby exacerbating the loss.

*Certain Securities Markets*
Stock markets in certain countries may have a relatively low volume of trading. Securities of companies in such markets may also be less liquid and more volatile than securities of comparable companies elsewhere. There may be low levels of government regulation of stock exchanges, brokers and listed companies in certain countries. In addition, settlements of trades in some markets may be slow and subject to failure.

*Co-Investment*
The Fund may co-invest with one or more Co-Investment Vehicles.. There can be no assurance that any Co-Investment Vehicle will agree on all matters and the Fund or any Co-Investment Vehicle could take actions that are disadvantageous to the other.

*Hedging Transactions and Other Methods of Risk Management*
The Fund may utilize financial instruments such as derivatives for investment purposes and for risk management purposes, for example in order to: (i) protect against possible changes in the relative values of the Fund's portfolio position as a result of fluctuations in the securities markets and changes in interest rates; (ii) protect the unrealized gains in the value of the investment portfolio; (iii) facilitate the sale of any investment; (iv) enhance or preserve returns, spreads or gains on any investment in the portfolio; (v) hedge the interest rate or currency exchange rate on any liabilities or assets; (vi) protect against any increase in the price of any securities which GIP anticipates purchasing at a later date; or (vii) for any other reason that GIP deems appropriate. Such hedging transactions may not always achieve the intended effect and can also limit potential gains.

While the Fund may enter into such transactions to seek to reduce currency, exchange rate and interest rate risks, unanticipated changes in currency, interest rates and equity markets

may result in a poorer overall performance by the Fund. For a variety of reasons, the Fund may not obtain a perfect correlation between such hedging instruments and the portfolio holdings being hedged. Such imperfect correlation may prevent the intended hedge or expose the Funds to risk of loss.

There can be no assurance that a given exposure will be hedged at any given time, or, even if the exposure is hedged, that such hedge will be effective.

*Credit Risk*

The Funds are also subject to credit risk, i.e. the risk that an issuer of securities will be unable to pay principal and interest when due, or that the value of the security will suffer because investors believe the issuer is less able to pay. This is broadly gauged by the credit ratings of the securities in which the Fund invests. However, ratings are only the opinions of the agencies issuing them, may change less quickly than the relevant circumstances and are not absolute guarantees of the quality of the securities. Furthermore, the investments of the Funds may not be rated by any rating agency or may be below investment grade. The Funds will be more dependent upon the judgment of GIP as to the credit quality of such unrated securities. A default, downgrade or credit impairment of any of its investments could result in a significant or even total loss of the investment.

**Risks Related to Certain Financial Instruments**

*Global Listed Equity Securities*

The Funds may invest in listed equity securities on a global basis. An investment in equity securities is subject to the risk that the value of the securities held by the Funds will fall due to general market and economic conditions, perceptions regarding the industries in which the issuers of securities held by the Funds participate or factors relating to specific companies in which the Fund invests. For example, an adverse event, such as an unfavorable earnings report, may depress the value of equity securities of an issuer held by the Fund the price of common stock of an issuer may be particularly sensitive to general movements in the stock market; or a drop in the stock market may depress the price of most or all of the common stocks and other equity securities held by the Funds. In addition, common stock of an issuer in a Fund's portfolio may decline in price if the issuer fails to make anticipated dividend payments because, among other reasons, the issuer of the security experiences a decline in its financial condition. Common stock is subordinated to preferred stocks, bonds and other debt instruments in a company's capital structure, in terms of priority to corporate income, and therefore will be subject to greater dividend risk than preferred stocks or debt instruments of such issuers. In addition, while broad market measures of common stocks have historically generated higher average returns than fixed income securities, common stocks have also experienced significantly more volatility in those returns.

