UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
GRIFOLS, S.A.,                                                  :

                                                               :        OPINION AND ORDER
                              Plaintiffs,                                24 Civ. 576 (LJL) (GWG)
                                                               :

      -v.-                                                      :

                                                               :

DANIEL YU et al.,                                              :

                                                               :
                              Defendants.
----------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

Plaintiff Grifols, S.A. ("Grifols") has filed a motion to compel the production of

documents from defendants Daniel Yu, Cyrus De Weck, Gotham City Research LLC

("Gotham"), and General Industrial Partners LLP ("GIP") — a motion that is addressed in a

separate opinion issued today.  Defendants have filed a cross-motion for a protective order under

New York's "Shield Law," N.Y. Civ. Rights Law § 79-h.[1]  For the reasons set forth below, we

---

[1] See Notice of Motion for Protective Order, filed Nov. 26, 2025 (Docket # 92) ("Cross-Mot.");
Defendants' Memorandum of Law in Support, filed Nov. 26, 2025 (Docket # 94) ("Defs.'
Mem."); Declaration of David S. Korzenik in Support, filed Nov. 26, 2025 (Docket # 93)
("Korzenik Decl."); Plaintiff's Memorandum of Law in Opposition, filed Dec. 17, 2025 (Docket
# 105) ("Pl.'s Opp."); Declaration of Peter D. Doyle in Opposition, filed Dec. 17, 2025 (Docket
# 106) ("Doyle Decl."); Defendants' Reply Memorandum of Law in Further Support, filed Jan.
16, 2026 (Docket # 109) ("Defs.' Reply"); Declaration of David S. Korzenik, filed Jan 16, 2026
(Docket # 110); Letter from Peter D. Doyle, filed Jan. 22, 2026 (Docket # 111); Letter from
David S. Korzenik, filed Jan. 22, 2026 (Docket# 112); Letter from David S. Korzenik, filed Mar.
13, 2026 (Docket# 119) ("Korzenik Letter"); Declaration of Cyrus De Weck, filed Mar. 13, 2026
(Docket # 120) ("De Weck Decl."); Declaration of Daniel Yu, filed Mar. 13, 2026 (Docket
# 121) ("Yu Decl."); Declaration of Michael A. Asaro, filed Mar. 13, 2026 (Docket # 123) and
filed under seal Mar. 13, 2026 (Docket # 125); Letter from Peter D. Doyle, filed Mar. 20, 2026
(Docket # 127) ("Doyle Letter"); Declaration of William T. Walsh, filed Mar. 20, 2026 (Docket
# 128) ("Walsh Decl."); Letter from David S. Korzenik, filed Mar. 26, 2026 (Docket # 133) ("2d
Korzenik Letter"); Declaration of Michael A. Asaro, annexed as Ex. 2 to 2d Korzenik Letter,

deny defendants' cross-motion for a protective order.

I.      BACKGROUND

   A.  Plaintiff's Allegations and Procedural History

Plaintiff is a publicly traded Spanish corporation.  See Redacted Amended Complaint, filed Mar. 3, 2026 (Docket # 115) ("Compl.") ¶¶ 69-71.  Yu operates Gotham, a Delaware LLC.  Id. ¶ 55.  De Weck is a member of GIP, a British LLP.  Id. ¶ 56.  Plaintiff alleges that "Gotham, through Yu and in coordination with Defendants GIP and De Weck, engages in short selling and publishes 'research reports' about the target company of its short selling positions on its website, www.gothamcityresearch.com."  Id. ¶ 55.

On January 9, 2024, Gotham published a report about plaintiff (the "Report").  Id. ¶ 122.  It began with a disclaimer:

> GOTHAM CITY RESEARCH LLC, its affiliates, or related persons . . . hold short positions in [Grifols] . . . and stand to profit in the event the issuer's stock price declines.  Thus, while GOTHAM CITY RESEARCH LLC has made every effort to present the information contained in the Report in an objective manner, the reader of the Report must bear in mind that GOTHAM CITY RESEARCH LLC's interest and that of its affiliates is to see the price of the issuer's stock decline.

