**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| GRIFOLS, S.A.,<br><br>                Plaintiff,<br><br>     v.<br><br>DANIEL YU, GOTHAM CITY RESEARCH LLC,<br>GENERAL INDUSTRIAL PARTNERS LLP, and<br>CYRUS DE WECK,<br><br>                Defendants. | Index No. 1:24-cv-00576-LJL-GWG<br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANTS' APPEAL/OBJECTIONS ON MAGISTRATE**
**JUDGE'S RULING ON REPORTERS' PRIVILEGE (Dkt. 141)**

Miller Korzenik Rayman LLP
David S. Korzenik
Gillian Vernick
1501 Broadway, Suite 2015
New York, NY 10036
212-752-9200

*Attorneys for Defendants*

Defendants Cyrus De Weck, Gotham City Research LLC, Daniel Yu and General

Industrial Partners LLC ("Defendants," "Gotham") submit this Memorandum of Law in support

of their appeal of the Ruling of the Magistrate Judge, Dkt. 141,[1] ("Ruling") denying their Motion

for a Protective Order under New York's Reporters' Privilege.[2] N.Y. Civ. Rights Law § 79-h.

## PRELIMINARY STATEMENT

The Ruling creates a new restriction on 79-h's definition of a "professional journalist"

that is contrary to the case law and legislative intent.  This limitation would not only be

troublesome for activist short report publishers like Defendants, but also for the large range of

journalists who do not receive the requisite "gain" through conventional business models (ad or

subscription-based) or whose earnings are in any way "contingent," subject to "risk" or

otherwise less than a direct salary. This creates a new obstacle to the diverse revenue models

journalism needs to survive. This new causal-connection "gain" test will increase confusion and

uncertainty for those who invoke 79-h protections. 79-h case law rejects this kind of parsing:

> "To condition coverage on a fact-intensive inquiry analyzing a publication's number of subscribers, subscription fees, and the extent to which it allows further dissemination of information is unworkable and would create substantial prospective uncertainty, leading to a potential "chilling" effect." *Murray Energy Corp. v. Reorg Rsch., Inc.*, 152 A.D.3d 445, 447 (1st Dept. 2017).

*Serious Error*: The Ruling's analysis is founded on a serious misreading of the 79-h(a)(6)

definition. The word "regular" does not modify or pertain to "*gain*" or earnings; it modifies and

pertains to the "regular *function*" of "processing and researching of news for dissemination to the

public." 79-h does not require "regular gains." Many forms of journalism have no regular

earnings. They often lose money, do it for public service or to learn, or on spec, or as a

percentage of contingent and unrealized gain. They may look to payment based on page views

---

[1] Footnote 1 of the Ruling (Dkt. 141) lists the filings made in the course of briefing the Reporters' Privilege motion.
[2] We are not asserting the Reporters Privilege as to any documents that pertain to the remaining Scranton loan issue.

1

that may or may not materialize. Op-ed writers often are not paid for their contributions. Documentary filmmakers often have contingent or elusive earnings.[3] No court has ever barred such writers or publishers from 79-h protections as this Ruling would. It would burden journalists with the unworkable and unpredictable parsing analysis into the nature of their earnings that chills reporting and makes reliance on 79-h costly and uncertain. The Ruling must be corrected.

The Ruling is also predicated on factual error. Daniel Yu and Cyrus de Weck receive regular management fees to support their work. [4] The Ruling ignores their compensated functions as publishers and investment managers and looks only at their position as investors in the funds they manage. Yu and de Weck are defendants in this case due to their activities as publishers and investment managers, not as investors. The Ruling is predicated on the legally and factually incorrect assumption that they only earn contingently from their short positions. If the funds lose money, they are still compensated for their functions as writers, publishers and managers. Investors pay a monthly fee and that covers the work that Yu and de Weck do, which includes their news dissemination function. It is quite analogous to a subscription fee.

Yu's function and profession is made all the more than apparent by the fact that Gotham City Research's *only function* is to publish financial news. And Yu is the sole officer of Gotham and de Weck's GIP is "professionally affiliated" with Gotham. They collaborate on the Reports that they research, write and disseminate. So, if the Ruling requires "regular gain" for their publication work, Defendants have that erroneous requirement covered as well.

