USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 08/20/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GRIFOLS, S.A.,

Plaintiff,

-v-

DANIEL YU, et al.,

Defendants.

24-cv-576 (LJL)

MEMORANDUM AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendants Daniel Yu, Cyrus De Weck, Gotham City Research LLC ("Gotham"), and General Industrial Partners LLP ("GIP") (collectively, "Defendants") appeal the ruling of Magistrate Judge Gabriel W. Gorenstein denying their motion for a protective order under New York's "Shield Law," N.Y. Civ. Rights Law § 79-h. Dkt. No. 156.

For the following reasons, Judge Gorenstein's Order at Dkt. No. 141 is affirmed.

**BACKGROUND**

Familiarity with the prior proceedings in this matter is presumed. The Court describes only those facts necessary to understand its ruling.

Plaintiff Grifols, S.A. ("Plaintiff" or "Grifols") is a publicly traded Spanish corporation that develops and produces lifesaving plasma-derived and transfusion medicines. *See* Dkt. No. 115 ("Compl.") ¶¶ 66, 69–71. Gotham is a Delaware limited liability company that engages in short-selling and publishes research reports on the targets of its short-selling activities for the investing public. *Id.* ¶ 55; Dkt. No. 121 ¶ 7. GIP is a limited liability partnership registered in both England and Wales, and registered with the Securities and Exchange Commission as an investment adviser. Compl. ¶ 56, Dkt. No. 128-3 at 2. It is an affiliate of Gotham. Compl. ¶ 56,

Dkt. No. 120 ¶ 3. Yu is the founder, publisher, and editor of Gotham. Compl. ¶ 54, Dkt. No. 121 ¶ 2. De Weck operates and is a member of GIP. Compl. ¶ 56, Dkt. No. 120 ¶ 3. In 2022, Yu, De Weck, and their respective firms "joined forces, combining an investment manager with a short selling research publishing business model." Dkt. No. 120 ¶ 8; Dkt. No. 121 ¶ 7.

On January 9, 2024, Gotham published a report about Plaintiff (the "Report") titled "Grifols SA: Scranton and the Undisclosed Debts." Compl. ¶ 122. The thrust of the Report was that the manner in which Grifols reported its debt and its earnings before interest and debt amortization ("EBITDA") was misleading, that Grifols's "true" debt was far greater than reported and its EBITDA far lower than reported, that accordingly Grifols's "true leverage" was far greater than reported, and that, as a result, Grifols's shares were overvalued and, if the assumptions stated in the Report were applied, "uninvestable" and worth "likely zero." Dkt. No. 115-1 at 4. The Report's conclusions rested upon, among other things, supposedly "undisclosed loans to Scranton Enterprises," a U.S.-based affiliate to which Grifols lent $95 million in 2018 (the "Scranton Loan"). *Id.* at 23–25. Specifically, the Report stated that one would "expect to find details about [the Scranton Loan] in Note 11 and Note 31 of [Grifols's] GRF Annual Report," but those details were conspicuously absent. *Id.* at 23. Gotham's Report also contained a disclaimer:

> Our research expresses our opinions, which we have based upon publicly obtainable information, field research, inferences and deductions through our due diligence and analytical processes . . . GOTHAM CITY RESEARCH LLC, its affiliates, or related persons . . . hold short positions in [Grifols] . . . and stand to profit in the event the issuer's stock declines. Thus, while GOTHAM CITY RESEARCH LLC has made every effort to present the information contained in the Report in an objective manner, the reader of the Report must bear in mind that GOTHAM CITY RESEARCH LLC's interest and that of its affiliates is to see the price of the issuer's stock decline.

*Id.* at 2.

Prior to publishing the Report, Defendants had amassed a large short position in Grifols stock. Compl. ¶ 120. In the wake of the Report, Grifols shares "fell as much as 43% during trading on January 9, 2024," causing the company to lose nearly $3 billion of market value. *Id.* ¶ 127. Grifols alleges that Defendants shortly thereafter "reduced their short position [in Grifols stock] from .57% to .06%, resulting in a multi-million-dollar windfall." *Id.* ¶ 128.

One day after publication, on January 10, 2024, Defendants revised the Report, removing the assertion that Grifols had failed to disclose the Scranton Loan. *Id.* ¶¶ 143–44. As revised, the Report stated that "details about [the $95 million] loan lie buried in Note 31 [of Grifols's 2018 Annual Report], appearing nowhere else." *Id*. ¶ 147.

**PROCEDURAL HISTORY**

On January 26, 2024, Plaintiff filed a complaint alleging that the Report was false and defamatory. Dkt. No. 1; Compl. ¶ 6. Plaintiff filed the Redacted Amended Complaint on March 3, 2026. Dkt. No. 115.[1] The Redacted Amended Complaint contains five counts: libel and defamation by implication against Yu and Gotham, *id.* ¶¶ 231–44; aiding and abetting libel and defamation by implication against GIP and De Weck, *id.* ¶¶ 245–54; tortious interference with business relations against Yu and Gotham, *id.* ¶¶ 255–66; aiding and abetting tortious interference with business relations against GIP and De Weck, *id.* ¶¶ 267–75; and unjust enrichment against all Defendants, *id.* ¶¶ 276–81.

