**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GRIFOLS, S.A.,<br>Plaintiff,<br><br>v.<br><br>DANIEL YU, GOTHAM CITY RESEARCH LLC, GENERAL INDUSTRIAL PARTNERS LLP, and CYRUS DE WECK,<br>Defendants. | Index No. 1:24-cv-00576-LJL-GWG |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR RECONSIDERATION OF AUGUST 20, 2026 MEMORANDUM AND ORDER (ECF 186)**

Miller Korzenik Rayman LLP
David S. Korzenik
Gillian Vernick
1501 Broadway, Suite 2015
New York, NY 10036
212-752-9200

*Attorneys for Defendants*

Defendants Daniel Yu, Cyrus de Weck, Gotham City Research LLC ("Gotham"), and General Industrial Partners LLP ("GIP") (collectively, "Defendants") respectfully move, pursuant to Local Civil Rule 6.3 and the Court's inherent authority, for reconsideration of the Court's Memorandum and Order dated August 20, 2026 (the "Order," ECF 186), which affirmed Magistrate Judge Gorenstein's denial of Defendants' motion for a protective order under New York's Shield Law, N.Y. Civ. Rights Law § 79-h.

**OPENING STATEMENT**

The Magistrate Judge's ruling, with its narrow parsing of the Reporters' Privilege, misses the forest for the trees. It was based on law that no court had ever enunciated—a test of "contingent earnings" that Defendants never had a fair opportunity to address. The fact is that de Weck and Yu both receive *steady, non-contingent compensation* for their services, which include researching, writing, and publishing matters of substantial public interest. In spite of the fact that "one of their functions" is the dissemination of "news," the Court disqualified them as "professional journalists."

It is not fair, procedurally or under § 79-h, to say that Defendants "failed to show that they were paid for their reporting activities." Order, at 22. They were prevented by the Magistrate's new "contingent earnings test" from having any opportunity to show that they indeed had steady, non-contingent earnings. Defendants were not put on notice that they needed to proffer evidence to support a test that no court had ever articulated. The Magistrate Judge declared this as his operative test ***before*** Defendants knew its standard was one that they would be required to meet. In Defendants' objections to the below ruling, we proffered evidence of steady non-contingent earnings to de Weck and Yu, but these were not considered. Order, n. 10.

The conclusion that Defendants did not establish that "one of [their] regular functions [is] the processing and researching of news intended for dissemination to the public" is not logical. Order at 22. First, it is uncontroverted that the Gotham Report qualifies as "news" – addressing a matter of public interest. The allocation of capital is the lifeblood of the economy and publishing information about it is not just a matter of public interest, but it is a matter of critical public concern. Second, the Court recognized that if Defendants could show that they "first" gather information based on their judgment about its public interest, and only thereafter take a short position, then they would qualify as professional journalists. *Id.* In fact, that is exactly what they do. It is the only way that their work can be done.[1] But it is more than unfair to set up such a test *after the fact* and after Defendants were not given the chance to meet that newly minted test.[2]

This motion is not an effort to relitigate settled questions. Defendants bring it because the Order, in the course of affirming, articulated and applied a reporter's privilege standard that overlooks controlling and persuasive authority and, in doing so, decides the case on a test that no Second Circuit or New York court has ever adopted. The Order holds that a publisher forfeits the Shield Law's protection unless it can prove it is exclusively "paid for [its] reporting activities" as such—divorced from any other business line—and unless it can show that it "gather[s] the information first, as a result of a judgment about the interest that the information will have to their audience, and only then take[s] the short position in order to subsidize their reporting."

[1] Notably, this is exactly what Grifols alleges in its complaint—that Defendants identified Grifols as a debt-distressed company in March 2023 and only thereafter took their short position nine months later. ECF 115, ¶ 5.

[2] It is not an answer to this unfairness to point to *Chevron* or to *Fitch*. In both of those cases, it was the subject of the report/documentary that *controlled* the content of the report – not the publisher Fitch or the documentarist. The "boiler room" conundrum has nothing to do with the facts of this case. Order, at 18. Gotham and GIP are not a boiler room operation. No impropriety of the kind has any basis in the facts of this case; and no collusion with the subject of the report is even close to having anything to do with this case. The Order ignores the Second Circuit's point in *Fitch* that its finding should not be extended beyond the limited facts of that case. Yet the foundation of the Magistrate's ruling is a new and expanded reading of *Fitch.*

Order at 21-22. Respectfully, that standard is analytically flawed and legally unsupported in three independent respects.