*OTC Derivative Instrument Transactions*

The Funds may invest a substantial portion of its assets in investments which are not traded on organized exchanges to the extent that all necessary CFTC registrations or exemptions have been obtained. Such registrations or exemptions would not include review or approval by the CFTC of any offering memorandum or the trading strategies of the Fund. Such transactions are known as over-the-counter ("OTC" transactions) are not standardized, and may include forward contracts, options, swaps or other derivatives. Whilst some OTC markets are highly liquid, transactions in OTC derivatives may involve greater risk than investing in exchange traded derivatives because there is no exchange market on which to close out an open

position.  It may be impossible to liquidate an existing position, to assess the value of the position arising from an off-exchange transaction or to assess the exposure to risk.  Bid and offer prices need not be quoted and, even where they are, they will be established by dealers in these instruments and consequently it may be difficult to establish what is a fair price.  The participants in such markets are typically not subject to credit evaluation and regulatory oversight as members of "exchange-based" markets.  This exposes the Funds to the risk (i) of counterparty failure (ii) that a counterparty will not settle a transaction in accordance with its terms and conditions because of a dispute over the terms of the contract (whether or not bona fide)  or because of a credit or liquidity problem and (iii) of the inability or refusal of a counterparty to perform with respect to such contracts or redeliver cash or securities delivered by the Fund to support such contracts, thus causing the Fund to suffer a loss. Such "counter-party risk" is accentuated for contracts with longer maturities where events may intervene to prevent settlement, or where the Fund has concentrated its transactions with a single or small group of counterparties.  Market illiquidity or disruption could result in major losses to the Fund and, indirectly, to the Fund.

The instruments, indices and rates underlying derivative transactions expected to be entered into by the Fund may be extremely volatile in the sense that they are subject to sudden fluctuations of varying magnitude, and may be influenced by, among other things, government trade, fiscal, monetary and exchange control programs and policies; national and international political and economic events; and changes in interest rates. The volatility of such instruments, indices or rates, which may render it difficult or impossible to predict or anticipate fluctuations in the value of instruments traded by the Funds, could result in losses.

*Debt Securities*

The Fund may invest in debt securities which may be unrated by a recognized credit-rating agency or below 14 investment grade and which are subject to greater risk of loss of principal and interest than higher-rated debt securities. Because investors generally perceive that there are greater risks associated with unrated and below investment grade securities, the yields and prices of such securities may fluctuate more than those for higher-rated securities. The market for non-investment grade securities may be smaller and less active than that for higher-rated securities, which may adversely affect the prices at which these securities can be sold and result in losses to the client. The Funds may invest in debt securities which rank junior to other outstanding securities and obligations of the issuer, all or a significant portion of which may be secured on substantially all of that issuer's assets. The Funds may invest in debt securities which are not protected by financial covenants or limitations on additional indebtedness. Also, the market for credit spreads is often inefficient and illiquid, making it difficult to accurately calculate discounting spreads for valuing financial instruments.

*Convertible Securities*

The Funds may invest in convertible securities. Convertible securities are bonds, debentures, notes, preferred stocks or other securities that may be converted into or exchanged for a specified amount of common stock of the same or different issuer within a particular period of time at a specified price or formula. A convertible security entitles the holder to receive interest that is generally paid or accrued on debt or a dividend that is paid or accrued on preferred stock until the convertible security matures or is redeemed, converted or exchanged. Convertible securities have unique investment characteristics in that they generally:

> (i) have higher yields than common stocks, but lower yields than comparable non-convertible securities;

(ii) are less subject to fluctuation in value than the underlying common stock due to their fixed-income characteristics; and (iii) provide the potential for capital appreciation if the market price of the underlying common stock increases.

*Exchange-Traded Futures Contracts and Options on Futures Contracts*
The Funds may invest in futures and related options to the extent that all necessary CFTC registrations or exemptions have been obtained. Such registrations or exemptions would not include review or approval by the CFTC of any offering memorandum or the trading strategies of the Fund. The Fund's use of futures contracts and options on futures contracts will present the same types of volatility and leverage risks associated with transactions in derivative instruments generally (see below).  In addition, such transactions present a number of risks which might not be associated with the purchase and sale of other types of investment products.