Grifols, S.A. v. Yu, 2025 WL 1826611, at *3 (S.D.N.Y. July 2, 2025) (quoting Report, annexed as Ex. 1 to Amended Complaint (Docket # 22-1)).[2]  The Report described at length Gotham's

---

filed Mar. 26, 2026 (Docket # 133-2); Letter from Peter D. Doyle, filed Apr. 2, 2026 (Docket # 135) ("2d Doyle Letter"); Letter from David S. Korzenik, filed Apr. 10, 2026 (Docket # 137); Letter from Peter D. Doyle, filed Apr. 14, 2026 (Docket # 138).

[2] For convenience, we cite to the district court opinion on defendants' motion to dismiss the amended complaint, which quotes from plaintiff's amended complaint and the Report.  The amended complaint and the Report were originally in the record at Docket # 22, but that docket entry was stricken, see Order, dated June 6, 2025 (Docket # 51), and a new amended complaint was then filed, which appears in the record at Docket # 115.  The Report appears at Docket # 115-1.

view that Grifols' stock was vastly overvalued.  See id.  This conclusion rested, among other reasons, on supposedly "undisclosed loans to Scranton Enterprises," a U.S.-based affiliate to which Grifols lent $95 million in 2018.  Id. at *4 (quoting Report).  The Report stated:

> Grifols does not disclose that the company lent $95 million to Scranton.  We did not see any mention of this $95 million loan to Scranton in its GRF annual reports nor in its Corporate governance reports — in English or in Spanish.  We should expect to find details about related party loans in Note 11 and Note 31 of GRF Annual Report.  Instead, we find that Note 11 refers to Note 31 for details, and Note 31 refers to Note 11 for details — a circular reference.  And neither provides any details about a loan to Scranton.

Id. (quoting Report).

The price of Grifols' stock plummeted in trading on January 9, 2024.  See id. at *5.  Grifols alleges that defendants reaped a "multimillion-dollar windfall."  Id.

The next day, on January 10, 2024, Gotham revised the Report, "eliminat[ing] the accusation that Grifols had failed to disclose the Scranton Loan."  Id.  As revised, the Report stated that "details about a loan to Scranton lie buried in Note 31, appearing nowhere else."  Id. at *13 (quoting Compl. ¶ 147).

On January 26, 2024, Grifols filed this case.  See id. at *8.  Among other claims, plaintiff's amended complaint accused Yu and Gotham of defamation under New York law, and De Weck and GIP of aiding and abetting defamation.  See id. (citing Compl. ¶¶ 231-54); id. at *9 (applying New York law).  The amended complaint listed a number of statements that plaintiffs contended were defamatory, including the statement about the loan to Scranton.  See Compl. ¶¶ 131-216.

After defendants moved to dismiss the amended complaint, Judge Liman granted the motion in large part, which included his ruling that a number of the challenged statements were "protected opinion" under New York law.  See Grifols, 2025 WL 1826611, at *8, *11, *23.

However, Judge Liman held that plaintiff "adequately pled a defamation claim based on the statement that Grifols failed to disclose the Scranton Loan," id. at *11, along with a claim for aiding and abetting defamation, see id. at *21. Judge Liman found that the Report

> states that "Grifols lent Scranton $95 million in 2018 . . . . [T]his loan is undisclosed in Grifols' filings." It also states that "Grifols does not disclose that the company lent $95 million to Scranton," and that "Grifols did not disclose its $95 million loan to Scranton Enterprises in 2018." The January 10 revision to the Report states that "[t]he details about a loan to Scranton lie buried in Note 31, appearing nowhere else." These statements are factual, even in the context of a report consisting largely of opinion, because they state specific and verifiable details regarding what Grifols did or did not report.

Id. at *13 (citations omitted). Next, he accepted the complaint's allegations that these statements were false — that the loan to Scranton "was disclosed on Grifols' 2018, 2019, 2020, 2021, and 2022 Annual Reports on Form 20-F," filed with the U.S. Securities and Exchange Commission. Id. at *20. Finally, he ruled that "the same facts suffice to show actual malice, which requires 'knowledge that the statements were false or . . . reckless disregard as to their falsity.'" Id. (quoting Biro v. Conde Nast, 807 F.3d 541, 544 (2d Cir. 2015)). Judge Liman explained:

> The Report repeatedly cites to Grifols' financial filings, giving rise to the plausible inference that the author reviewed them. The Report specifically references note 31 of the 2018 Annual Report as somewhere "we would expect to find" the loan. It then states the loan was undisclosed. But the revisions made to the Report the next day acknowledged that the loan in fact was disclosed . . . . It is therefore plausible to infer that the author saw the disclosure and, notwithstanding having seen the disclosure, stated precisely the opposite. Because the author had "obvious . . . reasons to doubt the veracity" of the information he was imparting, actual malice has been plausibly pled.