---

[3] Sometimes they don't get a distributor after the film is done. Do they have no 79-h protections? They do and must.
[4] The briefing on 79-h focused largely on whether the Report was "news." The creative analysis of earnings invoked by the Ruling was hardly anticipated by the parties. It is not only based on a legally erroneous reading of 79-h(a)(6) as if it requires "regular *earnings*" when it actually requires a "regular *function*" as a "news disseminator," but it is also based on a factually erroneous premise that Yu and de Weck do not earn salaries for what they do. The Ruling also develops a strange parsing and separation of the "journalists" from their organizations, finding that a publisher gets 79-h protection only derivatively from the writers. No court has relied on such an unworkable parsing before.

The Ruling does not challenge whether the Report qualifies as "news" as defined by 79-h (a)(8). Nor does it challenge the related point that its "function [engages] the processing and researching of news intended for dissemination to the public."

Instead, the Ruling seems to disapprove of Defendants' being activist short-sellers and therefore seeks to undo their entitlement to the protections of 79-h by parsing their "gains" as shorts to disqualify them. This is in spite of the Ruling's recognition that the unambiguous language of the statute *would* include them in 79-h(a)(6)'s definition of "professional journalists." This perception of activist short publishers runs contrary to this Court's broader view of short report publishers: Your Honor recognized them to be as entitled to publish criticisms of publicly traded companies, just as those companies are entitled to tout their own claims. Op. & Order, at 23, Dkt. No. 56.

## **ARGUMENT**

To break Defendants' otherwise firm inclusion in the Reporters' Privilege, the Ruling undertakes an analysis that no 79-h case law has indulged. The first peculiar step in the Ruling's analysis is to *segregate* Daniel Yu's and Cyrus de Weck's activities from those of their affiliated companies. The Ruling backfills slightly by acknowledging that the companies would be protected if the individuals were protected. But that does not correct the problem. Rather, the maneuver presages the next unusual steps in the analysis:

1. The Ruling's "*segregation*" analysis conflicts directly with the obviously inclusive "*affiliation*" language of 79-h(a)(6):

   > "such person may be someone performing said function [news dissemination] either as a regular employee of *or as **one otherwise professionally affiliated** for gain or livelihood *with such medium of communication*." (emphasis added)

3

2. The Ruling acknowledges that the broad 79-h(a)(6) definition of "professional journalist" does indeed include the four Defendants, but it then tries to escape that result by proposing that "even a statutory term that is unambiguous may not provide proper guidance as to the legislative intent under New York law." *Id.* at 8. The cases cited for this escape hatch from unambiguous statutory language have no bearing here. The "legislative intent and spirit" safety valve, when applied to *remedial* legislation like 79-h, demands a *liberal* reading – *not restriction. See Matter of Holmes v. Winter* 22 N.Y.3d 300, 309–10 (2013) (discussing that the 1981 amendments to 79-h were "an effort to strengthen its provisions" in response to courts "affording inadequate protections to reporters"). *See also Kimmel v. State,* 29 N.Y.3d 386, 396–97 (2017) ("limitations should not be read into such remedial statutes 'unless the limitations proposed are clearly expressed'") (cleaned up). *See also People v. Juarez,* 31 N.Y.3d 1186, 1204–05 (2018) (79-h has "always" been amended to "strengthen[]" its protections, sometimes in response to courts "failing to follow its letter or even spirit").

3. This Ruling also runs counter to the often-cited legislative intent that 79-h be given a broad and generously inclusive reading. (*See infra* p. 9). If the legislature wanted to limit 79-h to "subscription" and "advertising"-based news outlets, as the Ruling proposes, it could have easily done so by using such specific limiting language. *Kimmel,* 29 N.Y.3d at 396–97. The legislature clearly sought to protect far more.