[1] Plaintiff originally filed an amended complaint on September 9, 2024. Dkt. No. 22. That submission was subsequently struck from the docket after Plaintiff was directed to refile its amended complaint with certain specified redactions. Dkt. Nos. 49, 50, 51. However, when Plaintiff refiled its amended complaint, it omitted the four attachments thereto. As a result, the Court directed Plaintiff to refile the amended complaint afresh along with the four exhibits that were attached to the original amended complaint, Dkt. No. 114, which Plaintiff did on March 3, 2026, Dkt. No. 115.

In particular, Plaintiff alleges that Defendants took a short position in Grifols stock and then made false and defamatory statements about Grifols, including the statement about the Scranton Loan, in order to drive down the price of that stock and correspondingly to increase the value of their short position. *Id.* ¶¶ 113, 137–48. In other words, Grifols claims that Defendants released the Report to "inject panic in the market," spurring a Grifols stock sell-off, and ensuring their short position would turn a profit. *Id.* ¶ 102.

More broadly, Plaintiff alleges that "Gotham, through Yu and in coordination with Defendants GIP and De Weck, engages in short selling and publishes 'research reports' about the target company of its short selling positions on its website, www.gothamcityresearch.com." *Id.* ¶ 55. Plaintiff alleges that this short-and-report scheme has been Defendants' business model since Gotham's "inception." *Id.* ¶ 99. Defendants bet that "the share price of a publicly traded company will collapse after the company is the target of a disparaging report by Gotham." *Id.* Defendants describe their business similarly: they "combin[e] a short selling research publishing model with investment managing . . . publish[ing] [their] reports online for the investing public." Dkt. No. 121 ¶ 7.

Defendants moved to dismiss the amended complaint on December 20, 2024. Dkt. No. 26. On May 29, 2025, the Court partially granted Defendants' motion to dismiss. Dkt. No. 48; *Grifols, S.A. v. Yu*, 2025 WL 1826611 (S.D.N.Y. July 2, 2025). In so doing, the Court recognized that a number of the challenged statements were "protected opinion" under New York law. *Grifols*, 2025 WL 1826611, at *11. However, the Court held that Plaintiff "adequately pled a defamation claim based on the statement that Grifols failed to disclose the Scranton Loan," *id.*, along with a claim for aiding and abetting defamation, *see id.* at *21.

## I. The Instant Discovery Dispute

Following the ruling on the motion to dismiss, the parties opened discovery. On November 11, 2025, Plaintiff filed a motion to compel concerning 28 requests for production, Dkt. No. 84, which targeted, *inter alia*, Defendants' "communications about Grifols, Scranton, and this litigation," Dkt. No. 85 at 11; Defendants' "editorial process" with respect to the Report, *id.* at 15; Defendants' "trading activity and financial records," *id.* at 17; and "the organizational structure and relationships among Gotham and GIP," *id.* at 19.

In response, on November 26, 2025, Defendants filed a cross-motion for a protective order and accompanying memorandum of law, arguing that certain categories of information sought by Plaintiff[2] were protected by New York's "Shield Law," N.Y. Civ. Rights Law § 79-h. Dkt. Nos. 92, 94.[3] They supplemented this motion with a declaration by counsel Mr. Korzenik asserting that Defendants qualified for the shield because the Report is "news" as defined by Section 79-h(a)(8). Dkt. No. 93 ¶¶ 17–18. Counsel also asserted that Defendants are "professional journalists" as defined by Section 79-h(a)(6) because they research, write, and publish their reports for dissemination to the public "for gain," Gotham is "engaged in the regular function of processing and researching news," and Gotham stands to profit if the subject

[2] Defendants do not claim the Shield Law's protection as to discovery pertaining to the publication of the Scranton Loan statement. *See* Dkt. No. 92 ¶ 3 ("Defendants assert their §79-h privilege only as to matters unrelated to the loan nondisclosure statements in the Report."). The accompanying declaration of counsel indicates that Defendants seek § 79-h protection over "communications, drafts and editorial process concerning statements which Judge Liman dismissed and ruled nonactionable," "communications, draft and editorial process concerning statements which Grifols' [sic] never challenged in its FAC," discovery pertaining to any "confidential sources" or "non-confidential sources or third-party communications that do not relate to any of the actionable claims," and "documents or materials that simply pertain to Grifols or Scranton generally." Dkt. No. 93 ¶ 19.

[3] Defendants' opposition to Plaintiff's motion to compel argued against discovery of the same material on alternative grounds, including that such discovery is neither relevant nor proportionate under Fed. R. Civ. P. 26. *See* Dkt. No. 91. Judge Gorenstein addressed these arguments by way of a separate memorandum opinion issued on May 19, 2026. Dkt. No. 142.

company's stock price declines. *Id.* ¶ 16. On December 17, 2025, Plaintiff filed a memorandum of law and supporting declaration in opposition to the motion, arguing that Defendants do not qualify as professional journalists under the statute because their "reporting" is motivated by specific financial incentives rather than a general interest in publishing newsworthy material. Dkt. No. 105 at 7–10. Plaintiff argued, *inter alia*, that Defendants submitted no evidence that Yu or De Weck were journalists, relying instead on a declaration of counsel. *Id.* at 10. On December 22, 2025, Defendants requested, and the Court granted, an extension of time to file their reply in support of the motion. Dkt. Nos. 107, 108. On January 16, 2026, Defendants filed a reply memorandum and additional declaration from counsel, attaching exhibits. Dkt. Nos. 109, 110. Plaintiff shortly thereafter filed a letter motion for leave to file a short sur-reply to Defendants' cross-motion for a protective order, setting forth the sur-reply in the body of the letter motion. Dkt. No. 111. Defendants filed a letter response thereto, Dkt. No. 112, and by order of February 12, 2026, the Court deemed both letters to be part of the briefing on Defendants' cross-motion, Dkt. No. 113.