First, the controlling authority the Order invokes—*In re Fitch*, 330 F.3d 104 (2d Cir. 2003)—does not turn on whether a publisher is paid directly or contingently "for" its reporting. It turns on editorial independence and the publisher's relationship to the *subject* of its reporting. The decisions applying *Fitch* confirm that the "most important factor" is "the nature of [the publisher's] relationship with the alleged 'source,'" and the subject's control over the content, not the accounting source of its revenues. *Compuware Corp. v. Moody's Invs. Servs.*, 324 F. Supp. 2d 860, 865 (E.D. Mich. 2004) (applying New York law). The Order's newly minted non-contingent "paid-for-reporting" requirement has no footing in the statute or the case law and cannot be reconciled with the courts that have extended the privilege to financially interested publishers—including credit-rating agencies that profit from the very securities they analyze.

Second, the Order conflates two distinct interests: Defendants' public-interest purpose in exposing an overvalued public company through Gotham, and any financial return Defendants may earn on short positions held through GIP. It is a backdoor attempt to undo the unquestioned fact that the Report constitutes "news." The former is a cognizable and independent basis for the privilege. The Shield Law and the First Amendment do not withdraw protection from a publisher simply because it also holds a financial stake in the outcome of its reporting on a matter of public concern. The question is whether the subject of the report controls the reporting. To hold otherwise would strip the privilege from the entire enterprise of investigative financial journalism that activist short reporters undertake. The Court's finding that Defendants' work was not based "at least in part" on their interest in publishing news and that their purpose was

"exclusively" related to their later adopted short position is not only unjustified but also unfairly bars Defendants from addressing this newly minted test created by the Magistrate.

Third, to the extent the Order now requires Defendants to *disaggregate* (a) compensation attributable solely to reporting through Gotham from investment returns through GIP, and (b) the newsworthiness purpose of their reporting from their profit motive, Defendants were never afforded a meaningful opportunity to develop a record on either discrete question. That was more than unfair; it is at the core of this motion for reconsideration. The proceedings below briefed whether the Report was "news" and whether Defendants earned "gain or livelihood" from journalism in the general sense. If the operative standard is the far more granular one the Order announces, fairness requires that the Court either reconsider its ruling or permit Defendants to supplement the record with targeted evidence.

**LEGAL STANDARD**

A motion for reconsideration under Local Civil Rule 6.3 is properly granted where the movant identifies "controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). Reconsideration is also appropriate to correct a clear error of law or to prevent manifest injustice.

Defendants respectfully submit that the Order overlooked controlling and persuasive authority defining the reporter's privilege, and that it rests on a legal standard—the requirement of direct non-contingent payment "for" reporting and of a particular temporal sequence between newsgathering and trading—that finds no support in the governing law. Because the Order reviewed Magistrate Judge Gorenstein's decision under Rule 72(a)'s "clearly erroneous or contrary to law" standard, *see* Order at 9-10, the legal errors identified here are properly the

subject of reconsideration: an order that "fails to apply or misapplies relevant statutes, case law, or rules of procedure" is contrary to law. *Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 206 F.R.D. 78, 86 (S.D.N.Y. 2002) (quoted at Order at 9-10). And the failure to allow Defendants to establish a record that addresses that new standard, even if it was a permissible reading of the law, is manifestly unjust.

**ARGUMENT**

**I. The Order's Reporters' Privilege Standard is Erroneously Applied and Overlooked and Misapplied Controlling Authority.**

The Order affirms on a single ground: that Defendants "fail to show that they are paid for their reporting activities" and therefore "fail to differentiate themselves from the stock promoter or the ad man." Order at 22. That formulation—which asks whether a publisher is compensated directly, non-contingently and specifically "for" the act of reporting—is not the test the Second Circuit or New York courts apply. The governing standard asks whether the publisher gathered information with the intent to disseminate it to the public and exercised independent editorial judgment. Measured against the correct standard, the Order's analysis fails as a matter of both law and policy.

**a. *Fitch* turns on editorial independence and relationship to the subject of its reporting, not on whether the publisher is paid "for" its reporting.**

The Order treats *In re Fitch* as establishing that a publisher must be paid specifically for its reporting to claim the privilege. It does not. Fitch addressed a credit-rating agency that "report[ed] on" only the "specific transactions for which it ha[d] been hired," and whose gathering and dissemination were therefore "not based on a judgment about newsworthiness." *Fitch,* 330 F.3d at 109-10. The Second Circuit's distinction between Fitch and S&P did not rest on whether either was paid, or on the accounting source of revenue; both were paid. *Id*. It rested on the nature of the newsgathering: S&P "rated virtually all public debt financing and preferred

stock issues whether they were done by S&P clients or not," so its activities "resembled more closely the newsgathering activities of a professional journalist." Order at 19 (citing *Fitch*, 330 F.3d at 111). Fitch was disqualified because it "t[ook] on an active role in the planning of the transactions it analyzed, a role that is inconsistent with traditional journalism." *Id*.