*Repurchase Agreements*
The Funds may enter into repurchase and reverse repurchase agreements.  When a Fund enters into a repurchase agreement, it "sells" securities to a broker-dealer or financial institution and agrees to repurchase such securities on a mutually agreed date for the price paid by the broker-dealer or financial institution, plus interest at a negotiated rate.  In reverse repurchase transactions, the Fund "buys" securities from a broker-dealer or financial institution subject to the obligation of the broker-dealer or financial institution to repurchase such securities at the price paid by the Fund, plus interest at a negotiated rate.  The use of repurchase and reverse repurchase agreements by the Fund involves certain risks. For example, if the seller of securities the Fund under a reverse repurchase agreement defaults on its obligation to repurchase the underlying securities as a result of its bankruptcy or otherwise, the Fund will seek to dispose of such securities, which action could involve costs or delays. If the seller becomes insolvent and subject to liquidation or reorganisation under applicable bankruptcy or other laws, the ability of the Fund to dispose of the underlying securities may be restricted. It is possible in a bankruptcy or liquidation scenario that the Fund may not be able to substantiate its interest in the underlying securities. In addition, if a seller defaults on its obligation to repurchase securities under a reverse repurchase agreement, the Fund may suffer a loss to the extent that it is forced to liquidate its position in the market and proceeds from the sale of the underlying securities are less than the repurchase prices agreed by the defaulting seller.

*Credit Default Swaps*
The Funds may enter into credit default swap agreements. The "buyer" in a credit default contract is obligated to pay the "seller" a periodic stream of payments over the term of the contract provided that no event of default on an underlying reference obligation has occurred. If an event of default occurs, the seller must pay the buyer the full notional value, or "par value", of the reference obligation in exchange for the reference obligation. The Fund may be either the buyer or seller in a credit default swap transaction. If the Fund is a buyer and no event of default occurs, the Fund will lose its investment and recover nothing. However, if an event of default occurs, the Fund (if the buyer) will receive the full notional value of the reference obligation that may have little or no value. As a seller, the Fund receives a fixed rate of income throughout the term of the contract, which typically is between six months and three years, provided that there is no default event. If an event of default occurs, the seller must pay the buyer the full notional value of the reference obligation. Credit default swap transactions involve greater risks than if the Fund had invested in the reference obligation directly. These contracts are typically marked-to-market and the Fund may be obliged to pay amounts into a margin account whether or not a default occurs. Much of the settlement in

CDS contracts is manual and there is a general settlement risk if backlogs arise and counterparties are not able to meet their obligations. This may be part of a broader crisis in markets.

**Other Risks**

*Cyber Crime and Security Breaches*
With the increasing use of the internet and technology, we are susceptible to greater operational and information security risks through breaches in cyber security. Cyber security breaches include, without limitation, infection by computer viruses and gaining unauthorized access to our systems through "hacking" or other means for the purpose of misappropriating assets or sensitive information, corrupting data, or causing operations to be disrupted. Cyber security breaches may also occur in a manner that does not require gaining unauthorized access, such as denial-of-service attacks or situations where authorized individuals intentionally or unintentionally release confidential information stored on our systems. A cyber security breach may cause disruptions and impact the Master Fund's and/or the Firm's business operations, which could potentially result in financial losses, inability to determine the Master Fund's and the Firm's net asset value, violation of applicable law, regulatory penalties and/or fines, compliance and other costs. The Funds could be negatively impacted as a result. In addition, because the Master Fund and GIP work closely with third-party service providers (e.g., prime brokers, transfer agents, administrators and distributors), indirect cyber security breaches at such third-party service providers may subject the Master Fund, GIP and investors in the Fund to the same risks associated with direct cyber security breaches. Further, indirect cyber security breaches at an issuer of securities in which the Fund invests may similarly negatively impact the Fund and its investors. While GIP has established risk management systems designed to reduce the risks associated with cyber security breaches, there can be no assurances that such measures will be successful.

The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment by Clients. Prospective investors should read the entire relevant Memorandum and consult with their own advisers before deciding whether to invest. In addition, as the investment program develops and changes over time, an investment in either the Fund or an Account may be subject to additional and different risk factors.

**Item 9: Disciplinary Information**

The Firm has not been subject to any disciplinary action, whether criminal, civil or administrative (including regulatory) in any jurisdiction. Likewise, no persons involved in the management of the Firm have been subject to such action.

**Item 10: Other Financial Industry Activities and Affiliations**

The management and employees of GIP plan to substantially dedicate all of their professional efforts to the Firm and its affiliates.

The Firm and its employees do not have any relationships or arrangements with other financial services companies that pose material conflicts of interest.