Id. (citations omitted).

  B. The Instant Discovery Dispute

Plaintiff's motion to compel concerns 28 requests for production. See Plaintiff's Memorandum of Law in Support of Motion to Compel, filed Nov. 14, 2025 (Docket # 85) ("Pl.'s Mem."), at 11-21; Amended Second Set of Requests for Production, annexed as Ex. A. to

4

Declaration of Peter D. Doyle (Docket # 86-1).  These requests target defendants' "communications about Grifols, Scranton, and this litigation," Pl.'s Mem. at 11; defendants' "editorial process" with respect to the Report, id. at 15; defendants' "trading activity and financial records," id. at 17; and "the organizational structure and relationships among Gotham and GIP," id. at 19.

Defendants represent that they have already committed to "disclos[ing] all facts and documents relating to the publication and correction of the Loan Disclosure statement." Defendants' Memorandum of Law in Opposition to Motion to Compel, filed Nov. 26, 2025 (Docket # 91) ("Defs.' Opp."), at 30; accord Korzenik Decl. ¶ 10.  They ask the Court to deny plaintiff's motion, contending that plaintiff's requests target irrelevant information and are disproportionate under Fed. R. Civ. P. 26(b).  See Defs.' Opp. at 31.  In the instant cross-motion, defendants argue that plaintiff's requests seek information protected by New York's Shield Law. See Defs.' Mem.  Specifically, they contend the following is privileged under New York's Shield Law: "communications, drafts and editorial process[es]" concerning statements which Judge Liman "ruled nonactionable" and "statements which Grifols' [sic] never challenged in its [first amended complaint]"; discovery pertaining to either "confidential sources" or "non-confidential sources or third-party communications that do not relate to . . . actionable claims"; and "documents or materials that simply pertain to Grifols or Scranton generally."  Korzenik Decl. ¶ 19.  Consistent with their claimed commitment to "disclos[ing] all facts and documents relating to the publication and correction of the Loan Disclosure statement," Defs.' Opp. at 30, defendants do not claim the Shield Law's protection "as to discovery pertaining to the remaining challenged Loan Statement," Defs.' Mem. at 1.

5

II.     DISCUSSION

    A.  Governing Law

Rule 501 of the Federal Rules of Evidence provides that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." The Shield Law "appl[ies] in federal court through Rule 501" where, as here, New York supplies the governing law.  Fowler v. Vary, 2022 WL 3211638, at *5 (S.D.N.Y. Aug. 9, 2022) (citation omitted); accord Baez v. JetBlue Airways, 2012 WL 5471229, at *1 (E.D.N.Y. Nov. 9, 2012) ("New York's Shield Law . . . applies in diversity cases.").

New York's Shield Law provides in pertinent part:

> [N]o professional journalist . . . presently or having previously been employed or otherwise associated with any . . . professional medium of communicating news or information to the public shall be adjudged in contempt by any court in connection with any civil or criminal proceeding . . . for refusing or failing to disclose any news obtained or received in confidence . . . .

N.Y. Civ. Rights Law § 79-h(b).  The Shield Law extends similar protection with respect to "unpublished news . . . not obtained or received in confidence," except that a court may order disclosure of such news if the party seeking such news makes a "clear and specific showing" that it "(i) is highly material and relevant; (ii) is critical or necessary to the maintenance of a party's claim, defense or proof of an issue material thereto; and (iii) is not obtainable from any alternative source."  Id. § 79-h(c).

In other words, the Shield Law affords professional journalists "an absolute privilege . . . with regard to news obtained under a promise of confidentiality but only a qualified privilege with regard to news that is both unpublished and not obtained under a promise of confidentiality."  Baker v. Goldman Sachs & Co., 669 F.3d 105, 107 (2d Cir. 2012).

The Shield Law defines "news" to mean "written, oral, pictorial, photographic, or

6

electronically recorded information or communication concerning local, national or worldwide events or other matters of public concern or public interest or affecting the public welfare." N.Y. Civ. Rights Law § 79-h(a)(8). "News" extends to "unpublished details of the newsgathering process." Baker, 669 F.3d at 109. And, as relevant here, the statute provides protection only to a "professional journalist." N.Y. Civ. Rights Law § 79-h(a)(6). Thus, a party invoking the Shield Law must "show[] that the information it [seeks] to protect was gathered pursuant to the newsgathering activities of a professional journalist." In re Fitch, Inc., 330 F.3d 104, 111 (2d Cir. 2003).