4. It is significant too that 79-h is tied in its case law and legislative history to the similarly broad Art. I, § 8 of the NY State Constitution. New York's Constitution provides long-established, *wider* protections for free speech than the First

4

Amendment to the U.S. Constitution. Reporters' Privilege laws, statutory or common law, are all grounded in Constitutional imperatives. 79-h is not just a stand-alone enactment.[5] *See Juarez*, 31 N.Y.3d 1186, at 1204–05 ("The Shield Law…is embedded in [this] venerable tradition [of protecting the newsgathering process]. It has been amended multiple times, always strengthening its protections[.]").

5. Instead of turning directly to the legislative history of 79-h, which gets only an impressionistic reading on pages 13-14,[6] the Ruling skips into a discussion of *In re Fitch*, a Court of Appeals ruling on a sell-side advertisement and promotion that has, as the Court itself recognizes, no factual analog here. 330 F.3d 104, 109 (2d Cir. 2003). Nonetheless, the Ruling concludes that *In re Fitch* licenses the Magistrate to parse the nature and circumstances of Defendants' "gain" to impermissibly restrict the definition of "professional journalist."

6. Importantly, the Court in *In re Fitch* cautions that its ruling is to be strictly limited to the specific and unusual facts at issue. 330 F.3d 104, 111 ("Nor do we seek to amplify or interpret New York law beyond the facts of this case."). Significantly, Fitch's report was utter promotion and self-dealing—a *lack of independence* uncharacteristic of journalism.  Fitch was paid for and even structured the deal that it reported on and rated.

---

[5] § 79-h, "has its origins in the New York Constitution's free press provision (Art. I, § 8), which provides the broadest possible protection to the sensitive role of gathering and disseminating news of public events." *Giuffre v. Maxwell*, 221 F. Supp. 3d 472, 475 (S.D.N.Y. 2016).

[6] Remarkably, the Ruling reviews the increasingly expansive definitions of professional journalist in each of the NY Legislature's amendments to 79-h, but seems to pay that no heed. Clearly the amendments were made to overcome the prior narrow judicial readings of the statute. In prior briefing, Grifols relied on Reporters' Privilege cases that **pre-dated** the more expansive amendments. Here the Ruling recognizes the expanded amendments, but draws nothing from them.

7. Why then does the Ruling rely on *In re Fitch*? The Magistrate treats *Fitch* as a license to articulate his own style of inquiry into legislative intent. But *In re Fitch* is about "independence,"[7] and it is expressly *limited* to that inquiry. Independence is an appropriate inquiry. The Ruling's inquiry into "regular" non-contingent gain is not. Instead, it is an unprecedented effort to constrain 79-h's plain language. And it is used unjustifiably to import into the statute a *colloquial, cliched and anachronistic* understanding of the word "journalist." The Ruling would favor limited variations on Walter Cronkite or Dan Rather or publications that earn revenue exclusively from "advertising" and "subscriptions." But the 79-h(a)(6) definition of "professional journalist" is not confined to journalists who earn money via traditional avenues only.

8. The statute was designed to protect far more than traditional or legacy media. *See Holmes,* 22 N.Y.3d 300 at 309 (the statute was designed to "provide[] a mantle of protection for those who gather and report the news—and their confidential sources[.]"). The legislature, through its amendments, recognized that a narrow definition of "journalist" would crimp the protections under 79-h. The Ruling forces 79-h cases into the kind of hair-splitting parsing that the First Department eschewed in *Murray Energy*:

> "To condition coverage on a fact-intensive inquiry analyzing the publications, number of subscribers, subscription fees, and the extent to which it allows further dissemination of information is unworkable and would create substantial prospective uncertainty, leading to a potential chilling effect." 152 A.D.3d, 445, 447 (1st Dept. 2017).

This Ruling with its fact-intensive earnings causation test would have a "chilling" impact on any news outlet that does not follow a conventional or traditional business

---

[7] So too is *Murray Energy,* which found Reorg Research's reports to be "independent[t]" even if not conventional. 152 A**.**D**.**3d, 445, 447.

model. And it empowers those who oppose the Reporters Privilege to seek needless and costly discovery of financial arrangements.