On March 4, 2026, Judge Gorenstein held a conference with the parties where he observed that the parties had not clearly briefed the "factual elements of the statutes" and, expressing a preference for deciding the motion on the merits rather than based upon a "procedural failure" on Defendants' part, gave Defendants "a chance to file affidavits that provides all the facts necessary for me to find in their favor on the reporters' [privilege]." Dkt. No. 117 at 3:4–4:9.

After the conference, Defendants' counsel filed a supplemental letter on the docket specifically addressing, among other issues, the question of whether Defendants publish news for "gain or livelihood," as required by the Shield Law. *See* Dkt. No. 119. The letter stated: "Both

de Weck and Yu are either regular employees, or professionally affiliated for gain or livelihood in the partnership between GIP and Gotham to identify, write, research and publish on publicly traded companies." *Id.* at 2–3. Alongside the letter, Defendants submitted three declarations from De Weck, Yu, and Michael Asaro. De Weck's declaration explained:

> We publish our reports for "gain and livelihood," as I understand the statute requires of "professional journalists." We short the stocks on which we report and hope to benefit in doing so. We fully disclose this financial motive to our readers at the outset . . . . Our ability to secure such gains turns on our credibility, and on the soundness and dependability of our reporting.

Dkt. No. 120 ¶¶ 19–20.

Yu's declaration contained nothing addressing the "gain or livelihood" question. *See* Dkt. No. 121. Neither did the declaration of Asaro, who had represented Defendants in connection with the SEC's investigation into the Report and whose declaration relayed facts as to Defendants' production of documents to the SEC and to the United Kingdom's Financial Conduct Authority in connection with investigations conducted by those agencies. *See* Dkt. No. 122.

On March 20, 2026, Plaintiff filed a response and supporting declaration to Defendants' supplemental submission in support of their cross-motion for a protective order, arguing *inter alia* that Defendants' supplemental declarations failed to establish their entitlement to Section 79-h's protections. Dkt. Nos. 127, 128. On March 26, 2026, Defendants filed a further response and two additional declarations addressing purported inaccuracies in Grifols's supplemental opposition with respect to Defendants' document productions to regulators. Dkt. No. 133. With leave of Court, Plaintiff filed an additional letter response arguing that Defendants still had not met their burden to show that they were "professional journalists" under the Shield Law. Dkt. No. 135. Plaintiff reiterated that Yu had not shown that he and Gotham "derive revenue from publishing their reports" and De Weck did not qualify because he was merely "an associated

financial third party," rather than a reporter himself, and also did not generate revenue from publishing. *Id.* at 1–2.

On May 19, 2026, Judge Gorenstein issued an Opinion and Order denying Defendants' cross-motion for a protective order. Dkt. No. 141.

## II. Judge Gorenstein's Decision

Judge Gorenstein rejected Defendants' claim to the protections of the Shield Law. He determined that the Report fit squarely within the statute's definition of "news," but concluded that Yu and De Weck were not "professional journalists" as defined by the Shield Law because "there is no evidence from which we can conclude that Yu and De Weck make their gain or livelihood from producing reports as opposed to from trading activities." *Grifols, S.A. v. Yu*, 2026 WL 1399095, at *4, *6 (S.D.N.Y. May 19, 2026).

Two principles drove his reasoning: first, the intent of the New York State legislature to limit the protection of the Shield Law to "'professional'—not amateur—journalists,"[4] and second, a principle derived from the Second Circuit's opinion in *In re Fitch*, 330 F.3d 104 (2d Cir. 2003) that "a court interpreting § 79-h must make a judgment about whether the activities of the person claiming the privilege can be reasonably characterized as those of a 'professional journalist.'" *Id.* at *6. Because nothing in the record established that anyone paid Yu and De Weck "in any form for reports that they produce," whether that be through commissions, sales, or advertising revenues from the reports themselves or on Gotham's website, and because Yu

[4] Judge Gorenstein's analysis of the legislature's intent also includes the 1981 amendment to the Shield Law which broadened the definition of "news" and of "professional journalist" but retained an emphasis on the requirement that the newsgatherer obtain "gain or livelihood" from the practice of journalism. *Id.* at *8. Judge Gorenstein therefore reasoned that "nothing in the legislative history or the text of the statute suggests an intention to broaden the § 79-h's protection beyond individuals who are being paid, or expect to be paid, specifically for their journalistic efforts." *Id.*

and De Weck did not produce the reports "with any expectation that someone will ever pay them for a report," Judge Gorenstein concluded that they failed to satisfy their burden to show that they produced and published the reports for "gain or livelihood" as required by the Shield Law. *See id.* That their financial gain depends on a "complicated series" of "contingent events" that are "untethered to the practice of journalism" (such as those involved in making a profit from short selling) suggested, in Judge Gorenstein's view, that Yu and De Weck make their "gain or livelihood" from their short-selling activities and not from their reporting. *Id.* at *7–8. Judge Gorenstein reasoned that if Defendants could invoke the Shield, then so too could "a person who attaches writings to their LinkedIn page in the 'hope' that their writings will cause an employer to hire them in the future." *Id.*