Courts applying *Fitch* have made the point explicit. In *Compuware*, the court read *In re Pan Am* and *Fitch* together and held that "the most important factor in determining whether Defendant is qualified to assert the journalist's privilege is the nature of Defendant's relationship with the alleged 'source.'" *Compuware*, 324 F. Supp. 2d at 865. Moody's qualified under the privilege despite being a for-profit enterprise with obvious financial interests for two reasons: "(1) it analyzes information on matters of public interest and concern, thereby fitting the statutory definition of a newsgatherer; and (2) it did not participate in the structuring of the debt it was rating, and therefore remained in the role of a newsgatherer." *Id*. at 862. The controlling question is independence from the subject of the reporting—not how the publisher earns money or the mechanism by which it does so. *See id*.

The Order overlooks this framework. Defendants—unlike Fitch—do not "report on" transactions they were "hired" to analyze. Defendants were retained by no one and did not play any "role in structuring" Grifols' transactions or disclosures that they analyzed. *See Fitch*, 330 F.3d at 109-10. Defendants have already sworn that they independently select the companies they report on, research them using publicly available disclosures, and publish their conclusions for the investing public. *See generally* ECF 121 ¶¶ 5-7; ECF 120 ¶¶ 7-11. Specifically, de Weck swore: "In our work, we've exposed, amongst others, the extraordinary fraud committed by Wirecard…[and] have helped expose large scale fraud at Steinhoff and NMC Health. **We believe**

**that this work serves a compelling public interest** that fewer people and organizations have the experience and resources to undertake." ECF 120 ¶ 26 (emphasis added).

The Order asks the wrong question of who paid for the Report, instead of the right one—were Defendants independent of the subject, exercising their own editorial judgment instead of the subjects' interest? This is a misapplication of the authority the Order relied upon, which is grounds for reconsideration.

**b. "Having a bias or point of view does not disqualify a claimant"—and neither does a financial interest.**

The Order itself acknowledges that "having a 'bias' or 'point of view' does not disqualify a claimant from the privilege's protections," Order at 14, and that "[a] person can write a negative report about a company and still be entitled to the privilege[.]" *Id.* The Second Circuit has gone further, holding that even a publisher solicited by a litigant to advance that litigant's perspective "can establish entitlement to the privilege by establishing the independence of her journalistic process, for example, through evidence of editorial and financial independence." *Chevron Corp. v. Berlinger*, 629 F.3d 297, 309 (2d Cir. 2011). The privilege was denied in *Chevron* not because the filmmaker had a point of view, but because he "solicited" the project from a party and "removed at least one scene from the final version…at their direction"—i.e., because he surrendered editorial control to an interested party. *Id* at 308. There was also criminal misconduct in the *Chevron* facts that has no equivalent here.

If a publisher who takes direction from a litigant can still qualify by showing editorial independence, then a publisher who takes direction from *no one*—who independently chooses its subjects and controls its content—cannot be categorically excluded merely because it holds a financial position in the outcome. The Order's rule effectively treats a financial interest as more

disqualifying than the outright loss of editorial control that *Chevron* held was curable by proof of independence. That inversion cannot be squared with *Chevron* and warrants reconsideration.

## II. Defendants' Public Interest in Exposing an Overvalued Company is an Independent and Cognizable Basis for the Privilege, Distinct from Any Profit Motive.

The Order collapses two separate things: the public-interest character of Defendants' reporting through Gotham, and Defendants' financial interest through short positions held via GIP. Properly disaggregated, the former is an independent and cognizable basis for the privilege that does not evaporate because the latter also exists. Most publications and broadcasters have a financial interest in the financial consequences and results of their reporting.