**Item 11: Code of Ethics, Participation or Interest in Client Transactions and Personal Trading**

**Participation or Interest in Client Transactions**

GIP serves as the AIFM to the Clients. Employees, affiliates of the employees, and relatives of the employees may make investments in the Fund.

GIP maintains an employee personal trading policy which is restrictive and aimed at mitigating any potential conflict of interest between the Clients' investments and those of employees. In general, employees are very limited in the extent to which they are permitted to engage in personal trading.

Additionally, the Firm's principals and employees do not purchase any securities for their own accounts from the Fund.

**Code of Ethics and Personal Trading**

The Firm has adopted a Code of Ethics that establishes various procedures with respect to investment transactions in accounts in which GIP employees or related persons have a beneficial interest or accounts over which an employee has investment discretion.

The foundation of the Code of Ethics is based upon the following underlying fiduciary principles:

- Employees must at all times place the interests of the Clients first;
- Employees must make sure that all personal securities transactions are conducted consistent with the Code of Ethics; and
- Employees should not take inappropriate advantage of their position at GIP.

All GIP partners and investment team members are deemed to be "Access Persons" and are required to adhere to a comprehensive Code of Ethics, which cover the duty of confidentiality as well as personal trading. All employees are required to certify their adherence to the terms set forth in the Code of Ethics upon commencement of employment and quarterly thereafter.

All GIP employees must direct their brokers to send duplicate copies of personal discretionary brokerage account statements to the CCO. These records are used to monitor compliance with the Firm's employee personal trading policies.

Employees must also obtain pre-approval from the CCO before engaging in any outside business activities or private investments or receiving an allocation of an Initial Public Offering ("IPO").

**Insider Trading Policies and Procedures**

GIP maintains insider trading policies and procedures that are designed to prevent the misuse of material, non-public information. Among other things, such policies seek to control and monitor the flow of inside information to and within GIP, as well as prevent trading based on inside information. On a periodic basis, GIP employees are required to attest to their compliance with the insider trading policies which are set forth in the Compliance Manual and Code of Ethics. GIP's Code of Ethics is available to investors upon request.

**Item 12: Brokerage Practices**

**Selection of Broker-Dealers**

In respect of the Fund, as the Manager, GIP selects broker-dealers in accordance with internal policies and procedures. A number of factors are considered by GIP in selecting a broker-dealer to execute transactions (or series of transactions) and determining the reasonableness of the broker-dealer's compensation. Such factors include price, the broker-dealer's relevant expertise related to specific instruments traded, speed of execution, transaction costs including fees and commissions, likelihood of execution and settlement, size of the trade, nature of the trade, market impact and other considerations relevant to the trade.

The Chief Compliance Officer and the Investment Team periodically evaluate the broker-dealers used to execute client trades.

**Soft-Dollars Arrangement**

European regulatory requirements in relation to changes to inducements requirements and the regulation of research, particularly regarding payment for research and research budgets were set out in the Markets in Financial Instruments Directive ('MiFID II') which came into effect on January 3, 2018. The rules prohibit firms who provide portfolio management services from receiving any inducements in relation to these services to clients, except for minor non-monetary benefits. However, firms are permitted to receive third party research from third parties in a way that does not contravene the inducements rules.

Under MiFID II strict rules apply to the receipt and payment for investment research, and the Firm has established policies and procedures around such receipt and payment.

In anticipation of the new MiFID II requirements for research payments, a no-action letter was produced by the SEC on 26 October 2017 that facilitates compliance by firms with the new MiFID II research provisions while respecting the existing U.S. regulatory structure and provides relief that the Firm may continue to rely on an existing safe harbour when paying broker-dealers for research and brokerage whilst the SEC determines if any further action, including rulemaking, is necessary and appropriate in the public interest.