B. Analysis

The first question we address is whether the Report qualifies as "news." The subject of the Report — the accounting practices of a publicly traded company — fits the definition in § 79-h(a)(8) inasmuch as accounting practices of public companies are presumably of interest to the public and affect the public welfare. See Novagold Res., Inc v. J Cap. Rsch. USA LLC, 2024 WL 4250265, at *1 (E.D.N.Y. Mar. 29, 2024) (report which accused publicly traded company "of misleading investors as to the feasibility of a project" found to "qualif[y] as news" under the Shield Law); see also Murray Energy Corp. v. Reorg Rsch., Inc., 152 A.D.3d 445, 446 (1st Dep't 2017) (entity which "provides subscribers with real-time information about debt-distressed companies" held to be "professional medium or agency which has as one of its main functions the dissemination of news to the public" under the Shield Law). Plaintiff does not contend otherwise.

The remaining question on the issue of coverage is whether defendants are "professional journalists" under the statute. The Shield Law defines a "professional journalist" as:

> one who, for gain or livelihood, is engaged in gathering, preparing, collecting, writing, editing, filming, taping or photographing of news intended for a

> newspaper, magazine, news agency, press association or wire service or other professional medium or agency which has as one of its regular functions the processing and researching of news intended for dissemination to the public; such person shall be someone performing said function either as a regular employee or as one otherwise professionally affiliated for gain or livelihood with such medium of communication.

N.Y. Civ. Rights Law § 79-h(a)(6).  This definition has been characterized as "very broad."

Matter of Home Box Off., Inc. (Laster), 64 Misc. 3d 566, 571 (Sup. Ct. 2019).  In applying the

Shield Law, we consider the activities of Yu and De Weck rather than their companies because

the title of the statute identifies it as providing protection to "persons" who are "employed by, or

connected with" news media.  Moreover, the protection offered by the statute "shall apply to

supervisory or employer third person or organization having authority over" such persons.  N.Y.

Civ. Rights Law § 79-h(f); see Matter of Beach v. Shanley, 62 N.Y.2d 241, 247 n.1 (1984)

("[An] employer may claim any benefit of the Shield Law.").

In interpreting a New York statute, the New York Court of Appeals has held that "courts

are obliged to interpret a statute to effectuate the intent of the Legislature."  People v. Williams,

19 N.Y.3d 100, 103 (2012) (citation and internal quotation marks omitted).  While New York

courts examine statutory language as the "clearest indicator" of legislative intent and use it as the

"starting point in any case of interpretation," People v. Golo, 26 N.Y.3d 358, 361 (2015)

(citation and internal quotation marks omitted), even a statutory term that is unambiguous may

not provide proper guidance as to legislative intent under New York law.  The Court of Appeals

has stated:

> In matters of statutory interpretation generally, and particularly here, legislative intent is the great and controlling principle.  Legislative intent may be discerned from the face of a statute, but an apparent lack of ambiguity is rarely, if ever, conclusive.  Generally, inquiry must be made of the spirit and purpose of the legislation, which requires examination of the statutory context of the provision as well as its legislative history.

8

Matter of Sutka v. Conners, 73 N.Y.2d 395, 403 (1989) (citations and internal quotation marks omitted).  Furthermore, the Court of Appeals has admonished that "[l]iteral meanings of words are not to be adhered to or suffered to defeat the general purpose and manifest policy intended to be promoted." Council of City of N.Y. v. Giuliani, 93 N.Y.2d 60, 69 (1999) (citation and internal quotation marks omitted); accord Palmer v. Amazon.com, Inc., 51 F.4th 491, 514 (2d Cir. 2022).