It is worth looking again at 79-h(a)(6)'s definition of professional journalist to see how this novel inquiry twists the statutory language to reach its conclusion:

> "Professional journalist shall mean one who, for gain or livelihood, is *engaged in gathering, preparing, collecting, writing, editing*, filming, taping, or photographing of *news* intended for a newspaper, magazine, news agency, press association or wire service *or **other professional medium** or agency* which has as *one of its regular functions the processing and researching of news* intended for dissemination to the public; *such person shall be someone performing said function,* either as a regular employee ***or as one otherwise professionally affiliated*** for *gain or livelihood with such medium of communication*." (emphasis added).

The Ruling both elides operative words of this definition and then incorrectly suggests that there is no "evidence that anybody pays Yu and de Weck in any form for reports that they produce." There are at least two problems with this:

1) The Ruling sets out and the pleadings set out, many times over, that the Defendants are activist short report publishers whose *investors* derive earnings from successful short positions resulting from their reports. The Magistrate may not approve of that, but it is a source of "gain" that the Ruling itself describes on page 2; and

2) Daniel Yu and Cyrus de Weck (as writers and as investment managers) are paid steadily for their work by Gotham and GIP. The four Defendants have a *professional affiliation* that combines investment management *with research publishing,* They are paid regardless of whether their short report proves successful. Most critically, they execute a news dissemination function. Decl. of Cyrus de Weck, ¶ 8, Dkt. No. 120.

The Ruling also mistakenly takes exception to the possibility that Yu and de Weck's earnings *might* be "***contingent***" or subject to "***risk***" and that, in some cases, they might earn or

7

gain nothing for their efforts. Again, this is not only factually incorrect, but it also ignores their obvious function as disseminators of financial news.  79-h does not say that a journalist must "regularly" earn money for his/her work; It says that their "*regular functions [must be] the processing and researching of news…*" "Regular" refers to one's "*function,*" not one's "gain."

This misreading of the law would disqualify a broad swathe of even traditional "journalists" who do not earn a regular income from their work. Today, even traditional news providers do not earn money from merely news. The New York Times has significant earnings from *puzzles*. But the 21st-century news media's economic struggle does not negate their profession. Only "one of its regular functions" needs to be news dissemination. 79-h(a)(6). The Ruling misses the purpose of the privilege entirely. If one were to indulge this misreading, cases would devolve into unmanageable and unpredictable quibbling over whether the 79-h applies at all. This is a formula for chaos and needlessly costly discovery.

Next, the Ruling unjustifiably separates the writers from their companies:

> "Certainly, Gotham has 'its own interest,' as defendants put it, id. at 10, in publishing reports. But that interest does not translate to Yu and de Weck's earning 'gain or livelihood' from anybody paying for a report." Op. & Order, at 11.

Again, this is contrary to the language of 79-h, which provides that a journalist must make "gain or livelihood" either through news-related duties for an organization as either a "regular employee" or as one "otherwise professionally affiliated … with such medium of communication." The statute does not justify any such "translation" or novel causal earnings test.

None of this makes sense for news media in the 21st Century. Traditional news media, cable among them, are failing or in decline. New distribution business models are critical to the survival of journalism and news delivery. Some news organizations are being taken over by large corporations that seek to please the government by tailoring their reporting to the

8

administration's preferences. New media are struggling to provide independent news – some offering content for free in the hopes of getting traction. This Ruling, and its ill-conceived test, if adopted, would darken new news media's prospects when help is most needed. Traditional financial news media have less bandwidth to do in-depth, long-form reporting on public companies. Short report publishers devote substantial resources to such in-depth reporting. To bar them from doing their reporting without the 79-h protections that solid reporting depends on would be an "incursion[] on press freedom[.]" *Holmes*, 22 N.Y.3d 300 at 309.

The Ruling's gloss on legislative history is both superficial and circular. The fact that the bill jacket in 1970 referred to the interest in protecting "the First Amendment rights of all legitimate newspapermen, reporters and television and radio broadcasters" does nothing to advance the Ruling's premise. In fact, the legislature amended 79-h in 1981 because courts had been interpreting the statute restrictively in contravention of the "spirit" of the law. *Holmes*, 22 N.Y.3d 300, at 309–310. Furthermore, in line with the "[e]xpansive" press protection embedded in New York's "history," the law has *always* been amended to "strengthen[] its protections." *Juarez*, 31 N.Y.3d 1186, at 1204–1205. The Ruling resists this straightforward legislative intent and history—even while acknowledging this constant expansion "regardless of [] job title."