**LEGAL STANDARD**

A magistrate judge, designated under Rule 72(a) to hear and decide non-dispositive pretrial matters, Fed. R. Civ. P. 72(a), enjoys discretion whether to grant or deny a motion for a protective order. *See, e.g.*, *Yusupov-Millevoi v. Kingyum Transports LLC*, 349 F.R.D. 491, 498 (S.D.N.Y. 2025) (decision by magistrate judge granting motion for protective order); *In re OpenAI, Inc., Copyright Infringement Litig.*, 2025 WL 3268785, at *4 (S.D.N.Y. Nov. 24, 2025) (denying same). The district judge "must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a). However, "[t]his standard of review is highly deferential, and magistrate judges are afforded broad discretion in resolving nondispositive disputes[;] reversal is appropriate only if their discretion is abused." *Pugh-Ozua v. Springhill Suites*, 2020 WL 6562376, at *3 (S.D.N.Y. Nov. 9, 2020) (cleaned up). An order may be deemed "contrary to law" when it "fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 206 F.R.D. 78, 86 (S.D.N.Y. 2002) (quoting *Tompkins v. R.J. Reynolds Tobacco Co.*, 92

F. Supp. 2d 70, 74 (N.D.N.Y. 2000)). The party seeking to overturn a magistrate judge's decision carries a heavy burden. *Citicorp v. Interbank Card Ass'n*, 87 F.R.D. 43, 46 (S.D.N.Y. 1980).

**DISCUSSION**

New York's Shield Law grants absolute privilege for information obtained under a promise of confidentiality and qualified protection for nonconfidential, unpublished material.[5] *See Baker v. Goldman Sachs & Co.*, 669 F.3d 105, 107 (2d Cir. 2012). As currently codified, it provides:

> [N]o professional journalist . . . presently or having previously been employed or otherwise associated with any . . . professional medium of communicating news or information to the public shall be adjudged in contempt by any court in connection with any civil or criminal proceeding . . . for refusing or failing to disclose any news obtained or received in confidence . . . .

N.Y. Civ. Rights Law § 79-h(b).

The law affords similar protection with respect to "unpublished news . . . not obtained or received in confidence," except that a court may order disclosure of such news if the party seeking it makes "a clear and specific showing" that the news: "(i) is highly material and relevant; (ii) is critical or necessary to the maintenance of a party's claim, defense or proof of an issue material thereto; and (iii) is not obtainable from any alternative source." *Id.* § 79-h(c); *see People v. Combest*, 828 N.E.2d 583, 586 (N.Y. 2005) ("In 1990, the Legislature enacted Civil Rights Law § 79-h(c) to codify our three-pronged test."); *In re McCray, Richardson, Santana,*

---

[5] Rule 501 of the Federal Rules of Evidence provides that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501. The Shield Law "appl[ies] in federal court through Rule 501" where, as here, New York supplies the governing law. *Fowler v. Vary*, 2022 WL 3211638, at *5 (S.D.N.Y. Aug. 9, 2022) (citation omitted); *accord Baez v. JetBlue Airways*, 2012 WL 5471229, at *1 (E.D.N.Y. Nov. 9, 2012) ("New York's Shield Law . . . applies in diversity cases.").

*Wise, & Salaam Litig.*, 928 F. Supp. 2d 748, 753, 757–59 (S.D.N.Y. 2013) (applying test), *aff'd*, 991 F. Supp. 2d 464 (S.D.N.Y. 2013).

New York's Shield Law defines a "professional journalist" as:

> one who, for gain or livelihood, is engaged in gathering, preparing, collecting, writing, editing, filming, taping or photographing of news intended for a newspaper, magazine, news agency, . . . or other professional medium or agency which has as one of its regular functions the processing and researching of news intended for dissemination to the public; such person shall be someone performing said function either as a regular employee or as one otherwise professionally affiliated for gain or livelihood with such medium of communication.

N.Y. Civ. Rights Law § 79-h(a)(6).

New York's "mantle of protection for those who gather and report the news—and their confidential sources . . . has been recognized as the strongest in the nation." *Holmes v. Winter*, 3 N.E.3d 694, 700 (N.Y. 2013). The state's defense of a free press predates even the Constitution's First Amendment. *See id.* at 698 ("New York has a long tradition, with roots dating back to the colonial era, of providing the utmost protection of freedom of the press . . . our guarantee of free speech and a free press . . . was adopted in 1821, before the First Amendment was rendered applicable to the states."). The Shield Law was enacted in 1970 to supplement the state's constitutional guarantee of a free press, *id.* at 698–99, and "reflect[s] a paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters," *Baker v. F & F Inv.*, 470 F.2d 778, 782 (2d Cir. 1972).

"[T]he burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship." *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987) (quoting *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 224 (2d Cir. 1984)); *accord Application of Minebea Co., Ltd.*, 143 F.R.D. 494, 502 (S.D.N.Y. 1992); *Martin v. Valley Nat'l Bank of Arizona*, 140 F.R.D. 291, 302

(S.D.N.Y. 1991). The same allocation of burden applies when the privilege is one established under state law. *See Bonde v. Wexler & Kaufman, PLLC*, 345 F.R.D. 31, 39 (S.D.N.Y. 2023) (holding that the proponent of state law-derived attorney-client privilege bears burden); *Spectrum Sys. Int'l Corp. v. Chem. Bank*, 581 N.E.2d 1055, 1059 (N.Y. 1991) ("[T]he burden of establishing any right to protection is on the party asserting it; the protection claimed must be narrowly construed; and its application must be consistent with the purposes underlying the immunity."); *accord People v. Mitchell*, 448 N.E.2d 121, 123–24 (N.Y. 1983); *Priest v. Hennessy*, 409 N.E.2d 983, 986 (N.Y. 1980).