The privilege exists "to support the press in its valuable public service of seeking out and revealing truthful information." *Chevron*, 629 F.3d at 308. Reporting that a publicly traded company is overvalued and has misrepresented its debt serves precisely that function. This Court has already recognized as much: "[s]hort-seller reports perform a useful function by bringing information that securities are overvalued to the market," Order at 14 (quotation omitted), and the Report here—"covering the accounting practices and financial details of an international, publicly traded company"—is "presumably of interest to the public and affect[s] the public welfare[.]" *Id.* "The market would be poorer and less efficient without vigorous and honest reporting on both the strengths and the weaknesses of public companies."[3] *Id.*

Given those findings, the existence of a profit motive should not be dispositive. Newsgatherers with financial interests and a profit motive routinely qualify. Moody's profits

[3] Without a confident application of § 79-h, speakers like Defendants are vulnerable to Strategic Lawsuits Against Public Participation (SLAPP) suits like this one— attempts at muzzling and punishing critics through untempered civil discovery costs. Despite 20 of 21 claims getting dismissed, cases like this become mired in overreaching discovery if they are allowed past a motion to dismiss and languish in discovery. They become nothing more than a punitive exercise to impose costs in speakers time and money based on conspiratorial theories. The Reporters Privilege can and does provide critical protection against more punitive dimensions of SLAPP suits. The Court must recognize that Defendants asserted the privilege in an effort to control the SLAPP harm that Grifols is imposing.

from the rating business and yet is a newsgatherer because it "analyzes information on matters of public interest and concern" and remains independent of the subject it covers. *Compuware*, 324 F. Supp. 2d at 862; *see also Fitch*, 330 F.3d at 109-10 (recognizing S&P—a paid, for-profit rater—produces privileged journalism). Traditional newspapers also publish for profit. The touchstone "is not…whether the journalistic enterprise was 'unbiased'; by that standard, few, if any, daily newspapers could assert the privilege." Order at 14 (quotation omitted). A publisher's motive to profit—whether through subscriptions, advertising,[4] or, as here, an openly disclosed trading position—does not negate the independent public interest served when the publisher exercises genuine editorial judgment about a matter of public concern.

The correct rule, which the Order overlooks, is that the privilege attaches when the publisher gathered the information "with the intent to disseminate information to the public and that such intent existed at the inception of the newsgathering process." *Am. Sav. Bank, FSB v. UBS Painewebber, Inc.*, No. M8-85, 2002 WL 31833223, at *2 (S.D.N.Y. Dec. 16, 2002). Where, as here, the publisher discloses its financial interest at the outset and disseminates truthful analysis of a public company to the entire investing public, the public-interest basis for the privilege is satisfied independent of, and notwithstanding, a profit motive. The Shield Law should not be read to deny protection to reporting merely because the reporter also holds a financial stake in the outcome, so long as the reporting itself serves a genuine public interest.

## III. Defendants Were Not Afforded Adequate Opportunity to Submit Evidence on the Discrete Issues the Order Now Makes Dispositive.

The Order faults Defendants for failing to prove two highly specific propositions: (a) that they are compensated non-contingently for reporting through Gotham as distinct from their

[4] It is more than notable that § 79-h does not limit professional journalists to those who earn money via subscriptions or advertising. Instead, the defendant must only be "otherwise professionally affiliated."

investment returns through GIP, and (b) that they "gather the information first, as a result of a judgment about the interest that the information will have to their audience, and only then take the short position in order to subsidize their reporting." Order at 21-22. If those disaggregated showings are the operative standard going forward, Defendants respectfully submit that they were never given a meaningful opportunity to develop a record on either discrete question.

Neither the invitation nor the briefing put Defendants on notice that they would need to (i) allocate compensation between reporting and trading with accounting precision, or (ii) prove a particular temporal sequence—newsgathering first, trading second—as a condition of the privilege. The very fact the Order treats as telling—that Defendants added the assertion that they receive a salary or "management fee" to "support their work"—was excluded from consideration precisely because it was raised only after Judge Gorenstein's order and thus outside "the factual record presented in the first instance." Order at 22 & n.10. Defendants were thus caught between a standard that demands granular financial and sequencing evidence and a procedural posture that foreclosed supplementing the record to address it.

Fundamental fairness counsels that a party not be defeated on a ground it had no fair opportunity to address. Because the Order elevates these two discrete propositions to dispositive status for the first time, Defendants respectfully request that the Court either (a) reconsider its ruling under the correct legal standard set out above, or (b) in the alternative, permit Defendants to supplement the record with targeted evidence directed to (i) the compensation Yu and de Weck receive that supports their newsgathering and publishing activities through Gotham, and (ii) the independent, newsworthiness-driven basis on which Gotham initially selects and researches its subjects.

Respectfully Submitted,

By: //s// *David S. Korzenik*

Miller Korzenik Rayman LLP
David S. Korzenik
Gillian Vernick
1501 Broadway, Suite 2015
New York, NY 10036
212-752-9200

*Attorneys for Defendants*