**Aggregation**

If GIP determines that the purchase or sale of an asset is appropriate with regards to multiple Clients, it may, but is not obligated to, achieve the execution on behalf of Clients with an aggregated order. When an aggregated order is filled through multiple trades at different prices on the same day, GIP seeks to provide that each participating Client will receive the average price, with transaction costs generally allocated pro rata based on the size of each Client's participation in the order (or allocation in the event of a partial fill) as determined by GIP. In the event of a partial fill, allocations may be modified on a basis that GIP deems to be appropriate and consistent with its fiduciary duties to the Client(s), including, for example, in order to avoid odd lots or de minimis allocations. When orders are not aggregated, trades generally will be processed in the order that they are placed with the broker or counterparty selected by GIP. As a result, certain trades in the same asset for one Client may receive more or less favourable prices or terms than another Client, and orders placed later may not be filled entirely or at all, based upon the prevailing market prices at

the time of the order or trade. In addition, some opportunities for reduced transaction costs and economies of scale may not be achieved.

**Trade Errors**

If it appears that a trade error has occurred, GIP will review the relevant facts and circumstances to determine an appropriate course of and provide disclosure to the relevant affected clients. To the extent that trade errors and breaches of investment guidelines and restrictions occur, the objective of the error correction procedure is to ensure that clients are treated fairly. GIP will resolve a particular error in any appropriate manner that is consistent with the above stated policy.

**Soft Dollars**

The Firm may use "soft dollars" generated by the Clients' trading activities to purchase research services or products that would otherwise have been an expense of GIP. GIP intends to keep any such arrangements within the parameters of Section 28(e) of the United States Securities Exchange Act of 1934, as amended.

**Item 13: Review of Accounts**

**Review of Accounts**

The Firm's Investment Managers and investment professionals continuously monitor and analyze the transactions, positions, and investment levels of the Clients to ensure that they conform with the investment objectives and guidelines that are stated in the investment advisory agreements and the Fund offering documents. In these reviews, the Firm pays particular attention to any changes in the investment's fundamentals, overall risk management and changes in the markets that may affect price levels. GIP engages in active management for the Fund and reviews transactions, positions and cash balances on a daily basis.

**Reporting**

The Firm will distribute annual audited financial statements to the investors in the Fund within 120 days of the Fund's fiscal year-end. In addition, the Firm distributes reports to investors in the Fund, which include monthly investor statements from the fund administrator, monthly performance and risk reports and quarterly/annual investment letters. The Firm distributes a monthly performance and risk report to the Segregated Account holder, in a similar format to the reports for the Fund investors.

**Item 14: Client Referrals and Other Compensation**

GIP does not currently compensate third parties for referrals whereby the third party introduces potential investors to invest in the Fund. However, GIPs current stance may change. Should GIP begin to compensate third parties, before making payments for any referral, GIP would require each third party to enter into a written referral agreement. The fee paid to the third party would be calculated as a percentage of the fee received by GIP from the client in respect of the investment introduced by the third party.

**Item 15: Custody**

For the Fund, the Manager is deemed to have custody of client assets. GIP intends to comply with Rule 206(4) 2 under the Advisers Act (the "Custody Rule") by meeting the conditions of the independent auditor exemption of the Custody Rule (Rule 206(4) 2(b)(4)).

**Item 16: Investment Discretion**

GIP has full discretionary authority over the Clients including authority to make decisions with respect to which securities to be bought and sold as well as the amount and price of those securities. Additionally, GIP has full discretion over the brokers or dealers to be used for transactions and the commissions to be paid. These terms are established in the offering documents of the Funds.

**Item 17: Voting Client Securities**

The Firm intends to vote proxies on a case-by-case basis. Prior to voting a proxy, the relevant employees of GIP will make a determination, in their opinion, as to what vote if any, is in the best interest of the Clients. The Firm maintains written records of the proxy vote on each occasion a proxy is voted.

Investors in the Fund or an Account may not direct the voting of proxies.

If a material conflict of interest between the Firm and the Clients should arise, the Firm will determine whether voting in accordance with the guidelines set forth in the proxy voting policies and procedures is in the best interests of the Clients or take another appropriate action.

Investors may request a copy of the Firm's proxy voting policy, as well as the records of any proxy votes for the respective Fund in which they have an investment.

**Item 18: Financial Information**

Registered investment advisers are required in this Item to provide certain financial information or disclosures about the Firm's financial condition.

GIP has no financial commitment that impairs its ability to meet contractual and fiduciary commitments to clients and has not been the subject of a bankruptcy proceeding.