A Second Circuit case considering the Shield Law implicitly recognized the importance under New York law of effectuating the "general purpose and manifest policy intended to be promoted." Council of City of N.Y., 93 N.Y.2d at 69.  In In re Fitch, the Second Circuit was called upon to decide whether a financial rating agency, Fitch, could claim the protection of the statute.  See 330 F.3d at 105.  In re Fitch quoted in full the statutory definition of a "professional journalist" in § 79-h(a)(6) but conducted its analysis of whether the financial rating agency's reports amounted to professional journalism without relying on any of the specific language within that definition.  The Second Circuit concluded that Fitch could not claim the Shield Law's privilege.  Id. at 111.  In re Fitch gave two reasons for that conclusion.  The first was that Fitch was essentially "'cover[ing]' its own clients," a practice which, in the Second Circuit's view, "weigh[ed] against treating Fitch like a journalist." Id. at 109.  The second reason was that Fitch had a "close relationship" with the companies it covered (Fitch went so far as to "take[] an active role in the planning of the transactions it analyzes"), which the Second Circuit found is not "typical" of the relationship "between a journalist and the activities upon which the journalist reports." Id. at 109, 111.  This atypical relationship "counsel[ed] strongly against finding that Fitch may assert the [Shield Law's] privilege." Id. at 111.  Ultimately, the Second Circuit accepted that the district court properly exercised its "discretion" in finding that the information

9

sought from Fitch was not "gathered pursuant to the newsgathering activities of a professional journalist." Id.

In re Fitch's conclusion has no clear application here inasmuch as the companies Yu and De Weck write about are not their clients; indeed, there is no relationship at all between these companies on the one hand, and Yu and De Weck on the other. But In re Fitch also teaches that a court interpreting § 79-h must make a judgment about whether the activities of the person claiming the privilege can be reasonably characterized as those of a "professional journalist" — or as the Second Circuit put it, whether the information at issue was "gathered pursuant to the newsgathering activities of a professional journalist." Id. And, as noted, New York law specifically requires that we make inquiry into "the spirit and purpose of the legislation." Matter of Sutka, 73 N.Y.2d at 403.

One thing made clear by the language of the Shield Law is that New York sought to protect only "professional" — not amateur — journalists: that is, individuals who are regularly paid for their journalism, or as the statute puts it, individuals who make their "gain or livelihood" from their journalistic activities. Indeed, the term "gain or livelihood" appears twice in the definition of "professional journalist." See N.Y. Civ. Rights Law § 79-h(a)(6).

Our analysis of exactly how Yu and De Weck earn their "gain or livelihood" compels the conclusion that they are not in fact professional journalists within the meaning of § 79-h(a)(6).

What distinguishes Yu and De Weck from every other individual who, to the Court's knowledge, has ever successfully claimed the Shield Law's privilege is the absence of evidence that anybody pays Yu and De Weck in any form for reports that they produce.[3] Nor do they

---

[3] Novagold Res., Inc., relied on by defendants, see Defs.' Reply at 7, involved an individual who was paid for writing a report. 2024 WL 4250265, at *3. Many other cases cited by defendants in their submissions did not involve an application of the Shield Law.

produce these reports with any expectation that someone will ever pay them a report.  Nothing in the record reflects any direct connection between Yu and De Weck's production of reports and their "gain or livelihood."  There is no evidence that any report they have produced has ever been commissioned by anyone or sold to anyone.  There is no evidence that any report has ever generated any revenue through advertising.  There is no evidence that Gotham's website, which posts the reports, has generated any advertising revenue, or that this website even has advertisers.  Indeed, defendants admit that they have no "third-party sources of financial support."  Defs.' Reply at 8.

Certainly, Gotham has "its own interest," as defendants put it, id. at 10, in publishing reports.  But that "interest" does not translate to Yu and De Weck's earning "gain or livelihood" from anybody paying for a report.  As there is no evidence from which we can conclude that Yu and De Weck make their gain or livelihood from producing reports as opposed to from trading activities, we are constrained to find that they are not professional journalists.  See generally Mueller v. Aris, 2021 N.Y. Misc. LEXIS 70542, at *15 (Supt. Ct. Jun. 2, 2021) (individual who "not engaged in the activities of [news website] for gain or livelihood but lives off of his savings" not a "professional journalist"); Trussell-Slutsky v. McIlmurray, 2018 N.Y. Misc. LEXIS 8146, at *23 (Sup. Ct. Oct. 11, 2018) (individual not a "professional journalist" absent evidence "she is paid by any [news website], or that she is a 'regular employee' of, or 'otherwise professionally affiliated for gain or livelihood' with, any" such website) (quoting N.Y. Civ. Rights Law § 79-h(a)(6)); see also Blum v. Schlegel, 150 F.R.D. 42, 44 (W.D.N.Y. 1993) (opining that "law student working on a volunteer basis" for campus newspapers would not be covered by Shield Law).