The definition of "professional journalist" is *primarily derived from the newsgathering process*. For example, in *Matter of Application of Home Box Off., Inc.,* the Court held that "the statute's very broad definition of 'professional journalist' encompasses anyone involved in news gathering." 103 N.Y.S.3d 794, 798 (N.Y. Sup. Ct. 2019). *Torah Soft Ltd. v. Drosnin,* is also instructive:

> "In response to decisions such as *LeGrand,* the legislature broadened the definition of a 'professional journalist' so that '[all] those persons, whatever their job titles, performing a legitimate journalistic function will be protected.' 1970 N.Y. Legis. Ann. at 257. Indeed, Assemblyman Steven Sanders, one of the sponsors of the bill, wrote in his

9

memorandum that: 'the highly absurd present situation of a Mr. Smith who writes news stories for a New York Times being covered while that same Mr. Smith six months later leaving the Times and beginning work on an investigative book of non-fiction intended for sale to a Harper & Row is not covered, is corrected in this bill. **Thus the new bill will protect the journalistic process wherever that process is being professionally undertaken**.'" 2001 WL 1425381, at *6 (S.D.N.Y. Nov. 14, 2001) (emphasis added).

The NY Court of Appeals' extensive analysis of legislative intent in *Holmes* sums it up best:

"New York public policy as embodied in the Constitution and our current statutory scheme provides a mantle of **protection for those who gather and report the news— and their confidential sources**—that has been recognized as the strongest in the nation. And **safeguarding the anonymity of those who provide information in confidence is perhaps the core principle of New York's journalistic privilege.**" This is because, prior to the 1981 amendment, the '[c]ase history ma[de] it abundantly clear that the **courts have been all too often disinclined to follow the letter or even the spirit of the existing law.'** 22 N.Y.3d 300, 309–10 (2013) (emphasis added).

If the Magistrate wanted to follow the "intent and spirit of the law," there is ample case law to refer to. Instead, a narrow and aberrant Ruling is crafted. The overwhelming case law looks to the clear "spirit" of the statute, not the minutiae of which dollar comes from where.

The Ruling's erroneous test and misreading is not just a problem for activist short sellers. It is a serious problem for new news disseminators who are becoming increasingly reliant on new revenue models to survive. This is a serious setback for NY Reporters' Privilege, long regarded as the strongest in the nation. If adopted, without correction, it will create costly confusion and uncertainty for those who rely on this critical privilege at this critical time. [8]

**CONCLUSION**

For the foregoing reasons, the Court should not adopt and indeed correct the clear error of the Ruling and grant Defendants' protective order and such other relief as the Court deems just and proper.

---

[8] When the administration attacks them and issues subpoenas to expose their sources, as is now the increasing and abusive practice, the 79-h protections will not be there to protect them, if the Magistrate's Ruling is not corrected.

10

Respectfully Submitted,
Miller Korzenik Rayman LLP

By: //s// _David S. Korzenik_

David S. Korzenik
Gillian Vernick
1501 Broadway, Suite 2015
New York, NY 10036
212-752-9200

_Attorneys for Defendants_

11

**CERTIFICATE OF WORD COUNT**

Pursuant to Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, I certify that the accompanying Defendant's Appeal/Objections on Magistrate Judge's Ruling on Reporters' Privilege is produced using 12-point Times New Roman type, with 10-point Times New Roman type in the footnotes, and contains 3477 words, including footnotes. This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word) used to prepare the document.

I declare under the penalty of perjury that the foregoing is true and correct.


By: //s// _David S. Korzenik_

David S. Korzenik
Miller Korzenik Rayman LLP
1501 Broadway, Suite 2015
New York, NY 10036
212-752-9200


Executed on June 10, 2026