The substance of what must be proven depends on the elements of the privilege invoked. *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 470 (S.D.N.Y. 1993). A party seeking protection under the New York Shield Law must "show[] that the information it [seeks] to protect was gathered pursuant to the newsgathering activities of a professional journalist." *Fitch*, 330 F.3d at 111. The invoking party does so by showing that (1) she "for gain or livelihood, is engaged in gathering, preparing, collecting, writing, editing, filming, taping or photographing of news" and (2) the news is intended for an entity "which has as one of its regular functions the processing and researching of news intended for dissemination to the public." N.Y. Civ. Rights Law § 79-h(a)(6). A person who satisfies those criteria is entitled to the protection of the Shield Law so long as she is a "regular employee" of such medium of communication or is "otherwise professionally affiliated" with it "for gain or livelihood." *Id.* In many cases, the showing that must be made to enjoy the benefit of the privilege is straightforward and not particularly fact-laden; in other cases, as with all privileges, the question may be fact-intensive.[6]

[6] Defendants argue that New York courts eschew a fact-intensive inquiry into the availability of

The New York Shield Law does not discriminate on the basis of factual content. All "written, oral, pictorial, photographic, or electronically recorded information or communication" can constitute news so long as it concerns "local, national or worldwide events or other matters of public concern or public interest" or "affect[s] the public welfare." *Id.* § 79-h(a)(8). The Shield Law's "broadly construed" notion of "news" encompasses "a wide variety of articles on matters of public interest." *Cummings v. Soul Train Holdings LLC*, 67 F. Supp. 3d 599, 603–04 (S.D.N.Y. 2014) (quoting *Messenger ex rel. Messenger v. Gruner + Jahr Printing & Publ'g*, 727 N.E.2d 549, 552 (N.Y. 2000)). Thus, financial information can qualify as news, just as political,

---

the privilege under the Shield Law for fear that the need to establish such facts will chill the vigorous reporting that the Shield Law was intended to protect. Dkt. No. 156 at 6–7; Dkt. No. 164 at 3. But the case that they cite does not support that proposition. In *Murray Energy Corp. v. Reorg Rsch., Inc.*, 58 N.Y.S.3d 369 (1st Dep't 2017), the court held that the protection of the privilege should not be conditioned upon "a fact-intensive inquiry analyzing a publication's number of subscribers, subscription fees, and the extent to which it allows further dissemination of information" because a test based on such factors would be "unworkable and would create substantial prospective uncertainty." *Id*. at 371–72. The court did not hold that the enjoyment of the privilege would never require a fact-intensive inquiry. In some cases, a fact-intensive inquiry may be necessary to properly draw the line between reporting and other information dissemination. But that a court may need to engage in such inquiry does not make the test for the privilege indeterminate or defeat the objective of the privilege any more than a fact-intensive inquiry with respect to other privileges defeats the goal of those privileges. *See Gucci Am., Inc. v. Guess?, Inc.*, 2011 WL 9375, at *2 (S.D.N.Y. Jan. 3, 2011) (holding that a person claiming the attorney-client privilege may be required to show facts that the person to whom the communication was made "is a member of the bar of a court"); *United States v. Ray*, 585 F. Supp. 3d 445, 450–54 (S.D.N.Y. 2022) (holding that a person claiming the benefit of the psychotherapist-patient privilege must show that communications were made to a mental-health professional covered by the privilege and were made in the course of diagnosis or treatment); *In re The City of N.Y.*, 607 F.3d 923, 944 (2d Cir. 2010) (holding that a person claiming the benefit of the law enforcement privilege must show that the documents at issue contain "information that the law enforcement privilege is intended to protect"). In every case, a person claiming a privilege is required to submit information establishing its entitlement to the privilege. But that does not mean that the purpose of the privilege is defeated by the very inquiry into whether the privilege exists. When faced with a *bona fide* challenge, the claimant can be required to produce information demonstrating the gain or livelihood it receives or establishing that it exercises editorial judgment without so intruding into the exercise of that judgment as to chill the exercise of First Amendment rights.

health, culture, sports, or numerous other types of information can. *See Grifols*, 2026 WL 1399095, at *4 (the Report, covering the accounting practices and financial details of an international, publicly traded company, is "presumably of interest to the public and affect[s] the public welfare"). Indeed, "[s]hort-seller reports 'perform a useful function by bringing information that securities are overvalued to the market.'" *Grifols*, 2025 WL 1531713, at *11 (quoting *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020)); *Novagold Res., Inc. v. JCap. Rsch. USA LLC*, 2024 WL 4250265, at *1 (E.D.N.Y. Mar. 29, 2024) (report which accused publicly traded company "of misleading investors as to the feasibility of a project" found to "qualif[y] as news" under the Shield Law); *cf. In re Pan Am Corp.*, 161 B.R. 577, 584 (S.D.N.Y. 1993) (holding that federal reporter's privilege applies to the financial press). The market would be poorer and less efficient without vigorous and honest reporting on both the strengths and the weaknesses of public companies.

Moreover, having a "bias" or "point of view" does not disqualify a claimant from the privilege's protections. *Schiller v. City of New York*, 245 F.R.D. 112, 119 (S.D.N.Y. 2007) ("[T]he touchstone is not . . . whether the journalistic enterprise was 'unbiased'; by that standard, few, if any, daily newspapers could assert the privilege."); *Sines v. Yiannopoulos*, 2020 WL 6058279, at *6 (S.D.N.Y. Oct. 14, 2020) (recognizing that respondent's "confrontational and biased" style "is not wholly without journalistic content" and serves the public's interest in a free press); *In re McCray*, 928 F. Supp. 2d at 755 (notion that a filmmaker would have a point of view does not change that she was engaged in journalism). Newspapers are not expected to be anodyne. Much of our best journalism has come from reporters, and papers, with a point of view. A person can write a negative report about a company and still be entitled to the privilege.