The only information as to how Yu and De Weck financially benefit from their

production of reports is that they "short" the companies they write about and "hope to benefit in doing so." De Weck Decl. ¶ 19. This "hope," however, is not a hope that someone will pay them for producing a report (as might be true for a book written on spec). Instead, the "hope" is that a complicated series of events will reduce the share price of the stock they have shorted. The events that must occur for this to happen are: that a report will come to the attention of individuals who own or advise on shares in the company the report covers; that these individuals will sell or advise the sale of stock in the company; that there will be sufficient sales to drive down the share price; that nobody elects to "engage in what is called a 'short squeeze,' whereby investors seeking to prop up a company's stock price buy a large number of shares of the company," Declaration of Daniel Yu in Beaver Cnty. Emps. Ret. Fund v. Tile Shop Holdings, Inc., No. 16-MC-80062 (N.D. Cal.), annexed as Ex. 8 to Doyle Decl. (Docket # 106-8) ("Yu California Decl.") ¶ 6; and that Yu and De Weck can capitalize on the drop in share price through their short positions. If any one of these events fails to occur, defendants make no "gain or livelihood" from a report. Thus, their "gain or livelihood" depends on actions that countless unknown individuals take, and none of these actions involves in any way payment for producing journalism. It would be far more accurate to say that what they make their "gain or livelihood" from is short-selling, not producing reports.[4]

In our view, the need for these contingent events to occur completely undermines Yu and

---

[4] GIP's public filings have made quite clear that its activities consist only of "portfolio management for pooled investment vehicles" and that it is not engaged in any other business. Doyle Letter at 3 (quoting Form ADV, annexed as Ex. C to Walsh Decl. (Docket # 128-3), at *9). GIP has also explained that its purpose is to "generate good returns for investors by investing its assets in a globally focused short bias strategy" and that it makes its money only from investment fees, not through journalism. Id. (quoting Form ADV Part 2A, annexed as Ex. D to Walsh Decl. (Docket # 128-4), at 4).

De Weck's claim that they are "professional journalists."  The intention of the New York Legislature as reflected in the Shield Law was that the required "gain or livelihood" be directly tied to the journalistic activities and not dependent on events (such as those involved in making a profit from short selling) untethered to the practice of journalism.

Notably, Yu and De Weck are in the extraordinary situation of potentially making the opposite of a "gain or livelihood" by producing reports.  De Weck freely admits that producing reports creates "risks and perils" for the defendants, including the possibility that they could "lose substantial sums if our reporting is not correct," De Weck Decl. ¶ 21 (emphasis added) — apparently referring to the possibility that the share price of a company they write about might not fall (or might not fall sufficiently to cover their short position).  Yu too has stated that if he is "wrong about the company" or a "short squeeze" occurs, "then Gotham would lose money on its investment."  Yu California Decl. ¶ 6 (emphasis added).  One need only read the legislative history of the Shield Law and examine the overall structure of the statute to see that Yu and De Weck's livelihood has no parallel with that of the "professional journalist" whom the Legislature sought to protect.

"New York courts give 'considerable weight in discerning legislative intent' to lawmakers' 'contemporaneous interpretation[s] of a statute,' especially those expressed in the 'Governor's Bill Jacket' attached to all New York laws and the 'sponsor's Memorandum' contained therein."  Reyes v. City of New York, 141 F.4th 55, 69 (2d Cir. 2025) (quoting Knight-Ridder Broad., Inc. v. Greenberg, 70 N.Y.2d 151, 158-59 (1987)).  The history of the original statute in 1970 reflects that the Legislature saw a value in shielding evidence from litigants to protect journalists and their sources, especially confidential sources.  See generally

13

Bill Jacket, L. 1970, ch. 615.[5]  According to a sponsor of the bill that became the Shield Law, the purpose of the statute was to protect the "legitimate press" (as opposed to the "underground press") from "unwarranted governmental interference."  See Letter from Emeel S. Betros, dated Apr. 28, 1970, Bill Jacket, L. 1970, ch. 615, at 8.  The "Bill Jacket" accompanying what became the Shield Law makes reference to "the First Amendment rights of all legitimate newspapermen, reporters, and television and radio broadcasters" — individuals whose trade was journalism.  Signing Statement by Gov. Nelson D. Rockefeller, Bill Jacket, L. 1970, ch. 615, at 92.