*See, e.g.*, *Novagold*, 2024 WL 4250265, at *1 (report qualified as news and its publisher could assert reporter's privilege under Shield Law).

Several other principles emerge from the language of the statute. As Judge Gorenstein held, Section 79-h contemplates that the court will look at the activities of natural persons, and not exclusively the entities they work for, in evaluating the applicability of the privilege. *See Grifols*, 2026 WL 1399095, at *5 (considering "the activities of Yu and De Weck rather than their companies" because of the title and text of the statute). Defendants argue that Judge Gorenstein erred in "segregating" the activities of Yu and De Weck from those of the companies which published the results of their research. Dkt. No. 156 at 3. But the statute's language appears to foreclose that argument. The statute distinguishes between individuals—"professional journalists"—and the entities that employ them. The operative language of the statute instructs that "professional journalists and newscasters" are exempt from contempt. N.Y. Civ. Rights Law § 79-h(b), (c). Once the "professional journalist" earns the protection of the shield, its reach extends to the journalist's employer. *See id.* § 79-h(f) ("The privilege contained within this section shall apply to supervisory or employer third person or organization having authority over the person described in this section."); *Beach v. Shanley*, 465 N.E.2d 304, 306 n.1 (N.Y. 1984) ("[An] employer may claim any benefit of the Shield Law."); *see PPM Am., Inc. v. Marriott Corp.*, 152 F.R.D. 32, 34 (S.D.N.Y. 1993) (the Shield Law "forbids the use of the contempt power against *individual* journalists who refuse to divulge information" (emphasis added)). Moreover, the title of the statute identifies it as providing protection to "persons" who are "employed by, or connected with" news media. N.Y. Civ. Rights Law § 79-h. The statute thus requires the court to look at the employee or person connected with the news media and not just the news media itself.

Furthermore, following the awkward language of the statute, the putative privilege holder must prove the existence of two types of intent. The journalist must gather news "intended" for a news agency and the agency must have as "one of its regular functions the processing and researching of news intended for dissemination to the public." The language of the statute is considered. The agency need not have as its sole function the dissemination of news intended for the public. The Shield Law requires that a "professional journalist" be regularly employed or "otherwise professionally affiliated" with a "professional medium or agency which has as *one of its regular functions* the processing and researching of news intended for dissemination to the public." N.Y. Civ. Rights Law § 79-h(a)(6) (emphasis added). The Court is required to interpret the statute "giv[ing] effect to the plain meaning of the words used.'" *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 225 n.8 (2d Cir. 2003) (Cabranes, J., concurring) (quoting *Auerbach v. Board of Educ.*, 654 N.E.2d 972, 974 (N.Y. 1995) (internal quotation marks and citations omitted)); *see also People v. Williams*, 968 N.E.2d 983, 985 (N.Y. 2012). "Regular" means "customary, usual, or normal." *Peterson v. Cont'l Cas. Co.*, 77 F. Supp. 2d 420, 427 (S.D.N.Y. 1999) (citing *Webster's II New Riverside Dictionary* (1994) at 990); *see DiGiovanni v. Ergoteles LLC*, 2024 WL 1364727, at *7 (S.D.N.Y. Mar. 31, 2024) (noting that "customarily and regularly" connotes a frequency "that must be greater than occasional but which, of course, may be less than constant" and does not include "isolated or one-time" occasions). "Function" means "the action for which a person or thing is specially fitted or used or for which a thing exists." *Function*, Merriam-Webster, https://www.merriam-webster.com/dictionary/function. But the language "one of" suggests that the agency may have regular functions other than the dissemination of news to the public. An agency may generate the revenues it needs to function from subscriptions, advertisements, reader or charitable

contributions, or the pocket of a wealthy benefactor. It may be subsidized by other businesses within the same corporate umbrella. The agency need not make its money exclusively (or even at all) from the dissemination of news. It may, for example, hold conferences to generate revenue, produce and distribute feature-length motion pictures, *see In re Am. Broad. Cos., Inc.*, 735 N.Y.S.2d 919, 921–22 (N.Y. Sup. Ct. 2001) (applying Section 79-h's absolute and qualified privilege to broadcast television network ABC), or even provide investment advice for a fee, *cf. Fitch*, 330 F.3d at 109–10 (recognizing Standard & Poor credit rating agency as producing privileged journalism).