A 1981 amendment to the Shield Law "broadened" the "definitions of 'news' and of 'professional journalist' . . . to protect the work of and the individual engaged in any professional capacity of preparing news and information of a topical interest for public dissemination regardless of their job title."  N.Y. State Assembly Introducer's Mem., Bill Jacket, L. 1981, ch. 468, at 4.[6]  Originally, a "professional journalist" was defined as "one who, for gain or livelihood, is engaged in gathering, preparing or editing of news for" one of the followings kinds of outlets: a "newspaper, magazine, news agency, press association or wire service."  People v. LeGrand, 67 A.D.2d 446, 150 (2d Dep't 1979) (citation omitted).  The amendment appended to this list of outlets a "professional medium or agency which has as one of its regular functions the processing or researching of news intended for dissemination to the public."  Mem. for Gov. Hugh L. Carey, Bill Jacket, L. 1981, ch. 468, at 8.  The amendment also added a requirement that a "professional journalist" be "someone performing said function either as a regular employee or as one otherwise professionally affiliated for gain or livelihood with such medium of

---

[5]  The 1970 bill jacket is available at
https://nysl.ptfs.com/#!/s?a=c&q=*&type=16&criteria=lb_document_id%3D85483&b=0

[6]  The 1981 bill jacket is available at
https://nysl.ptfs.com/#!/s?a=c&q=*&type=16&criteria=lb_document_id%3D58834&b=0

communication." Id. Thus, the requirement that the news-gatherer be in it for "gain or livelihood" remained in the statute and was in fact emphasized. The amendment demonstrates the Legislature's continuing view that the earning of "gain or livelihood" from the practice of journalism was paramount. The sponsor's memorandum accompanying the amendment stated:

> All those persons, whatever their job titles, performing a legitimate journalistic function will be protected. But the highly absurd present situation of a Mr. Smith who writes news stories for a New York Times being covered while that same Mr. Smith six months later leaving the Times and beginning work on an investigative book of non-fiction intended for sale to a Harper & Row is not covered, is corrected in this bill.

N.Y. State Assembly Introducer's Mem., Bill Jacket, L. 1981, ch. 468, at 5. In other words, the amendment expanded the Shield Law's coverage to those who operated on a freelance basis or who worked for any outlet, but never deviated from the requirement that the individuals covered make their "gain or livelihood" from journalism.

In sum, nothing in the legislative history or the text of the statute suggests an intention to broaden the § 79-h's protection beyond individuals who are being paid, or expect to be paid, specifically for their journalistic efforts.

To our knowledge, defendants have not brought to our attention a single case where a professional who gains her livelihood indirectly through report-writing has been deemed a "professional journalist" under § 79-h. If defendants qualify as professional journalists, we see little difference between them and a person who attaches writings to their LinkedIn page in the "hope" that their writings will cause an employer to hire them in the future. In the end, the fact that defendants' "gain or livelihood" depends on numerous events uncertain to occur — all of which are unconnected to the act of engaging in journalism — reflects that defendants are not professionals who are paid for their writing as the New York Legislature intended. We thus find that Yu and De Weck's writing of reports do not reflect "newsgathering activities of a

15

professional journalist," <u>In re Fitch, Inc.</u>, 330 F.3d at 111, and they are not entitled to claim the privilege.[7]

      SO ORDERED.

Dated: May 19, 2026
      New York, New York

                                    _____
                                    GABRIEL W. GORENSTEIN
                                    United States Magistrate Judge

---

[7] We are aware that Gotham's efforts to invoke privilege was similarly rejected in <u>Beaver Cnty. Emps. Ret. Fund v. Tile Shop Holdings, Inc.</u>, 2016 WL 3162218, at *4 (N.D. Cal. June 7, 2016). There, the court found that Gotham's "primary motivation" is to "disseminate . . . negative information so that it can profit on its short position," thus reflecting that Gotham did not have an "intent at the inception of its newsgathering process" to disseminate its writings to the public. <u>Id.</u> at *3. While we have rejected defendants' invocation of privilege in this case just as <u>Beaver Cnty. Emps. Ret. Fund</u> did, we do not rely on that case because it construed the federal journalist's privilege.