At the same time, however, to earn the protection of the Shield Law, a person must show more than that he or she, for gain or livelihood, gathers information that would be of public interest or concern and that will be publicly disseminated. Virtually all factual information, presented in the right form and in the right context, could be considered "news" under that definition and the person who writes it up for money therefore considered a "professional journalist." *See Psihoyos v. Nat'l Exam'r*, 1998 WL 336655, at *6 (S.D.N.Y. June 22, 1998) ("New York courts have deemed as a matter of public interest not only news in the sense of current events but also 'all types of factual, educational and historical data, or even entertainment and amusement, concerning interesting phases of human activity in general.'" (quoting *De Gregorio v. CBS, Inc.*, 473 N.Y.S.2d 922, 924 (N.Y. Sup. Ct. 1984))). An account of the nutritional benefits of a food product when uttered by one person may constitute an advertisement and the person who generates it considered an ad man, but when disseminated by another may constitute news and the person who generates it a health and wellness reporter. A narration of a businessperson's life, generated because of its value to a public audience, might be considered to be news and the person who films it a professional journalist, while that same

account generated to promote the same person's business interests might be considered an infomercial and not entitled to the protection of the Shield Law. *See Chevron Corp. v. Berlinger*, 629 F.3d 297, 308 (2d Cir. 2011). So too a report about the financial strength of a company and the value of a security representing an equity stake in the company. Under some circumstances, the person who disseminates it may be considered a finance reporter. *See In re Pan Am.*, 161 B.R. at 584; *cf. Fitch*, 330 F.3d at 110. A person generating the same report, but disseminating it through a boiler room,[7] might be considered a stock promoter. *See Chevron Corp.*, 629 F.3d at 307–08 ("While freedom of speech and of the press belongs to virtually anyone who intends to publish anything (with a few narrow exceptions), all those who intend to publish do not share an equal entitlement to the press privilege from compelled disclosure."). The ad man may wish that the content he distributes attracts the attention of the viewer but only as an incident to his objective to sell the product.

In *Fitch*, the court held that the protection of the Shield Law does not rest exclusively upon the content of the material disseminated but also on the process by which it is gathered. The case concerned protection for an entity that disseminated reports on the financial strength of a publicly issued security. The appellant, Fitch, generated public reports on the underlying financial strength of a security that one of its clients planned to issue. 330 F.3d at 106. When Fitch was retained by a client to assist in a transaction, it researched, analyzed, and provided a rating of the proposed transaction. *Id.* A competitor of Fitch's with similar business activity, Standard & Poor's ("S&P"), also issued ratings on public debt financings and preferred stock issues. *Id.* at 109. The court held that, while S&P might be entitled to the protection of the New

[7] *See Boiler Room*, Merriam-Webster, https://www.merriam-webster.com/dictionary/boiler%20room ("a room equipped with telephones used for making high-pressure usually fraudulent sales pitches").

York Shield Law, Fitch—which generated reports containing the same type of information—was not. The key was that Fitch "report[ed] on" only the "specific transactions for which it ha[d] been hired," *id.*, and thus its gathering of the information and its dissemination of it was not "based on a judgment about newsworthiness." *Id.* at 110.[8] By contrast, the court held that there should be a "different outcome" for S&P because it "rated virtually all public debt financing and preferred stock issues whether they were done by S&P clients or not." *Id.* at 109. S&P's activities thus resembled more closely "the newsgathering activities of a professional journalist." *Id.* at 111. The different outcome for the two different companies was based on the "nature of [the] asserted newsgathering" for each company—one devoted to disseminating information solely to help effectuate a transaction on which it had been retained by a client, and the other devoted at least in part to disseminating information because of a perception that such information would have inherent value and interest to its intended public audience. *Id.* at 109. It could be said in the case of S&P that the publication decision was made, at least in part, based on the judgment that the information "serve[d] the needs and interests of a public audience." Randall P. Bezanson, *The Developing Law of Editorial Judgment*, 78 Neb. L. Rev. 754, 760 (1999); *see also id.* (defining editorial judgment as a judgment "made in the service of the public informing and checking functions to which the press, as a speaker under the First Amendment, is devoted," which involves a decision by the speaker that the story "serve[s] the needs and interests of a public audience, especially as it relates to the information and ideas upon which members of the public audience will conduct their public and private lives," and which involves criteria that relate "to the general purpose or function to be served"); Linda L. Berger, *Shielding*

[8] The court also concluded that Fitch "t[ook] an active role in the planning of the transactions it analyze[d], a role that [wa]s inconsistent with traditional journalism." *Id.* at 110.

*the Unmedia: Using the Process of Journalism to Protect the Journalist's Privilege in an Infinite Universe of Publication*, 39 Hous. L. Rev. 1371, 1399 (2003) ("What distinguishes the protected press from other, unprotected, information businesses is the use of editorial judgment—the independent choice of information and opinion of current value, directed to public need, and borne of non-self-interested purposes." (internal quotation marks omitted)). It is the requirement that the target of a subpoena have exercised editorial judgment, *i.e.*, have gathered information for dissemination with an eye at least in part to educating its reading public, that links the protection of the Shield Law to its objective of promoting "a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters." *Baker*, 470 F.2d at 782.

*Fitch* has been followed and adopted by the Appellate Division of the New York State Supreme Court. *See Murray Energy Corp. v. Reorg Rsch., Inc.*, 58 N.Y.S.3d 369 (1st Dep't 2017). In *Murray Energy*, the court cited *Fitch*, *inter alia*, for the proposition that "the extent of a publication's independence and editorial control" is a factor in determining whether to apply the Shield Law. *Id.* at 371. Respondent there provided subscribers with real-time information about debt-distressed companies via daily emails. *Id.* at 370. Even though distribution of the emails was limited to 375 unique subscribers who paid subscription fees ranging from $30,000 to $120,000 per year, the court held that the protection of the Shield Law applied because "the editorial staff [wa]s solely responsible for deciding what to report on and . . . it d[id] not accept compensation for writing about specific topics or permit its subscribers to dictate the content of its reporting." *Id.* at 371.[9] The question of whether the reporter and the organization for whom

[9] The court framed the analysis as turning on "independence," as well as on "editorial control." *Id.* at 371. The reference to "independence", however, admittedly is somewhat indeterminate. It necessarily gives rise to the questions "independent" of what and what degree of "independence"

she reports is involved in the dissemination of "news," as opposed to the release of mere information, may not be challenging in the run-of-the-mill cases where the publication's revenue stream turns at least in part on subscriptions or on advertisements. In other cases, such as this, it is more challenging. But, under *Fitch*, it at least provides a measure by which a court can determine whether the reporter and the agency serve the interests for which the Shield Law was created.

By that measure, Defendants fail to demonstrate their entitlement to the Shield Law privilege. Defendants have failed to demonstrate that Yu or De Weck made their gain or livelihood from newsgathering activities. Defendants have established that Yu and De Weck research companies that are overvalued, take short positions in them, and then profit from those short positions after they publish reports which attack the value of the companies in which they hold the short position. That is, having taken a short position, they profit when they are able to purchase the stock that is necessary to cover that position at prices that have been discounted as a result of the information that they disseminate. It is a matter of indifference that they are on the buy side as opposed to the sell side of a stock promoter. Defendants' explanations of that gain only ever reference profit from their *trading* activities. De Weck states, for example, that Defendants publish reports for gain and livelihood because they "short the stocks on which we report and hope to benefit in doing so." Dkt. No. 120 ¶ 19. Yu states that he and De Weck "independently identify companies as a potential subject of a report, research that company based on publicly obtainable financial reporting and disclosures and publish our reports online

---

is necessary. The more precise framing—albeit one that is fact-specific and requires the exercise of judgment by the court—is whether the dissemination of the information is based at least in part on a judgment of its quality as news: information of public interest and public concern to an audience.

for the investing public." Dkt. No. 121 ¶ 7. Tellingly, neither Yu nor De Weck states that they gather the information first, as a result of a judgment about the interest that the information will have to their audience, and only *then* take the short position in order to subsidize their reporting. They do not indicate that their research is based on, at least in part, a view as to which companies their audience might have an interest in, as opposed to which companies are easy targets for taking a short position. Their claim to the protection of the privilege thus does not fail alone because the source from which they are paid comes from short sales rather than subscriptions or advertisements. It fails because, even if they make their livelihood through Gotham or GIP, they fail to show that they are paid for their reporting activities. That is, they fail to differentiate themselves from the stock promoter or the ad man—putting information out into the world not because of the exercise of judgment regarding its newsworthiness, but exclusively to enhance the value of property that they hold. *See Beaver Cnty. Emps. Ret. Fund v. Tile Shop Holdings, Inc.*, 2016 WL 3162218, at *4 (N.D. Cal. June 7, 2016).[10]

Defendants also have not established that Gotham is an entity "which has as one of its regular functions the processing and researching of news intended for dissemination to the

[10] After the issuance of Judge Gorenstein's Order, Defendants added a factual assertion to the record: that they are paid a salary, or "management fee," to "support their work," which includes newsgathering. Dkt. No. 156 at 2. A district judge reviewing a magistrate judge's order on appeal is bound to the factual record presented in the first instance. *See Creighton v. City of New York*, 2015 WL 8492754, at *5 (S.D.N.Y. Dec. 9, 2015) ("The overwhelming weight of authority favors the view that, upon review of objections to a magistrate judge's non-dispositive ruling, a district court may not consider evidence not presented to the magistrate judge in the first instance." (citation omitted)); *Verint Sys. Inc. v. Red Box Recorders Ltd.*, 183 F. Supp. 3d 467, 470 (S.D.N.Y. 2016) ("In reviewing the decision of a magistrate judge, a district judge should not consider factual evidence that was not presented to the magistrate judge." (internal quotation marks omitted)); *Rivera v. Hudson Valley Hosp. Grp., Inc.*, 2019 WL 3955539, at *9 (S.D.N.Y. Aug. 22, 2019) (same). Regardless, the new fact would not change the Court's conclusion, because Defendants still do not assert that this salary funds the production and dissemination of news, as opposed to the production of reports whose purpose are only to augment Defendants' trading activities.

public." N.Y. Civ. Rights Law § 79-h(a)(6). De Weck has sworn that his purpose and that of Yu is to "publish meaningful information and opinions about publicly traded companies that are overvalued or misunderstood by the market," Dkt. No. 120 ¶ 18, and that the reports that the two publish through Gotham are "written information and communications about matters of public concern, interest and welfare," *id.* ¶ 11. He also states that the reports "require extensive work and effort" and fill a gap created because "financial news organizations have diminished resources" and "[r]egulators . . . have less bandwidth to monitor publicly traded companies," *id.* ¶ 24. But it is not enough that the reports contain meaningful information about public companies and that they require extensive work. The same assertions could have been made about the reports generated by Fitch, whose reports concerned matters of public concern, required extensive work and effort, and certainly would have been intended to be meaningful. *See Fitch*, 330 F.3d at 106. What is conspicuously absent from Defendants' showing, as it was from Fitch's, is any assertion that Gotham publishes its reports at least in part based on a judgment about their newsworthiness, *i.e.*, their interest to the public as a matter of public concern or interest, rather than exclusively because they were with respect to a company as to which Gotham and GIP had built or could build a large short position.

**CONCLUSION**

Judge Gorenstein's Order denying Defendants' motion for a protective order is AFFIRMED.

The Clerk of Court is respectfully directed to close Dkt. No. 156.

SO ORDERED.

Dated: August 20, 2026
New York, New York

LEWIS J. LIMAN
United States District Judge